# APPENDIX

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **LUCAS HORTON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:20-cv-01884-B** |
| **SUNPATH, LTD.,** | |
| **Defendant.** | |

**DECLARATION OF ANDREW GARCIA
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, I, ANDREW GARCIA, under penalty of perjury, declare as follows:

1.      My name is Andrew Garcia. I am over 21 years of age and am competent to give testimony. I make the statements in this declaration based on my personal knowledge, including knowledge gained in my position as President of SunPath Ltd. ("SunPath").

2.      SunPath is a Delaware corporation and maintains its only principal place of business in Braintree, Massachusetts.

3.      SunPath does not own or lease any real estate in the state of Texas.

4.      While SunPath is registered to do business in the State of Texas, there are no office locations in Texas where SunPath has ever conducted business operations of any kind.

5.      SunPath does not engage in outbound telemarketing itself and therefore does not initiate outbound sales calls to consumers.  Therefore, SunPath did not initiate any of the calls to the Plaintiff alleged in this Complaint in this case (the "Subject Calls").

6.      Moreover, SunPath did not direct, oversee, or manage any third party in initiating the Subject Calls, or any other outbound telemarketing phone calls to consumers in Texas.  SunPath did not cause anyone else to call Plaintiff.

{01088469;v2}

7.     SunPath has no role or involvement in the third-party telemarketing companies' selection of who to market to, or the manner in which they conduct their marketing operations.

8.     Further, SunPath has no oversight or control over what the marketing companies' representatives say. The marketing operations of these companies, including how they obtain leads and what scripts they use, are conducted independently by the telemarketing companies themselves.

9.     SunPath is a third party administrator of extended service contracts for automobiles. It is engaged primarily in the business of handling claims by policy holders and customer service for such policy holders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21 day of _____, 2020.

_____
ANDREW GARCIA

**2**

## *Alexander v. Greenwood Hall, Inc.*

United States District Court for the Southern District of Texas, Houston Division

July 8, 2019, Decided; July 8, 2019, Filed, Entered

CIVIL ACTION NO. 4:18-CV-04540

**Reporter**
2019 U.S. Dist. LEXIS 113956 *; 2019 WL 2913953

CYNTHIA ALEXANDER, et al, Plaintiffs, VS. GREENWOOD HALL, INC., et al, Defendants.

**Counsel:** [*1] For Cynthia Alexander, Carmen Anderson, Connie Bernal, Gloria Bernal, Michelda Burns, Savannah Caldera, Vanessa Carballo, Tejus Collins, Brittney Covey, Terry Dalton, Takela Davis, Aquanita Hemphill, Desiree Hinojosa, Joanna Jimenez, Lorraine Juarez, Danielle Kirkpatrick, Teddy Kirkpatrick, Cora Kopf, Danielle Knipe, Rebecca Kopf, Cynthia Lampkin, Sherry Maxey, Andrea E Moore, Angela Ocon, Shane Ogden, Robbie Reece, Candice Rice, April Richardson, Linda Sanders, Raven Sanders, Kiara Shepard, Kandia Smart, LeDeidra Stonum, Phylicia Taylor, Suzan Timmins, Brittney Towell, Cecily Valdez, Haven Wallace, Jasmine White, Carol Wiede, Estella Wilson, Sharnita Woods, Plaintiffs: Matthew Darrell Sharpe, LEAD ATTORNEY, Bryan, TX.

For Bill Bradfield, Defendant: Giles M Schanen, Jr., LEAD ATTORNEY, Nelson Mullins Riley Scarborough, LLP, Greenville, SC; Benjamin Witten Allen, Feldman & Feldman, PC, Houston, TX.

For Timothy Boris, Defendant: Arvin Tseng, Christopher A Lily, LEAD ATTORNEYS, TroyGould PC, Los Angeles, CA; Daniel Joshua Israel Goldberg, The Goldberg Law Office PLLC, Houston, TX; David A Shields, Shields Legal Group, Addison, TX.

For Lyle Green, Defendant: David C Kent, LEAD ATTORNEY, [*2] Drinker Biddle Reath LLP, Dallas, TX; Kristopher Davis, LEAD ATTORNEY, Drinker Biddle et al, Los Angeles, CA.

For AnswerNet, Inc., AnswerNet Education Services, Inc., Defendants: David Matthew Murdza, AnswerNet, Willow Grove, PA.

**Judges:** ANDREW S. HANEN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ANDREW S. HANEN

# Opinion

## ORDER

This Court has before it Defendant Timothy Boris' First Motion to Dismiss (Doc. No. 5), Defendant Bill Bradfield's Motion to Dismiss (Doc. No. 10), Defendant AnswerNet, Inc.'s Motion to Dismiss (Doc. No. 22), and Defendant AnswerNet Education Services, Inc.'s Motion to Dismiss (Doc. No. 23). After considering the motions, responses, and applicable law, for the reasons detailed below the Court grants the motions to dismiss.

## I. Factual Background

This case involves a large number of Plaintiffs[1] who

---

[1] The Plaintiffs in this case include Cynthia Alexander, Carmen Anderson, Connie Bernal, Gloria Bernal, Michelda Burns, Savannah Caldera, Vanessa Carballo, Tejus Collins, Brittney Covey, Terry Dalton, Takela Davis, Aquanita Hemphill, Desiree Hinojosa, Joanna Jimenez, Lorraine Juarez, Danielle Kirkpatrick, Teddy Kirkpatrick, Cora Klinkerfuss, Danielle Knipe, Rebecca Kopf, Cynthia Lampkin, Sherry Maxey, Andrea Moore, Angela Ocon, Shane Ogden, Robbie Reece, Candice Rice, April Richardson, Linda Sanders, Raven Sanders, Kiara Shepard, Kandia Smart, LeDeidra Stonum, Phylicia Taylor, Suzan Timmins, Brittney Towell, Cecily Valdez, Haven Wallace, Jasmine White, Carol Wiede, Estella

allege that they were not paid overtime wages in accordance with the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201 et seq.*, and that they were not provided adequate notice before a mass layoff, as required under the Worker Adjustment and Retraining Notification Act ("WARN Act"), *29 U.S.C. § 2101 et seq.* Plaintiffs filed their Complaint against seventeen Defendants: Greenwood Hall, Inc. ("Greenwood Hall"), PCS Link, Inc., Bill Bradfield, Timothy **[*3]** Boris, Tina J. Gentile, Josh Cage, Dave Ruderman, Shane Cobb, Kelly Agpawa, Bryan Hale, Michael Poutre, Anastasia Banks, Lianne Corbiere, Jonathan Newcomb, Lyle Green, AnswerNet, Inc. ("AnswerNet"), and AnswerNet Education Services, Inc. ("AES") (hereinafter collectively referred to as "Defendants"). (Doc. No 1 ¶¶ 1.1-1.2).[2]

Greenwood Hall, according to Plaintiffs' Complaint, is a corporation incorporated in Nevada with its principal place of business in California. (*Id.* ¶ 4.44). The corporation acted as a call center for universities around the nation, which provided its customers with outsourced solutions for generating new students and/or helping students with financial aid for traditional and non-traditional online educational programs. Plaintiffs were employed by Greenwood Hall at its Bryan, Texas facility. Plaintiffs allege that on December 1, 2017, Greenwood Hall announced that it would close its entire location immediately and terminated all employees of that location. (*Id.* ¶ 5.1-5.3).

As a result of the sudden closing, Plaintiffs allege that they were not paid at least minimum wage by Greenwood Hall in order to compensate them for the last two paychecks[3] they should have received **[*4]** as employees if the location had remained open. Plaintiffs further allege that they were missing overtime wages from the previous three years under the FLSA. (*Id.* ¶ 5.4). Plaintiffs also allege that Defendants did not provide adequate notice under the WARN Act and failed to remedy the lack of notice. Plaintiffs finally claim that

---

they did not receive the sixty days of pay and benefits that they should have received under the WARN Act. (*Id.* ¶ 5.5).

Shortly before Greenwood Hall's employees were terminated, the company was in the middle of financial difficulty, as it was facing an asset foreclosure by its secured lender. Eventually Greenwood Hall's senior secured lender foreclosed on the company's assets and sold those assets to third parties. According to Plaintiffs, AnswerNet purchased Greenwood Hall's assets, allegedly to save at least part of the company and focus its efforts on a smaller geographical region of call centers and clients. (*See* Doc. No. 33). AnswerNet then created AES allegedly to continue the business and operations of Greenwood Hall. (Doc. No. 1 ¶ 4.58).[4]

## II. Jurisdictional Allegations

As part of the allegations concerning the actual basis of dispute between the Parties, **[*5]** Plaintiffs include factual allegations presumably intended to support its claim that this Court has personal jurisdiction over the Defendants. In their Complaint and Response to Defendants' Motions to Dismiss, Plaintiffs made no specific legal arguments in support of this Court's jurisdiction over the four Defendants at issue, only factual allegations. While those alleged contacts are discussed in more detail in the following section, the broad summary is that, according to Plaintiffs, the individual Defendants were allegedly employed as executives of Greenwood Hall at the time the company was shuttered, and therefore must have been involved in the decision to close the Bryan plant, and therefore must be liable under the causes of action described above. With regard to the entity Defendants, Plaintiffs argue that the Defendants conducted business within Texas, that AnswerNet and AES purchased Greenwood Hall's assets, and were aware or should have been aware of the closure of the Bryan plant. The Court will describe each Defendants' alleged contacts in more detail below.

## III. A Breakdown of Defendants' Alleged Contacts with Texas

---

Wilson, and Sharnita Woods. The Court will hereinafter refer to these Parties collectively as "Plaintiffs."

[2] The Court notes that Plaintiffs requested leave to file a First Amended Complaint (Doc. No. 32), which would have dropped some Defendants and added others. This motion was denied for failure to comply with local rules' conferral requirements. (Doc. No. 40).

[3] Plaintiffs' Complaint describes the missing wages as pay "for the time encompassing the last two paychecks that were meant to be issued by Greenwood Hall, Inc in order to compensate them for work as employees if the location had remained open." (Doc. No. 1 ¶ 5.4).

---

[4] The Court notes that Defendants AnswerNet and AES dispute these facts. AnswerNet alleges that a related entity, AES, purchased Greenwood Hall's assets. AnswerNet maintains that it has no involvement with Greenwood Hall, the AES purchase, or Plaintiffs. (*See* Doc. 22 p. 4).

2019 U.S. Dist. LEXIS 113956, *5

Prior to discussing the precedents guiding this Court's [*6] decision and an application of that law to the facts herein, the Court finds that the most efficient way to address these issues is to set out the Texas contacts, if any, of each Defendant as taken from the Plaintiffs' Complaint (Doc. No. 1), as well as from their Response (Doc. No. 33) to Defendants' various motions to dismiss.

Plaintiffs' Complaint and/or Response allege:

**Timothy Boris's Texas Contacts**[5]

• "Defendant Timothy Boris has conducted business within this judicial district." (Doc. No. 1 ¶ 4.47).

• "Defendant Timothy Boris was an officer and/or director of Greenwood Hall at times relevant to Plaintiffs [sic] claims and was involved in the decision to close the Bryan, Texas office without providing the proper notice to Plaintiffs and in the decision not to pay Plaintiffs wages earned." (*Id.*).

• "On December 1, 2017 Plaintiffs received an email from Greenwood Hall that the Bryan, Texas office was going to be closed. . . . The Chief Operating Officer on that date was Timothy Boris." (Doc. No. 33).

**Bill Bradfield's Texas Contacts**[6]

• "Defendant Bill Bradfield has conducted business within this judicial district." (Doc. No. 1 ¶ 4.46).

• "Defendant Bill Bradfield was an officer and/or director [*7] of Greenwood Hall at times relevant to Plaintiffs [sic] claims and was involved in the decision to close the Bryan, Texas office without providing the proper notice to Plaintiffs and in the decision not to pay Plaintiffs wages earned." (*Id.*).

• "On December 1, 2017 Plaintiffs received an email from Greenwood Hall that the Bryan, Texas office was going to be closed. The CEO on that date for Greenwood Hall was Defendant Bill Bradfield." (Doc. No. 33).

• "Bill Bradfield was the one that informed Plaintiffs

that the Bryan, Texas office was closing down and that they no longer had a job." (*Id.*).

**AnswerNet's Texas Contacts**[7]

• "Defendant AnswerNet, Inc. purchased Greenwood Hall, Inc. and at the time it knew or should have known that Plaintiffs had not been paid the proper wages for the time Plaintiffs worked and that Plaintiffs were not provided proper notice prior to termination." (Doc. No. 1 ¶ 4.58).

• "Defendant AnswerNet, Inc. then created AnswerNet Education Services, Inc. to continue the business and operations of Greenwood Hall." (*Id.*).

• "Defendant AnswerNet, Inc. and/or its agents and/or predecessor(s) has conducted business within this judicial district." (*Id.*).

• "At the time the AnswerNet [*8] Defendants purchased those assets, the AnswerNet Defendants were aware that Plaintiffs had been terminated, that the Bryan, Texas office had been closed, and that Plaintiffs had not received a WARN Act notice or wages for the time that they had worked." (Doc. No. 33).

**AES's Texas Contacts**[8]

• "Defendant AnswerNet, Inc. and/or its agents and/or predecessor(s) has conducted business within this judicial district." (*Id.* ¶ 4.59.).

• "At the time the AnswerNet Defendants purchased those assets, the AnswerNet Defendants were aware that Plaintiffs had been terminated, that the Bryan, Texas office had been closed, and that Plaintiffs had not received a WARN Act notice or wages for the time that they had worked." (Doc. No. 33).

Defendants not only contest many of these factual

---

[5] Boris is an individual with his domicile in California.

[6] Bradfield is an individual with his domicile in South Carolina.

[7] AnswerNet, Inc. is a corporation incorporated in the State of Delaware with its principal place of business in Pennsylvania.

[8] AnswerNet Education Services, Inc. is a corporation incorporated in the State of Delaware with its principal place of business in Pennsylvania.

2019 U.S. Dist. LEXIS 113956, *8

allegations but also whether the actual facts give rise to jurisdiction.

Defendants add for consideration the following facts (supported by sworn declarations):

### Timothy Boris's Additional Jurisdictional Testimony

• Timothy Boris served as the Chief Operating Officer and General Counsel of Greenwood Hall from April 2017 to December 2017. In that capacity, he worked for Greenwood Hall in its Los Angeles headquarters. (Doc. No. 5-1 **[*9]** (Boris Decl.) ¶ 2).

• Boris occasionally conversed with the Bryan location via telephone and email. Boris estimated that he participated in fewer than ten phone calls to Texas to discuss operational matters and sent approximately the same number of emails. None of those communications involved the location closure or employee wages. (*Id.* ¶ 3)

• Boris never traveled to Texas for Greenwood Hall matters and has not traveled to Texas at all within the past ten years. (*Id.* ¶ 2).

• Boris did not make the decision to close the Texas office or participate in the closure. (*Id.* ¶¶ 3-4).

### Bill Bradfield's Additional Jurisdictional Testimony

• Bill Bradfield served as interim CEO of Greenwood Hall from August 2017 to December 2017. (Doc. No. 10-1 (Bradfield Decl.) ¶ 2).

• As an employee of Greenwood Hall, Bradfield worked from his home office in South Carolina. Bradfield never traveled to Texas for business and had not visited the Bryan location. (*Id.* ¶¶ 3-4).

• Bradfield did not participate in the decision to close the Bryan location. That decision was made by the Company's Board of Directors on November 30, 2017, and was subsequently communicated to him. (*Id.* ¶ 5).

• In 2017, Bradfield talked to a Greenwood **[*10]** Hall manager who had traveled to South Carolina for the opening of a new facility in South Carolina. That manager was based at the Bryan location.

Their discussion did not involve the Bryan location or its employees. (*Id.* ¶ 8).

• Bradfield sent one email to the entire company, which would include the Bryan location, announcing his role as interim CEO position. (*Id.* ¶ 7).

### AnswerNet's Additional Jurisdictional Testimony

• AnswerNet is a Delaware corporation, incorporated under Delaware laws in 1998, with its principal place of business in Pennsylvania. (Doc. No. 22-1 (Pudles Decl.) ¶¶ 3-5).

• AnswerNet has never been incorporated in Texas and is not registered to conduct business there. (*Id.* ¶¶ 6-7).

• AnswerNet does not own or lease any real property in Texas. It does not maintain any office, facilities, or assets in Texas, nor does it have any employees in Texas. (*Id.* ¶¶ 8-10).

• AnswerNet does not conduct business operations in Texas, nor has it ever conducted business in Texas. (*Id.* ¶¶ 11, 13).

• AnswerNet's related entity, AES, purchased assets in foreclosure from Greenwood Hall's lender on December 15, 2017. (*Id.* ¶¶ 16, 18).

### AES's Additional Jurisdictional Testimony

• AES is a corporation **[*11]** incorporated in Pennsylvania with its principal place of business in Pennsylvania. (Doc. No. 23-1 (Pudles Decl.) ¶¶ 3-4).

• AES has never been incorporated in Texas and is not registered to conduct business there. (*Id.* ¶¶ 6-7).

• AES does not own or lease any real property in Texas. It does not maintain any office, facilities, or assets in Texas,[9] nor does it have any employees

---

[9] The Asset Purchase Agreement attached to the Pudles Declaration raises some confusion as to whether AES might own physical assets in Texas, as the description of assets

in Texas. (*Id.* ¶¶ 9-11).

• AES's employees have never visited the Bryan location nor have they conducted business at the Bryan location. AES has never employed or supervised individuals at the Bryan location. (*Id.* ¶¶ 12-14).

• AES purchased assets in foreclosure from Greenwood Hall's lender in a Uniform Commercial Code sale after the lender foreclosed on Greenwood Hall due to its default. (*Id.* ¶ 16).

• The lender from which AES purchased Greenwood Hall's assets was Moriah Education Management, LLC, a Delaware limited liability company. (Doc. No. 23-1, Ex. D (Asset Purchase Agreement)).

• AES was not yet formed at the time of the Bryan office closing and never had an employment relationship with Plaintiffs. (Doc. No. 23 p.2). Greenwood Hall closed its doors to the Bryan office on December 1, 2017 (Doc. No. 1 ¶ 1.3), **[*12]** while AES was created on December 4, 2017 (Doc. No. 23-1, Ex. A ¶ 4).

Plaintiffs' reply to Defendants' factual contentions was brief, and all of their factual allegations are included in the first list above. Attached to their reply, Plaintiffs included three exhibits: a copy of Timothy Boris' declaration, which he had submitted along with his motion to dismiss; an unidentified letter—which neither identified the sender nor recipients—discussing the circumstances of Greenwood Hall's closure and AnswerNet's purchase of its assets; and an unauthenticated asset purchase agreement involving the sale of Greenwood Hall and PCS Link, Inc.'s assets by Moriah Education Management LLC, the lender, to AES, the purchaser (*Id.*, Exs. 1-3).[10] The Court notes

---

purchased (described in Exhibit A to the Asset Purchase Agreement) includes, *inter alia,* equipment, fixtures, goods, instruments, and inventory. Although it appears from the record that Greenwood Hall had offices outside of Texas, such as in California and South Carolina, from the context it seems possible that this asset purchase could have included physical assets located at the Bryan, Texas office.

[10] The unauthenticated Asset Purchase Agreement filed as Exhibit 3 to Plaintiffs' Response to Defendants' various motions is an identical copy of the authenticated Asset Purchase Agreement filed by AnswerNet and AES as exhibits to their respective motions to dismiss. The Court therefore considers this document's authenticated versions as properly before the Court. Further, the Court notes that the Asset

that it can only consider the non-conclusory factual allegations raised in the Plaintiffs' pleadings and information submitted under oath, such as an affidavit. *Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)* (quoting *D.J. Invs., Inc., 754 F.2d at 546*). Plaintiffs asserted no further arguments or factual bases for jurisdiction over the Defendants.

## IV. Jurisdictional Considerations under *Rule 12(b)(2)*

Given these "facts," the Court must decide if the Defendants' contacts with Texas are of such a nature and extent to justify one or **[*13]** more of these foreign individuals and entities being sued in Texas. Phrased differently, the legal question before the Court is straightforward: Does this Court have personal jurisdiction over one or more of the Defendants who have moved for dismissal? That question breaks down into two different categorical analyses: whether this Court may exercise general or specific jurisdiction over any Defendant.

### A. The Law Governing Jurisdictional Challenges

The plaintiff bears the burden of establishing a district court's jurisdiction over a non resident, but it need only make a prima facie case if the district court rules without an evidentiary hearing. *Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994)* (citations omitted). Proof by a preponderance of the evidence is not required. *Bullion, 895 F.2d at 217* (citing *D.J. Invs., Inc.,* 754 F.2d at 545-46). Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted, non-conclusory allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists. *Id.* (quoting *D.J. Invs., Inc.,* 754 F.2d at 546); *see also Central Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 380 (5th Cir. 2003)* ("The court shall accept as true [the party seeking to assert jurisdiction's] **[*14]** uncontroverted allegations (so long as the allegations are not merely conclusory) . . . ."). In reviewing a motion to dismiss, the court "may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any

---

Purchase Agreement is the only document indicating that PCS Link, Inc. was jointly and severally a borrower with Greenwood Hall, and that PCS Link, Inc.'s assets were also sold as part of the agreement.

2019 U.S. Dist. LEXIS 113956, *14

combination of the recognized methods of discovery." *Stuart v. Spademan, 772 F.2d 1185, 1192 (5th Cir. 1998).*

Notwithstanding this, the Fifth Circuit has explained "that the prima-facie-case does not require the court to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 869 (5th Cir. 2001)* (citing *Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 326 (5th Cir. 1996)); Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir.1998)* ("[T]he law does not require us to struthiously to credit conclusory [jurisdictional] allegations or draw farfetched inferences.") (citation and internal quotation marks omitted).") Accordingly, where sworn affidavit testimony controverts conclusory jurisdictional allegations, the Court is not required to resolve conflicts in favor of the party relying on those allegations.

A federal court sitting in diversity may assert jurisdiction if (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the *fourteenth amendment to the United States Constitution. Cycles, Ltd. v. W.J. Digby, Inc., 889 F.2d 612, 616 (5th Cir. 1989).* A district court must determine whether both the forum state's long-arm statute and federal due process permit the court to exercise personal jurisdiction. **[\*15]** *Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 418 (5th Cir. 1993)* (citations omitted). Since the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis. *See Wilson, 20 F.3d at 647* (citations omitted). Federal due process requires a plaintiff to prove: (1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the state; and (2) that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id. at 647* (quotations and citations omitted).[11]

Personal jurisdiction over a nonresident defendant is consistent with due process when the defendant has established "minimum contacts" with the forum state

and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Johnston, 523 F.3d at 609* (quoting *Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994)).*

"Minimum contacts" can give rise to either specific personal jurisdiction or general personal jurisdiction. *Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001).* Specific jurisdiction exists if the asserted claims arise out of or relate to the defendant's contacts with the forum. *Cent. Freight Lines Inc., 322 F.3d at 381.* The contacts must indicate that the nonresident defendant "purposefully availed himself of the benefits of the forum state." *See Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958);* **[\*16]** *Brown v. Flowers Indus. Inc., 688 F.2d 328, 333 (5th Cir. 1982).* In contrast, general jurisdiction exists for any cause of action if the nonresident defendant's contacts with the forum are so substantial, continuous and systematic that the defendant is essentially "at home" in the forum. *See Monkton Ins. Servs., Ltd. v. Ritter, 768 F.3d 429, 432 (5th Cir. 2014).* While the courts accept well-pleaded facts, they do not accept as true all conclusions and inferences made in the pleadings.

Although jurisdictional allegations must be accepted as true, such acceptance does not automatically mean that a prima facie case for specific jurisdiction has been presented. Establishing a prima facie case still requires the plaintiff to show the nonresident defendant's purposeful availment of the benefits and protections of and minimum contacts with the forum state. *See Burger King, 471 U.S. at 474, 105 S.Ct. 2174* ("[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."); *Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1079 (10th Cir. 1995)* ("[T]he mere allegation that an out-of-state defendant has tortuously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts."); *IMO Indus., Inc. v. Kiekert, A.G., 155 F.3d 254, 263 (3d Cir. 1998); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625-26 (4th Cir. 1997),* cert. denied, 523 U.S. 1048, 118 S. Ct. 1364, 140 L. Ed. 2d 513 (1998). . . . ("[T]he law **[\*17]** does not require us to struthiously to credit conclusory [jurisdictional] allegations or draw farfetched inferences.") (citation and internal quotation marks omitted). Appellants' sole evidence is their state court petition, which

---

[11] This synopsis of the law is taken almost verbatim from *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008).* This Court utilizes this opinion because it finds Judge King's summary to be one of the best and most succinct descriptions available. To avoid confusion and for ease of reading the Court has omitted the quotation marks.

2019 U.S. Dist. LEXIS 113956, *17

alleges "on information and belief" that Appellee knew Appellants are Texas residents and knew its actions would intentionally cause harm to Appellants in Texas. *Appellants present no other evidence of Appellee's contacts with Texas relating to Appellants' claims, and thus the district court properly concluded that the allegations are merely conclusory.*

*Panda Brandywine, 253 F.3d at 868-69* (emphasis added).

### B. General Jurisdiction

Many consider the concept of general jurisdiction to be the area of jurisdictional law that has experienced the most radical changes over the past five years. Although Plaintiffs do not explicitly state their argument, their briefing suggests that Plaintiffs believe that they have alleged enough facts to establish that Defendants are essentially "at home" in Texas, while Defendants strongly disagree. Some Defendants cited *Daimler A.G. v. Bauman, 571 U.S. 117, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)*, in support of their positions.

It is not surprising to this Court that the Defendants might seek to align themselves with the Supreme Court's opinion **[*18]** in *Daimler*, which is widely considered to be a landmark case currently inspiring (or inciting) most legal commentators to analyze its effects and most judges to adjust their approach to weighing general jurisdiction arguments.

In *Daimler* the Supreme Court held that despite any number of contacts with California, Daimler could not be sued there in connection with claims that arose in South America. Despite prior jurisprudence dealing with general jurisdiction, the Court found that a non-resident forum court could only find a defendant subject to general jurisdiction in states where it was "at home."

> [O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose [general] jurisdiction. For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[—]for a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.

*Id. at 137*.

Prior to *Daimler*, most lawyers, commentators, and jurists alike agreed with the above statement as a general proposition, but felt that the case law supported the conclusion that a corporation, for example, could be sued in any jurisdiction **[*19]** in which it engaged in a substantial continuous and systematic course of dealing. *Daimler* can only be interpreted as severely undermining this school of thought. In fact, the Fifth Circuit has, based upon *Daimler*, specifically agreed that *Daimler* has narrowed the application of general jurisdiction. *Monkton Ins. Servs. Ltd., 768 F.3d at 429*; *Patterson v. Aker Solutions, Inc., 826 F.3d 231 (5th Cir. 2016)*. It has instructed both district courts and practitioners alike that finding general jurisdiction based upon any factors not described in *Daimler* is virtually impossible absent exceptional circumstances.

> The [Supreme] Court has held that for a corporation the place of incorporation and principal place of business are where it is at home and are thus the paradigm bases for jurisdiction. [citing *Daimler*]. It is therefore incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business. *See id.* [*Daimler*]; *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*.

*Monkton Ins. Servs. Ltd., 768 F.3d at 432*.

According to *Daimler* an individual is at home in his or her domicile—which in this case is South Carolina for Bradfield and California for Boris. AnswerNet is incorporated in Delaware, AES is incorporated in Pennsylvania, and both have their principal place of business in Pennsylvania. Thus, absent extraordinary circumstances, **[*20]** Bradfield is "at home" in South Carolina, Boris is "at home" in California, AnswerNet is "at home" either in Pennsylvania or Delaware, and AES is "at home" in Pennsylvania. Obviously, this is a "sea-change" in the way district courts judge jurisdictional claims, especially for business entities.

Thus, while made more difficult by the Supreme Court, this Court will still consider the pleadings in effect using the traditional factors to determine if this is a case in which exceptions to the general "at home" rule should apply. Although Plaintiffs make few if any arguments, their filing of claims against the Defendants suggest that Plaintiffs believe Defendants have continuous and systematic contacts in Texas sufficient to subject Defendants to this Court's jurisdiction. Therefore, assuming *arguendo* that there remains some vitality in the concept that a substantial continuous and systematic presence in a state gives rise to general

jurisdiction, regardless of an entity's residency, the Court will analyze that concept in view of the relevant pleadings.

> Where a defendant 'has continuous and systematic general business contacts' with the forum state, the court may exercise 'general jurisdiction' **[*21]** over any action brought against the defendant.

*McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)*. In order for these systematic contacts to establish general jurisdiction they must demonstrate that these defendants are "at home" in Texas. That being the case, this Court will analyze each of the Plaintiffs' claims of general jurisdiction and rule accordingly as to each Defendant.

### 1. Boris

Given the pleaded "facts," the most favorable interpretation for the Plaintiffs shows that Boris was an executive officer of Greenwood Hall, the company whose Texas office closed while Plaintiffs were employed at that location, and that Boris conducted business within this judicial district. Including facts supplied by Boris, Boris participated in approximately ten calls and ten emails sent to Texas regarding Greenwood Hall operational matters.

### 2. Bradfield

Given the pleaded "facts," the most favorable interpretation for the Plaintiffs shows that Bradfield was the CEO of Greenwood Hall, the company whose Texas office closed while Plaintiffs were employed there, at the time when the company closed without providing notice or final paychecks, and has conducted business within this judicial district. According to Plaintiffs, Bradfield sent a communication **[*22]** to the Bryan location to inform employees that the office was closing. Including facts from Bradfield, Bradfield spoke on one occasion with a Greenwood Hall manager who was based at the Bryan location—although their conversation occurred out of Texas. Bradfield also sent an email firmwide that included the Bryan office employees as recipients.

### 3. AnswerNet

Given the pleaded "facts," the most favorable interpretation for the Plaintiffs shows that AnswerNet alleged purchased the assets of Greenwood Hall, the company whose Texas office closed while Plaintiffs were employed at that location, and that AnswerNet conducted business within this judicial district.

### 4. AES

Given the pleaded "facts," the most favorable interpretation for the Plaintiffs shows that AES or one of its predecessor or affiliates purchased the assets of Greenwood Hall, the company whose Texas office closed while Plaintiffs were employed at that location, and that AES conducted business within this judicial district.

As stated above, for general jurisdiction to attach to the Defendants, *Daimler* dictates that they must be "at home." Clearly neither of the Defendant entities are incorporated in Texas, nor is Texas their principal **[*23]** place of business. Neither Bradfield nor Boris are domiciled in Texas. Some commentators have theorized that *Daimler* has, as a practical matter, essentially limited general jurisdiction to these factors. Whether practical or not, the *Daimler* opinion specifically makes a point of holding that there may be an exceptional case where a foreign corporation (or citizen) has so many contacts either significant in number or nature (or both) with a jurisdiction that it may be "at home" in a non-resident state. The Supreme Court cited *Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485, 63 Ohio Law Abs. 146 (1952)*, as just such a case.

The Supreme Court did not delineate a test for courts to utilize to make this determination in a post-*Daimler* world. Since it did not outline a test, this Court will utilize the pre-*Daimler* factors to determine if the Defendants here are at home in Texas. Prior to *Daimler*, courts traditionally used the general jurisdiction test that evolved after the Supreme Court's decisions in *Perkins and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. As previously stated, courts analyzed a person's or entity's contacts, both in terms of quality and quantity, with a state to determine if they were so substantial, continuous, and systematic that (to borrow *Daimler*'s language) it was or they were, in effect, "at **[*24]** home." This Court finds that regardless of whether one uses the *pre-Daimler* standards or "heightened" *post-Daimler* standards,[12] there is no general jurisdiction as to any Defendant in this case.

The only factors cited by Plaintiffs and provided in their pleadings (as opposed to provided by the Defendants) that might support the argument that the Defendants

---

[12] It goes without saying that it was the intent of the Supreme Court in *Daimler* to narrow the reach of general jurisdiction as courts were interpreting it in the post-*Helicopteros* days.

directed contact toward Texas are the following:

🔲 Go to table1

These are the totality of the alleged Texas contacts for each individual/entity. As Defendants have explained, Boris [*25] and Bradfield each participated in occasional communications with Texas. While Greenwood Hall, the company whose assets were sold to the entity Defendants, did conduct business in Texas and operated the Bryan office, Defendants AnswerNet and AES have no offices in Texas, no employees in Texas, and provide no services in Texas. Plaintiffs offer no further theories for why these scant contacts with Texas, even if true, are sufficient to establish the Defendants as "at home" in Texas.

Nevertheless, one could attempt to discern the legal theories upon which Plaintiffs seek to establish jurisdiction. Most likely Plaintiffs claim jurisdiction because they experienced damage in Texas, that Defendants communicated occasionally with entities or individuals in Texas, and that one or both of the entity Defendants purchased Greenwood Hall's assets.

Out of state phone calls, emails, and/or texts do not establish one is "at home" in the recipient's jurisdiction. Communications to Texas have been held to be merely fortuitous and insufficient to constitute purposeful availment of the jurisdiction. *Monkton Ins. Servs., Ltd., 768 F.3d at 433*; *Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986)*; *Patterson v. Dietze, Inc., 764 F.2d 1145, 1147 (5th Cir. 1985)*. Further, the out-of-state receipt of bank funds or assets, regardless of whether completed by check [*26] or wire transfer or some other means, does not establish "residency" by the out-of-state Defendant in the home of the transferring financial institution.

The next apparent justification for jurisdiction is that Defendants AnswerNet and AES purchased the assets of Greenwood Hall, which conducted business in Texas and previously employed the Plaintiffs. As the Court noted in footnote 3, AnswerNet argues that only AES was involved in the asset purchase. Further, the assets were not purchased from Greenwood Hall directly but rather from a company in Delaware. Plaintiffs' argument would require the Court to impute jurisdiction of one entity to its purchaser simply by virtue of an out-of-state transaction with a third party. Courts presume the institutional independence of even related corporations, such as a parent and its subsidiary, when they determine if one corporation's contacts with a forum can

be the basis of jurisdiction over the related corporation. *Dickson Marine, Inc. v. Panalpina, Inc., 179 F.3d 331, 338 (5th Cir. 1999)*. It is well established in the Fifth Circuit that when "a wholly owned subsidiary is operated as a distinct corporation, its contacts with the parent cannot be imputed to the parent." *Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 773-74 (5th Cir. 1988)*. To fuse two companies for jurisdictional purposes, [*27] there must be "proof of control by the parent over the internal business operations and affairs of the subsidiary." *Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1160 (5th Cir. 1983)*. The theory is that because—in that instance—the two companies are the same entity, "the jurisdictional contacts of one are the jurisdictional contacts of the other for purposes of *International Shoe* due process analysis." *Patin v. Thoroughbred Power Boats, Inc., 294 F.3d 640, 653 (5th Cir. 2002)*.

No such facts are at work here between AnswerNet or AES and Greenwood Hall. Unlike a parent corporation and a subsidiary, Greenwood Hall was an unrelated corporation who did not directly interact in any manner with AES. AES purchased Greenwood Hall's assets from a third party, the secured lender. Once AES purchased the assets, it did not begin to operate offices or have employees in Texas. Further, there is no relationship between Greenwood Hall and AES. They are separate and distinct entities, with no element of control between them. The Court notes that the relationship between AnswerNet and AES appears to be much more of the kind anticipated by the Fifth Circuit for purposes of imputing jurisdiction. The AES's purchase of Greenwood Hall's assets cannot subject it or AnswerNet to jurisdiction in a forum state in which they would not otherwise be [*28] subject to jurisdiction.

Moreover, as the Court has already detailed above, the transfer of funds or payments to and from Texas does not make a defendant "at home" in Texas. *Johnston, 523 F.3d at 610*. The facts here are even less indicative of Texas contacts as those considered in *Johnston*. Greenwood Hall was not a Texas corporation and did not have its principal place of business in Texas, albeit it did have a location in Bryan, Texas. When its assets were foreclosed upon, the secured lender which did the foreclosure was Moriah Education Management LLC—a third party—which was a Delaware limited liability company. That LLC then sold and transferred the purchased assets to AES, as shown in the Asset Purchase Agreement, which is a Pennsylvania corporation with its principal place of business in Pennsylvania. No part of this chain of transactions

2019 U.S. Dist. LEXIS 113956, *28

involved Texas, except to the extent that Greenwood Hall owned some assets in Texas prior to its foreclosure. These facts are insufficient to establish availment of Texas, much less purposeful availment of the forum state.

Furthermore, that fact that Plaintiffs were injured in Texas because of alleged actions of Defendants does not make the Defendants "at home" in Texas. **[*29]** Even assuming *arguendo* that violations of the WARN Act or FLSA could be considered tortious actions toward the Plaintiffs, the record as pled does not necessarily show that these Defendants were involved in the allegedly harmful acts or that these Defendants intended those acts to be directed toward Texas. Although *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*, and *Guidry v. U.S. Tobacco, 188 F.3d 619 (5th Cir. 1999)*, stand for the proposition that a tortfeasor who commits a tort in one state can be sued in another if an individual in that state is damaged, that proposition is true only if the action is directed toward the forum state:

> However, *Calder*'s "effects" test "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state." *Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir. 1997)*, cert. denied, 522 U.S. 1048, 118 S. Ct. 691, 139 L. Ed. 2d 637 (1998). "'[T]he key to *Calder* is that the effects of an alleged intentional tort are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum.'" *Id.* (quoting *Wallace, 778 F.2d at 395*). Appellants' allegations, even if true, only relate to the foreseeability of causing injury in Texas, which is not a "sufficient benchmark" for specific jurisdiction. *Burger King, 471 U.S. at 474, 105 S.Ct. 2174*; *Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212 (5th Cir. 1999)* ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts **[*30]** toward the forum."). The "foreseeability that is critical to due process analysis. . . that the defendant's conduct and connection with the forum State are such that he should *reasonably* anticipate being haled into court there." *Burger King, 471 U.S. at 474, 105 S.Ct. 2174* (emphasis added). To conclude that a defendant should "reasonably anticipate" being haled into the forum State requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," or "purposefully directs"

its efforts toward the forum State residents. *Id. at 475, 476, 105 S.Ct. 2174*.

*Panda Brandywine, 253 F.3d at 869*; *see also McFadin, 587 F.3d at 762*; *Southmark Corp., 851 F.2d at 773* ("Nothing in the record indicates that USLICO expressly aimed its allegedly tortious activities at Texas, or that Texas is even the focal point of USLICO's tortious conduct"). Similarly no Defendant herein aimed any activity towards Texas.

Finally, even if Defendants had some business contact with entities in Texas—which has not been established through the record—occasional business contact is not enough. In *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 614 (5th Cir. 2008)*, the defendant actually worked in Texas for 37 days out of a 3-year period (far more contact with the state than any of the Defendants in a 17-year period). The Fifth **[*31]** Circuit described this level of contact as "lacking the substance and regularity to establish general jurisdiction." *Id. at 611*; *see also Patterson v. Aker Solutions Incorporated, 826 F.3d 231, 236-37 (5th Cir. 2016)* (finding no general jurisdiction where defendant had six employees in Texas, other employees trained in Texas, employees were processed in Texas, and defendant paid unemployment and franchise taxes in Texas).

As pleaded, Plaintiffs' jurisdictional allegations premised on Defendants conducting business in Texas and having ties to Greenwood Hall are conclusory, provide no specific claims upon which to attach jurisdiction, and are unreliable. Accordingly, the Court considers the sworn declarations from Defendants when they contradict these conclusory allegations. This Court finds no exceptional circumstances to distinguish this case from *Daimler* or *Hall* or any of myriad number of Fifth Circuit cases finding no general jurisdiction. Even if these allegations are accurate, none indicate the Defendants were at home in Texas. Their activities are not regular and very few have substance. They are not continuous and certainly not systematic. In this case, there is no general jurisdiction over any of the Defendants.

*C. Specific Jurisdiction*

Again, while Plaintiffs have **[*32]** not explained the reasoning for their assumption that the Court has personal jurisdiction over the Defendants, the Court assumes that Plaintiffs also believe that Defendants are subject to the specific jurisdiction of this Court. There

2019 U.S. Dist. LEXIS 113956, *32

have been no recent upheavals in the law of specific jurisdiction. While it is highly fact determinative, the law which sets the standards is well-developed:

> In this circuit, specific personal jurisdiction is a claim-specific inquiry: "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." We have articulated a three-step analysis for specific jurisdiction: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

> The "minimum contacts" inquiry is fact intensive and no one element is decisive; rather the touchstone **[*33]** is whether the defendant's conduct shows that it "reasonably anticipates being haled into court." The defendant "must not be haled into a jurisdiction solely as a result of 'random,' fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third person.'"
> In determining whether or not exercise of jurisdiction is fair and reasonable, defendants bear the burden of proof and "it is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." In this inquiry we examine five factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies."

_McFadin, 587 F.3d at 759-60_ (citations omitted).

All of the pleaded facts applicable to specific jurisdiction have been discussed in great detail above. They are conclusory and unsupported by facts. In summary, Plaintiffs' briefing seems to suggest that their claims to jurisdiction rest heavily on the allegations that AnswerNet and AES purchased assets from Greenwood **[*34]** Hall, that the individual Defendants were officers of Greenwood Hall, and that Boris and Bradfield occasionally communicated with persons in Texas.

This Court will not recount all the factors or analyze the

alleged contacts a second time. The Defendants' sole contacts with Texas in this regard were Boris and Bradfield's occasional communications with Greenwood Hall employees in Texas. Only the alleged harms happened in Texas. Defendants never set foot in Texas in connection with any purchased assets or alleged legal violations. They never directed any action toward Texas.

Specific jurisdiction requires a link between the defendant's contacts and the specific claim asserted. It is a claim-specific injury. _Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006)_. The only contacts with Texas in the instant case were those of the Plaintiffs and/or Greenwood Hall. Courts have consistently held that a plaintiff's contacts or an unaffiliated defendant's contacts with the forum state are not imputed to another defendant.

Plaintiffs' remaining possible premise could again be boiled down to this theme: because Plaintiffs are located in Texas and damaged there, the resulting damage is enough to subject the Defendants to the jurisdiction of this Court. **[*35]** If taken to its logical end, Plaintiffs' argument suggests that if Plaintiffs had been located in Iowa or New Mexico, the Defendants could be sued there—regardless of where Defendants were when the alleged misconduct took place and regardless of whether they had ever been to either state.

The Fifth Circuit has held time and again that "economic consequences or other miscellaneous fall out" do not give rise to specific jurisdiction. _Jobe v. ATR Mktg., Inc., 87 F.3d 751, 753-55 (5th Cir. 1996)_. This Court holds that the Plaintiffs have not established that specific jurisdiction exists in this case over any of the Defendants. They did not establish that Defendants had minimum contacts or that the cause of action arose out of those contacts. Even if it had under the facts of this case, the exercise of jurisdiction would not be fair and reasonable. The Fifth Circuit in _Panda Brandywine_ summed up its situation with a conclusion equally applicable here:

> If we were to accept Appellants' arguments, a nonresident defendant would be subject to jurisdiction in Texas for an intentional tort simply because the plaintiffs complain alleged injury in Texas to Texas residents regardless of the defendant's contacts, and would have to appear in Texas to defend **[*36]** the suit "no matter how groundless or frivolous the suit may be." _Wallace, 778 F.2d at 395_. Such result would completely

2019 U.S. Dist. LEXIS 113956, *36

vitiate the constitutional requirement of minimum contacts and purposeful availment. We refuse to ignore the limits of specific jurisdiction to allow Appellants to sue Appellee in the district court based on Appellants' self-serving allegations when the "potential" injury claimed by Appellants resulted from interference with financing agreements that have nothing to do with Texas except for the mere fortuity that Appellants reside there.

*Panda Brandywine, 253 F.3d at 870*.

Therefore, specific jurisdiction cannot be a basis for the maintenance of this lawsuit.

**V. Conclusion**

Although Plaintiffs may well be right that certain statutory rights were violated in the manner in which they were dismissed from employment and paid, these four Defendants are not properly before this Court. None of the Defendants' alleged acts were aimed at Texas. Nothing in their business decisions or purchase of assets connected the Defendants with Texas in sufficient ways as to give rise to specific jurisdiction. Finally, given the minimal number of contacts with Texas, especially with regard to the Defendants' alleged connections to this case, Defendants **[\*37]** cannot be held subject to the general jurisdiction of this State, even under the pre-*Daimler* standards. Clearly, in the post-*Daimler* world, they are not "at home" in Texas.

Accordingly, it is hereby **ORDERED** that Defendant Timothy Boris' First Motion to Dismiss (Doc. No. 5), Defendant Bill Bradfield's Motion to Dismiss (Doc. No. 10), Defendant AnswerNet, Inc.'s Motion to Dismiss (Doc. No. 22), and Defendant AnswerNet Education Services, Inc.'s Motion to Dismiss (Doc. No. 23) are **GRANTED**.

Signed at Houston, Texas, this 8th day of July, 2019.

/s/ Andrew S. Hanen

ANDREW S. HANEN

UNITED        STATES        DISTRICT        JUDGE

Patricia O'Neill

2019 U.S. Dist. LEXIS 113956, *37

**Table1** (*Return to related document text*)

| Boris | Bradfield | AnswerNet | AES |
|---|---|---|---|
| 1. Boris was an executive officer of Greenwood Hall, a company which had an office in Texas and conducted business in Texas. | 1. Bradfield was an executive officer of Greenwood Hall, a company which had an office in Texas and conducted business in Texas | 1.AnswerNet purchased assets obtained from Greenwood Hall, a company that owned assets, including an office location in Texas, and conducted business in Texas. | 1. AES or its affiliate purchased assets obtained from Greenwood Hall, a company that owned assets, including an office location in Texas, and conducted business in Texas. |
| | 2. Bradfield communicated with the Texas employees to inform them that the office was closing. | | |

**Table1** (*Return to related document text*)

End of Document

## *Born v. Celtic Mktg. LLC*

United States District Court for the Central District of California

May 20, 2020, Decided; May 20, 2020, Filed

8:19-cv-01950-JLS-ADS

**Reporter**
2020 U.S. Dist. LEXIS 89220 *

Dennis Born v. Celtic Marketing LLC et al.

**Prior History:** *Born v. Celtic Mktg. LLC, 2020 U.S. Dist. LEXIS 61974 (C.D. Cal., Apr. 8, 2020)*

**Counsel:** [*1] ATTORNEYS PRESENT FOR PLAINTIFF: Not Present.

ATTORNEYS PRESENT FOR DEFENDANT: Not Present.

**Judges:** JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOSEPHINE L. STATON

# Opinion

**CIVIL MINUTES — GENERAL**

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Doc. 49)**

Before the Court is a Motion to Dismiss filed by Defendants Northcoast Warranty Services, Inc. and Sunpath Limited Corp. (Mot., Doc. 49.) Plaintiff Dennis

Born opposed and Defendants replied. (Opp., Doc. 60; Reply, Doc. 64.) Having reviewed all relevant papers and taken the matter under submission, for the following reasons, the Court GRANTS Defendants' Motion.

## I. BACKGROUND

Plaintiff is a resident of Wisconsin. (First Amended Complaint ("FAC") ¶ 8, Doc. 40.) He brings this putative *TCPA* class action against Defendants Celtic Marketing, LLC d/b/a VAD, Sunpath Limited Corp., and Northcoast Warranty Services, Inc. According to the FAC, Defendants are each engaged in the business of selling and administering vehicle protection contracts. (*Id.* ¶ 21.) Specifically, Sunpath issues and administers the "Vehicle Protection Contracts . . . provided by Northcoast as obligor." (Opp. at 1; *see* Mot. at 1.) Sunpath and Northcoast are Delaware corporations [*2] with their principal places of business in Massachusetts and Ohio respectively. (*Id.* ¶¶ 10, 11.) VAD is a Nevada limited liability corporation with its principal place of business in Irvine, California. (*Id.* ¶ 9.)

Born alleges that Northcoast and Sunpath contracted with VAD, creating a relationship whereby VAD served as the other Defendants' sales representative, authorized to solicit customers and sell vehicle protection plans administered by Sunpath and issued by Northcoast. (*Id.* ¶¶ 17, 18, 25, 27; Celtic FAC Answer ¶¶ 17, 18, 26, 27, Doc. 46.)[1] Northcoast Secretary Barry Moses explains that Northcoast authorizes independent, non-exclusive sellers of automobile service contracts to sell its protection plans. (Moses Decl. ¶ 8.) Northcoast provides those independent sellers with no compensation and "does not . . . control, direct, or

---

[1] In its Answer Celtic d/b/a VAD indicates that "it is authorized by SunPath to sell certain specified agreements under which SunPath and Northcoast have certain rights and duties" but admits only to entering into an agreement with Sunpath, while denying entering into any agreement with Northcoast. (*See, e.g.*, Celtic FAC Answer ¶¶ 79, 92.)

2020 U.S. Dist. LEXIS 89220, *2

manage the marketing practices of any" third-party seller. (*Id.* ¶¶ 7, 10.) Sunpath President Andrew Garcia has provided a declaration to a substantially similar effect, noting that corporations such as VAD are non-exclusive sellers of policies administered by Sunpath who receive no remuneration from Sunpath. (Garcia Decl. ¶¶ 10, 14, 15, Doc. 49-3.) Further, **[*3]** he clarifies that: (1) "SunPath has no role or involvement in the telemarketing companies' representatives' selection of [which protection plan, among available alternatives] to sell" to a prospective customer; (2) "SunPath has no oversight or control over what the telemarketing representatives say;" and, (3) "[t]he marketing operations of [companies like VAD], including how they obtain leads and what scripts they use, are created and maintained entirely by the telemarketing companies." (*Id.* ¶ 12.)[2]

Nevertheless, as the FAC puts it, under its agreement with Sunpath and Northcoast, VAD carried out a telemarketing campaign, making thousands of unsolicited sales calls with the aid of an automatic telephone dialing system. (FAC ¶¶ 23-27.) Born received such a call on August 13, 2019 at 1:32 p.m., which according to his caller ID, was placed from the number 920-980-7352. (*Id.* ¶¶ 29-30.) In connection with his Opposition, Born provided VAD's response to a special interrogatory, in which VAD states that this call was placed to Born and then transferred to VAD "by an entity known to [VAD] as MMS."[3] (VAD Special Interrogatory Response, Ravitch Decl. Ex. 1, Doc. 60-2.) When Born answered **[*4]** the call, a live agent informed him that they were selling vehicle protection plans, but did not identify the entity on behalf of which the agent was calling. (FAC ¶¶ 32, 34.) Born purchased a plan "for the sole purpose of identifying who was calling and/or the company who was responsible for calling." (*Id.* ¶ 35.) After making his purchase, Born received documentation from VAD indicating that Sunpath and Northcoast were responsible for the vehicle protection plan. (*Id.* ¶¶ 36-47.)

─────────────────

[2] Born argues that much of the Moses and Garcia Declarations is a collection of impermissible legal conclusions. (Opp. at 4-5.) The portions of the Declarations cited by the Court are statements of fact based on Messrs. Moses and Garcia's personal knowledge. Insofar as Born objects to the Court's reliance on these Declarations, his objection is OVERRULED.

[3] VAD "contracted orally with MMS[] and communicated with MMS via the following telephone number: +63-9325552729." (VAD Special Interrogatory Response.) "[VAD] has no mailing or email address for MMS." (*Id.*)

Born filed this action on October 12, 2019. (Complaint, Doc. 1.) He asserts a lone claim for violation of *47 U.S.C. § 227*, the *Telephone Consumer Protection Act ("TCPA")*. (FAC ¶¶ 131-137.) Born seeks to represent a class defined as:

> All persons in the United States who: (1) between October 12, 2015 and the date of class notice; (2) received at least one telephone call; (3) on his or her telephone; (4) that was initiated by an automatic telephone dialing system; (5) for the purpose of promoting Defendants' services; (6) where Defendants did not first obtain the person's express written consent.

(*Id.* ¶ 53.)

Sunpath and Northcoast presently seek dismissal from this action on the basis that this Court lacks personal jurisdiction **[*5]** over them.

## II. LEGAL STANDARD

*Rule 12(b)(2)* allows a party to assert lack of personal jurisdiction as a defense by motion. *Fed. R. Civ. P. (12)(b)(2)*. "Although the defendant is the moving party on a motion to dismiss [for lack of personal jurisdiction], the plaintiff bears the burden of establishing that jurisdiction exists." *Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1019 (9th Cir. 2002)*. "[I]n the absence of an evidentiary hearing, the plaintiff need only make 'a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" *Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010)* (quoting *Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006))*.[4] Generally, the court may consider the pleadings as well as any declarations submitted by the parties when deciding a motion to dismiss for lack of personal jurisdiction. *See Data Disc. Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977)*. The "uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Props., 284 F.3d at 1019*. In other words, "for the

─────────────────

[4] The district court has discretion to hold an evidentiary hearing on a *12(b)(2)* motion to resolve "issues of credibility or disputed questions of fact" raised in the pleadings and other submitted materials. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977)*. Neither party has requested an evidentiary hearing, and based on the papers before it, the Court concurs that none is necessary.

purpose of this [prima facie] demonstration, the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach, 453 F.3d at 1154*.

"In evaluating the appropriateness of personal jurisdiction over a nonresident defendant, [courts] ordinarily examine whether such jurisdiction satisfies the 'requirements of the applicable state long-arm **[*6]** statute' and 'comport[s] with federal due process.'" *Bauman v. DaimlerChrysler Corp., 644 F.3d 909, 919 (9th Cir. 2011)* (alteration in original) (quoting *Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1404-05 (9th Cir. 1994))*. "Because California permits the exercise of personal jurisdiction to the full extent permitted by due process, [courts] need only determine whether jurisdiction over [a defendant] comports with due process." *Id.* (internal citation and quotation marks omitted); *see Cal. Civ. Proc. Code § 410.10* ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."). "For due process to be satisfied, a defendant, if not present in the forum, must have 'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach, 453 F.3d at 1155* (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. & Placement, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*.

"Applying the 'minimum contacts' analysis, a court may obtain either general or specific jurisdiction over a defendant." *Doe v. Unocal Corp., 248 F.3d 915, 923 (9th Cir. 2001)*. "If the defendant's activities in the forum are substantial, continuous and systematic, general jurisdiction is available; in other words, the foreign defendant is subject to suit even on matters unrelated to his or her contacts to the forum." *Id.* On the other hand, "[a] court may exercise specific jurisdiction over a foreign **[*7]** defendant if his or her less substantial contacts with the forum give rise to the cause of action before the court." *Id.* The Ninth Circuit applies a three-part test to determine whether a district court can exercise specific personal jurisdiction over a nonresident defendant:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws (the "purposeful availment" requirement);
(2) the claim must be one which arises out of or

relates to the defendant's forum-related activities; and
(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004)* (quoting *Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987))*.

"The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King, 471 U.S. at 477*). Where a Court is exercising specific jurisdiction **[*8]** over a defendant, "the fair warning that due process requires arises not at the time of the suit, but when the events that gave rise to the suit occurred." *Steel v. United States, 813 F.2d 1545, 1549 (9th Cir. 1987)*.

## III. DISCUSSION

In the motion at bar, Sunpath and Northcoast assert that they (1) lack the continuous and systematic contacts with California required for this Court to exercise general jurisdiction and (2) have not purposefully directed any actions towards the California forum in a manner that would render specific jurisdiction appropriate. (Mot. at 6-19.) Born does not dispute that this Court lacks general jurisdiction over Sunpath and Northcoast and argues only that an exercise of specific jurisdiction is warranted. (*See* Opp. at 5-16.)

### A. Jurisdictional Analysis

"The purposeful availment requirement ensures that a nonresident defendant will not be haled into court based upon 'random, fortuitous or attenuated' contacts with the forum state." *Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1320 (9th Cir. 1998)* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))*. The phrase "purposeful availment" includes both purposeful availment and purposeful direction, which are distinct concepts. *Schwarzenegger, 374 F.3d at 802*. While a purposeful availment analysis is used in suits sounding in contract, a purposeful direction analysis is used in suits sounding in tort. *Id.* Claims for violation **[*9]** of the *TCPA* sound squarely in tort and require application of the purposeful direction

analysis. *Moser v. Health Ins. Innovations, Inc., No. 3:17-CV-1127-WQH-KSC, 2018 U.S. Dist. LEXIS 3237, 2018 WL 325112, at *3 (S.D. Cal. Jan. 5, 2018)* (collecting cases); *Abedi v. New Age Med. Clinic PA, No. 1:17-CV-1618 AWI SKO, 2018 U.S. Dist. LEXIS 105932, 2018 WL 3155618, at *2 n.2 (E.D. Cal. June 25, 2018)*.

Accordingly, in this case, the Court's personal jurisdiction inquiry is appropriately limited to an examination of whether Defendants may be said to have purposefully directed their activities at California. *Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1149 (9th Cir. 2017)* ("[P]urposeful availment test does not apply" where "the claims at issue are premised on alleged tortious conduct by [d]efendants."). The Ninth Circuit "evaluate[s] purposeful direction under the three-part 'effects' test traceable to the Supreme Court's decision in *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*." *Schwarzenegger, 374 F.3d at 803*. Under this test, "the defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (quoting *Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002)* (citations omitted)). In *Walden v. Fiore*, the Supreme Court emphasized that under the *Calder* effects test, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but **[*10]** whether the defendant's conduct connects him to the forum in a meaningful way." *Walden, 571 U.S. at 290*. In other words, in tort actions, while conducting the minimum contacts inquiry, the Court is to focus on "the relationship among the defendant, the forum, and the litigation." *Id. at 291*. "And it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Id.*

Here, Born does not dispute that the lone alleged telemarketing call described in the FAC was made to him in Wisconsin, via his cellular phone number, which bears a Wisconsin area code. (*See* Mot. at 1-3, 8-10; Opp.) It should go without saying that an allegedly tortious call to Wisconsin does not amount to an intentional act expressly aimed at California. And an out-of-state defendant's mere agreement with a third-party located within the forum, pursuant to which that third-party independently operates an advertising or solicitation campaign, does not satisfy the first prong of the three-part jurisdictional analysis set forth in *Schwarzenegger*, and is thus an insufficient basis for an exercise of specific jurisdiction over the foreign defendant. *See Durward v. One Techs. LLC, No. CV 19-*

*6371-GW-AGRX, 2019 U.S. Dist. LEXIS 174012, 2019 WL 4930229 (C.D. Cal. Oct. 3, 2019)* (finding lack of jurisdiction **[*11]** over an out-of-state defendant in connection with unsolicited emails sent to the plaintiff by in-state, third-party advertising affiliates where the affiliates "controlled all aspects of transmitting the emails and [made] fundamental decisions concerning the emails themselves, including choosing each email's recipient"); *Zoobuh, Inc. v. Williams, No. 2:13-CV-791-TS, 2014 U.S. Dist. LEXIS 175737, 2014 WL 7261786 (D. Utah Dec. 18, 2014)* (finding no purposeful direction in very similar circumstances)[5]; *see also Ziegler v. Indian River Cty., 64 F.3d 470, 473 (9th Cir. 1995)*. In light of (1) the nature of the conduct pleaded in this matter—an unsolicited call made to Wisconsin by or at the direction of VAD, a California corporation, and (2) the declarations of Northcoast and Sunpath executives decisively disavowing any involvement in the marketing practices of VAD, Born has failed to make a prima facie showing that either Northcoast or Sunpath has purposefully directed its activities towards the California forum.

Perhaps recognizing that he fails to show purposeful direction by the moving defendants, Born submits two far more creative theories of personal jurisdiction that ignore purposeful direction and instead are founded on (1) purposeful availment and (2) agency. Specifically, Born argues that Sunpath **[*12]** and Northcoast availed themselves of the benefits, privileges, and protections of doing business in California by entering into an agreement with VAD, and alternatively that VAD is the agent of Sunpath and Northcoast, such that VAD's California contacts should be imputed to Sunpath and Northcoast as principals. (Opp. at 7-16.) Therefore, Born asserts, under either theory this Court may exercise jurisdiction over Sunpath and Northcoast. The Court has considered all of Born's arguments suggesting that the jurisdictional inquiry in this matter should extend beyond the obviously applicable purposeful direction analysis — none is persuasive.

First, binding Ninth Circuit precedent treats the purposeful direction and availment inquiries as distinct and appropriately applied under different circumstances.

---

[5] Importantly, in both *Durward* and *Zoobuh*, the plaintiffs were forum domiciliaries, meaning the connection between the defendants' alleged conduct, the harm suffered, and the forum was much stronger than that here. *See Durward, 2019 U.S. Dist. LEXIS 174012, 2019 WL 4930229 at *1*; *Zoobuh, 2014 U.S. Dist. LEXIS 175737, 2014 WL 7261786, at *1*.

2020 U.S. Dist. LEXIS 89220, *12

*See, e.g., In re Boon Glob. Ltd., 923 F.3d 643, 651 (9th Cir. 2019); Pakootas v. Teck Cominco Metals, Ltd., 905 F.3d 565, 577 (9th Cir. 2018),* cert. denied sub nom. *Teck Metals Ltd. v. Confederated Tribes of the Colville Reservation,* 139 S. Ct. 2693, 204 L. Ed. 2d 1091 (2019); *HK China Grp., Inc. v. Beijing United Auto. & Motorcycle Mfg. Corp., 417 F. App'x 664 (9th Cir. 2011)* (emphasizing the importance of applying the more applicable of the two analyses); *Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1149 (9th Cir. 2017)* (same). This case sounds in tort and Born presents no convincing reason to depart from the well-established rule that purposeful direction is the relevant analysis.

Second, while Born presents three alternative agency theories under which he argues that VAD's California contacts should **[\*13]** be attributed to Sunpath and Northcoast[6], none addresses the key element lacking here, namely, the principal's right of control. *See Williams v. Yamaha Motor Co., 851 F.3d 1015, 1024-25 (9th Cir. 2017)* (even assuming the relevance of agency to a specific jurisdiction analysis, "under any standard for finding an agency relationship, the [principal] must have the right to substantially control its [agent's] activities." (emphasis added)). *Cf. Delacruz v. Serv. Corp. Int'l, No. 1:18-cv-00154-LJO-EPG, 2018 U.S. Dist. LEXIS 84172, 2018 WL 2287962, at \*7 (E.D. Cal. May 18, 2018)* (failure to show substantial control doomed agency theory for imputing forum contacts of agent to principal); *AirWair Int'l Ltd. v. Pull & Bear Espana SA,* No. 19-CV-07641-SI, 020 U.S. Dist. LEXIS 78158, 2020 WL 2113833, at \*4 (N.D. Cal. May 4, 2020) (same); *Page v. Minnesota Life Ins. Co., No. SACV 18-01208 AG (KESx), 2019 U.S. Dist. LEXIS 43993, 2019 WL 3059561, at \*5 (C.D. Cal. Mar. 11, 2019)* (same). Because Born has failed to show that Sunpath and Northcoast exercise any control over VAD's activities, his agency theory does not confer specific jurisdiction.

**B. Request to Conduct Jurisdictional Discovery**

Born requests that if the Court is inclined to grant the instant Motion, he first be afforded an opportunity to conduct jurisdictional discovery on the subject of Defendants' contacts with California. (Opp. at 19-20.)

"A district court is vested with broad discretion to permit or deny [jurisdictional] discovery." *Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1093 (9th Cir. 2003).*

Jurisdictional discovery need not be allowed **[\*14]** if the request amounts merely to a "fishing expedition," *Johnson v. Mitchell, No. CIV S-10-1968 GEB GGH PS, 2012 U.S. Dist. LEXIS 65934, 2012 WL 1657643, \*7 (E.D. Cal. May 10, 2012),* or is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing, 539 F.3d 1011, 1020 (9th Cir. 2008).* Rather, the party seeking jurisdictional discovery must make at least a "colorable" showing that jurisdiction exists. *Mitan v. Feeney, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007).* Born has not made such a colorable showing. Rather, based on the facts already presented, it is clear that this Court lacks personal jurisdiction over Northcoast and Sunpath, regardless of the answers to the further jurisdictional questions Born proposes (*see* Opp. at 19-20.) Therefore, his request is DENIED

**IV. CONCLUSION**[7]

For the foregoing reasons, Born has failed to make out a prima facie showing of jurisdictional facts to withstand Defendants' Motion. Accordingly, the Motion is GRANTED. Northcoast and Sunpath are DISMISSED from this action.

---

[6] Born argues agency via (1) actual authority; (2) apparent authority; and (3) ratification. (Opp. at 10-16.)

[7] Because the Court holds that Born has not satisfied the first prong of the applicable specific jurisdiction analysis, it does not reach the parties' arguments on the remaining two prongs, whether the claim arises out of or relates to the Defendants' forum-related activities and whether the exercise of jurisdiction would comport with the notions of fair play and substantial justice, or in other words, be reasonable. (*See* Opp. at 16-18; Reply at 15-21.)

Patricia O'Neill

## *Hudnall v. State Bar of Ga.*

United States District Court for the Western District of Texas, El Paso Division

June 18, 2016, Decided; June 18, 2016, Filed

EP-15-CV-364-KC

**Reporter**

2016 U.S. Dist. LEXIS 79663 *

ROBERT KENNETH HUDNALL, Plaintiff, v. STATE BAR OF GEORGIA, Defendant.

**Prior History:** *In re Hudnall, 259 Ga. 247, 379 S.E.2d 517, 1989 Ga. LEXIS 229 (1989)*

**Counsel:** **[*1]** For ROBERT KENNETH HUDNALL, Plaintiff: Richard Deck, LEAD ATTORNEY, Law Office of Richard Deck, El Paso, TX.

For STATE BAR OF GEORGIA, Defendant: Patrick N. Arndt, Robert L. Goldstucker, LEAD ATTORNEYS, Nall & Miller, LLP, Atlanta, GA; Henry J. Paoli, Scott, Hulse, Marshall, Feuille, Finger, Thurmond, El Paso, TX.

**Judges:** KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KATHLEEN CARDONE

# Opinion

## ORDER

On this day, the Court considered Defendant's Brief Concerning Jurisdiction in Response to Court Order and Motion to Dismiss Pursuant to *Rule 12(b)(2)* ("Motion to Dismiss"), ECF No. 9, and Plaintiff's Motion for Declaratory Judgment, ECF No. 11. For the following reasons, the Motion to Dismiss is **GRANTED**, and the Motion for Declaratory Judgment is **DENIED** as moot.

## I. BACKGROUND

This case has its origin in disciplinary proceedings that culminated in the Supreme Court of Georgia's decision, in 1989, to accept Plaintiff's application for voluntary surrender of his license to practice law in the State of Georgia. *See In re Hudnall, 259 Ga. 247, 379 S.E.2d 517 (1989)*; Am. Pet. 5, 19, Notice of Removal Ex. No. 1, ECF No. 1-1.[1] The Supreme Court of Georgia stated that Plaintiff had "petitioned for voluntary surrender of his license to practice law in the State of Georgia," and upon **[*2]** accepting Plaintiff's application, noted that Plaintiff was effectively disbarred in Georgia. *See In re Hudnall, 259 Ga. at 247*. According to Defendant, the disciplinary proceedings against Plaintiff were "conducted pursuant to the Rules and Regulations for the Organization and Government of the State Bar of Georgia," and were "undertaken as part of the disciplinary process set forth by the Supreme Court of Georgia in the Georgia Rules of Professional Conduct." Aff. of Paula J. Frederick ("Frederick Aff.") 3, Mot. to Dismiss Ex. No. 2, ECF No. 9-2.[2]

According to Plaintiff, a citizen of Texas, a document entitled "Petition for Voluntary Surrender of License" ("Petition for Voluntary Surrender"), which the Supreme Court of Georgia relied upon in accepting Plaintiff's application for surrender of his license, contains a forgery of his signature. *See, e.g.*, Am. Pet. 4-5, 8-9.

---

[1] For clarity in citing to the Amended Petition, the Court cites to the page numbers provided by the Court's electronic docketing system.

[2] When deciding a motion to dismiss for lack of personal jurisdiction, the Court is not limited to considering the allegations in the complaint, but may also consider contents of the record. *See Hazim v. Schiel & Denver Book Publishers, No. 15-20586, 647 Fed. Appx. 455, 2016 U.S. App. LEXIS 8321, 2016 WL 2609772, at *1 (5th Cir. May 5, 2016)*.

2016 U.S. Dist. LEXIS 79663, *2

The Petition for **[*3]** Voluntary Surrender, filed in the Supreme Court of Georgia on February 9, 1989, states: "Robert K. Hudnall, Respondent in the above-captioned matters, and pursuant to Bar Rule 4-212(d) files . . . his Petition for Voluntary Surrender of License with the Special Master for the State Bar of Georgia, after the issuance of Formal Complaints . . . ." *See* Pet. for Voluntary Surrender 49, 88, Notice of Removal Ex. No. 1, ECF No. 1-1.[3] The Petition recounts a series of wrongdoings Plaintiff committed in violation of State Bar of Georgia Rules, and concludes by stating: "[Plaintiff] respectfully submits that the appropriate discipline to be imposed under the circumstances is to accept [Plaintiff]'s Petition for Voluntary Surrender of License," and that Plaintiff "prays that this Petition for Voluntary Surrender of License be accepted by the Special Master, Review Panel and Supreme Court of Georgia." *Id.* at 88. Although the Petition for Voluntary Surrender is dated January 30, 1989, and signed by "Robert K. Hudnall, Respondent," Plaintiff maintains that this signature is not his, and that he never signed the Petition for Voluntary Surrender. *See id.; see, e.g.*, Am. Pet. 4-5.

Plaintiff alleges that for over twenty-five years, Defendant "has stalked him across the country causing him to be terminated from numerous positions and denied the opportunity for entry into other Bars." Am. Pet. 37. According to Plaintiff, at some point, Defendant distributed the Petition for Voluntary Surrender to the United States Attorney in El Paso, Texas, and to the Assistant Attorney General of Texas. *See, e.g., id.* at 40. The Petition for Voluntary Surrender, according to Plaintiff, was "the reason he was denied a federal position since it was the opinion of the Assistant U.S. Attorney in El Paso that due to this alleged confession[,] Plaintiff could not pass a background check." *Id.* at 43.

Defendant states that the Petition for Voluntary Surrender "is a public document that is part of the record in [Plaintiff's] disciplinary case at the Supreme Court of Georgia." Frederick Aff. 2. Further, "[a]ny individual or entity could obtain the record by requesting it from the Clerk of the Supreme Court [of Georgia]." *Id.* Defendant states that it "does not, on its own volition, send disciplinary information **[*5]** about any member or former member to anyone."[4] *Id.* Instead, Defendant

"provide[s] information in response to requests from individuals or entities." *Id.* Defendant usually receives such requests when a member or former member of the State Bar of Georgia seeks admission to the bar of another state, or has applied for a position which requires the member or former member "to provide a disciplinary history." *Id.* In the event Defendant were to receive a request regarding Plaintiff, Defendant "would provide a copy of the Order accepting Plaintiff's voluntary surrender of license," and would also provide the Petition for Voluntary Surrender if a requesting party asked for the document. *Id.* at 2-3.

On October 8, 2015, Plaintiff filed his Amended Petition in the 171st District Court of El Paso County, Texas. *See* Am. Pet. 3. Through his Amended Petition, Plaintiff brought three causes of action against Defendant State Bar of Georgia, including **[*6]** defamation, stalking, and denial of rights under color of law. *See id.* at 39-45. Defendant removed the case to this Court on December 3, 2015, on the basis of federal question and diversity jurisdiction. *See* Notice of Removal, ECF No. 1; *see also* Mot. to Dismiss 9 (stating that the Court has jurisdiction over Plaintiff's state law claims for stalking based on diversity jurisdiction). Defendant filed its Motion to Dismiss on February 29, 2016, alleging, among other things, that the Court lacks personal jurisdiction over Defendant. *See* Mot. to Dismiss. Plaintiff filed his Motion for Declaratory Judgment on March 15, 2016. *See* Mot. for Decl. J.

## II. DISCUSSION

### A. Standard

A district court may exercise personal jurisdiction over a nonresident defendant if: "(1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution." *Clemens v. McNamee, 615 F.3d 374, 378 (5th Cir. 2010)*. Because Texas's long-arm statute extends to the limits of due process, the Court's inquiry is limited to whether exercising personal jurisdiction over the defendant offends due process.

---

[3] For clarity in citing to the Petition for **[*4]** Voluntary Surrender, the Court cites to the page numbers provided by the Court's electronic docketing system.

[4] The only exception, not relevant here, is when a member of

the State Bar of Georgia who is being investigated is also a member of another state's bar, in which case Defendant "would notify the sister state so that it could do a reciprocal discipline case." Frederick Aff. 2 n.1.

*Pervasive Software, Inc. v. Lexware GmbH & Co. KG, 688 F.3d 214, 220 (5th Cir. 2012)* (citations omitted); *Clemens, 615 F.3d at 378*; *Stroman Realty, Inc. v. Antt, 528 F.3d 382, 385 (5th Cir. 2008)*.

A court's exercise **[*7]** of personal jurisdiction over a nonresident defendant comports with due process requirements when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Clemens, 615 F.3d at 378*. Two types of contacts may satisfy the "minimum contacts" requirement: contacts that give rise to specific jurisdiction and those that give rise to general jurisdiction. *Id*. Specific jurisdiction arises when the defendant has "purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id. at 379* (internal quotation marks omitted) (alteration in original) (quoting *Burger King v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))*. In contrast, general jurisdiction exists "only where a defendant maintains 'continuous and systematic' contacts with the forum state." *Herman v. Cataphora, Inc., 730 F.3d 460, 464 (5th Cir. 2013)* (quoting *Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir. 1990))*.

The plaintiff bears the burden of establishing that the court may exercise personal jurisdiction over the nonresident defendant. *Clemens, 615 F.3d at 378*. If the court rules on personal jurisdiction without holding an evidentiary **[*8]** hearing, the plaintiff need only establish a prima facie case of personal jurisdiction. *Hazim v. Schiel & Denver Book Publishers, No. 15-20586, 647 Fed. Appx. 455, 2016 U.S. App. LEXIS 8321, 2016 WL 2609772, at *1 (5th Cir. May 5, 2016)* (citation omitted). The court "must accept the plaintiff's uncontroverted allegations as true, and resolve in his favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Clemens, 615 F.3d at 378* (citing *Revell v. Lidov, 317 F.3d 467, 469 (5th Cir. 2002))*. Further, the court "is not obligated to consult only the assertions in the plaintiff's complaint in determining whether a *prima facie* case for jurisdiction has been made," but may also "consider the contents of the record at the time of the motion." *Hazim, 2016 U.S. App. LEXIS 8321, 2016 WL 2609772, at *1* (citation omitted).

**B. Personal Jurisdiction**

Defendant argues that the Court should dismiss Plaintiff's case because the Court lacks personal jurisdiction over Defendant. *See* Mot. to Dismiss 6-8. Specifically, Defendant asserts that it does not have sufficient minimum contacts with Texas, and that the Court's exercise of personal jurisdiction over Defendant would offend traditional notions of fair play and substantial justice. *See id.* at 7, 11-14. With respect to the first requirement—that Defendant has sufficient minimum contacts with Texas—Plaintiff does not assert that Defendant has minimum contacts giving rise to general jurisdiction, but **[*9]** instead appears to argue that the Court may exercise specific jurisdiction over Defendant. *See* Resp. 8-10, ECF No. 12. Thus, the Court addresses whether Defendant has established minimum contacts giving rise to specific jurisdiction only.

**1. Specific Jurisdiction**

According to Defendant, the Court lacks jurisdiction over Defendant because its only contact with Texas is its act of providing a publicly available document to government officials in Texas who requested the document. Mot. to Dismiss 12. This contact, Defendant argues, "is the very definition of 'random, isolated, or fortuitous.'" *Id.* Moreover, Defendant asserts that "as an arm of the Georgia Supreme Court tasked with regulating the legal profession in Georgia, [it] sought no 'benefit, advantage, or profit'" when it provided the Petition for Voluntary Surrender to officials in Texas who requested the document. *Id.* Defendant also notes that it has no offices in Texas, conducts no business in Texas, and has contact with Texas only when a person or entity requests information from Defendant. *Id.* Defendant argues that as a result, it "could not reasonably anticipate being sued in Texas based on its conduct." *Id.*

For the Court to **[*10]** exercise personal jurisdiction over a nonresident defendant, the nonresident defendant must have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King, 471 U.S. at 472* (alteration in original) (citation omitted). Thus, "[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,    U.S.   , 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 1 (2014)* (internal quotation marks omitted) (quoting *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)* (citations omitted)). For a court to exercise specific jurisdiction, "[f]irst, the relationship must arise out of contacts that

the 'defendant *himself*' creates with the forum State." *Id. at 1122* (quoting *Burger King, 471 U.S. at 475*). Such "contacts must have been *purposefully established* by the defendant." *Pervasive Software, 688 F.3d at 227* (citation omitted); *see Christian Tours, Inc. v. Homeric Tours, Inc., 239 F.3d 366*, [published in full-text format at *2000 U.S. App. LEXIS 39119*] 2000 WL 1741614, at *1 (5th Cir. Nov. 13, 2000). And, "[a] court does not acquire jurisdiction over a defendant as the result of unilateral activities by another person." *Caldwell v. Palmetto State Sav. Bank of S.C., 811 F.2d 916, 918 (5th Cir. 1987)*. Requiring that the defendant himself create the contacts with the forum state "ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third person." *Burger King, 471 U.S. at 475* (internal quotation marks omitted) (quoting *Keeton, 465 U.S. at 774*; *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*; *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 299, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980))*.

Second, the court examines "the defendant's **[\*11]** contacts with the forum State itself," and not merely "the defendant's contacts with persons who reside there." *Walden, 134 S. Ct. at 1122* (citing *Hanson v. Denckla, 357 U.S. 235, 251, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)*; *Int'l Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*); *see Walden, 134 S. Ct. at 1124* (explaining that in *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*, the Court "examined the various contacts the defendants had created with [the forum state] (and not just with the plaintiff)"). Thus, the Supreme Court has upheld a court's exercise of specific jurisdiction where defendants "have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State, . . . or by circulating magazines to 'deliberately exploi[t]' a market in the forum State[.]" *Walden, 134 S. Ct. at 1122* (first and third alterations in original) (citations omitted).

However, a nonresident defendant's "relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id. at 1123*. Instead, "the defendant's conduct . . . must form the necessary connection with the forum State," and must "connect[] him to the forum in a meaningful way." *Id. at 1122, 1125*. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts **[\*12]** he makes by interacting with

other persons affiliated with the State." *Id. at 1123* (quoting *Burger King, 471 U.S. at 475*). Additionally, while "physical presence in the forum is not a prerequisite to jurisdiction, . . . physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id. at 1122* (citations omitted).

Although even "a single act directed at the forum" may give rise to specific jurisdiction, *Herman, 730 F.3d at 464* (quoting *Bullion, 895 F.2d at 216*), it is nonetheless imperative "that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws," *Clemens, 615 F.3d at 379* (citing *Hanson, 357 U.S. at 253*). Courts reason that when a nonresident defendant's purposefully directed "activities are shielded by the benefits and protections of the forum's laws[,] it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *El Paso Healthcare Sys., Ltd. v. Molina Healthcare of N.M., Inc., Civil Action No. 3:09-CV-54-KC, 2009 U.S. Dist. LEXIS 125546, 2009 WL 1743221, at \*4 (W.D. Tex. May 1, 2009)* (quoting *Burger King, 471 U.S. at 474*); *see Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 292 (1st Cir. 1999)* (noting that in determining whether defendant purposefully availed himself of the privilege of conducting activities in forum state, **[\*13]** court must consider "whether the defendant benefitted from those contacts in a way that made jurisdiction foreseeable," even if "defendant's contacts with the forum are deemed voluntary").

In this case, Defendant's only relevant contacts with Texas, from which Plaintiff's causes of action arise, are Defendant's sending the Petition for Voluntary Surrender to the United States Attorney in El Paso, Texas, and to the Assistant Attorney General of Texas. *See* Am. Pet. 38. Thus, the Court must discern whether Defendant's sending the Petition for Voluntary Surrender to these two individuals constituted Defendant's purposeful availment such that Defendant could have reasonably anticipated being haled into a Texas court as a result of these acts. *See Herman, 730 F.3d at 464* (quoting *Clemens, 615 F.3d at 379*).

Plaintiff has not met his burden of establishing that the Court may exercise personal jurisdiction over Defendant. Plaintiff has failed to make a prima facie showing that Defendant has minimum contacts with Texas giving rise to specific jurisdiction. First, it is relevant to the Court's inquiry that, although Defendant

2016 U.S. Dist. LEXIS 79663, *13

sent the Petition for Voluntary Surrender inside Texas to the United States Attorney in El Paso and the Assistant Attorney [*14] General of Texas, Defendant did not "purposefully" initiate these contacts with Texas. *See Walden, 134 S. Ct. at 1122*. Defendant presented evidence establishing that it sends the Petition for Voluntary Surrender, which is a public document, only to individuals or entities that request it. *See* Frederick Aff. 2-3. Defendant, therefore, only sent the Petition for Voluntary Surrender to the United States Attorney in El Paso and the Assistant Attorney General of Texas because these individuals requested the document. *See id.;* Mot. to Dismiss 11-12. Plaintiff does not dispute this evidence, and does not argue that Defendant sent the Petition for Voluntary Surrender on its own initiative. *See* Resp. ¶ 23 (stating only that if the potential employers did request the document, "[P]laintiff is entitled to see the written request on official stationary [sic]"). For this reason, Defendant's contacts, which arose only in response to a request by third persons located in Texas, do not constitute purposeful availment. *See Rodi v. S. New England Sch. of Law, 255 F. Supp. 2d 346, 350-51 (D. N.J. 2003)* (finding no purposeful availment where Plaintiff relied on two correspondences Defendant mailed into forum state in response to Plaintiff's actions, including sending request for information to Defendant); *Christian Tours, 2000 U.S. App. LEXIS 39119, 2000 WL 1741614, at *1*; *see also [*15] Thomas v. Kadish, 748 F.2d 276, 282-83 (5th Cir. 1984)* (noting that basing personal jurisdiction upon letter, not claimed by plaintiff to be defamatory, and written by one defendant "in response to a request from the Texas state bar initiated by [plaintiff] himself," was insufficient to establish minimum contacts for plaintiff's claim that defendants conspired to create record against him).

"Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *See Walden, 134 S. Ct. at 1123* (quoting *Burger King, 471 U.S. at 475*). Here, Defendant could not reasonably expect to be haled into court in any state in which it sends a public document, based on the mere fortuity that the requesting party is located in that state. *See id.* To do so would be to allow a court to exercise personal jurisdiction over Defendant in any forum where Plaintiff happens to seek employment.

Plaintiff relies upon Defendant's sending of the Petition for Voluntary Surrender to two individuals inside Texas;

however, these acts constitute two isolated contacts with individuals inside Texas resulting from Defendant's adherence to a routine [*16] request for a publicly available document. *See* Frederick Aff. 1-2. Defendant's contacts are significantly more limited in scope than the contacts of "defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State, . . . or by circulating magazines to 'deliberately exploi[t]' a market in the forum State[.]" *Walden, 134 S. Ct. at 1122* (first and third alterations in original) (citations omitted). Defendant's contacts with Texas—forwarding a public document in response to a standard request from two employers considering hiring a former member of the Georgia Bar—are too attenuated for Defendant to have had "fair warning" that it would be subject "to the jurisdiction of a foreign sovereign." *See Burger King, 471 U.S. at 472*. Thus, Defendant's acts do not establish sufficient contact with Texas because Defendant's conduct does not "connect[ it] to the forum in a meaningful way." *See id. at 1125*.

Furthermore, Defendant argues that sending the Petition for Voluntary Surrender to two individuals in Texas is not an invocation of the benefits and protections of the laws of Texas, and that it sought no "benefit, advantage, or profit" [*17] by forwarding the document. *See* Mot. to Dismiss 12. The Court finds this argument persuasive: when a state bar reactively sends out requested notices in a ministerial fashion, it does not appear to be acting purposefully, nor is it seeking any benefits or protections from this forum state.

Moreover, this is not the first time that Plaintiff has litigated this issue. In 1994, Plaintiff sued Defendant in New Mexico, alleging that Defendant "interfered with his admission into the Bar of New Mexico and thus availed itself of the legal system of th[e] State." Mem. Op. at 1, 4, *Hudnall v. State Bar of Ga., Civ. No. 94-409-HB, 1994 U.S. Dist. LEXIS 22088 (D. N.M. Dec. 5, 1994)*, ECF No. 86. The District of New Mexico dismissed the case against Defendant for lack of personal jurisdiction, explaining that Plaintiff had "not shown any act by which Defendant State Bar of Georgia purposefully availed itself of the privilege of conducting activities within th[e] State." *Id.* at 5. Likewise, in the instant case, Plaintiff has not met his burden of demonstrating that there are acts by which Defendant "purposefully avail[ed itself] of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." [*18] *See Clemens, 615 F.3d at 378*; *cf. Burger King, 471 U.S. at 478-80* (holding that nonresident

2016 U.S. Dist. LEXIS 79663, *18

defendant franchisees had purposefully availed themselves of benefits and protections of forum state's law, by entering into "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in [forum state]"). The Court concludes that Defendant has not invoked the benefits and protections of the laws of Texas.

Plaintiff relies exclusively on *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*, as a basis for the Court's exercise of personal jurisdiction over Defendant. *See* Resp. 7-10. According to Plaintiff, Defendant aimed its tortious conduct at him, knowing the brunt of Plaintiff's injury would be felt in Texas, as Plaintiff is a Texas resident. *See id.* In *Calder*, a California plaintiff brought a libel suit in a California state court against a reporter and editor who worked for the National Enquirer. *Calder, 465 U.S. at 784-85*. The plaintiff's claims were based on an article the defendants wrote and edited in Florida for publication in the National Enquirer. *See id.* The National Enquirer, a national weekly newspaper, was headquartered in Florida, but circulated approximately 600,000 copies in California. *See id. at 785*.

The Court found the defendants' contacts with the forum state **[*19]** were "ample":

> The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff in that State . . . . [T]he reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff.

*Walden, 134 S. Ct. at 1123-25*.

As the Supreme Court recently explained, "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." *Walden, 134 S. Ct. at 1125*. Moreover, even if the plaintiff suffered harm in the forum state and the defendant was aware of the likelihood of such damage in the forum state, the Fifth Circuit has held that under *Calder*, specific jurisdiction does not exist in a defamation case unless the plaintiff shows "the subject matter of and . . . the sources relied upon for the article were in the forum state." *See Clemens, 615 F.3d at 379-80* (quoting *Revell, 317 F.3d at 469*). Thus, "[t]o support personal jurisdiction against the defaming defendant," *Calder* requires that the forum state be the "focal point" of the defamatory content. **[*20]** *Id. at 379* (quoting *Calder, 465 U.S. at 788-89*); *see Herman, 730 F.3d at 465* ("A plaintiff's suffering damage in the forum state is part of the calculus, but for minimum contacts to be present the allegedly defamatory statements must be adequately directed at the forum state.").

*Calder* does not support this Court's exercise of personal jurisdiction over Defendant. First, the fact that Plaintiff was injured in Texas is insufficient on its own to establish Defendant's minimum contacts with Texas. *See Walden, 134 S. Ct. at 1125*. Second, Plaintiff fails to establish, let alone argue, that Texas is the "focal point" of the defamatory content. *See generally* Resp. Instead, the subject matter of the Petition for Voluntary Surrender centers on Plaintiff's conduct in Georgia while he was a member of the State Bar of Georgia. *See, e.g.*, Pet. for Voluntary Surrender 50-55, 59-74, 77-78. The subject matter "did not concern activity in Texas; nor [was it] made in Texas or directed to Texas residents any more than residents of any other state." *See Clemens, 615 F.3d at 380*. Thus, the focal point of the allegedly defamatory content is Georgia, not Texas. *See id.; Revell, 317 F.3d at 473* (finding Texas was not focal point of defamatory statement sufficient to establish minimum contacts under *Calder* because article contained "no **[*21]** reference to Texas," did not "refer to the Texas activities of [plaintiff]," and "was not directed at Texas readers as distinguished from readers in other states"). Because Plaintiff fails to establish sufficient contacts between Defendant and Texas, *Calder* does not support this Court's exercise of personal jurisdiction over Defendant, even if Plaintiff suffered harm in Texas and Defendant was aware of the likelihood of such damage in Texas. *See Clemens, 615 F.3d at 379-80; Revell, 317 F.3d at 473*.

Accepting Plaintiff's uncontroverted allegations as true, and resolving in his favor any conflicts between facts in the record, Plaintiff has failed to meet his burden of making a prima facie case of personal jurisdiction. *See Hazim, 2016 U.S. App. LEXIS 8321, 2016 WL 2609772, at *1; Clemens, 615 F.3d at 378*. Because Defendant did not "purposefully avail[] himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state," the Court need not decide whether exercising jurisdiction over Defendant offends traditional notions of fair play and substantial justice. *See Clemens, 615 F.3d at 378*. The Court may not exercise specific jurisdiction over Defendant because Defendant has not established the requisite minimum contacts, and exercising personal jurisdiction

Patricia O'Neill

2016 U.S. Dist. LEXIS 79663, *21

over Defendant would therefore offend **[*22]** due process. *See Pervasive Software, 688 F.3d at 220; Clemens, 615 F.3d at 379*. Accordingly, Plaintiff's claims against Defendant must be dismissed.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss, ECF No. 9, is **GRANTED**, and the case is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Declaratory Judgment, ECF No. 11, is **DENIED** as moot.

**SO ORDERED**.

**SIGNED this 18th day of June, 2016**.

/s/ Kathleen Cardone

KATHLEEN CARDONE

UNITED STATES DISTRICT JUDGE

_____

**End of Document**

Patricia O'Neill

## *Lander v. Larocque*

United States District Court for the Eastern District of Texas, Sherman Division

November 6, 2019, Decided; November 6, 2019, Filed

CIVIL ACTION NO. 4:18-CV-00811-ALM-CAN

**Reporter**

2019 U.S. Dist. LEXIS 212460 *; 2019 WL 6718957

PETER E. LANDER, Plaintiff, v. GLORIA LAROCQUE, ET AL., Defendants.

**Subsequent History:** Adopted by, Dismissed by, Without prejudice, Dismissed by *Lander v. Larocque, 2019 U.S. Dist. LEXIS 212127 (E.D. Tex., Dec. 10, 2019)*

**Prior History:** *Lander v. Larocque, 2019 U.S. Dist. LEXIS 122509 (E.D. Tex., June 19, 2019)*

**Counsel: [*1]** Peter E. Lander, Plaintiff, Pro se, Plano, TX.

For Oswald Walsh, Joan Commodore, Justice Bernie Stephenson, Defendants: Julia M Haines, LEAD ATTORNEY, Jeffrey David Anderson, Holland & Knight LLP - Houston, Houston, TX.

**Judges:** Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Christine A. Nowak

## Opinion

### AMENDED REPORT AND RECOMMENDATION OF

### UNITED STATES MAGISTRATE JUDGE

Pending before the Court are Defendants Government of Dominica, Levi A. Peter, Oswald Walsh, Justice Bernie Stephenson, and Joan Commodore's Motion to Dismiss [Dkt. 32] and Supplement [Dkt. 35] (collectively, "Motion to Dismiss"). After considering the Motion to Dismiss [Dkts. 32, 35] and all other relevant filings, the Court recommends the Motion to Dismiss be **GRANTED** and Plaintiff's case be dismissed for lack of jurisdiction, as set forth herein.[1]

### RELEVANT BACKGROUND

On November 13, 2018, Plaintiff filed the instant suit against Defendants Gloria LaRocque, Anthony Commodore, Oswald Walsh, Joan Commodore, Peter Joseph, Justice Bernie Stephenson, the Government of Dominica, and Levi A. Peter [Dkt. 1]. Plaintiff filed an Amended Complaint six days later [Dkt. 3]. Plaintiff seeks money damages against all Defendants except Justice Stephenson **[*2]** [Dkt. 3 at 23-25]. Plaintiff asks for this court to "'admonish' Justice Bernie Stephenson and advice [sic] the OECS Judiciary that Justice Bernie Stephenson may no longer be capable of carrying out her duties" [Dkt. 3 at 25].

On April 9, 2019, Defendants Levi A. Peter, the Government of Dominica, Oswald Walsh, Justice Stephenson, and Joan Commodore (herein, Walsh,

---

[1] The Court's initial Report and Recommendation incorrectly stated in its conclusion that the claims against the Dominica Defendants should be dismissed with prejudice [Dkt. 46]. While no objections were filed to the Report and Recommendation, the Court upon independent review identified the error. A dismissal on the basis of personal jurisdiction cannot result in dismissal with prejudice. *See Guidry v. U.S. Tobacco Co., Inc., 188 F.3d 619, 623 n.2 (5th Cir. 1999)*. Accordingly, this Amended Report and Recommendation is entered to correct such error and to clarify that the claims against the Dominica Defendants are dismissed for lack of personal jurisdiction without prejudice.

2019 U.S. Dist. LEXIS 212460, *2

Stephenson, and Joan Commodore are collectively referred to as "the Dominica Defendants") filed the instant Motion to Dismiss [Dkt. 32] and supplemented same on May 9, 2019 [Dkt. 35], seeking dismissal of Plaintiff's claims under *Rules 12(b)(1)*, *(2)*, *(4)*, *(5)*, and *(6)*. Specifically, the Dominica Defendants argue Plaintiff's claims must be dismissed because: (1) they have immunity under the Foreign Sovereign Immunities Act; (2) Plaintiff does not state a claim upon which relief can be granted; (3) Plaintiff lacks personal jurisdiction over the Dominica Defendants; and (4) Plaintiff failed to effect legally sufficient process and service of process [Dkt. 32 at 2]. Plaintiff filed a Response on May 10, 2019 [Dkt. 36]; the Dominica Defendants filed a Reply on May 16, 2019 [Dkt. 39]. Subsequently, on May 28, 2019, Plaintiff moved to nonsuit his claims against **[\*3]** the Government of Dominica and Levi A. Peter [Dkt. 41]. On July 2, 2019, an Order granting the nonsuit was entered [Dkt. 44]. Thus, the remaining Defendants in this cause are the Dominica Defendants, Gloria LaRocque, Anthony Commodore, and Peter Joseph.

**ANALYSIS**

*Subject Matter Jurisdiction*[2]

The Dominica Defendants move for dismissal under multiple *Rule 12* provisions; however, "[w]hen a *Rule 12(b)(1)* motion is filed in conjunction with other *Rule 12* motions, the court should consider the 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001)*. As such, the Court takes up first the arguments by the Dominica Defendants made under *Rule 12(b)(1)*, specifically whether the Foreign Sovereign Immunities Act bars Plaintiff's claims against the Dominica Defendants in their official capacity. *See Palmer v. Bone, No. 4:18-CV-422-ALM-CAN, 2019 U.S. Dist. LEXIS 111435, 2019 WL 2882053 (E.D. Tex. May*

*24, 2019)*; *report and recommendation adopted*, *No. 4:18-CV-422, 2019 U.S. Dist. LEXIS 111210, 2019 WL 2868923 (E.D. Tex. Jul. 3, 2019)* (Mazzant, J.) (analyzing whether sovereign immunity applied before reaching other *Rule 12(b)* motions).

*The Foreign Sovereign Immunities Act of 1976*

The Dominica Defendants argue that they are entitled to immunity from Plaintiff's claims in their official capacities under the *Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 et seq.* [Dkt. 32 at 2]. The issue **[\*4]** of sovereign immunity implicates the Court's subject matter jurisdiction. *Palmer, 2019 U.S. Dist. LEXIS 111435, 2019 WL 2882053, at \*5*. The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state. *Dale v. Colagiovanni, 443 F.3d 425, 427-28 (5th Cir. 2006)* (citing *Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-39, 109 S. Ct. 683, 102 L. Ed. 2d 818 (1989))*. "'The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts.'" *Id. at 428* (quoting *Byrd v. Corporacion Forestal y Industrial De Olancho S.A., 182 F.3d 380, 388 (5th Cir. 1999))*. However, in 2010, the Supreme Court unanimously decided in *Samantar v. Yousuf* that an individual foreign official is not a "foreign state" within the meaning of the FSIA, and therefore the immunity granted to foreign states under the FSIA does not extend to foreign officials.[3] *560 U.S. 305, 325, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010)* ("the Court of Appeals correctly held the FSIA does not govern [a foreign official's] claim of immunity."); *see also Jimenez v. United Mexican States, 978 F. Supp. 2d 720, 723 (S.D. Tex. Jul. 24, 2013)* ("Officials acting on behalf of a foreign state are not included in the FSIA's definition of a foreign state."). The Court in *Samantar* held that the FSIA does not deprive federal district courts of subject-matter jurisdiction with regard to claims against foreign officials. *Id.* Thus, because the Government of Dominica itself is no longer a party to this action and only the

---

[2] The parties do not dispute, and the Court finds that beyond the scope of the sovereign immunity issue, it has subject matter jurisdiction pursuant to *28 U.S.C. § 1331* because Plaintiff alleged several federal causes of action in his Original Petition [Dkt. 3 at 13]. Additionally, the parties do not dispute, and the Court finds that subject matter jurisdiction is also proper pursuant to *28 U.S.C. § 1332* because Plaintiff is a U.S. citizen domiciled in Texas and all remaining defendants are citizens of Dominica [Dkt. 3 at 6-7].

[3] The Dominica Defendants' only argument with respect to *Rule 12(b)(6)* is that the Plaintiff cannot recover on his claim because "the Dominica Government Defendants are a foreign sovereign with immunity" under the FSIA [Dkt. 32 at 7]. Because this argument is duplicative of the argument discussed by the Court in its analysis of *Rule 12(b)(1)*, the Court need not address its implications regarding *Rule 12(b)(6)* separately because the *Rule 12(b)(6)* Motion fails for the same reason.

2019 U.S. Dist. LEXIS 212460, *4

Dominica Defendants (who are foreign officials and not foreign states) seek to invoke the FSIA's immunity, the **[*5]** FSIA does not deprive this Court of subject-matter jurisdiction.

### Personal Jurisdiction

The Dominica Defendants also allege that the Court lacks personal jurisdiction over the Dominica Defendants [Dkt. 32 at 4]. _Federal Rule of Civil Procedure 12(b)(2)_ requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. "After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that _in personam_ jurisdiction exists." _Lahman v. Nationwide Provider Sols., No. 4:17-CV-00305, 2018 U.S. Dist. LEXIS 101757, 2018 WL 3035916, at *4 (E.D. Tex. June 19, 2018)_ (Mazzant, J.) (citing _Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)_ (citing _WNS, Inc. v. Farrow, 884 F.2d 200, 202 (5th Cir. 1989)))_. "To satisfy that burden, the party seeking to invoke the court's jurisdiction must 'present sufficient facts as to make out only a prima facie case supporting jurisdiction,' if a court rules on a motion without an evidentiary hearing." _Id._ (quoting _Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000))_. "When considering the motion to dismiss, '[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits.'" _Id._ (quoting _Int'l Truck & Engine Corp. v. Quintana, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003)_ (citing _Wyatt v. Kaplan, 686 F.2d 276, 282-83 n.13 (5th Cir. 1982))_; _accord Black v. Acme Mkts., Inc., 564 F.2d 681, 683 n.3 (5th Cir. 1977)_.

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction: (1) "[f]irst, absent a controlling federal statute regarding service of **[*6]** process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant;" and (2) "second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution." _Id._ (citing _Ham v. La Cienega Music Co., 4 F.3d 413, 415 (5th Cir. 1993)_). "The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution;" accordingly, "the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees." _Id._ (citing _Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc., 963 F.2d 90, 93 (5th Cir. 1992)_; _Bullion, 895 F.2d at 216_). "The _Due Process Clause_ permits the

exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" _Id._ (quoting _Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))_. "Minimum contacts with a forum state can be satisfied by contacts that give rise to either general jurisdiction or specific jurisdiction." _Id._ (citing _Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994))_.

### General Jurisdiction

"General jurisdiction exists only when the defendant's contacts with the forum state are so 'continuous and systematic' as to render them essentially at home in the forum State." _Lahman, 2018 U.S. Dist. LEXIS 101757, 2018 WL 3035916, at *5_ (quoting _Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)_ (quoting _Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011))_; **[*7]** citing _Cent. Freight Lines v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003)_ (citing _Helicopteros, 466 U.S. at 414 n.8_)). "Substantial, continuous and systematic contact with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum." _Id._ (citing _Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008))_. "The minimum contacts required to establish general jurisdiction are 'more extensive [in] quality and nature than those needed for specific jurisdiction.'" _Oldaker v. Johnson & Johnson, Inc., 3:13-CV-2159-O, 2013 U.S. Dist. LEXIS 202941, 2013 WL 12126260, at *4 (N.D. Tex. Nov. 20, 2013)_ (quoting _Choice Healthcare Inc. v. Kaiser Found. Health Plan of Colo., 615 F.3d 364, 368 (5th Cir. 2010)_ (citations omitted); citing _Busch v. Viacom Int'l, Inc., 477 F. Supp 2d 764, 773 (N.D. Tex. 2007)_ (citing cases establishing that "threshold contacts required for assertion of [general] jurisdiction are very substantial")). "To find general jurisdiction over the defendant, a defendant's contacts with the forum must be substantial; random, fortuitous, or attenuated contacts are not sufficient." _Id._ (quoting _Choice Healthcare, 615 F.3d at 368_). "Courts evaluate all of the defendant's contacts with the forum over a reasonable number of years, but 'vague and overgeneralized assertions' are insufficient to support general jurisdiction." _Id._ (quoting _Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 610 (5th Cir. 2008)_ (citing _Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717 (5th Cir. 1999)))_; _see also Lahman, 2018 U.S. Dist. LEXIS 101757, 2018 WL_

*3035916, at *5* ("[V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction.") (quoting *Johnston, 523 F.3d at 609*)).

"For an individual, the paradigm forum **[*8]** for the exercise of general jurisdiction is the individual's domicile." *Arrow Elecs., Inc. v. Fireracker, LLC, No. 4:17-CV-00895, 2018 U.S. Dist. LEXIS 61795, 2018 WL 1761883, at *2 (E.D. Tex. Apr. 12, 2018)* (Mazzant, J.) (quoting *Daimler, 571 U.S. at 127* (citing *Goodyear, 564 U.S. at 919*)); *see also Clement Grp., LLC v. ETD Servs., LLC, No. 4:16-CV-00773, 2017 U.S. Dist. LEXIS 107571, 2017 WL 2972877, at *3 (E.D. Tex. July 12, 2017)* (Mazzant, J.) (same); *Yasinosky v. River Oaks Farms Inc., No. 4:17-CV-214-A, 2017 U.S. Dist. LEXIS 97067, 2017 WL 2709736, at *2 (N.D. Tex. June 22, 2017)* (same).

### The Dominica Defendants

In the instant case, it is undisputed that each of the Dominica Defendants are domiciled in a foreign country other than the United States. Indeed, Plaintiff himself alleges that each of the Dominica Defendants reside and/or are employed in Dominica [Dkt. 3 at 6-7]. Plaintiff's pleadings make only the barest suggestion of any connection between the Dominica Defendants and the United States and no connection whatsoever with the state of Texas. Plaintiff alleges only that "[m]any of the people on the Caribbean Island hold Dual USA Citizenship or absentee USA permanent Resident Status" [Dkt. 36 at 24]. There are no facts on the present record demonstrating that any of the Dominica Defendants' contacts with Texas, if any, are continuous or systematic. Plaintiff's assertions are insufficient for Plaintiff to carry his burden; Plaintiff has not established **[*9]** that the Dominica Defendants are considered at "home" in Texas [Dkt. 36 at 10].[4] The Court may not exercise general personal jurisdiction

over the Dominica Defendants.

### Defendants Gloria LaRocque, Anthony Commodore and Peter Joseph

Like the Dominica Defendants, it is also undisputed that the three remaining Defendants Gloria LaRocque, Anthony Commodore, and Peter Joseph are citizens of Dominica. Plaintiff alleges Defendant LaRocque resides in the state of Washington. Anthony Commodore and Peter Joseph are purportedly domiciled in Dominica [Dkt. 3 at 6-7]. Although these Defendants did not join in the Dominica Defendants' Motion to Dismiss, under the present circumstances and because a judgment entered without personal jurisdiction is void, the court may raise the issue of personal jurisdiction as to them *sua sponte*.[5] *System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001)* (holding that the district court committed no error in raising the issue of personal jurisdiction *sua sponte*). In fact, although objections to personal jurisdiction must be raised in a timely fashion (*i.e.*, as a party's first pleading in the case) or they are waived, where, as in the present case, the defendant in question has not yet appeared for purposes of Federal *Rule 12(h)*, it **[*10]** cannot be said that such defendant failed to raise the issue. *Broadcast Music, Inc. v. M.T.S. Enterprises, Inc., 811 F.2d 278 (5th Cir. 1987)* (citing *Giannakos v. M/V BRAVO TRADER, 762 F.2d 1295, 1298 (5th Cir. 1985))* (holding that the court may raise the issue of personal jurisdiction *sua sponte* so long as the defendant has not waived such objection by failing to address it in their first pleading or appearance for purposes of *Rule 12(h)*). In each of Plaintiff's filings, including those responding directly to the Dominica Defendants' challenges to personal jurisdiction, the strongest connection advocated by Plaintiff between any of the Defendants and the United States is speculation that perhaps some of the Defendants hold dual citizenship or have "anchor babies" in the U.S. [Dkt. 36 at 24]. Whether LaRocque, Commodore, or Joseph live in Dominica, Washington,

---

[4] Plaintiff requests this Court to "command" the Defendants to disclose whether any of the Dominican Defendants are U.S. citizens or lawful residents because such information "changes the whole 'context' of the case" [Dkt. 36 at 24]. Because Plaintiff, not Defendants or the Court, has the burden of alleging such facts as necessary to rebut the Dominica Defendants' *Rule 12(b)(2)* motion, the Court declines to do so. *Lahman v. Nationwide Provider Sols., 2018 U.S. Dist. LEXIS 101757, 2018 WL 3035916, at *4 (citing *Bullion, 895 F.2d at 217* (citing *WNS, 884 F.2d at 202*)).

[5] The Court has recommended Plaintiff's Motion for Default Judgment be denied as to Defendant Gloria LaRocque; the Court could have also appropriately analyzed the personal jurisdiction issues discussed herein as to Defendant LaRocque in that recommendation. *See, e.g., System Pipe & Supply, Inc., 242 F.3d at 324* (holding that the court has an affirmative duty to evaluate personal jurisdiction before granting a default judgment but may *sua sponte* raise personal jurisdiction at any time unless the defendant has waived such arguments).

2019 U.S. Dist. LEXIS 212460, *10

or anywhere else, Plaintiff must allege such facts as demonstrate that each Defendant had contacts, not with any U.S. state, but specifically with the forum state of Texas, to satisfy the personal jurisdiction requirements. *See, e.g., Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006)* (requiring the plaintiff to establish that the defendant had minimum contacts sufficient for due process *with the forum state*). Plaintiff has failed to do so. As such, general jurisdiction does not exist over Defendants Gloria LaRocque, Anthony **[*11]** Commodore, or Peter Joseph.

### *Specific Jurisdiction*

"Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state." *Lahman, 2018 U.S. Dist. LEXIS 101757, 2018 WL 3035916, at *5* (citing *Helicopteros, 466 U.S. at 414 n.8*). "For the Court to exercise specific jurisdiction, the Court must determine[:] '(1) whether the defendant has. . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.'" *Id.* (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374, 378 (5th Cir. 2002)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))).* Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Id.* (quoting *Burger King Corp., 471 U.S. at 475* (citing *Travelers Health Assoc. v. Virginia, 339 U.S. 643, 647, 70 S. Ct. 927, 94 L. Ed. 1154 (1950))).* "Establishing a defendant's minimum contacts with the forum state requires contacts that are more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person.'" *Id.* (quoting *Burger King Corp., 471 U.S. at 475*).

### *The Dominica Defendants [*12]*

Plaintiff makes no allegations whatsoever that any of the Dominica Defendants purposely directed activities toward Texas or purposely availed themselves of the privileges of conducting activities in Texas. In fact, Plaintiff is explicitly suing the Dominica Defendants for actions they committed in Dominica, actions which were

to allegedly impact Plaintiff's rights under Dominican law. As far as the Court can tell, the Dominica Defendants' only forum-related contact of any relevance whatsoever is Plaintiff himself, and Plaintiff makes no attempt to argue that the exercise of personal jurisdiction would be just and reasonable in this case.[6]

Plaintiff's only remaining argument regarding personal jurisdiction is that "[t]he Court can assert Personal Jurisdiction as it has personal jurisdiction over Plaintiff and personal jurisdiction over one party gives it the right to exercise jurisdiction over all parties" [Dkt. 36 at 9-10]. However, this Court recognizes no such rule—the exercise of personal jurisdiction over a nonresident will only comply with due process principles if the minimum contacts, purposeful availment, and fairness prongs are satisfied. *See, e.g., Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir. 1990)*; *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*; *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (citing *Int'l Shoe, 326 U.S. at 316*). Thus, this **[*13]** Court finds that because Plaintiff failed to allege facts that would rebut the Dominica Defendants' *Rule 12(b)(2)* challenge to personal jurisdiction, this Court finds personal jurisdiction lacking as to those Defendants.[7]

### *Defendants Gloria LaRocque, Anthony Commodore and Peter Joseph*

As with its analysis of general personal jurisdiction above, the Court is obliged to raise *sua sponte* the issue of specific jurisdiction over the remaining Defendants.

---

[6] In fact, because Plaintiff himself complains of the time, effort, and expense it takes to travel between the U.S. and Dominica, Plaintiff is certainly aware of just how substantial such a burden would be on the Dominica Defendants.

[7] Because the Court finds that it does not have personal jurisdiction as to the Dominica Defendants or any of the remaining Defendants, it does not reach and finds it unnecessary to determine whether the Dominica Defendants were properly served. Additionally, even if the Court found that service was improper, the Court would most likely provide Plaintiff with additional chances to attempt to correct defects in service before dismissal on that basis. *See Styles v. McDonalds Rest., No. 4:17-CV-791, Dkt. 56 at 6, 2019 U.S. Dist. LEXIS 161499 (E.D. Tex. Jul. 24, 2019)* (Mazzant, J.) ("The Court rarely dismisses a case due to the failure to properly serve a defendant. On the occasions where the Court has granted dismissal for improper service, it was only after multiple chances were given").

Patricia O'Neill

2019 U.S. Dist. LEXIS 212460, *13

*Broadcast Music, Inc., 811 F.2d at 278* (citing *Giannakos, 762 F.2d at 1298*). As with the Dominica Defendants, Plaintiff does not attempt to provide any factual basis for connecting the facts of this case or the actions of Defendants Gloria LaRocque, Anthony Commodore, and Peter Joseph to the State of Texas. Because it is the Plaintiff's burden to allege such facts as necessary to establish jurisdiction, and because Plaintiff has failed to provide any facts connecting the actions of the remaining Defendants with the forum state, Plaintiff has failed to carry his burden with regard to specific jurisdiction over the remaining Defendants. *See, e.g., Lahman, 2018 U.S. Dist. LEXIS 101757, 2018 WL 3035916, at *5* (citing *Helicopteros, 466 U.S. at 414 n.8*). Thus, the Court likewise finds personal jurisdiction lacking as to the remaining Defendants.

**CONCLUSION AND RECOMMENDATION**

Based on the **[*14]** foregoing, the Court recommends that the Dominica Defendants' Motion to Dismiss [Dkts. 32; 35] be **GRANTED**, and Plaintiff's claims as to the Dominica Defendants be **DISMISSED** for lack of personal jurisdiction **WITHOUT PREJUDICE**. Additionally, the Court recommends that Plaintiff's claims as to the remaining Defendants also be **DISMISSED** for lack of personal jurisdiction **WITHOUT PREJUDICE**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. *28 U.S.C. § 636(b)(1)(C)*. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain **[*15]** error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996)* (en banc), *superseded by statute on other grounds*, *28 U.S.C. § 636(b)(1)* (extending the time to file objections

from ten to fourteen days).

**SIGNED this 6th day of November, 2019**.

/s/ Christine A. Nowak

Christine A. Nowak

UNITED STATES MAGISTRATE JUDGE

---

End of Document

## *Matheson Tri-Gas, Inc. v. FlexTM, Inc.*

United States District Court for the Southern District of Texas, Houston Division

May 24, 2018, Decided; May 24, 2018, Entered

CIVIL ACTION NO. 4:18-CV-0248

**Reporter**

2018 U.S. Dist. LEXIS 87195 *; 2018 WL 2363958

MATHESON TRI-GAS, INC., Plaintiff, v. FLEXTM, INC., Defendant.

**Counsel:** **[*1]** For Matheson Tri-Gas, Inc., Plaintiff: Jeffrey S. Davis, Jill Megan Hale, Foley Gardere, Houston, TX; Philip James Morgan, Husch Blackwell, LLP, Houston, TX.

For FlexTM, Inc., Defendant: Robert G Smith, Jr, Lorance Thompson PC, Houston, TX.

**Judges:** NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** NANCY F. ATLAS

## Opinion

### MEMORANDUM AND ORDER

In this breach of contract action, Defendant FlexTM, Inc. ("FlexTM") has filed a Motion to Dismiss For Lack of Personal Jurisdiction and For Improper Venue [Doc. # 3] (the "Motion") asserting lack of personal jurisdiction and improper venue. Plaintiff, Matheson Tri-Gas, Inc. ("Matheson") filed a timely response, to which Defendant replied.[1] The Motion is now ripe for decision.

Having considered the parties briefing, the applicable legal authorities, and all pertinent matters of record, the Court concludes that the Motion should be **denied**.[2]

### I. BACKGROUND

Plaintiff is a Delaware corporation whose principal place of business is Basking Ridge, New Jersey. Defendant is a North Dakota corporation whose principal place of business is Wahpeton, North Dakota.[3] Defendant does not operate, or otherwise conduct any business, in the State of Texas. Additionally, none **[*2]** of the interactions between Plaintiff and Defendant in this case occurred in, or were directed towards, the State of Texas.

On April 1, 2010, Plaintiff and non-party Ro-Banks Tool & Manufacturing Co. ("Ro-Banks") entered into a product supply agreement with respect to the purchase and sale of liquid argon (the "Argon Agreement"). The Argon Agreement, which is governed by Texas law, contains mandatory forum selection clause (the "Forum Selection Clause"). Specifically, the Forum Selection Clause provides that the parties to the Argon Agreement "agree to consent to the exclusive jurisdiction of the courts of the State of Texas with regard to any dispute arising hereunder." Argon Agreement [Doc. # 10-3], ¶ 12(f).

---

[1] *See* Plaintiff's Response to Defendant's Motion [Doc. # 10]; Defendant's Reply to Plaintiff's Response [Doc. # 11].

[2] The Court determined that the Motion should be denied after considering the evidence Defendant submitted with its Reply. Consequently, Plaintiff's Motion to Strike Or, Alternatively, Motion for Leave to File Sur-Reply [Doc. # 12] and Defendant's Unopposed Motion for Leave to Submit Evidence [Doc. # 13] are **denied as moot**.

[3] Defendant removed this case from the 127th Judicial District Court of Harris County, Texas to Federal Court pursuant to the Court's diversity jurisdiction under *28 U.S.C. § 1332(a)*. Notice of Removal [Doc. # 1], ¶¶ 4-5. There is no dispute that for subject matter jurisdiction purposes, Plaintiff and Defendant are "completely diverse" and the amount in controversy exceeds the $75,000 statutory threshold.

2018 U.S. Dist. LEXIS 87195, *2

Prior to entering into the Argon Agreement, in August 2007, Ro-Banks and a predecessor entity of Plaintiff also entered into an agreement with respect to the purchase and sale of bulk oxygen (the "Oxygen Contract"). Oxygen Contract [Doc. # 10-2]. The Oxygen Contract, which is governed by West Virginia law, does not contain a forum selection clause. Whether the Court may exercise personal jurisdiction over Defendant in this case depends entirely on whether there is *prima facie* evidence of Defendant's agreement to the Argon **[*3]** Agreement. Therefore, the Court focuses in this Memorandum and Order on the Argon Agreement.

On November 19, 2010, Defendant and Ro-Banks entered into an Asset Purchase Agreement (the "APA"). Pursuant to the terms of the APA, Defendant purchased from Ro-Banks, among other assets, "all contracts and agreements to which [Ro-Banks] is a party including, without limitation, all service contracts, product distribution agreements, rental agreements and franchise agreements, as listed on Exhibit 2.1(d) (collectively, the 'Operating Contracts'); to which [Defendant] has expressly informed [Ro-Banks] it has an interest their continuation." APA [Doc. # 10-7], ¶ 2.1(d). The parties to the APA did not prepare an Exhibit 2.1(d).[4] According to Bradley Odegard, Defendant's President, Defendant neither had any interest in continuing the Argon Agreement nor intended or expected for the Argon Agreement to be a "Purchased Asset" within the meaning of the APA.[5]

Less than a month after Defendant completed its purchase of Ro-Banks's assets, it began purchasing argon from Plaintiff's predecessor-in-interest[6] and continued making purchases of argon from Plaintiff thereafter. Defendant took delivery in North **[*4]** Dakota of all of its purchases from Plaintiff. The location of the source of Plaintiff's supply of this argon is not established by the record, but there is no evidence that the supply originated in Texas. Defendant stored the argon in a tank located on Ro-Banks's former property in North Dakota, property that Defendant acquired (or at

least acquired a right to occupy) via the APA. Defendant cites no evidence that the pricing of its argon purchases from Plaintiff or its predecessor differed from what was required under the Argon Agreement.

On October 2, 2014, Josh Rahn, Defendant's Controller and Human Resources Manager, emailed Vince Watje, his sales contact with Plaintiff, asking for a copy of the "lease" governing the argon storage tank. On October 15, 2014, Watje responded that he had obtained a copy of the Argon Agreement and that he intended to bring a copy of that agreement to Rahn the next day. The Argon Agreement was not attached to Watje's email. The record before the Court includes no evidence that Watje provided a copy of the Argon Agreement to Rahn or any of Defendant's other employees on or before October 16, as he had promised.

On October 20, 2014, Watje and Gregg Hoffmann, **[*5]** Plaintiff's Regional General Manager, met with Rahn and Odegard. According to Plaintiff, Watje and Hoffmann brought copies of the Argon Agreement to this meeting, discussed the agreement with Rahn and Odegard, and left copies of it with Rahn and Odegard.[7] Plaintiff also contends that at no time during the meeting, or in any follow-up thereto, did Defendant claim it was not bound by the Argon Agreement, object to it, or dispute any of its terms.[8] Defendant sharply disagrees with Plaintiff's description of what transpired during the October 20, 2014 meeting. Specifically, Odegard avers that during the meeting, the Argon Agreement was not discussed and that neither he nor Rahn ever received a copy.[9] Odegard also avers that at no point during the meeting did Watje or Hoffmann state that Plaintiff believed Defendant was party to the Argon Agreement.[10]

Following the October 20, 2014 meeting, Defendant continued to purchase argon from Plaintiff for approximately three years. According to Plaintiff, Defendant's argon purchases were made in accordance with the terms of the Argon Agreement, including its pricing provisions.[11] In contrast, Defendant asserts that

---

[4] *See* Affidavit of Bradley A. Odegard [Doc. # 11-1], ¶ 3 ("The Asset Purchase Agreement between Ro-Banks and FlexTM only included Exhibit 2.1(a) and 4.1(b). The Agreement did not include Exhibits 2.1(d), 2.1(f), 2.1(h), 6.4, 6.11, 10.1(c), or 12.6").

[5] *Id.* at ¶ 4.

[6] Invoice, dated January 25, 2011 [Doc. # 10-9], at ECF 1; Invoice, dated January 31, 2011 [Doc. # 10-10].

[7] Declaration of Vince Watje [Doc. # 10-11], ¶¶ 5-6; Declaration of Gregg Hoffmann [Doc. # 10-1], ¶¶ 3-4.

[8] Declaration of Vince Watje [Doc. # 10-11], ¶ 7; Declaration of Gregg Hoffmann [Doc. # 10-1], ¶ 6.

[9] Affidavit of Bradley A. Odegard [Doc. # 11-1], ¶ 7.

[10] *Id.*

[11] Declaration of Vince Watje [Doc. # 10-11], ¶ 7; Declaration

2018 U.S. Dist. LEXIS 87195, *5

all of its purchases from Plaintiff **[\*6]** were made and priced on a per-transaction basis, and not pursuant to any binding agreement between it and Plaintiff.

On October 16, 2017, Defendant informed Plaintiff that it would no longer purchase argon from Plaintiff because it believed it had been materially overcharged by Plaintiff for a significant period of time. Nearly a month later, on November 14, 2017, Hoffmann emailed Odegard a copy of the Argon Agreement and asked him when he would have time to discuss the agreement. According to Defendant, Hoffmann's November 14, 2017 email was the first time it became aware of the Argon Agreement or that Plaintiff believed it had a binding contract with Defendant regarding the sale of argon.

Plaintiff filed the instant litigation against Defendant in December 2019. Plaintiff alleges, among other causes of action, breach of the Argon Agreement and seeks damages resulting therefrom.

## II. LEGAL STANDARDS

### A. Personal Jurisdiction

Plaintiff has the burden of establishing that this Court has personal jurisdiction over Defendant. *See Int'l Energy Ventures Mgmt., LLC v. United Energy Group, Ltd., 800 F.3d 143, 151 (5th Cir. 2015)*. On a motion to dismiss, a plaintiff is required to present only a *prima facie* case for personal jurisdiction. *Walk Haydel & Assocs. v. Coastal Power Prod. Co., 517 F.3d 235, 241 (5th Cir. 2008)*. Where, as here, the Court has not conducted a full **[\*7]** evidentiary hearing, the Court makes only a preliminary finding on the basis of the evidence presented by the parties "to help it resolve the jurisdictional issue," and must "construe all disputed facts in Plaintiff's favor and consider them along with the undisputed facts." *Id.*[12]

---

of Gregg Hoffmann [Doc. # 10-1], ¶ 6.

[12] That the parties have engaged in jurisdictional discovery does not heighten Plaintiff's burden beyond a *prima facie* showing. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 242 (5th Cir. 2008)* (holding, after limited jurisdictional discovery, that "[b]ecause the district court did not conduct a full-blown evidentiary hearing, it should have required [the plaintiff] to establish only a *prima facie* case for personal jurisdiction.").

Courts in Texas may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *DeJoria v. Maghreb Petroleum Expl., S.A., 804 F.3d 373, 388 (5th Cir. 2015)* (citing *Moncrief Oil Int'l, Inc. v. OAO Gazprom, 414 S.W.3d 142, 149 (Tex. 2013))*. In Texas, the long-arm statute extends to the limits of federal constitutional due process. *See Companion Prop. & Cas. Ins. Co. v. Palermo, 723 F.3d 557, 559 (5th Cir. 2013)*.

Jurisdiction may be general or specific. Where a defendant has "continuous and systematic general business contacts" with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*, the court may exercise "general" jurisdiction over any action brought against that defendant. *Id. at 414 n.9*. Plaintiff does not assert that the Court has general personal jurisdiction over Defendant.

Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Id. at 414 n. 8*. "Asserting personal jurisdiction **[\*8]** comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice." *DeJoria, 804 F.3d at 388* (citing *Moncrief, 414 S.W.3d at 150*). A defendant establishes minimum contacts with a state when he purposefully avails himself "of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* (citations omitted). "In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice." *Id.* (quoting *Moncrief, 414 S.W.3d at 154*).

"Personal jurisdiction, however, is a waivable right, and a freely-negotiated forum-selection clause is sufficient to constitutionally establish personal jurisdiction." *Sealed Appellant 1 v. Sealed Appellee 1, 625 F. App'x 628, 632 (5th Cir. 2015)* (internal citations and quotation marks omitted); *see also Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte, 536 F.3d 439, 441 (5th Cir. 2008)* ("Under federal law, forum-selection clauses are presumed enforceable, and the party resisting enforcement bears a heavy burden of proof.") (internal quotation marks omitted); *Alliantgroup, L.P. v. Feingold,*

2009 U.S. Dist. LEXIS 34730, 2009 WL 1109093, at *9 (S.D. Tex. Apr. 24, 2009) ("A forum-selection clause alone, without a specific additional agreement as to personal jurisdiction, is sufficient evidence of consent to personal jurisdiction [*9] in the designated state."); Kevlin Servs., Inc. v. Lexington State Bank, 46 F.3d 13, 15 (5th Cir. 1995). Additionally, "[w]here such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 n.14, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (internal citations omitted).

**B. Venue**

Federal Rule 12(b)(3) allows defendants to move for dismissal based on improper venue. Fed. R. Civ. P. 12(b)(3); Bigham v. Envirocare of Utah, Inc., 123 F. Supp. 2d 1046, 1047-48 (S.D. Tex. 2000); see also 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."). Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff. Laserdynamics Inc. v. Acer America Corp., 209 F.R.D. 388, 390 (S.D. Tex. 2002); Bigham, 123 F. Supp. 2d at 1048. If there is no evidentiary hearing, a plaintiff may carry its burden by presenting facts, taken as true, that establish venue. Laserdynamics, Inc., 209 F.R.D. at 390. Courts will accept uncontroverted facts in a plaintiff's pleadings as true, and will resolve any conflicts in the plaintiff's favor. Id.

**III. ANALYSIS**

**A. Personal Jurisdiction Based on the Argon Agreement**

Plaintiff alleges the Court may exercise personal jurisdiction over Defendant, a nonresident of the State of Texas, because it is party [*10] to the Argon Agreement and thus subject to its mandatory forum selection provision. Other than potentially the Forum Selection Clause, it is undisputed that Defendant has no contacts with Texas. Plaintiff argues that Defendant is bound by the Forum Selection Clause for at least one of three

reasons: (i) Defendant expressly assumed the Argon Agreement pursuant to the APA when it acquired Ro-Banks's operating asserts; (ii) Defendant impliedly assumed the Argon Agreement, or is obligated to continue performing thereunder, under the equitable doctrine of direct benefit estoppel; or (iii) Defendant ratified the Argon Agreement after obtaining actual knowledge of its terms during the October 20, 2014 meeting among Rahn, Odegard, Watje and Hoffmann. Defendant denies ever agreeing to or adopting the Argon Agreement, either expressly or by implication.[13] The Court concludes based on the evidence of record that Plaintiff has made a *prima facie* showing that Defendant ratified the Argon Agreement and thus is bound by the Forum Selection Clause. The Court does not reach the two other theories proffered by Plaintiff.

**1. Contract Ratification Under Texas Law**

"Texas law provides that 'if a party acts in a manner that recognizes the validity [*11] of a contract with full knowledge of the material terms of the contract, the party has ratified the contract and may not later withdraw its ratification and seek to avoid the contract.'" Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografía, S.A. de C.V., 817 F.3d 241, 250 (5th Cir. 2016) (quoting Advanced Nano Coatings, Inc. v. Hanafin, 478 F. App'x 838, 843-44 (5th Cir.2012)); Verizon Corp. Servs. Corp. v. Kan—Pak Sys., 290 S.W.3d 899, 906 (Tex. App.—

---

[13] Defendant's objection to the applicability of the Forum Selection Clause in this case is based solely on its argument that it is not party to the Argon Agreement. Defendant does not argue that the Forum Selection Clause is "unreasonable." See Haynsworth v. The Corp., 121 F.3d 956, 963 (5th Cir. 1997) (citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595, 111 S. Ct. 1522, 113 L. Ed. 2d 622 (1991)) (holding that a forum-selection clause may be found unreasonable when the movant shows: (1) that it is the product of fraud or overreaching; (2) that it violates a strong public policy of the forum; (3) that enforcement of the clause effectively deprives plaintiff of his day in court; or (4) that the fundamental unfairness of the chosen law will deprive plaintiff of a remedy). Nor does Defendant argue that Plaintiff's Argon Agreement claims do not arise under the Forum Selection Clause. See Huawei Techs. Co. v. Yiren Ronnie Huang, No. 4:17-CV-00893, 2018 U.S. Dist. LEXIS 69745, 2018 WL 1964180, at *4 (E.D. Tex. Apr. 25, 2018) (citing Ginter ex rel. Ballard v. Belcher, Predergrast & Laporte, 536 F.3d 439, 441 (5th Cir. 2008)) ("If the forum-selection clause is found to be reasonable, courts must then determine whether the claims arise under the forum-selection clause.").

2018 U.S. Dist. LEXIS 87195, *11

*Amarillo 2009, no pet.))*.

Plaintiff's representatives aver that on October 20, 2014, they physically provided Defendant with copies of the Argon Agreement. For approximately three years following the October 2014 meeting, Defendant continued to purchase argon and lease an argon bulk storage tank from Plaintiff. According to Plaintiff, the pricing Defendant paid for argon and use of the storage tank was the pricing provided for in the Argon Agreement.

Defendant cites no evidence that the terms of its argon purchases and bulk storage lease payments to Plaintiff between October 2014 and October 2017 differed from, or were inconsistent with, the terms of the Argon Agreement. Rather, Defendant strenuously denies having any knowledge of the Argon Agreement prior to Hoffmann's November 2017 email to Odegard.

At this stage of the proceedings the law requires this Court to resolve factual disputes, such as whether copies of the Argon Agreement actually were provided to Defendant at the October **[*12]** 20, 2014 meeting, in Plaintiff's favor. *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008)*. "Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists." *Id.* Resolving the disputed facts in Plaintiff's favor, as the Court must given the current posture of this case, Plaintiff has made a *prima facie* showing that from and after the October 20, 2014 meeting, Defendant (i) had possession of a copy of the Argon Agreement, (ii) had actual knowledge of its material terms, and (iii) performed thereunder for a period of nearly three years. Accordingly, Plaintiff has made a *prima facie* showing that Defendant ratified the Argon Agreement and has submitted to the personal jurisdiction of this Court pursuant to the terms of the Forum Selection Clause. Moreover, because Defendant does not challenge the reasonableness of the Forum Selection Clause, enforcement of that provision "does not offend due process." *Rudzewicz, 471 U.S. at 473 (1985)*. The Motion is **denied** to the extent it seeks dismissal of Plaintiff's claims for breach of the Argon Agreement based on **[*13]** lack of personal jurisdiction.

## 2. Venue

In addition to challenging personal jurisdiction,

Defendant also contests whether venue for this case is proper in the Southern District of Texas. Plaintiff initiated this litigation in Texas pursuant to the terms of the Forum Selection Clause. The Forum Selection Clause is a mandatory provision. As discussed in section III.A.1 *supra*, Plaintiff has made a *prima facie* showing that Defendant ratified the Argon Agreement and is thus subject to its Forum Selection Clause. Given that the Court at this stage must credit Plaintiff's evidence that Defendant agreed to the mandatory Forum Selection Clause, which provides the "courts of the State of Texas" with exclusive jurisdiction over any dispute arising under the Argon Agreement, the Court must conclude that Defendant has waived its right to challenge the propriety of venue in the Southern District of Texas. *See City of New Orleans v. Mun. Admin. Servs., Inc., 376 F.3d 501, 504 (5th Cir. 2004)* ("A party may waive its rights by explicitly stating that it is doing so, by allowing the other party the right to choose venue, or by establishing an exclusive venue within the contract."); *Argyll Equities LLC v. Paolino, 211 F. App'x 317, 319 (5th Cir. 2006)* ("Contrary to [the defendant's] contention that the clause only explicitly provides for exclusive jurisdiction and not exclusive venue, the former dictates the latter, as submission to the exclusive jurisdiction **[*14]** of one set of courts necessarily excludes venue in all other courts."). Consequently, the Motion is **denied** insofar as it seeks dismissal or transfer of Plaintiff's claims for breach of the Argon Agreement on venue grounds.[14]

---

[14] Dismissal or transfer of Plaintiff's Argon Agreement claims on venue grounds also is unwarranted on the basis of judicial efficiency. Defendant argues that this case should be transferred to the District of North Dakota because venue is only "proper" there. Specifically, Defendant argues that it resides in the District of North Dakota and that the only jurisdiction where a substantial part of the events giving rise to the claims in issue in this case occurred was the District of North Dakota. *See 28 U.S.C. §1391(b)(1)-(2)*. However, once transferred to the District of North Dakota, Plaintiff could then, pursuant to the Supreme Court's holding in *Atlantic Marine Construction Company v. United States District Court for the Western District of Texas, 571 U.S. 49, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013)*, move to transfer the case under *28 U.S.C. § 1404(a)*, which "permits transfer to any district where venue is proper . . . or to any other district to which the parties have agreed by contract or stipulation." *Atlantic Marine, 571 U.S. at 59.*

The Supreme Court of the United States altered the analysis for transferring venue under *§ 1404(a)* when a forum-selection clause is involved because "'the interest of justice' is served by holding parties to their bargain." *Id.*

2018 U.S. Dist. LEXIS 87195, *14

**B. The Oxygen Contract**

In its Complaint, Plaintiff also asserts claims for breach of the Oxygen Contract. The Oxygen Contract, unlike the Argon Agreement, has no forum selection provision. Defendant's only connection **[*15]** to the State of Texas is the Argon Agreement's Forum Selection Clause. Therefore, it is clear that if the Court has the authority to exercise personal jurisdiction over Defendant with respect to claims arising from the Oxygen Contract, any such authority can derive only from the Court's personal jurisdiction over Defendant relating to Plaintiff's Argon Agreement claims. The parties did not address in their briefing the issue of whether the Court may exercise "supplemental" personal jurisdiction over Defendant regarding Plaintiff's Oxygen Contract claims by virtue of its personal jurisdiction over Defendant, at least at this stage of the litigation, pursuant to the Forum Selection Clause. The Court declines to reach this complex issue *sua sponte*. Instead, Defendant must file an Advisory by **12:00 p.m. on June 1, 2018**, stating whether or not Defendant agrees to pretrial litigation of the parties' disputes in this Court pertaining to the Oxygen Contract. Any agreement to, or pursuit of, pretrial litigation in this Court on the Argon Agreement or the Oxygen Contract is subject to reservation of Defendant's rights to contest personal jurisdiction and venue after full discovery and an evidentiary hearing on jurisdiction (and, if necessary, venue) prior to summary judgment **[*16]** briefing and rulings, and/or trial on the merits. If Defendant elects to contest supplemental personal jurisdiction and venue in this Court with respect to claims regarding the Oxygen Contract, the Court, at the upcoming initial pretrial conference, will set a briefing schedule on that issue.

**IV. CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion to Dismiss For Lack of Personal Jurisdiction and For Improper Venue [Doc. #

3] is **DENIED without prejudice**. It is further

**ORDERED** that Plaintiff's Motion to Strike Or, Alternatively, Motion for Leave to File Sur-Reply [Doc. # 12] and Defendant's Unopposed Motion for Leave to Submit Evidence [Doc. # 13] are **DENIED as moot**. It is further

**ORDERED** that Defendant shall file the Advisory required by this Memorandum and Order **on or before 12:00 p.m. on June 1, 2018**.

SIGNED at Houston, Texas this 24th day of **May, 2018**.

/s/ Nancy F. Atlas

NANCY F. ATLAS

SENIOR UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

*at 66*. "Because [the transfer analysis mandated by *Atlantic Marine*] will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id. at 64*. Therefore, even if the Court transferred the case to the District of North Dakota, that court likely would be bound to transfer the case back to this or another district in the State of Texas. Transfer of this case to North Dakota is not only inefficient; it is fundamentally inconsistent with the Supreme Court's intentions expressed in *Atlantic Marine*.

Patricia O'Neill

## *Reed v. Quicken Loans, Inc.*

United States District Court for the Northern District of Texas, Dallas Division

September 3, 2019, Decided; September 3, 2019, Filed

Case No. 3:18-cv-3377-K

**Reporter**

2019 U.S. Dist. LEXIS 159935 *; 2019 WL 4545010

JEREMY REED, Plaintiff, v. QUICKEN LOANS, INC., Defendant.

**Subsequent History:** Adopted by, Dismissed by, Without prejudice *Reed v. Quicken Loans, Inc., 2019 U.S. Dist. LEXIS 159337 (N.D. Tex., Sept. 18, 2019)*

**Counsel:** **[*1]** For Jeremy Reed, Plaintiff: Lloyd Ward, LEAD ATTORNEY, Ward Legal Group PLLC, Dallas, TX.

For Quicken Loans Inc, Defendant: Mark G Davis, LEAD ATTORNEY, Goodwin Procter, LLP, Washington, DC; William Kyle Tayman, PRO HAC VICE, Goodwin Procter LLP, Washington, DC; Bradford John Robinson, Hartline Dacus Barger Dreyer LLP, Dallas, TX.

**Judges:** REBECCA RUTHERFORD, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** REBECCA RUTHERFORD

# Opinion

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Quicken Loans, Inc.'s *Rule 12(b)(6)* Motion to Dismiss Plaintiff's Complaint. Mot. (ECF No. 8). For the reasons stated below, the District Court should GRANT Defendant's motion.

**Background**

Plaintiff Jeremy Reed filed his lawsuit against Defendant Quicken Loans, Inc. on November 28, 2018, in state court. Compl. 1 (ECF No. 1-4). Defendant removed Plaintiff's action to federal court on December 21, 2018. Notice (ECF No. 1). Plaintiff alleges that he registered his cell phone number with the Federal Trade Commission's National Do Not Call Registry (NDNCR) on December 29, 2011. Compl. 4. Even so, Plaintiff asserts that Defendant sent unsolicited text messages, phone calls, and voicemails to Plaintiff's personal **[*2]** cell phone to market real estate services. *Id.* Plaintiff contends he did not expressly invite, permit, or consent to Defendant's text-message communications. *Id.* Specifically, he alleges Defendant sent him a text message on July 25, 2018, two on July 31, 2018, and one on August 9, 14, and September 13, 2018. *Id.* 4-5. Plaintiff also alleges that Defendant called him and left voicemails on July 25, 26, 27, 28, 30, 31, and August 1 and 2, 2018. *Id.* In total, Plaintiff maintains he received six unsolicited text messages and eight unsolicited phone calls with voicemail messages from Defendant. *Id.* 5. Defendant's text messages indicated Plaintiff could opt out of future messages; Plaintiff replied "STOP" to Defendant's second text message sent on July 31, 2018, and its text message sent on August 9, 2018. *Id.*

Plaintiff asserts Defendant's communications violated the *Telephone Consumer Protection Act (TCPA)*. Defendant moves to dismiss Plaintiff's Complaint for failure to state a claim. Mot. The Motion is fully briefed and ripe for determination.

2019 U.S. Dist. LEXIS 159935, *2

**Legal Standards and Analysis**

When deciding a _12(b)(6)_ motion for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the **[*3]** light most favorable to the plaintiff." _In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)_ (quotation marks and citation omitted). To survive Defendant's Motion to Dismiss, therefore, Plaintiff's Complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_. "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" _In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 210 (5th Cir. 2010)_ (quoting _Twombly, 550 U.S. at 555_). This pleading standard does not require "'detailed factual allegations,'" but it does demand more than an unadorned accusation devoid of factual support. _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_ (quoting _Twombly, 550 U.S. at 555_). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." _Id. at 678_ (citing _Twombly, 550 U.S. at 556_). "[A] formulaic recitation of the elements of a cause of action will not do." _Twombly, 550 U.S. at 555_ (citing _Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))_. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." _Iqbal, 556 U.S. at 679_. Where the facts do not permit the Court to infer more than the mere possibility of misconduct, the Complaint has stopped short of showing that Plaintiff is plausibly entitled to relief. _Id. at 678_ (citing _Twombly, 550 U.S. at 557_).

In deciding a _Rule 12(b)(6)_ motion, a court may **[*4]** not look beyond the pleadings. _Spivey v. Robertson, 197 F.3d 772, 774 (5th Cir. 1999)_. However, the pleadings, for the purpose of determining a _Rule 12(b)(6)_ motion, include documents attached to the pleadings and to the motion to dismiss so long as they "are referred to in the plaintiff's complaint and are central to [his] claim." _Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004)_ (citing _Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000))_.

**TCPA**

Plaintiff brings a claim against Defendant under _47 U.S.C. § 227(b)(3)(B)_, which provides for a private right of action under the _Telephone Consumer Protection Act_. The TCPA prohibits persons:

> within the United States, or . . . outside the United States if the recipient is within the United States— . . . [from] mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

_47 U.S.C. § 227(b)(1)(A)(iii)_. Thus, "[a] [TCPA] violation occurs if: '(1) the defendant called a cellular telephone number; (2) using an **[*5]** automatic telephone dialing system; (3) without the recipient's prior express consent.'" _Adams v. Safe Home Sec. Inc., 2019 U.S. Dist. LEXIS 126522, 2019 WL 3428776, at *1 (N.D. Tex. July 30, 2019)_ (Lynn, C.J.) (quoting _Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012))_. An "automatic telephone dialing system" (ATDS) is defined as "equipment which has the capacity—to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." _47 U.S.C. § 227(a)(1)_. "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of _§ 227(b)(1)(A)(iii)_." _Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 667, 193 L. Ed. 2d 571 (2016)_.

Defendant moves to dismiss Plaintiff's Complaint "because the Complaint nowhere alleges that he was called or texted using an ATDS." Def.'s Br. Support 3 (ECF No. 9). "Simply alleging the use of an ATDS, without more, is insufficient to sustain a TCPA claim." _Cunningham v. Nationwide Sec. Sols., Inc., 2017 WL 10486988, at *3 (N.D. Tex. Nov. 2, 2017)_ (Lynn, C.J.) (citing _Cunningham v. TechStorm, LLC, 2017 U.S. Dist. LEXIS 25047, 2017 WL 721079, at *3 (N.D. Tex. Feb. 23, 2017)_ (Lynn, C.J.)). Nonetheless, "'[c]ourts have noted the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery,' and have found allegations of calls including 'dead-air time' sufficient to allege the use of an ATDS. _Adams, 2019 U.S. Dist. LEXIS 126522, 2019 WL 3428776, at *1_ (quoting _Hickey v. Voxernet LLC, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012)_; _TechStorm, LLC, 2017 U.S._

*Dist. LEXIS 25047, 2017 WL 721079, at *3)* (finding plaintiff's allegation "that each of the phone calls she received began with a pause of several seconds" sufficient to plead the use of an ATDS). In his Complaint, Plaintiff alleges that Defendant **[\*6]** "violated the Act through its barrage of calls . . . [and] numerous automated text messages to Plaintiff's private cell phone . . . after being expressly instructed in writing to cease all such communications." Compl. 6. Though Plaintiff avers the text messages were "automated" he does not plead that the text messages or phone calls were "placed with an ATDS that randomly or sequentially generated his number," nor does he assert that the phone calls included "dead-air time" indicative of use of an ATDS.

Plaintiff includes additional factual allegations describing the nature of the calls and text messages in his Response. *See* Pl.'s Resp. 5-6 (ECF No. 10). "Generally, if the Court is presented with matters outside the pleadings in deciding a *12(b)(6)* motion and does not exclude them, the motion must be treated as one for summary judgment." *TechStorm, 2017 U.S. Dist. LEXIS 25047, 2017 WL 721079, at *2* (citing *Fed. R. Civ. P. 12(d)*). "'Otherwise, a court must limit itself to the contents of the pleadings, including attachments thereto.'" *Id.* (quoting *Tornado BUS Co. v. BUS & Coach Am. Corp., 2015 U.S. Dist. LEXIS 179520, 2015 WL 11120584, at *1 (Dec. 15, 2015)* (Lynn, J.)). Because the Court has not given notice that it would consider facts outside the pleadings, it will only consider factual allegations in the pleadings. *See id.* Accordingly, the Court finds the facts, as alleged, **[\*7]** do not allow the Court to infer more than the mere possibility of misconduct. Plaintiff, therefore, has failed to state claim under the TCPA.

In his Response, Plaintiff also contends that Defendant violated *47 C.F.R. § 64.1200(c)(2)*, which prohibits soliciting people by telephone whose phone numbers are on the NDNCR. Pl.'s Resp. 3. However, Plaintiff does not specifically refer to this regulation in his Complaint. Rather, he states that the TCPA "through regulations promulgated by the Federal Trade Commission . . . prohibits any telephonic communications with a person or telephone number listed on the NDNCR," and that Defendant communicated with Plaintiff "despite [his] status as a listed member of the NDNCR." Compl. 6. To assert a claim that Defendant violated a regulation under the TCPA, Plaintiff must identify that regulation in his Complaint.

Additionally, Plaintiff appears to assert a separate "claim" for exemplary damages under *Texas Civil Practice and Remedies Code § 41.003*.[1] However, "[a] cause of action for punitive damages cannot be brought as a stand-alone claim." *See Stanissis v. DynCorp Int'l LLC, 2015 U.S. Dist. LEXIS 172412, 2015 WL 9478164, at *12-13 (N.D. Tex. Dec. 29, 2015)* (Fitzwater, J.) (citing *Tex. Civ. Prac. & Rem. Code § 41.003(a)* ("[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks **[\*8]** recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence."); *id.* at *§ 41.001(5)* ("'Exemplary damages' includes punitive damages.")). Because Plaintiff fails to sufficiently plead a TCPA claim, the Court pretermits consideration of damages under the TCPA. However, even if Plaintiff had successfully stated a claim under the TCPA, *§ 41.003(a)* makes plain that it provides for damages upon a showing of fraud, malice, or gross negligence. Plaintiff states that Defendant's conduct "constitutes 'gross negligence' and/or 'malice,' as those terms are defined at *§41.001*," but he does not plead a separate negligence cause of action. *See* Compl.

In his Response, Plaintiff also appears to assert new claims for invasion of privacy and gross negligence. Pl.'s Resp. 9. Plaintiff states that his "pleading of Quicken Loans' violation is the claim of an intentional invasion of a right of privacy and a recognized tort"; that "if Quicken Loans did not check the National Do Not Call Registry prior to directing it [sic] steam [sic] of calls to Reed that is evidence of negligence"; and that "[i]f Quicken Loans did check the National Do Not Call Registry and knew of Reed's election [to be on the NDNCR] that is **[\*9]** evidence of an intentional violation." *Id.* 9. But Plaintiff does not assert claims for gross negligence or invasion of privacy in his Complaint, and he is not now "entitled to add new claims to his complaint by way of his response." *Sheddy v. JPMorgan Chase Bank, N.A., 2013 U.S. Dist. LEXIS 140891, 2013 WL 5450288, at *5 (N.D. Tex. Sept. 30, 2013)* (citing *Bennett v. JPMorgan Chase, 2013 U.S. Dist. LEXIS 25303, 2013 WL 655059, at *7 n.7 (N.D. Tex. Feb. 5, 2013)*, adopted by *2013 U.S. Dist. LEXIS 24296, 2013 WL 655054 (N.D. Tex. Feb. 22, 2013)* (refusing to consider new claim raised for first time in response to motion to dismiss)).

---

[1] Plaintiff does not specifically name *§ 41.003*, but refers to "'gross negligence' and/or 'malice,' as those terms are defined at *§ 41.001 of the Texas Civil Practice and Remedies Code*," in connection with his "exemplary damages" claim. Compl. 8.

2019 U.S. Dist. LEXIS 159935, *9

Nonetheless, "new claim[s] or legal theor[ies] raised in response to a dispositive motion should be construed as a request for leave to amend the complaint, and the district court should determine whether leave should be granted." *Pierce v. Hearne Indep. Sch. Dist., 600 F. App'x 194, 200 (5th Cir. 2015)* (per curiam) (*Stover v. Hattiesburg Pub. Sch. Dist., 549 F.3d 985, 989 n.2 (5th Cir. 2008))*. "New *factual allegations* however, need not be so construed unless plaintiff explicitly requests leave to amend . . . ." *Id. at 200 n.6* (emphasis in original) (citing *United States ex rel. Willard v. Humana Health Plan of Tex. Inc., 336 F.3d 375, 387 (5th Cir. 2003)*. Accordingly, the Court construes the new claims that Plaintiff raises in his Response to be a request for leave to amend.

"'*Rule 15(a)* requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend.'" *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368, 378 (5th Cir. 2014)* (quoting *Jones v. Robinson Prop. Grp., LP, 427 F.3d 987, 994 (5th Cir. 2005))*. But district courts have discretion in granting leave to amend "and may consider a variety of factors including undue delay, bad faith or dilatory motive on the part of the movant, repeated **[*10]** failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." *Marucci, 751 F.3d at 378* (internal citation and quotation marks omitted). Because Plaintiff has not yet amended his Complaint, and this is his first opportunity to hear what the Court perceives as deficiencies in his pleading, the Court finds that Plaintiff should be granted leave to amend. *See Pierce, 600 F. App'x at 200* (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002))*("Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under *Rule 12(b)(6)*.").

## RECOMMENDATION

For the foregoing reasons, the Court should GRANT Defendant Quicken Loans, Inc.'s Motion to Dismiss, (ECF No. 8), and DISMISS Plaintiff's claims against it without prejudice. The Court should also GRANT Plaintiff leave to amend his Complaint.

**SO RECOMMENDED**.

September 3, 2019.

/s/ Rebecca Rutherford

REBECCA RUTHERFORD

UNITED STATES MAGISTRATE JUDGE

_____

**End of Document**

Patricia O'Neill

## *Rodney Dewayne Ford v. Fitness Int'l LLC*

United States District Court for the Northern District of Texas, Dallas Division

August 15, 2018, Decided; August 15, 2018, Filed

Case No. 3:17-cv-1460-L-BT

**Reporter**

2018 U.S. Dist. LEXIS 157238 *

RODNEY DEWAYNE FORD, Plaintiff, v. FITNESS INTERNATIONAL, LLC, doing business as LA FITNESS, Defendant.

**Subsequent History:** Adopted by, Summary judgment granted by, Dismissed by, Motion denied by, As moot *Ford v. Fitness Int'l, LLC, 2018 U.S. Dist. LEXIS 156059 (N.D. Tex., Sept. 13, 2018)*

**Counsel:** **[*1]** Rodney Dewayne Ford, Plaintiff, Pro se, Richardson, TX.

For Fitness International LLC, doing business as LA Fitness, Defendant: Wess H Tribble, LEAD ATTORNEY, Pascal Arteaga, Tribble & Ross, Houston, TX.

**Judges:** REBECCA RUTHERFORD, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** REBECCA RUTHERFORD

## Opinion

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

This *pro se* civil action has been referred to the United States Magistrate Judge for pretrial management

pursuant to *28 U.S.C. § 636(b)*.[1] Before the Court are Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 20) and Defendant's Motion for No-Evidence Summary Judgment (ECF No. 24). For the following reasons, the District Court should GRANT Defendant's Motions and dismiss with prejudice all of Plaintiff's claims and causes of action.

### Background

Plaintiff Rodney Dewayne Ford filed this lawsuit against Defendant Fitness International, LLC, d/b/a LA Fitness, after Defendant allegedly cancelled his gym membership. By his First Amended Complaint, which is the live pleading in this case, Plaintiff alleges that he was a member of Defendant's fitness club from January 2014 until May of 2017 and that he exercised seven days a week, for three **[*2]** hours a day, at one of Defendant's gyms in the Dallas, Texas area. Am. Compl. 3 ¶ 10 & 4 ¶ 12 (ECF No. 17). Plaintiff also trained his minor daughter at Defendant's gym. *Id.* at 5 ¶ 12. Plaintiff alleges that, in October of 2016, one of Defendant's employees confronted him about videotaping his daughter's workouts. *Id.* Plaintiff contends that the gym employee initiated the confrontation and treated him with hostility during the encounter because Plaintiff is a dark-skinned African-American and his daughter looks white. *Id.* Plaintiff further alleges that, on May 30, 2017, he stopped at the gym to give money to his daughter, who was exercising there. *Id.* at 6 ¶ 14. A white employee who was working

---

[1] The parties previously consented to proceed before United State Magistrate Judge Paul D. Stickney (ECF No. 13). However, Judge Stickney retired in January 2018, and the parties, after being provided with a Notice of Option to Consent (ECF No. 23), did not consent to have the undersigned conduct all further proceedings. Accordingly, the case must be returned to the district judge who originally presided over the matter, and the undersigned issues these Findings, Conclusions, and Recommendation pursuant to *28 U.S.C. § 636(b)*. *See* SPECIAL ORDER NO. 3-316 (Jan. 26, 2018).

at the counter demanded that Plaintiff sign in. *Id.* Plaintiff refused to sign in because he was only at the gym to drop off money for his daughter. *Id.* The following day, District Manager Traci Quetano allegedly called Plaintiff while he was at work. *Id.* at 7 ¶ 17. Plaintiff told Ms. Quetano that the employee at the counter talked to Plaintiff "like he was a slave." *Id.* 9 ¶ 19. At the end of the conversation, Ms. Quetano allegedly terminated Plaintiff's gym membership. *Id.* When Plaintiff asked to speak to a supervisor, **[*3]** Ms. Quetano had General Manager David Broom call Plaintiff. *Id.* at 9 ¶ 20. Mr. Broom allegedly informed Plaintiff that his gym membership was revoked. *Id.* at 10 ¶ 20. Plaintiff alleges that Defendant does not require white members to sign in every time they visit the gym, and that he was treated differently because he is African-American. *Id.* at 7 ¶ 16; 10-11 ¶ 22. Plaintiff further alleges that Defendant failed to provide him with a copy of his membership contract and that Defendant made repeated calls to Plaintiff's cell phone and work phone in an effort to collect past due membership fees. *Id.* at 10 ¶ 21; 11 ¶¶ 23-24.

Based on this alleged conduct, Plaintiff filed this civil action asserting claims against Defendant for violations of (1) the *Telephone Consumer Protection Act*; (2) the *Federal Unfair Debt Collection Practices Act*; (3) the *Texas Retail Installment Sales Act*; (4) the *Texas Deceptive Trade Practices Act*; and (5) the *Civil Rights Act of 1964*. Am. Compl. 13, 15, 17, 20 (ECF No. 17). Defendant has moved to dismiss all of Plaintiff's claims under *Fed. R. Civ. P. 12(b)(6)*, *see* Mot. Dism. (ECF No. 20), and for summary judgment on the ground that Plaintiff has no evidence of at least one essential element for all of his claims, *see* **[*4]** Sum. J. Mot. (ECF No. 24). Plaintiff failed to file a response to either of Defendant's Motions, and the time for doing so has expired.[2] Accordingly, the Court considers Defendant's Motions without the benefit of any response by Plaintiff.

**Legal Standards**

Defendant has moved for dismissal of Plaintiff's claims under *Fed. R. Civ. P. 12(b)(6)* and for summary judgment under *Fed. R. Civ. P. 56(a)*. When deciding a 12(b)(6) motion for failure to state a claim, the court

"accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig., 495 F.3d 191, 205-06 (5th Cir. 2007)*. To survive a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, Plaintiff's Complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Twombly, 550 U.S. at 570*. "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 210 (5th Cir. 2010)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. This pleading standard does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 555*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. "[A] formulaic recitation **[*5]** of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555*. "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal, 556 U.S. at 679*. Where the facts do not permit the Court to infer more than the mere possibility of misconduct, the Complaint has stopped short of showing that Plaintiff is plausibly entitled to relief. *Iqbal, 556 U.S. at 678*.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *See Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995)*. The movant's burden can be satisfied by demonstrating that there is an absence of evidence which supports the nonmoving party's case for which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr, 200 F.3d 291, 302 (5th Cir. 2000)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and **[*6]** on which it will bear the burden of proof

---

[2] On July 6, 2018, Plaintiff filed a CD containing a video recording and an email Plaintiff sent to defense counsel. (ECF No. 26). Although not required to consider this untimely submission, the Court, in the interest of justice, has reviewed the video and email.

at trial, the court must grant summary judgment in favor of the movant. *Celotex, 477 U.S. at 322-23*.

## Analysis

### Civil Rights Act, *42 U.S.C. § 1981*

Plaintiff alleges that Defendant discriminated against him and subjected him to unequal treatment because of his race in violation of *Section 1981* of the Civil Rights Act of 1964. Am. Compl. 20 ¶ 56 (ECF No. 17). *Section 1981* provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *42 U.S.C. § 1981(a)*. To succeed on a *Section 1981* discrimination claim, a plaintiff must establish (1) that he is a member of a racial minority; (2) that the defendant had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute, which in this case is Plaintiff's right to make and enforce contracts. *Arguello v. Conoco, Inc., 330 F.3d 355, 358 (5th Cir. 2013)* (citing *Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001))*. The plaintiff must allege and ultimately prove purposeful discrimination. *General Bldg. Contracts Ass'n Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982)*.

Here, Plaintiff has not shown that he can raise a genuine fact issue to prove a violation of *Section 1981*. Plaintiff has not identified any evidence that Defendant [*7] had an intent to discriminate against Plaintiff on the basis of race; nor has he identified evidence that Defendant's actions involved Plaintiff's right to make and enforce contracts, or any of the activities enumerated in the statute. Plaintiff's conclusory allegations set forth in the First Amended Petition that (1) "Caucasian members were treated entirely different than African American members," *see* Am. Compl. 9 ¶ 19; (2) "Caucasian members of the Defendant's gymnasium intending to use the facilities and equipment are treated differently, as they are not always required to sign in," *id.* 7 ¶ 16; and (3) "Caucasian members never had their gym memberships terminated for an alleged single incident of the failure to sign in," *id.* at 11 ¶ 22, are not evidence and are insufficient to withstand summary judgment.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim under the Civil Rights Act, and the District Court should dismiss this claim with prejudice.

## Federal Unfair Debt Collection Practices Act ("FDCPA") & Telephone Consumer Protection Act ("TCPA")

Plaintiff alleges that, during the term of his gym membership, Defendant "engaged in a prohibited pattern and practice of calling [*8] the Plaintiff at his place of work and on his cell phone in an effort to collect debts related to his gym[ ] membership." Am. Compl. 11 ¶ 23 (ECF No. 17). Plaintiff alleges that he never consented to receive collection calls from Defendant and that, even after he directed Defendant's staff not to call him at work, the calls continued. *Id.* 11 ¶ 24 & 12 ¶¶ 26-27. Based on this alleged conduct, Plaintiff asserts claims for violations of the FDCPA and the TCPA.

To state a FDCPA claim, Plaintiff must allege facts sufficient to show: "(1) [Plaintiff has] been the object of collection activity arising from a consumer debt; (2) the defendant is a debt collector defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Hunsinger v. SKO Brenner American, Inc., 2013 U.S. Dist. LEXIS 107795, 2013 WL 3949023, at *2 (N.D. Tex. 2013)* (quoting *Browne v. Portfolio Recovery Assocs., 2013 U.S. Dist. LEXIS 31257, 2013 WL 871966, at *4 (S.D. Tex. 2013))*. The purpose of the FDCPA is to "eliminate abusive debt collection practices *by debt collectors* . . . and to . . . protect consumers against debt collection abuses." *McMurray v. ProCollect, Inc., 687 F.3d 665, 668 (5th Cir. 2012)* (emphasis added). The FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mail in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempt to collect, directly [*9] or indirectly, debts owed or due or asserted to be owed or due to another." *Wagstaff v. United States Dep't of Educ., 509 F.3d 661, 663 (5th Cir. 2007)* (citing *15 U.S.C. § 1692a(6))*. Creditors who collect debts in their own name and whose principal business is not debt collecting are not subject to the FDCPA. *Verizon Emple. Benefits Comm. v. Boyer, 2007 U.S. Dist. LEXIS 53414, 2007 WL 2258685, at *2 (N.D. Tex. 2007)* (citing *Aubert v. Am. Gen. Fin., Inc., 137 F.3d 976, 978 (7th Cir. 1998))*. Here, Plaintiff fails to allege that Defendant Fitness International, doing business as LA Fitness, is in the business of collecting debts. Rather, Plaintiff alleges that Defendant is in the business of operating gym

2018 U.S. Dist. LEXIS 157238, *9

facilities. *See* Am. Compl. 3 ¶ 8, (ECF No. 17). Defendant is thus entitled to dismissal of Plaintiff's FDCPA under *Fed. R. Civ. P. 12 (b)(6)*.

Defendant is further entitled to summary judgment on Plaintiff's FDCPA claim on the ground that Plaintiff has failed to produce evidence to raise a genuine fact issue as to whether: (1) he was the object of a collection activity arising from consumer debt; (2) Defendant was a debt collector under the statute; and (3) Defendant attempted to collect any debt by unfair and unconscionable means. Summ. J. Br. 5 ¶ 17-19 (ECF No. 24-2). Plaintiff failed to file any response to Defendant's summary judgment motion highlighting the lack of evidence to support these elements, and Plaintiff has not identified any specific evidence as to any of **[*10]** these elements. Accordingly, the District Court should dismiss Plaintiff's FDCPA claim with prejudice.

The TCPA makes it unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service for which the called party is charged for the call." *Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 373, 132 S. Ct. 740, 181 L. Ed. 2d 881 (2012)* (citing *47 U.S.C. § 227(b)(1)(A)(iii)*. An "automatic telephone dialing system" is defined as equipment with the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator" and to dial such numbers. *47 U.S.C. § 227(a)*. The Fifth Circuit has held that "[t]o be liable under the artificial or prerecorded voice, section of the TCPA . . . a defendant must make a call and an artificial or prerecorded voice must actually play." *Ybarra v. Dish Network, LLC, 807 F.3d 635, 640 (5th Cir. 2015)*.

Here, Plaintiff alleges in his First Amended Complaint that Defendant used an automatic telephone dialing system to place its collection calls to him and that "[w]ith each call, there was a hold time of between 30 seconds to 1 minute, when finally . . . somebody would come online and ask for **[*11]** the Plaintiff by name." *See* Am. Compl. 12 ¶ 25 (ECF No. 17). Plaintiff does not allege that an "artificial or prerecorded voice" played on the call. Therefore, Plaintiff has failed to state a claim under the TCPA. Plaintiff's First Amended Complaint is further deficient in that it does not provide sufficient factual allegations regarding the source, time, and frequency of any calls. Plaintiff's "bare bones" allegation that Defendant engaged in a "pattern and practice" of calling

him at work and on his cell phone fails to state a claim under the TCPA. *See Cunningham v. TechStorm, LLC, 2017 U.S. Dist. LEXIS 25047, 2017 WL 721079, at *2 (N.D. Tex. Feb. 23, 2017)* (Lynn, C. J.) (holding that plaintiff failed to state a claim under the TCPA when he failed to provide the date or times for the calls and the frequency of the calls).

Defendant is also entitled to summary judgment on Plaintiff's TCPA claim because Plaintiff failed to identify any evidence that Defendant called Plaintiff using an automatic dialing system. In the absence of any evidence as to that element of the claim, the District Court should dismiss Plaintiff's TCPA claim with prejudice.

**Texas Retail Installment Sales Act ("TRISA")**

Plaintiff further alleges that Defendant violated the TRISA, *Tex. Finance Code §§ 345.065* and *345.301*, when it failed and/or refused to **[*12]** provide Plaintiff with a copy of his completed membership contract. Am. Compl. 17 ¶ 43 (ECF No. 17). Defendant moves to dismiss this claim on the ground that Plaintiff's allegations do not state a cause of action under the TRISA. Def.'s Br. 7 ¶ 14 (ECF No. 21).

Chapter 345 of the Texas Finance Code "applies only to a retail installment transaction." *Tex. Fin. Code § 345.007(a)*. A retail installment transaction is defined as "a transaction in which a retail buyer purchases goods or services from a retail seller under a retail installment contract or retail charge agreement that provides for a time price differential and under which the buyer agrees to pay the unpaid balance and the time price differential in one or more installments." *Tex. Fin. Code § 345.001(7)*. Here, Plaintiff has not alleged facts to show that Plaintiff and Defendant entered into a retail installment contract. Instead, Plaintiff's allegations under TRISA include only conclusory statements that he "would show that the Defendant violated the provisions of the Texas Retail Installment Sales Act" and that "Plaintiff's gymnasium membership contract with the Defendant was a 'retail installment contract,' as that term is defined in *§§ 345.001* and *345.052*[.]" Am. Compl. 17 ¶ 42 (ECF No. 17). **[*13]** Defendant is thus entitled to dismissal of Plaintiff's TRISA claim under *Fed. R. Civ. P. 12(b)(6)*.

Defendant is also entitled to summary judgment on Plaintiff's TRISA claim because Plaintiff has failed to identify any evidence that would raise a genuine fact

issue on any of the following elements: (1) that Defendant violated the statute; (2) that Defendant failed to present Plaintiff a copy of his membership agreement; and (3) that Defendant withheld the membership agreement. On July 6, 2018—well after the expiration of the deadline for filing a response to Defendant's summary judgment motion—Plaintiff filed a CD containing a video file. Attached to the CD is an email that purports to be from Plaintiff to defense counsel and states that, the video shows "two general managers conspired to keep [Plaintiff] from obtaining [his] contract." *See* ECF No. 26. The Court is not required to consider this tardy filing, but will do so in the interest of justice. The video appears to have been recorded by Plaintiff as he speaks to a single employee at Defendant's gym. The employee shows Plaintiff a computer screen and explains that the employee does not have the authority to pull up Plaintiff's membership agreement, but **[\*14]** the operations manager would be able to retrieve it. Plaintiff then asks if the employee could give him a blank copy of a service agreement and a blank copy of a contract. The employee explains that a service agreement and a contract are the same thing. The video ends after the employee hands Plaintiff a blank copy of the contract, and Plaintiff walks out of the gym. Contrary to Plaintiff's representations to defense counsel, the video does not show two general managers conspiring to keep Plaintiff from obtaining his contract. Instead, it shows Defendant's employee willingly assisting Plaintiff in his effort of obtain a copy of the agreement. Plaintiff's evidence fails to raise a genuine fact issue as to whether Defendant failed to present Plaintiff a copy of his membership agreement or withheld the membership agreement from him. Accordingly, the District Court should grant Defendant's summary judgment motion as to Plaintiff's claims under the TRISA and dismiss those claims with prejudice.

**Texas Deceptive Trade Practices Act ("DTPA")**

Finally, Plaintiff alleges that he "would show that the Defendant violated provisions of the Texas Deceptive Trade Practices—Consumer Protection Act, which **[\*15]** were a producing cause of damages to the Plaintiff." Am. Compl. 17-18 ¶ 46 (ECF No. 17). Plaintiff does not identify with any specificity the conduct allegedly committed by Defendant that violates the DTPA. He merely states that Defendant "violated *subdivisions (b)(5)*, *(7)*, and *(12)* . . . in that they constituted false, misleading, or deceptive acts or practices. . . ." *Id.* at 18 ¶ 48. Plaintiff then recites the statutory language of *Sections 17.46(b)(5)*, *(7)*, *(12)*, and *17.45(5)*, *(9)*, *(13)*.

*Id.* ¶¶ 48-53.

To maintain an action under the DTPA, Plaintiff must plead and prove that: (1) he is a consumer; (2) defendant was engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of his damages. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 327 (5th Cir. 2002)* (citing *Doe v. Boys Clubs, 907 S.W.2d 472, 478 (Tex. 1995)*; *Tex. Bus. & Com. Code Ann. § 17.50(a)(1)*. *Federal Rule of Civil Procedure Rule 9(b)* "requires that '[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud.'" *Ibe v. Jones, 836 F.3d 516, 525 (5th Cir. 2016)* (citing *Fed. R. Civ. P. 9(b)*). "At a minimum, *Rule 9(b)* requires allegations of the particulars of time, place, and the contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Electronics, Inc. v. J.M. Huber Corp, 343 F.3d 719, 724 (5th Cir. 2003)* (citing *Tel-Phonic Services, Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)*. The complaint must set forth specific facts supporting an inference of fraudulent intent. *Ibe, 836 F.3d at 525* (citing *Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir. 1994)*).

Plaintiff's DTPA allegations are vague and fail to satisfy the **[\*16]** pleading standard of *Rule 9(b)*. Def.'s Br. 8 ¶ 17 (ECF No. 21). In particular, Plaintiff's First Amended Complaint fails to allege the specific conduct by Defendant that constitutes a violation under the DTPA. Instead, Plaintiff provides only a "formulaic recitation of the elements" of the DTPA. *Twombly, 550 U.S. at 555*. Accordingly, Plaintiff has not alleged sufficient facts showing that Defendant violated the DTPA, and Defendant is entitled to dismissal of those claims.

Defendant further is entitled to summary judgment on Plaintiff's DTPA claim because he has failed to identify evidence that would raise a fact question as to whether: (1) Defendant engaged in false, misleading, or deceptive acts; (2) Defendant engaged in an unconscionable course of action; (3) any violation of the DTPA by Defendant was the producing cause of Plaintiff's injury; and (4) Plaintiff sustained any damages. Summ. J. Br. 7-8, ¶¶ 26-27 (ECF No. 24-2). Plaintiff failed to file a response to Defendant's summary judgment motion on this ground. In the absence of evidence sufficient to raise a fact question, Defendant is entitled to dismissal with prejudice of Plaintiff's DTPA claim.

2018 U.S. Dist. LEXIS 157238, *16

**Recommendation**

For the reasons stated, the District Court should **[*17]** GRANT Defendant Fitness International LLC's Motion to Dismiss (ECF No. 20) and its Motion for No-Evidence Summary Judgment (ECF No. 24) and dismiss Plaintiff's Amended Complaint (ECF No. 17) with prejudice.

**SO RECOMMENDED**.

August 15, 2018.

/s/ Rebecca Rutherford

REBECCA RUTHERFORD

UNITED STATES MAGISTRATE JUDGE

---

End of Document

## *Zoch v. Daimler*

United States District Court for the Eastern District of Texas, Tyler Division

May 16, 2017, Decided; May 16, 2017, Filed

CIVIL ACTION NO. 4:17-CV-00578-ALM

**Reporter**

2017 U.S. Dist. LEXIS 169240 *

HENRY ZOCH II, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF HENRY ZOCH III, DECEASED; Plaintiff, v. DAIMLER, AG, MERCEDES BENZ USA, LLC, SMART USA DISTRIBUTOR, LLC, MAGNA INTERNATIONAL, INC., MAGNA SEATING (GERMANY) GMBH F/K/A INTIER AUTOMOTIVE SEATING SYSTEMS, GMBH, PAG DISTRIBUTOR S1, LLC, JOHNSON CONTROLS, INC., JOHNSON CONTROLS METALS AND MECHANISMS GMBH & CO. KG, Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Dismissed by *Zoch v. Daimler, 2017 U.S. Dist. LEXIS 229423 (E.D. Tex., July 5, 2017)*

Related proceeding at *Zochii v. Daimler, 2017 U.S. Dist. LEXIS 226111 (E.D. Tex., Aug. 18, 2017)*

Motion granted by, Motion denied by *Zoch v. Daimler, 2017 U.S. Dist. LEXIS 185343 (E.D. Tex., Nov. 8, 2017)*

Motion granted by, in part *Zoch v. Daimler, 2018 U.S. Dist. LEXIS 40425 (E.D. Tex., Mar. 13, 2018)*

Summary judgment denied by, Stay denied by, Stay denied by, As moot, Motion denied by, Motion denied by, As moot *Zoch v. Daimler, A.G., 2018 U.S. Dist. LEXIS 127190 (E.D. Tex., June 19, 2018)*

Motion denied by *Zoch v. Daimler, A.G., 2018 U.S. Dist. LEXIS 164496 (E.D. Tex., Sept. 25, 2018)*

Motion denied by, Reserved by *Zoch v. Daimler, A.G., 2018 U.S. Dist. LEXIS 164500 (E.D. Tex., Sept. 25, 2018)*

Motion denied by *Zoch v. Daimler, A.G., 2018 U.S. Dist. LEXIS 165769 (E.D. Tex., Sept. 27, 2018)*

Decision reached on appeal by *Zoch v. Magna Seating (Germany) GmbH, 2020 U.S. App. LEXIS 13029 (5th Cir. Tex., Apr. 22, 2020)*

**Counsel:** [*1] For Henry Zoch, II, Individually and on behalf of The Estate of Henry Zoch III, Deceased, Plaintiff: Jeffrey Todd Embry, Hossley & Embry LLP, Tyler, TX.

For Daimler, AG, Mercedes Benz USA, LLC, PAG Distributor S1, LLC Defendants: Kurt Christopher Kern, LEAD ATTORNEY, Bowman & Brooke LLP - Dallas, Dallas, TX; Craig Douglas Dupen, Tanya Buler Scarbrough, Bowman and Brooke LLP - Plano, Plano, TX.

For Smart USA Distributor, LLC, Defendant: Craig Douglas Dupen, Tanya Buler Scarbrough, Bowman and Brooke LLP - Plano, Plano, TX.

For Magna International, Inc., Defendant: Johnny Wayne Chambless, II, LEAD ATTORNEY, Thompson Coe Cousins & Irons, LLP - Austin, Austin, TX.

For Magna International of America, Inc., Defendant: Johnny Wayne Chambless, II, LEAD ATTORNEY, Thompson Coe Cousins & Irons, LLP - Austin, Austin, TX.

For Magna Seating (Germany) GmbH f/k/a Intier Automotive Seating Systems, GmbH, Defendant: Johnny Wayne Chambless, II, Thompson Coe Cousins & Irons, LLP - Austin, Austin, TX.

For Johnson Controls, Inc., Defendant: Gordon Randall Akin, G R Akin Attorney at Law, Longview, TX; Jeffrey B Whitt, Tracy G Ferak, Drinker Biddle & Reath - Chicago, Chicago, IL.

2017 U.S. Dist. LEXIS 169240, *1

For Johnson Controls Metals and Mechanisms [*2] GmbH & Co. KG, Defendant: Gordon Randall Akin, G R Akin Attorney at Law, Longview, TX.

**Judges:** JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JOHN D. LOVE

# Opinion

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

The above-styled matter is referred to the undersigned for all pretrial matters in accordance with *28 U.S.C. § 636*. Before the Court are three *Rule 12(b)(2)* Motions to Dismiss for Lack of Personal Jurisdiction filed by Defendants Johnson Controls Metals and Mechanisms GmbH & Co. ("JCMM") (Doc. No. 129), Magna International Inc. ("Magna International") (Doc. No. 141), and Magna Seating (Germany) GmbH ("Magna Seating") (Doc. No. 143). Plaintiff filed responses to all three motions (Doc. Nos. 131, 145,147), and Defendants filed replies, respectively. (Doc. Nos. 139, 152, 153). Having considered the parties' arguments, and the applicable law, the Court recommends that the Motions (Doc. Nos. 129, 141, 143) be **GRANTED** and that Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE**.

## I. BACKGROUND

On October 15, 2014, at approximately 7:05 p.m., Mr. Henry Zoch III was stopped in traffic on the exit ramp of the President George Bush Turnpike in Plano, Texas, when another car rammed into the rear of his vehicle. Pl.'s Second Am. [*3] Compl. ("SAC") at ¶ 14 (Doc. No. 88). The impact from the crash thrust Mr. Zoch III's Smart Fortwo car into the vehicle stopped directly in front of him. *Id.* at ¶ 15. According to the Complaint, the steel bracket attached to the lower recliner mechanism under the driver's seat ripped, causing Mr. Zoch III's seat to collapse, and propelling him backwards. Mr.

Zoch III's head struck the rear window, resulting in a severe brain injury from which he eventually died on October 16, 2014. *Id.*

Mr. Zoch II, individually and on behalf of the Estate of Henry Zoch III, his son, filed this suit on February 16, 2016 asserting claims of design defect, manufacturing defect, and negligence against the following defendants: Daimler, A.G., a foreign corporation organized under the laws of Germany; Mercedes Benz USA, LLC, a New Jersey limited liability company; PAG Distributor S1, LLC, f/k/a smart USA Distributor, LLC a Delaware limited liability company; Daimler Vehicle Innovations, LLC, a Delaware limited liability company, Magna International, a Canadian corporation, Magna International of America, Inc. ("Magna America"), a Michigan Corporation, and Magna Seating, a German Corporation. Plaintiff further [*4] alleges that the parties are liable for the acts of each other under a joint enterprise theory. SAC at ¶ 43.

On June 1, 2016, the Court dismissed Defendant Daimler Vehicle Innovations, LLC (Doc. No. 35) in accordance with Plaintiff's Notice of Voluntary Dismissal. Plaintiff then joined Johnson Controls, Inc., and JCMM as parties to the suit. (Doc. Nos. 52, 88.) Johnson Controls, Inc. is a Wisconsin Corporation (Doc. No. 52), and JCMM is foreign entity organized under the laws of Germany (Doc. No. 88). On May 4, 2017, the Court dismissed Magna America pursuant to Plaintiff's Notice of Voluntary Dismissal. (Doc. No. 151.)

Mr. Zoch II specifically alleges that Magna International entered into agreements with Daimler, A.G. and other Defendants for the purpose of supplying the driver's seating system in the Smart Fortwo for distribution and use in vehicles that were targeted for sale in the United States, and specifically in Texas. SAC at ¶ 21. Plaintiff further claims that Magna America marketed and provided warranty support for the Fortwo's seating system in the United States. *Id.* Plaintiff alleges that Magna Seating designed, tested, and supplied the seat, chose the metal used in the seat's [*5] anchorage and fittings, and designed the seat-related components and anchorages generally. *Id.* Plaintiff alleges that Johnson Controls Inc. provided the steel seat frame and recliner mechanism components in the subject vehicle seat, including the portion that failed during the subject crash, and that JCMM also provided portions of the steel seat frame and recliner mechanism components in the subject vehicle seat, including portions of the mechanism that failed during the subject crash. *Id.* at ¶¶ 22, 23.

2017 U.S. Dist. LEXIS 169240, *5

The Magna Defendants each initially filed separate *Rule 12(b)(2)* Motions to Dismiss for Lack of Personal Jurisdiction arguing that they are not subject to general jurisdiction or specific jurisdiction in Texas. (Doc. Nos. 10, 12, and 23.) The Court denied those motions and permitted a period of jurisdictional discovery. (Doc. 101.) Thereafter, Magna International, Magna Seating, and JCMM all filed separate *Rule 12(b)(2)* Motions to Dismiss for Lack of Personal Jurisdiction arguing that they are not subject to general jurisdiction or specific jurisdiction in Texas.[1] (Doc. Nos. 129, 141, 143.)

## II. LEGAL STANDARD

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant **[*6]** (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the *Due Process Clause of the Fourteenth Amendment*." *Mullins v. TestAm., Inc. 564 F.3d 386, 398 (5th Cir. 2009)*. If a state's long-arm statute "extends to the limits of federal due process," as Texas's statute does, "the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008)* (citing *Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994))*. Due process is satisfied only through a showing "(1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (internal citations and quotations omitted).

Under *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, the plaintiff bears the burden of establishing personal jurisdiction over a non-resident, "but it need only make a *prima facie* case" if the district court does not conduct an evidentiary hearing.[2] *Johnston, 523 F.3d at 609*. "In considering a motion to dismiss for lack of

---

[1] Magna America also filed a motion to dismiss for lack of personal jurisdiction, but that motion was terminated when Magna America was dismissed from this action pursuant to Plaintiff's notice of voluntary dismissal. (Doc. No. 151.)

[2] The Court did not conduct an evidentiary hearing; therefore, Plaintiff need only make a *prima facie* showing to establish jurisdiction in Texas. *See Walk Haydel & Associates, Inc. v. Coastal Power Production Co., 517 F.3d 235, 242 (5th Cir. 2008)* (partial grant of plaintiff's motion for jurisdictional discovery was inadequate to justify raising plaintiff's burden above the *prima facie* level).

personal jurisdiction, a district court may consider affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Revell v. Lidov, 317 F.3d 467, 469 (5th Cir. 2002)* (internal citations omitted). "[U]ncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the **[*7]** facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Johnston, 523 F.3d at 609* (quoting *Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990))* (internal citations omitted). On the other hand, a court is not required to credit conclusory allegations even if they are uncontroverted. *See Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 869 (5th Cir. 2001)* (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998))* ("[T]he law does not require us to struthiously ? [sic] credit conclusory [jurisdictional] allegations or draw farfetched inferences.").

Minimum contacts may be established through either general or specific jurisdiction. If the plaintiff successfully makes a *prima facie* showing of minimum contacts, the burden then shifts to the defendant to show "that the traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction." *Johnston, 523 F.3d at 615* (citing *Wien Air Alaska, Inc., v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999))*.

The Supreme Court recently rearticulated the standards for both general and specific jurisdiction in *Daimler AG v. Bauman, 571 U.S. 117, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)*, and *Walden v. Fiore, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*, respectively.

### a. General Jurisdiction

General jurisdiction arises when a non-resident defendant's "continuous corporate operations within a state [are] so substantial and of such nature as to justify suit...*on causes of action arising from dealings entirely* **[*8]** *distinct from those activities.*" *Daimler, 134 S. Ct. at 761* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 318, 66 S. Ct. 154, 90 L. Ed. 95 (1945))* (emphasis in original). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id. at 760* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S.*

Ct. 2846, 180 L. Ed. 2d 796 (2011)). "With respect to a corporation, the place of incorporation and the principal place of business are 'paradig[m]...bases for general jurisdiction.'" *Id.* (internal citations omitted).

In *Daimler*, the Supreme Court qualified that "*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums." *Id.* However, the Court also found "unacceptably grasping" the notion that a corporation should be considered "at home" in "every state in which it engages in a substantial, continuous, and systematic course of business." *Id. at 760-61*. "Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Id. at 762 n.20*.

Similarly, for a court to exercise general jurisdiction over a foreign corporation, that corporation itself—not **[*9]** its managing agent or subsidiary or affiliate, must be "at home" in the forum state. *Air Tropiques, SPRL v. N. & W. Ins. Co. Ltd., Civil Action No. H-13-1438, 2014 U.S. Dist. LEXIS 44255, 2014 WL 1323046, at *10 (S.D. Tex. Mar. 31, 2014)* (citing *Daimler, 134 S. Ct. at 761*). In light of *Daimler*, the Fifth Circuit has observed that as a matter of course, it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Monkton Ins. Services, Ltd. v. Ritter, 768 F.3d 429, 432 (5th Cir. 2014)*

#### b. Specific Jurisdiction

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear, 564 U.S. at 919*. In *Walden*, the Supreme Court reaffirmed that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *134 S. Ct. at 1121*. The ultimate question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Goodyear, 564 U.S. at 924* (citing *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958))*. If the defendant committed at least one act in the forum state substantially related to the suit, it is enough to support specific jurisdiction. **[*10]** *See Moncrief Oil Int'l v. OAO*

*Gazprom, 481 F.3d 309, 311 (5th Cir. 2007)*.

The Fifth Circuit has established a three-step analysis for determining if specific jurisdiction exists:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Monkton, 768 F.3d at 432* (citing *Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006))*. Under this analysis, the plaintiff bears the burden of satisfying the first two prongs; if the plaintiff is successful, the burden shifts to the defendant to show that exercising jurisdiction would be unfair or unreasonable. *Seiferth, 472 F.3d at 271*.

Specific jurisdiction is a claim-specific inquiry. *Id. at 274*. Therefore, Mr. Zoch II must establish specific jurisdiction for each claim (design defect, manufacturing defect, and negligence) he has brought against each Defendant.

### III. DISCUSSION

The Court addresses Plaintiff's claims as to each moving Defendant in turn.

#### a. Johnson Controls Metals and Mechanisms GmbH & Co. ("JCMM")

As discussed above, JCMM is a German corporation with its principal **[*11]** place of business in Germany. (Doc. No. 129-1, Declaration of Thomas Schwenzer ("Schwenzer Decl.") at ¶ 3.) Around January 31, 2011, Johnson Controls, Inc. acquired C. Rob. Hammerstein GmbH & co. KG, and thereafter changed the name to Johnson Controls Metals and Mechanisms GmbH & Co. KG, referred herein as JCMM. *Id.* at ¶ 1. At the relevant time, JCMM "designed automobile seat structures, seat mechanism components, and seat structure components, which were then manufactured by sister companies of JCMM and supplied to automobile manufacturer assembly plants or seat manufacturer assembly plants." *Id.* at ¶ 4. Specifically, with respect to the model year 2008 Smart Fortwo vehicles, JCMM

2017 U.S. Dist. LEXIS 169240, *11

designed the seat's metal structural components in Germany pursuant to the technical specifications and performance requirements provided to it by Daimler, A. G. in Germany. *Id.* at ¶ 5. CRH Umformtecknik GmbH & Co. KG, a sister company of JCMM, manufactured the seat's metal structural components in Germany, and sold and supplied them to Magna Seating. *Id.* Magna Seating assembled the seat, including the structure, trim, foam and plastic parts of the seat, for the model year 2008 Smart Fortwo vehicle and supplied **[\*12]** the finished seat to the Smart automobile manufacturer assembly plant in France. *Id.*

JCMM argues that it is a German company that has no presence in, or systematic and continuous contacts with, the State of Texas. (Doc. No. 129, at 2.) As stated by its declarant, JCMM maintains that it merely designed the seat's metal and structural components in Germany according to specifications provided to it by Daimler, which it then supplied to Magna Seating in Germany. *Id.* JCMM contends it had no involvement, direction or control over the assembly of the finished seat or the transportation, distribution, or sale of the furnished seat or vehicle. *Id.* JCMM also argues that the vehicle in question did not enter Texas until after it left the stream of commerce and that Plaintiff's claims do not arise out of or relate to any activity of JCMM in Texas. *Id.* at 3. Finally, JCMM argues that jurisdiction over JCMM in Texas would be unfair and in violation of the *Due Process Clause*. *Id.*

Plaintiff concedes this is a specific jurisdiction case and argues that this Court has jurisdiction over JCMM under the Fifth Circuit's approach to the "stream of commerce" because JCMM derives economic benefits from the indirect sales of products **[\*13]** throughout the United States. (Doc. No. 131, at 13.) Plaintiff argues that the use of middlemen such as Daimler does not shield JCMM from liability and notes that over 24,000 Smart Fortwo vehicles were sold in the United States in 2008. *Id.* at 14. Plaintiff further argues that while JCMM would be somewhat burdened by having to defend this lawsuit in the United States, it would not be unjust and unfair to defend this litigation in Texas because JCMM derived an economic benefit from marketing its products for use in the United States and Texas. *Id.* at 16. Further, Plaintiff argues that the State of Texas has an interest in injuries that occur in this state and that Plaintiff has an interest in obtaining convenient and effective relief for the death of his son. *Id.* at 17.

Plaintiff's only argument that JCMM has minimum contacts with Texas is through the stream-of-commerce theory. Under this theory, specific jurisdiction may be based on the movement of goods from a manufacturer[3] through its distributor to consumers, *i.e.*, through the stream of commerce. *J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 881, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011).*

Circuit courts have been split in their application of the stream-of-commerce test since the Supreme Court's competing articulations in *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cnty., 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*, and later **[\*14]** in *J. McIntyre Machinery, Ltd.*, as to the quality of contacts a defendant must have with the forum state in order to satisfy Due Process.

"In cases involving a product sold or manufactured by a foreign defendant," the Fifth Circuit has consistently followed an approach "under which the minimum contacts required is met so long as the court 'finds that the defendant delivered its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.'" *Ainsworth v. Moffett Fuseling, Ltd., 716 F.3d 174, 177 (5th Cir. 2013)* (citing *World—Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980))*; *see also J. McIntyre Machinery, Ltd., 564 U.S. at 882*.[4] A defendant need not have "purposely directed" its activities to the forum. *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010) (citing *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 419 (5th Cir.1993))*. However, "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction [only] if the defendant's product made its way into the forum state while still in the stream of commerce." *Ainsworth, 716 F.3d at 177* (citing *Luv N'Care, Ltd. v. Insta—Mix, Inc., 438 F.3d 465, 470 (5th Cir. 2006))*.

---

[3] Under Texas law, a manufacturer is "a person who is a *designer*, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or *assembler* of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce. *Tex. Civ. Prac. & Rem. Code Ann. § 82.004(4)* (emphasis added).

[4] Texas state courts follow Justice O'Connor's "stream of commerce plus" plurality opinion in *Asahi*, which states that "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." *Asahi, 480 U.S. at 112*; *see CSR Ltd. v. Link, 925 S.W.2d 591 (Tex. 1996)*.

2017 U.S. Dist. LEXIS 169240, *14

Stated differently, "a defendant's placing of its product into the stream of commerce with the knowledge that the product will be used in the forum state is enough to constitute minimum contacts," in the Fifth Circuit, *Ruston, 9 F.3d at 419* (citing *World-Wide Volkswagen Corp., 444 U.S. at 298*), "but [t]he defendant's contacts must be more than 'random, fortuitous, or attenuated, or of the unilateral [*15] activity of another party or third person,'" *Ainsworth, 716 F.3d at 177* (internal citations and quotations omitted).

As an initial matter, Plaintiff has not pointed to a single contact that JCMM has with the State of Texas or any activity it has directed at Texas. Here, the record reflects that JCMM designed the seat's metal structural components at the direction of Daimler and then sold those parts to Magna Seating in Germany who assembled the seat and supplied the finished seat to an automobile manufacturer assembly plant in France. Schwenzer Decl. at ¶ 5. Plaintiff does not dispute this supply chain but instead contends that because JCMM derives benefits from the indirect sales of products in the United States it should be subjected to personal jurisdiction here and not shielded by the acts of any middlemen such as Daimler. (Doc. No. 131, at 13-14.) Plaintiff's own contentions admit that Daimler designed the vehicle in question in Germany, manufactured it in France, and sold it to its smart USA Distributor LLC, a general importer of smart vehicles into the United States at the time. (Doc. No. 131, at 5, citing Exhibit 9, at 5.) It was then that the vehicle in question was sold to Mercedes-Benz of Houston [*16] North and ultimately sold to its first owner, Gerard Thomas Berggren III, who titled the vehicle in Louisiana and used it there for the next six years. *Id.*

Under the Fifth Circuit's approach to the stream of commerce, the Court does not have jurisdiction over JCMM because there is not a single contention or any factual support to suggest that JCMM had any knowledge or awareness that the seat's metal components it designed would be sold or used in the State of Texas. According to JCMM's declarant, JCMM did not know the specific final destination or the ultimate place of sale of the smart vehicles, including the subject vehicle, and it did not enter into any contracts with the vehicle manufacturer, or any other entity, regarding the shipment, distribution, or sale of the vehicles, including the subject vehicle. Schwenzer Decl. at ¶ 7. JCMM admits only that it knew of the vehicle manufacturer's intention that some smart vehicles would ultimately be shipped to North America, but it had no knowledge where any specific smart vehicle would be shipped or

ultimately sold, and did not know any smart vehicle would be shipped to, or ultimately sold in, Texas. *Id.*

Plaintiff does not point to any [*17] facts that would indicate JCMM had knowledge that component parts it supplied would end up in the forum state, or even that it would be foreseeable that those component parts would end up in Texas. Daimler sold the vehicle to be imported to the United States without the specific or general knowledge of JCMM. JCMM designed the metal components in Germany at the direction of Daimler (which were ultimately manufactured by its sister company in Germany), supplied those components to Magna Seating in Germany who assembled the seat, which was ultimately shipped to France for vehicle assembly, and was then sold by Daimler to USA Distributor LLC who imported the vehicle to the United States and eventually sold to Mercedes-Benz of Houston North where it was sold to its first owner. Nothing among these relationships or any facts in the record impute knowledge to JCMM that its component parts would be sold or used in Texas or that it would be foreseeable those parts would end up in Texas. Because Plaintiff has failed to establish any minimum contacts between JCMM and Texas, dismissal of Plaintiff's claims as to JCMM is warranted.

As Plaintiff has not made a *prima facie* showing of the first two [*18] prongs of the jurisdictional analysis test as to JCMM, the Court need not address the third prong—whether the traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction.

Accordingly, for the reasons stated herein, it is **RECOMMENDED** that JCMM's Motion to Dismiss for lack of personal jurisdiction (Doc. No. 129) be **GRANTED**.

**b. Magna International, Inc. ("Magna International")**

Magna International is a Canadian corporation and the parent corporation to various subsidiary corporations and entities located in North America, South America, Europe, and Asia, including Magna America and Magna Seating. (Doc. No. 155-1 at 2, 4.) Magna International and its separately-incorporated subsidiary-corporations design, develop, and manufacture various automotive systems, assemblies, modules, and components, which are then supplied to automobile manufacturers around the world. *Id.*

Magna International asserts that specific jurisdiction

2017 U.S. Dist. LEXIS 169240, *18

over it does not exist because it is a Canadian company and it did not design, manufacture, test, distribute, or sell the vehicle or the component seating parts that Plaintiff claims are defective. (Doc. No. 141, at 2.) Magna International **[*19]** maintains that it has no contacts with Texas and has not directed any activities towards the forum. *Id.* Magna International asserts that it:

a. Does not maintain or register an agent for service of process in Texas;

b. Does not pay or have any obligation for payment of taxes in Texas;

c. Does not maintain any place of business in Texas;

d. Does not employ anyone in Texas;

e. Does not maintain corporate records in Texas;

f. Does not hold any Texas licenses;

g. Does not have a distributor, supplier, retailer, or other merchant selling [Magna Defendants'] products in or to Texas;

h. Does not own any real property in Texas;

i. [sic] Advertise any products directly to the Texas market;

j. Does not maintain any offices, manufacturing plants, equipment, directors, officers, agents, post offices boxes, bank accounts, telephone or fax numbers, or other tangible assets in Texas; or,

k. [sic] Make any contracts with the state of Texas.

(Doc. No. 141, at 3-4, citing Doc. No. 155-1, Declaration of Riccardo Trecroce ("Trecroce Decl.") at ¶¶ 6-9.)

Plaintiff concedes this is a specific jurisdiction case, but does not allege any contacts with Texas made by Magna International or any contacts with Texas from which **[*20]** the causes of action arose. Rather, Plaintiff primarily argues that jurisdiction exists as to Magna International based on an agency or alter ego theory that any contacts Magna Seating (Germany) had with Texas should be attributed to Magna International. (Doc. No. 145, at 1-2.) In support of the contention that Magna International controlled the activities of Magna Seating, Plaintiff cites to a 2005 Annual Information Form of Intier Automotive Seating Systems, which states in relevant part that "Magna will continue to be able to cause us to effect corporate transactions without the consent of minority shareholders and to control the amount and timing of dividends..." *Id.* at 2, citing Doc. No. 145-4, at 29.

As an initial matter, Plaintiff belatedly raises the agency or alter ego argument as an avenue for establishing personal jurisdiction for the first time in his response to Magna International's Motion. Although Plaintiff has amended his complaint at several junctures, he has not yet added this theory to his allegations against Magna International.

Even if Plaintiff had timely asserted a theory of alter ego jurisdiction, imputing a subsidiary's contacts with a forum state to a parent corporation **[*21]** under an alter ego/agency theory is not appropriate under the circumstances at hand. *See Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983)* ("in some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries."); *see also Daimler, 134 S. Ct. at 759* ("[S]everal Courts of Appeals have held, that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego.").

Under Fifth Circuit law, "the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 346 (5th Cir. 2004)* (citation omitted). The only exception to this rule is if the "presumption of institutional independence of related corporate entities may be rebutted by 'clear evidence,' which requires a showing of 'something beyond' the mere existence of a corporate relationship between a resident and nonresident entity," then exercise of jurisdiction may be warranted. *Id.* (citing *Dickson Marine, Inc. v. Panalpina, Inc., 179 F.3d 331, 338 (5th Cir. 1999).*

The Fifth Circuit "generally... demand[s] proof of control by [one corporation] over the internal business operations **[*22]** and affairs' of another corporation to make the other its agent or alter ego, and hence 'fuse the two together for jurisdictional purposes.'" *Id.* (citing *Hargrave, 710 F.2d at 1160* (internal quotations omitted). "In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, the [Fifth Circuit] considers the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities." *Id.* (citing *Hargrave, 710 F.2d at 1160*).

Here, Plaintiff has not cited to any clear evidence to rebut the corporate separateness of Magna International and Magna Seating. As discussed above, Plaintiff relies primarily on a 2005 Annual Information Form of Intier Automotive Seating Systems ("Intier") that suggests Magna International can effect corporate transactions and dividend payout without consent of minority shareholders. (Doc. No. 145-4.) This document shows that Magna International **[*23]** has direct and indirect ownership of Intier Automotive Inc.'s outstanding Class B shares. *Id.* at 3. The Court has reservations that Magna's stock ownership alone is sufficient to overcome the presumption of corporate separateness. However, even if that evidence were enough, there is no evidence to connect the stock ownership of Intier Automotive Inc. to *Magna Seating*, the entity over whom Plaintiff contends Magna International has control to support its alter ego theory for jurisdiction.

Plaintiff merely asserts that Magna International must have control because Magna Seating is a wholly owned subsidiary of Intier Automotive Inc. (Doc. No. 145, at 2.) But, "the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." *Hargrave, 710 F.2d at 1159 (5th Cir. 1983)*. Here, as the 2005 Annual Information Form shows, as of 2005 Intier Automotive Inc. owned 99% interest in Intier Investments S.A., which owned Intier (Germany) Holding GmbH, which owned Inter Automative Seating Systems GmbH (now Magna Seating). (Doc. No. 145-4, at 36.) Plaintiff has failed to provide clear evidence to connect the chain of control from Magna International to Intier Automotive Inc., to **[*24]** Intier Investments S.A., to Intier (Germany) Holding GmbH, to Magna Seating.

Ultimately, Plaintiff provides no evidence that Magna International controls any activities, policies, or actions of Magna Seating. As explained above, the only evidence in the record was that of stock ownership of Intier Automotive Inc. for which Plaintiff failed to establish a line of connectedness among the chain of subsidiaries to Magna Seating. Similarly, Plaintiff pointed to no common headquarters, directors, and officers; Plaintiff did not cite any shared policies or formalities between Magna International and Magna Seating; Plaintiff did not point to any shared accounting systems; and importantly, Plaintiff had no evidence of Magna International's control over Magna Seating's general policies or daily activities. Moreover, for the reasons discussed below with respect to Magna Seating, even if Plaintiff was correct in his alter ego theory and had provided clear evidence to support such

a theory, Magna Seating's contacts are insufficient to confer specific jurisdiction in Texas. *See supra* Section III(c).

Other than his alter ego theory, the only argument Plaintiff makes for personal jurisdiction as to **[*25]** Magna International is the same generic stream of commerce argument he made with respect to JCMM. But here again Plaintiff has not identified any minimum contacts Magna International has with Texas or any actions it took to purposefully avail itself of this forum. For the same reasons explained above, these arguments fail to establish jurisdiction.

As Plaintiff has not made a *prima facie* showing of the first two prongs of the jurisdictional analysis test as to Magna International, the Court need not address the third prong—whether the traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction.

In sum, Plaintiff fails to make a *prima facie* showing that Magna International purposefully availed itself of the benefits and protections of Texas law through minimum contacts giving rise to or resulting in the alleged causes of action. Thus, exercising specific jurisdiction over Magna International would be improper, and the Court **RECOMMENDS GRANTING** Magna International's 12(b)(2) Motion to Dismiss (Doc. No. 141).

### c. Magna Seating (Germany) GmbH ("Magna Seating")

Magna Seating is a German corporation that design, develops, and manufactures automobile **[*26]** seats, seating assemblies, and component parts in Germany, which are then supplied to various automobile manufacturer assembly plants in Europe. (Doc. No. 143-4, Declaration of T. Fleischhacker ("Fleischhacker Decl.") at ¶ 4). Magna Seating assembled the seat for the 2008 Smart Fortwo according to the technical specifications as defined by its customer, Smart GmbH. *Id.* at ¶ 6. According to Magna Seating, a different company selected by Smart GmbH "supplied the seat's metal structure (including its anchorage and fittings) and had design and manufacturing responsibility for those parts." *Id.* Magna Seating states that it supplied seats to Smart GmbH, "a company believed to be a division of Daimler AG, under a supply agreement between the companies." *Id.* at ¶ 7. Magna Seating's design and manufacturing of certain seat component parts and assembly of the seat for the Fortwo occurred in Germany. *Id.* Magna Seating denies having any

2017 U.S. Dist. LEXIS 169240, *26

contacts with Texas. (Doc. No. 143, at 5-6.)

Similar to JCMM, Plaintiff's only argument that Magna Seating has minimum contacts with Texas is through the stream-of-commerce theory. As explained above, the Fifth Circuit has consistently followed an approach "under **[*27]** which the minimum contacts required is met so long as the court 'finds that the defendant delivered its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.'" *Ainsworth, 716 F.3d at 177*. The "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction [only] if the defendant's product made its way into the forum state while still in the stream of commerce." *Id.* "The defendant's contacts must be more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person,'" *Id.* (internal citations and quotations omitted).

Plaintiff alleges that Mr. Zoch III's accident would not have occurred if Magna Seating had not participated in the development or manufacture of, or supplied, a defective seat in the 2008 Smart Fortwo that was then placed into the stream of commerce and ultimately sent for sale in Texas. (Doc. No. 147, at 1-2.) The parties' dispute focuses on what stream of commerce test should be applied and whether Magna Seating's activities satisfy that test thereby subjecting them to the jurisdiction of Texas courts.

While Magna Seating first argues that under *Erie* the Court **[*28]** should apply the "stream of commerce plus" test set forth in *Asahi*, the Court need not address the correctness of that argument as jurisdiction is not conferred under the Fifth Circuit's broader approach to the stream of commerce. Here, Plaintiff provides evidence that Magna Seating entered into a contract to supply seating for the 2008 Smart Fortwo with the knowledge that those vehicles would be sold within the United States. (Doc. No. 147, at 7, citing Doc. Nos. 147-10; 147-11; 147-15, at 58:2-60:5.) Plaintiff further cites to evidence of specific pricing for seats to be used in the U.S. market. (Doc. No. 147-14, at 25:7-13.) Ultimately, Magna Seating does not deny its knowledge that Daimler intended to market the Smart Fortwo vehicle in the United States. (Doc. No. 143, at 2.) Certainly, the record reflects that Magna Seating had knowledge the seats it manufactured would likely arrive in the United States as part of the Smart Fortwo vehicles sold there. (Doc. Nos. 147-10; 147-11; 147-15, at 58:2-60:5; 147-14, at 25:7-31:7.) However, the pertinent inquiry is not what knowledge Magna Seating had regarding

distribution of the Smart Fortwo to the United States, but whether it had knowledge **[*29]** or awareness that the seats it manufactured would end up in Texas. *McIntyre, 564 U.S. at 883* ("personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis.")

Initially, Magna Seating argues that the vehicles did not enter Texas while in the stream of commerce because the vehicle in question was purchased by a Louisiana citizen and titled in Louisiana. (Doc. No. 16-17.) This argument, however, is incorrect, because the record reflects that in fact the vehicle was imported to the United States, sold to Mercedes-Benz of Houston North and then sold to its first owner, Gerard Thomas Berggren III, in Texas, who titled the vehicle in Louisiana and used it there for the next six years. (Doc. No. 147-9.) Because the vehicle was sold to Mercedes-Benz of Houston North in Texas and then ultimately first sold to a consumer (its original owner) at Mercedes-Benz of Houston North in Texas, the vehicle entered Texas while still in the stream of commerce. The fact that a citizen of Louisiana purchased the vehicle in Texas to take it to Louisiana to title it there and use it there was fortuitous.

However, while the vehicle containing the seat assembled by Magna Seating entered the stream of commerce in Texas, **[*30]** that fact alone is not sufficient to confer jurisdiction over Magna Seating under any stream of commerce test. As discussed above, the Fifth Circuit's test is met only where the Court "finds that the defendant delivered its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Ainsworth, 716 F.3d at 177* (citing *World—Wide Volkswagen, 444 U.S. at 298*). The Supreme Court has since emphasized that that it is the "defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *McIntyre, 564 U.S.at 883*.

Here, Plaintiff has not established that Magna Seating engaged in activity directed at Texas or any activities that reveal an intent to benefit from the protection of Texas' laws. Moreover, there is no objective or subjective evidence of Magna Seating's knowledge of the Texas market that would satisfy the Fifth Circuit's stream of commerce test. For example, had Plaintiff provided evidence that Magna Seating knew Texas was a primary market for the Smart Fortwo vehicles in the United States, such evidence may have made it foreseeable to Magna Seating that the seats they assembled would have entered the stream of commerce in Texas. However, on the **[*31]** record before the

Patricia O'Neill

2017 U.S. Dist. LEXIS 169240, *31

Court, there is no evidence that Magna Seating knew, or that would suggest that it was foreseeable to Magna Seating, that the Smart Fortwo vehicles would enter the stream of commerce in Texas. While Plaintiff points to Magna Seating's knowledge that the vehicles were targeted for the U.S. market based on safety and design concerns, Plaintiff has no evidence that Magna Seating had any knowledge of the distribution channels to or within the United States or any activities directed at or involving Texas. The general knowledge that products were entering the United States is not enough to satisfy due process to hail Magna Seating into court in Texas. Indeed, if that were enough, Magna Seating would be subject to personal jurisdiction in all 50 states through its general awareness that its seats might end up in the U.S. market. *McIntyre, 564 U.S. at 883-84* ("personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis... a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution.").

As Plaintiff has not made a *prima facie* showing of **[*32]** the first two prongs of the jurisdictional analysis test as to Magna Seating, the Court need not address the third prong—whether the traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction.

For the reasons stated herein, the Court may not exercise specific jurisdiction over Magna Seating. Therefore, the Court **RECOMMENDS GRANTING** Magna Seating's *12(b)(2)* Motion to Dismiss (Doc. No. 143).

Finally, as to all Defendants, Plaintiff has alleged a "joint enterprise" theory of liability. (Doc. No. 88, at ¶ 43.) However, nothing about this theory, nor any authority pointed to by Plaintiff would suggest such a theory could legally or factually support jurisdiction over the moving Defendants. Therefore, the Court finds that such allegations do not impact its recommendation of dismissal as to the claims and motions raised herein.

**CONCLUSION**

For the foregoing reasons, the Court recommends that JCMM, Magna International and Magna Seating's Motions to Dismiss (Doc. Nos. 129, 141, 143) be **GRANTED**, and that Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE**.

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file **[*33]** written objections to the findings and recommendations of the Magistrate Judge. *28 U.S.C. § 636(b)*. Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the

jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution."). As Plaintiff has not made a *prima facie* showing of the first two prongs of the jurisdictional analysis test as to Magna Seating, the Court need not address the third prong—whether the traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction. For the reasons stated herein, the Court may not exercise specific jurisdiction over Magna Seating. Therefore, the Court **RECOMMENDS GRANTING** Magna Seating's *12(b)(2)* Motion to Dismiss (Doc. No. 143). Finally, as to all Defendants, Plaintiff has alleged a "joint enterprise" theory of liability. (Doc. No. 88, at ¶ 43.) However, nothing about this theory, nor any authority pointed to by Plaintiff would suggest such a theory could legally or factually support jurisdiction over the moving Defendants. **[*34]** Therefore, the Court finds that such allegations do not impact its recommendation of dismissal as to the claims and motions raised herein. **CONCLUSION** For the foregoing reasons, the Court recommends that JCMM, Magna International and Magna Seating's Motions to Dismiss (Doc. Nos. 129, 141, 143) be **GRANTED**, and that Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE**. Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge. *28 U.S.C. § 636(b)*. Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)*.

**So ORDERED and SIGNED [*35] this 16th day of**

2017 U.S. Dist. LEXIS 169240, *35

**May, 2017**.

/s/ John D. Love

JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE

---

End of Document

## *Cunningham v. CBC Conglomerate LLC*

United States District Court for the Eastern District of Texas, Sherman Division

December 4, 2019, Decided; December 4, 2019, Filed

CIVIL ACTION NO. 4:17-CV-00793-ALM-CAN

**Reporter**
2019 U.S. Dist. LEXIS 224240 *; 2019 WL 7500497

CRAIG CUNNINGHAM, Plaintiff, v. CBC CONGLOMERATE LLC, ET AL., Defendants.

**Subsequent History:** Adopted by, Partial summary judgment granted by, in part, Partial summary judgment denied by, in part *Cunningham v. CBC Conglomerate LLC, 2020 U.S. Dist. LEXIS 2410 (E.D. Tex., Jan. 7, 2020)*

**Prior History:** *Cunningham v. CBC Conglomerate LLC, 2018 U.S. Dist. LEXIS 144401 (E.D. Tex., July 27, 2018)*

**Counsel:** [*1] Craig Cunningham, Plaintiff, Pro se, Nashville, TN.

For CBC Conglomerate LLC, Bruce Phillip Hood, Carey Gorge Howe, USFFC Inc., Jay Singh, Defendants: Nicholas J Lanza, LEAD ATTORNEY, Lanza Law Firm PC, Houston, TX.

**Judges:** Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Christine A. Nowak

# Opinion

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court are Defendants CBC Conglomerate, LLC ("CBC") and USFFC, Inc.'s ("USFFC") (collectively, "Defendants") Motion for Partial Summary Judgment [Dkt. 123] and Plaintiff Craig Cunningham's ("Plaintiff") Partial Motion for Summary Judgment [Dkt. 125]. After reviewing the Motions [Dkts. 123; 125], the Parties' Responses [Dkts. 127; 130], and all other relevant filings, the Court recommends that Defendants' Motion for Partial Summary Judgment [Dkt. 123] be **GRANTED IN PART** and **DENIED IN PART**; and Plaintiff's Motion for Partial Summary Judgment [Dkt. 125] be **DENIED**.

## BACKGROUND

On November 9, 2017, Plaintiff initiated the instant lawsuit by filing his Original Complaint [Dkt. 1].[1] On September 17, 2018, Plaintiff filed his Amended Complaint—the live pleading in this case—asserting claims for (1) violations of the *Telephone Consumer Protection Act ("TCPA")*, [*2] *47 U.S.C. §§ 227(b)* and *(c)*; (2) invasion of privacy; (3) violations of the *Fair Debt Collection Practices Act ("FDCPA")*; and (4) violations of the *Texas Business and Commerce Code § 305.053* [Dkt. 48 at 14-16]. Therein, Plaintiff alleges Defendants "are liable for the calls placed on their behalf and for their benefit to the Plaintiff's cell phone 615-212-9191 offering unsolicited student loan consolidation services" [Dkt. 48 at 4].[2] Specifically, Plaintiff asserts Defendants

---

[1] Plaintiff additionally asserted claims against Bruce Phillip Hood, Carey Gorge Howe, and Jay Singh ("Individual Defendants") [Dkt. 1]. On February 5, 2019, Plaintiff's claims against the Individual Defendants were dismissed for lack of jurisdiction [Dkt. 100]. Only Plaintiff's claims against CBC and USFFC currently remain before the Court.

[2] Plaintiff's Amended Complaint [Dkt. 48] is properly before the

Patricia O'Neill

2019 U.S. Dist. LEXIS 224240, *2

made a minimum of seventy-three calls between August 2017 and October 2017, "[e]ach and every call had a delay of 3-4 seconds of dead air indicating the calls were initiated using an automated telephone dialing system," and none of the calls were related to any emergency purpose [Dkt. 48 at 4-6]. Plaintiff further contends he "never gave . . . any of the [D]efendants his cell phone number and never gave express or implied consent for the [D]efendants . . . to call his cell phone using an automated telephone dialing system or with a pre-recorded message" [Dkt. 48 at 6]. Plaintiff avers Defendant USFFC called Plaintiff on behalf of Defendant CBC to offer Defendant CBC's services in each call it made to Plaintiff [Dkt. 48 at 7]. Plaintiff alleges Defendant CBC hired [*3] Defendant USFFC "to place calls on their behalf to individuals looking for student loan consolidation" and is therefore liable for those calls placed on their behalf [Dkt. 48 at 7-8]. Additionally, Plaintiff posits Defendants are liable for failing to maintain an internal do-not-call list and train their agents on the use of such list, for placing calls using pre-recorded messages that do not identify the caller or seller of goods or services, and for making false or misleading representations in an attempt to collect a debt [Dkt. 48 at 14-15].[3]

On July 19, 2019, Defendants filed their Motion for Partial Summary Judgment requesting the Court grant summary judgment as to Plaintiff's TCPA and Texas Business and Commerce Code claims for calls allegedly placed after October 12, 2017 [Dkt. 123 at 1]. The same day, Plaintiff filed his Partial Motion for Summary Judgment requesting summary judgment for "all calls in this case for violations of *47 USC [sic] 227(c)(5)* violations [sic] as codified under *47 CFR [sic] 64.1200(d)*" [Dkt. 125 at 1]. Defendants filed their Response to Plaintiff's Motion on August 9, 2019 [Dkt. 127], and Plaintiff **[*4]** filed his Response to Defendants' Motion on August 12, 2019 [Dkt. 130]. The Parties' Motions for Partial Summary Judgment are ripe

---

[3] Notably, this is not Plaintiff's first lawsuit against Defendants. On April 16, 2015, Plaintiff brought a similar lawsuit against Defendants for violations of the TCPA regarding various calls made in 2015 to Plaintiff's cell phone number 615-212-9191, which is the same number at issue in the instant case. *See Cunningham v. CBC Conglomerate, LLC*, 3:15-CV-439 (M.D. Tenn. Apr. 16, 2015) (E.C.F. #1) (hereinafter the "2015 Lawsuit"). After Plaintiff advised the Court that the 2015 Lawsuit had been resolved, the Middle District Court of Tennessee dismissed the 2015 Lawsuit with prejudice. *See 2015 Lawsuit* (E.C.F. #46-47).

for consideration.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co., 655 F.2d 598, 602 (5th Cir. 1981)* (citations omitted). The substantive law identifies which facts are material. *Anderson, 477 U.S. at 248.*

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id. at 247.* If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all [*5]* of the essential elements of the claim or defense . . . ." *Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986)* (emphasis in original). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex, 477 U.S. at 325; Byers v. Dall. Morning News, Inc., 209 F.3d 419, 424 (5th Cir. 2000).* Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers, 209 F.3d at 424* (citing *Anderson, 477 U.S. at 248-49*). The nonmovant must adduce affirmative evidence. *Anderson, 477 U.S. at 257.* And the Court need only consider the record materials actually cited by the parties, though the Court may consider the entire record. *Fed. R. Civ. P. 56(c)(3).*

## EVIDENCE PRESENTED

2019 U.S. Dist. LEXIS 224240, *5

Defendants submit the following summary judgment evidence in support of their Motion:

Exhibit 1 [Dkt. 123-1]: Plaintiff's Responses to CBC's Requests for Admission;

Exhibit 2 [Dkt. 123-2]: Excerpts from the Deposition of Craig Cunningham (April 9, 2019);

Exhibit 3 [Dkt. 123-3]: Audio Recording of October 12, 2017 telephone call (File No. 171012182150I0343);

Exhibit 4 [Dkt. 123-4]: Audio Recording of October 12, 2017 telephone call (File No. 171012184706O0319);

Exhibit 5 [Dkt. 123-5]: Audio Recording of October 13, 2017 telephone call (File No. 171013173911O0334); **[*6]**

Exhibit 6 [Dkt. 123-6]: Audio Recording of October 23, 2017 telephone call (File No. 171023181055O0034); and

Exhibit 7 [Dkt. 123-7]: Signed and sworn affidavit of records custodian certifying records and documents produced by Magna5, LLC.

***

Defendants additionally submit the following summary judgment evidence in opposition to Plaintiff's Motion:

Exhibit 8 [Dkt. 127-1]: Excerpts from the Deposition of Jay Singh (May 10, 2019); and

Exhibit 9 [Dkt. 127-2]: Call logs (USFFC 000001-000003).

***

Plaintiff submits the following summary judgment evidence in support of his Motion:

Exhibit A [Dkt. 125-1]: Defendant USFFC's Objections and Responses to Plaintiff's Request for Production;

Exhibit B [Dkt. 125-2]: Defendant USFFC's Objections and Amended Answers to Plaintiff's Interrogatories;

Exhibit C [Dkt. 125-3]: Signed and sworn affidavit of records custodian certifying records and call records produced by Magna5, LLC; and

Exhibit D [Dkt. 125-4]: Plaintiff's Original Complaint in the 2015 Lawsuit.

***

Plaintiff additionally submits the following summary judgment evidence in opposition to Defendants' Motion:

Exhibit A [Dkt. 130-1]: Defendant USFFC's Objections and Responses to Plaintiff's Request for Production; **[*7]**

Exhibit B [Dkt. 130-2]: Defendant USFFC's Objections and Second Amended Answers to Plaintiff's Interrogatories;

Exhibit C [Dkt. 130-3]: Defendant CBC's Objections and Answers to Plaintiff's Interrogatories; and

Exhibit D [Dkt. 130-4]: Call logs (USFFC 001-003).

***

No objections have been made to the summary judgment evidence.

**ANALYSIS**

Defendants move for partial summary judgment as to Plaintiff's claims under the TCPA[4] and the Texas Business and Commerce Code for all calls allegedly placed on or after October 12, 2017, asserting that Defendant did not violate the TCPA because Plaintiff consented to be called by EI Docs—the independent contractor who placed the calls to Plaintiff [Dkt. 123 at 1-2].

Notably, Defendants only move for summary judgment under _47 U.S.C. § 227(b)_ and the _Texas Business and Commerce Code § 305.053_ for calls made on behalf of Defendants on or after October 12, 2017. All calls occurring _prior_ to October 12, 2017 are not the subject of Defendants' Motion and after consideration of Plaintiff's Motion should proceed to trial.[5]

_____

[4] In Plaintiff's Amended Complaint, Plaintiff seeks relief under (1) _47 U.S.C. §§ 227(c)(5)_ and _227(b)_; (2) the Fair Debt Collections Practices Act; (3) _Texas Business and Commerce Code § 305.053_; and (4) a claim for "Invasion of Privacy-Intruion [sic] on Seclusion" [Dkt. 48 at 14-16]. Defendants' Motion broadly seeks summary judgment on all TCPA claims and the _Texas Business and Commerce Code § 305.053_ [Dkt. 123]; however, Defendants thereafter cite only _227(b)(1)(B)_ and _305.053_. Indeed, the sum total of Defendants' analysis appears over the course of one page and Defendants do not cite _227(c)_. The Court addresses herein only the claims Defendants specifically reference in their Partial Motion for Summary Judgment: the claims under _§ 227(b)_ and _§ 305.053_. See e.g., _Boggs v Krum Independent School District, 376 F. Supp. 3d 714 (E.D. Tex. March 21, 2019)_.

[5] Defendants assert a total of eight calls were placed to Cunningham before Cunningham called EI Docs on October 12, 2017 and asked to enroll in the loan forgiveness service [Dkt. 127 at 10]. It is unclear the number of calls that are alleged to have occurred after October 12, 2017 as the Parties assert various different numbers.

2019 U.S. Dist. LEXIS 224240, *7

In their Motion for Summary Judgment, Defendants specifically argue, "[t]he summary judgment evidence indicates [Plaintiff] called the Defendants on October 12, 2017 and expressed a desire in the student **[*8]** loan services offered by the Defendants" [Dkt. 123 at 2]. Defendants contend Plaintiff's conduct on the October 12, 2017 calls—such as confirming his phone number, providing the independent contractor with personally sensitive information, and requesting more information—constituted express consent to be contacted; therefore, any phone calls made on behalf of Defendants after October 12, 2017, did not violate the TCPA [Dkt. 123 at 2, 3]. Defendants further point to additional calls on October 13 and October 23 in which Plaintiff gave his oral consent to move forward with Defendants' services [Dkt. 123 at 4]. In support of its position, Defendants cite a single case: *Morris v. Hornet Corp., 2018 U.S. Dist. LEXIS 170945, at *17-19 (E.D. Tex. Sept. 14, 2018)* [Dkt. 123 at 5].

Importantly, the burden is on Defendant "to prove its affirmative defense that it had consent to call Plaintiff's cell phone." *Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 8:18-CV-919-SCB-TGW, at 10 (M.D. Fla. Aug. 7, 2019) (citing *Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1304-05 (11th Cir. 2015))*; *see also Moser v. Health Ins. Innovations, Inc., 17-CV-1127-WQH-KSC, 2019 U.S. Dist. LEXIS 132790, 2019 WL 3719889, at *3 (S.D. Cal. Aug. 7, 2019)* (citing *Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1044 (9th Cir. 2017)*; *In the Matter of Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C. Rcd. 559, 565 (Jan. 4, 2008))* ("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of **[*9]** proof.").

In response to Defendants' Motion, Plaintiff argues (1) he never gave prior express written consent to be contacted by Defendants, as is required under the Federal Communications Commission's ("FCC") 2012 Order (*In the Matter of Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830 (February 15, 2012))* [Dkt. 130 at 3-4]; (2) "providing a phone number to be called for service calls is not consent to be called for telemarketing purposes" [Dkt. 130 at 9]; (3) prior express written consent must be for a specific party under *47 C.F.R. § 64.1200(f)(8)*, and here Defendants represented themselves as the "United States Federal Loan Forgiveness Department" rather than their true corporate identity [Dkt. 130 at 11]; and (4) Defendants were on notice that Plaintiff did not want to receive telemarketing calls based on the prior lawsuit,

which makes Plaintiff's case distinguishable from *Morris v. Hornet Corp.* [Dkt. 130 at 3].

### Defendants' Motion: TCPA Violations Related to Automatic Telephone Dialing System under *47 U.S.C. § 227(b)*

Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin. Servs., LLC, 565 U.S 368, 370, 132 S. Ct. 740, 181 L. Ed. 2d 881 (2012)*. Congress intended "to protect individual consumers from receiving intrusive and unwanted calls." **[*10]** *Gager v. Dell Fin. Servs., 727 F.3d 265, 268 (3d Cir. 2013)* (citing *Mims, 565 U.S. at 372*). Congress also authorized the FCC to implement rules and regulations enforcing the TCPA. *47 U.S.C. § 227(b)(2)*.

*Subsection (b)* of the TCPA governs "Restrictions on use of automated telephone equipment." *47 U.S.C. § 227(b)*. *Section 227(b) of the TCPA* makes it unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service for which the called party is charged for the call," or "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." *47 U.S.C. § 227(b)(1)(A)(iii)*, *(B)*. An "automatic telephone dialing system" is defined in the TCPA as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id. § 227(a)*. *Subsection (b)(3)*, in turn, provides a private right of action for a "violation of this subsection or the regulations prescribed under this subsection," including "an action to recover for actual monetary loss from such a violation, or **[*11]** to receive $500 in damages for each such violation, whichever is greater . . . ." *Id. § 227(b)(3)*.

In the context of *§ 227(b)* ("Restrictions on the use of automated telephone equipment") and "[i]n order to establish the essential allegations '[t]o state a claim under the TCPA for calls made to a cellular phone, a plaintiff is required to allege that [1] a call was made to a cell or wireless phone by the use of any automatic dialing system or an artificial or prerecorded voice and

2019 U.S. Dist. LEXIS 224240, *11

[2] without prior express consent of the called party.'" *Cunningham v. TechStorm LLC, 2018 U.S. Dist. LEXIS 105774, 2018 WL 3118400, at *3 (N.D. Tex. May 29, 2018)*; *47 U.S.C. § 227(b)(1)(A)*; *Chambers v. Green Tree Servicing LLC, No. 3:15-CV-1879-M-BN, 2017 U.S. Dist. LEXIS 94895, 2017 WL 2693565, at *1 (N.D. Tex. June 20, 2017))*.

### Express Consent Affirmative Defense

At present, "[t]he FCC has [a] two-tier standard for "prior express consent" to calls made using an ATDS: (i) calls containing advertisements or constituting telemarketing require prior express *written* consent; and (ii) all other calls, other than those made for emergency purposes or to collect a debt owed to or guaranteed by the United States, require prior express consent." *Pine v. A Place for Mom, Inc., 2019 U.S. Dist. LEXIS 60787, 2019 WL 1531689, at *2 (W.D. Wash. Apr. 9, 2019)* (citing *47 U.S.C. § 227(b)(1)(A)*; *47 C.F.R. § 64.1200(a)*) (emphasis in original). "For non-telemarketing calls, prior express consent is satisfied 'by the simple act of giving one's phone number directly to a caller.'" *Pine, 2019 U.S. Dist. LEXIS 60787, 2019 WL 1531689, at *2* (citing *Rotberg v. Jos. A. Bank Clothiers, Inc., 345 F. Supp. 3d 466, 477 (S.D.N.Y. 2018))*. "In contrast, prior [*12] express *written* consent [as discussed more fully *infra*] means 'an agreement, in writing, bearing the signature of the person called' that 'clearly authorizes' the ATDS-initiated telemarketing call." *Pine, 2019 U.S. Dist. LEXIS 60787, 2019 WL 1531689, at *2* (citing *47 C.F.R. § 64.1200(f)(8))*. Defendants argue that the calls at issue fall under the second tier for consent and that Plaintiff orally consented to any calls on or after October 12, 2017, because he contacted Defendants on October 12, 2017, and expressed interest in the student loan services offered by Defendant.[6]

### Person-to-Person or Manual Calls

As a preliminary matter, *§ 227(b)* generally does not apply to manual or live, person-to-person calls. *See J.T. Hand v. ARB KC, LLC, 2019 U.S. Dist. LEXIS 207798, 2019 WL 6497432 (W.D. Mo. Dec. 3, 2019)* (quoting *Moser v. F.C.C., 46 F.3d 970, 975 (9th Cir. 1995)* ("The

restrictions in the [TCPA] leave open many alternative channels of communication, including . . . all live solicitation calls."); *In re: Monitronics Int'l, Inc., 223 F. Supp. 3d 514, 521 (N.D. W. Va. 2016)*, *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp., Inc., 885 F.3d 243 (4th Cir. 2018)* ("First, while in-person telemarketing calls may be harassing to the consumer, they do not violate the TCPA. It is only when the calls are "robo-calls" or are made to persons on the do-not-call list that the calls violate the Act."). Moreover, the Fifth Circuit concluded that "[t]o be liable under the 'artificial or prerecorded voice' section of the TCPA . . . a defendant must make a call and an artificial [*13] or prerecorded voice must actually play." *Ybarra v. Dish Network, LLC, 807 F.3d 635, 640 (5th Cir. 2015)*. Here, Defendants have provided audio recordings of four calls: two on October 12, 2017 [Dkts. 123-3; 123-4], one on October 13, 2017 [Dkt. 123-5], and one on October 23, 2017 [Dkt. 123-6].[7] The summary judgment evidence does not reflect that any ATDS was used for any of these calls; rather the recordings demonstrate manual, person-to-person calls, wherein Plaintiff initiated and then affirmed interest in Defendants' services. The first call includes Plaintiff stating, "I just called." Plaintiff also provided and confirmed his personal contact information with Defendants during the calls. Because the calls on October 12, 2017, October 13, 2017, and October 23, 2017, were manual or live, person-to-person calls, those calls do not fall within the scope of *§ 227(b)*.[8]

### Initiation of Phone Calls

As set forth *supra*, Defendants contend that because Plaintiff initiated phone calls to Defendants' independent contractor asking about the student loan program, and specifically how to enroll [Dkts. 123 at 3; 123-3], Plaintiff consented to the aforementioned manual calls and also any further calls from Defendant [*14] [Dkt. 123 at 6]. Defendants broadly argue Plaintiff "consented to the

---

[6] Express consent does not cover any calls that may have been placed prior to Plaintiff's call with an independent contractor working on behalf Defendants on October 12, 2017, wherein Plaintiff expressed interest in Defendants' services and confirmed his contact information.

[7] Plaintiff has not objected to Defendants' summary judgment evidence. Notably, at deposition, Plaintiff additionally testified that the "[calls] do say what they say" [Dkt. 123-2 at 7].

[8] As to all other calls occurring after October 12, 2017 (for which no recordings are provided), it remains Defendants' burden "to prove its affirmative defense that it had consent to call Plaintiff's cell phone." *Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 8:18-CV-919-SCB-TGW, at 10 (M.D. Fla. Aug. 7, 2019) (citing *Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1304-05 (11th Cir. 2015))*.

calls made by El Docs on behalf of Defendants" starting on October 12, 2017, and continuing thereafter, going so far as to say this includes "any phone calls placed by El Docs" to Plaintiff [Dkts. 127 at 10; 123 at 2]. More narrowly, Defendants state Plaintiff "provided his express consent for Defendants to contact him for the purpose of completing enrollment in the loan forgiveness program" and point to Plaintiff's provision of his Social Security Number and credit card number to buttress such assertion [Dkts. 123 at 6; 127 at 9].

Plaintiff cites two cases to support his contra-argument that "[p]retending to be interested in a telemarketer's products is not consent to be called using an automated telephone dialing system" [Dkt. 130 at 8]: *Cunningham v. Rapid Response Monitoring Services, Inc.*, 251 F.Supp.3d 1187 (M.D. Tenn. 2017) [Dkt. 130 at 8] and *Shelton v. National Gas & Electric, LLC, No. 17-4063, 2019 U.S. Dist. LEXIS 59235, 2019 WL 1506378 (E.D. Pa. Apr. 5, 2019)*. Neither of Plaintiff's cited cases support his position; each involve a standing analysis and whether Plaintiff could establish standing to assert a TCPA claim where he may have sought out or accepted services he was offered—not a summary judgment analysis in which the movant must demonstrate that he or she is entitled to a judgment as a matter of law. *See* **[*15]** *id.* at 1196-97; *see also Fed. R. Civ. P. 56(a)*. Thus, while the cases concluded that the plaintiff had "a concrete and particularized injury sufficient to confer standing"—they did not conclude that "pretending to be interested" in a product is not effective consent under the TCPA as a matter of law.

The evidence before the Court reflects that Plaintiff orally provided express consent to calls *related to the loan service program* [Dkt. 123 at 3-4]. Plaintiff himself called Defendants [Dkt. 123-3], which Plaintiff confirmed during his deposition [Dkt. 123-2 ("You made outbound calls to some of the numbers you associate with USFFC and CBC; correct? Yes")]. Plaintiff, during the recordings provided to the Court, explicitly asked how to enroll in the program, what paperwork needed to be completed, and how to speed up the process of enrolling [Dkts. 123-3; 123-4; 123-5; 123-6]. When difficulties arose, Plaintiff scheduled or assented to follow-up calls regarding the enrollment process—including technical problems that arose during enrollment [Dkts. 123-3; 123-4; 123-5; 123-6]. Plaintiff specifically confirmed that he wanted to go ahead with Defendants' services and provided his consent for Defendants to enroll Plaintiff in **[*16]** the program [Dkts. 123-5; 123-6]. During the calls, Plaintiff confirmed his date of birth, telephone number, email address, Social Security number, and credit card information.

Nevertheless, Plaintiff's actions do not constitute Plaintiff's assent to *all* calls from Defendants. *See Van Patten, 847 F.3d at 1045* (finding that the provision of a phone number does not grant prior express consent "to any and all contact"). Rather, Plaintiff assented to calls for the "limited purpose" of the loan forgiveness program. *See In the Matter of Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1840 (Feb. 15, 2012)* (the "2012 Order"). In the 2012 Order, the FCC explained that "Consumers who provide a wireless phone number for a limited purpose—for service calls only—do not necessarily expect to receive telemarketing calls that go beyond the *limited purpose* for which oral consent regarding service calls may have been granted." *Id.* (emphasis added). Similarly, the Eleventh Circuit has found that, under *§ 227(b)(1)*, an individual provides "prior express consent" to be called or texted at the number provided where (1) he has provided his number to the party calling or texting him; and (2) there is some relation between the communications and the **[*17]** reason for which he provided his number. *See Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1308 (11th Cir. 2015)*; *see also Morris v. Copart, 4:15-CV-724, 2016 U.S. Dist. LEXIS 155755, 2016 WL 6608874, at *8 (E.D. Tex. Nov. 9, 2016)* (discussing the FCC's order and finding the plaintiff consented to being "contacted for the purpose of completing the donation of the vehicle" because the plaintiff originally advised the defendant "that he desired to donate a vehicle"). The purpose behind the provision of the phone number, therefore, is instructive to determine whether a specific call falls within the limited purpose of the party's prior express consent. The fact that a consumer provides his phone number to a business does not permit unrestricted access to that number.

Defendants have not proffered any evidence regarding the content of the phone calls Plaintiff received other than the calls on October 12, 2017, October 13, 2017, and October 23, 2017. Because the Court is unable to ascertain the subject matter of the remaining calls, Defendants cannot meet their burden as to their affirmative defense of consent as to any other calls. Stated differently, the Court is unable to evaluate whether Plaintiff's consent—if any—permitted the calls made on behalf of Defendants after October 12, 2017 (other than those on October 13 and October **[*18]** 23, 2017).

And different from *Morris* where a discrete number of

2019 U.S. Dist. LEXIS 224240, *18

calls existed and the purpose of each of the calls was clear,[9] in connection with the summary judgment briefing, Defendants assert that the independent contractor who actually made the calls on their behalf — EI Docs — markets twenty-five different products and placed calls on behalf of many companies, including Defendants [Dkts. 127 at 4; 127-1 at 3].[10] Thus, the Court cannot assume that all calls placed to Plaintiff after October 12, 2017 related to loan forgiveness; Defendant is not entitled to summary judgment on the issue of consent.

### Prior Express Written Consent

Plaintiff further argues that even if the Court had been provided the substance of the calls, Defendants still

_____

[9] Plaintiff also argues that Defendants were on notice that Plaintiff did not want to receive telemarketing calls based on the prior lawsuit, which makes Plaintiff's case further distinguishable from _Morris v. Hornet Corp._ In support of Plaintiff's argument that Defendants were on notice following Plaintiff's first lawsuit, Plaintiff cites _Cunningham v. Crosby Billing Services, Corp., No. 4:18-CV-00043-ALM-CAN, 2018 U.S. Dist. LEXIS 206257, 2018 WL 6424792 (E.D. Tex. Oct. 14, 2018)_ [Dkt. 125 at 3]. Specifically, Plaintiff points to the following language in the opinion: "certainly the initiation of a lawsuit filed against Defendants for making automated calls to Plaintiff's cellphone in violation of the TCPA, which is pleaded to be the same cell phone number as the instant case, gives Defendants reason to know that their conduct may potentially violate the TCPA" _2018 U.S. Dist. LEXIS 206257, [WL] at *10._ Thereafter, the Court found the "phone calls were made knowingly and willfully in violation of the TCPA and that a trebling of damages is appropriate in the instant case" _Id._ (citing _Texas v. American Blastfax, Inc., 164 F.Supp.2d 892, 899 (W.D. Tex. 2001))._ In response, Defendants argue that the case merely involved Plaintiff's Motion for Default Judgment, which thus required the Court "to take the factual allegations of the complaint as true due to the Plaintiff's default" [Dkt. 127 at 10]. Plaintiff's position is unavailing under the circumstances presented here. The uncontroverted evidence before the Court includes calls on October 12, 2017, October 13, 2017, and October 23, 2017, between Plaintiff and a human independent contractor working on behalf of Defendants. The Court is unpersuaded that Defendants were on notice because of a prior lawsuit filed when Plaintiff himself called and sought out the services.

[10] To further buttress this point, the deposition transcript of Jay Singh reflects the following discussion "So, Craig, if you got a second phone call that comes from EI Docs, okay, how do you EI Docs is pitching you for USFFC and not a Dell Computer?" [Dkt. 127-1].

could not prevail on its affirmative defense as the calls at issue fall, not under the second, but the first tier of consent and require written express consent. More specifically, Plaintiff argues such prior express written consent is required under the FCC's 2012 Order: _In the Matter of Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830 (February 15, 2012)._ In the 2012 Order, the FCC stated **[*19]** that it "revise[d] our rules to require express written consent for all _autodialed or prerecorded telemarketing calls_ to wireless numbers and residential lines . . . ." _27 F.C.C. Rcd. at 1831_ (emphasis added).

Since 2013, a calling entity needs to show that a consumer provided written clear and unmistakable intent to receive calls via an ATDS or artificial or prerecorded voice message. _47 C.F.R. § 64.1200(a)(2)_ ("No person or entity may . . . [i]nitiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice . . . other than a call made with the prior express written consent of the called party . . . ."). The regulation is clear that in the telemarketing context, prior express consent truly means prior express consent. _47 C.F.R. § 64.1200_ requires that the written consent "clearly authorize[]" and be a "clear and conspicuous disclosure." _Health Ins. Innovations, Inc., 2019 U.S. Dist. LEXIS 132790, 2019 WL 3719889, at *4_ (quoting _47 C.F.R. § 64.1200(f)(8)(i)_).

"[F]or purposes of the TCPA, express written consent means: 'The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person **[*20]** called advertisements or telemarketing messages _using an automatic telephone dialing system or an artificial or prerecorded voice_, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.'" _Health Ins. Innovations, Inc., 2019 U.S. Dist. LEXIS 132790, 2019 WL 3719889, at *4_ (quoting _47 C.F.R. § 64.1200(f)(8)_) (emphasis added); _see also Morris v. Modernize, Inc., 2018 WL 7076744, at *2-3 (W.D. Tex. Sept. 27, 2018)_ (discussing the "prior express written consent" definition under _47 C.F.R. § 64.1200(f)(8)_, which requires a "clear and conspicuous disclosure").[11] Here, Defendants fail to

_____

[11] As the Sixth Circuit interprets the cited regulation, "the FCC's regulations for telemarketers now require a more specific type of consent—namely, that the called party

Patricia O'Neill

2019 U.S. Dist. LEXIS 224240, *20

produce any summary judgment evidence that they had express written consent to make calls to Plaintiff's cell phone via an ATDS.[12]

In sum, Defendants, therefore, are entitled to summary judgment for Plaintiff's _47 U.S.C. § 227(b)_ claims for calls between Defendants and Plaintiff on October 12, 2017, October 13, 2017, and October 23, 2017. Defendants have not, however, at this juncture met their summary judgment burden for all other calls, as Defendants have not established that there is no genuine issue of material fact as to the content and nature of all other calls. _See Morris v. Hornet Corp., 4:17-CV-00350, 2018 U.S. Dist. LEXIS 170945, 2018 WL 4781273, at *6 (E.D. Tex. Sept. 14, 2018)_.

Moreover, because the Court concluded Defendants are entitled to summary judgment as to Plaintiff's _§ 227(b)_ claim under the TCPA for calls on October 12, 2017, October **[*21]** 13, 2017, and October 23, 2017, Defendants are also entitled to summary judgment as to calls on those dates for Plaintiff's claim under the Texas Business and Commerce Code. _See Morris, 2018 U.S. Dist. LEXIS 170945, 2018 WL 4781273, at *9_.

### Plaintiff's Motion: TCPA Violations Related to Residential Telephone Subscribers under _47 U.SC. § 227(c)_

In his Partial Motion for Summary Judgment, Plaintiff "moves for summary judgment for all calls in this case for violations of _47 USC [sic] 227(c)(5)_ violations as codified under _47 CFR [sic] 64.1200(d)_ against all defendants" [Dkt. 125 at 1].[13] Plaintiff makes three arguments in support of his Motion: (1) "Defendants were on notice from Plaintiff's previous lawsuit that he did not want to receive telemarketing calls" [Dkt. Plaintiff makes three arguments in support of his Motion: (1)

"Defendants were on notice from Plaintiff's previous lawsuit that he did not want to receive telemarketing calls" [Dkt. 125 at 2-3]; (2) "Defendants did not maintain an internal Do-not-call Policy and failed to produce one . . . in violation of _47 CFR [sic] 64.1200(d)(1)_" [Dkt. 125 at 2]; and (3) "Defendants falsely identified themselves in violation of _47 CFR [sic] 64.1200(d)(4)_" [Dkt. 125 at 2].

Defendants respond that fact issues exist which **[*22]** would preclude granting Plaintiff summary judgment: (1) how many calls occurred; (2) whether those calls were made on behalf of Defendant; and (3) whether Plaintiff consented to any of the calls [Dkt. 127 at 5, 10]. Defendants also posit (as argued in connection with their own Motion) that (1) Plaintiff's "conduct constituted express consent to be contacted" [Dkt. 127 at 2]; (2) "[t]he TCPA does not provide a private cause of action for rules pertaining to alleged violations of the technical and procedural standards, including _Section 64.1200(d)(4)_" [Dkt. 127 at 2, 6]; and (3) Plaintiff has not produced evidence to establish Defendants "identif[y] themselves as agents of the United States" and that calls were made on behalf of Defendants [Dkt. 127 at 2, 4].

_§ 227(c)(5) of the TCPA_ allows a private right of action for "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of the prescribed regulations. _47 U.S.C. § 227(c)(5)_. _§ 227(c)_ is titled "Protection of subscriber privacy rights" but specifically addresses the position of "residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object" _Id. § 227(c)(5)_. _47 C.F.R. § 64.1200(d)_, which was promulgated under _§ 227_, states **[*23]** that "[n]o person or entity shall initiate any call for telemarketing purposes to a _residential telephone subscriber_ unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." _47 C.F.R. § 64.1200(d)_ (emphasis added). "The regulation relates to a marketer's duty to prepare internal policies to receive and implement affirmative requests not to receive calls." _See Bailey v. Domino's Pizza, LLC, 867 F. Supp. 2d 835, 842 (E.D. La. 2012)_ (granting the defendant's motion to dismiss the plaintiff's claim because the plaintiff did not allege that he made an affirmative request to not receive calls).[14]

---

consents, in writing, to being called by an auto-dialer." _Hill v. Homeward Residential, Inc., 799 F.3d 544, 552 (6th Cir. 2015)_ (citing _47 C.F.R. 64.1200(f)(8)_).

[12] Plaintiff argues that the 2012 Order states there must be express written consent for all autodialed or prerecorded telemarketing calls [Dkt. 130 at 3-4]. Notably, Plaintiff has not demonstrated that all calls were autodialed or prerecorded.

[13] Plaintiff's Partial Motion for Summary Judgment seeks relief under _47 U.S.C. § 227(c)(5)_ [Dkt. 125]. Plaintiff does not assert he is entitled to a judgment as a matter of law for Plaintiff's claims under _47 U.S.C. § 227(b)_, the Texas Business and Commerce Code, or for invasion of privacy.

[14] The Court notes that the plain language of _47 C.F.R. § 64.1200(d)_ limits redress for violations that concern _residential_

2019 U.S. Dist. LEXIS 224240, *23

Plaintiff has not established, as movant, that he is entitled to a judgment as a matter of law under *47 U.S.C. § 227(c)(5)* and *47 C.F.R. § 64.1200(d)*. Plaintiff has not proffered any evidence entitling him to summary judgment. See *Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004)* (finding that a party must establish a specific fact at the summary judgment stage by identifying the corresponding evidence in the summary judgment **[*24]** record). A fact issue exists regarding the number of calls. It is unclear to the Court how many calls Plaintiff alleges occurred and/or that are in violation of the TCPA; there is conflicting evidence regarding the number of calls made to Plaintiff. Indeed, the evidence before the Court that addresses the number of calls include various call logs/records—which conflict with each other and do not illuminate the true number or content of the calls as they each reflect a different number of calls—and audio of the calls from October 12, 2017, October 13, 2017, and October 23, 2017.

Plaintiff asserts that "[b]y seeking summary judgment on all 90 calls on the Magna 5 documents, the Defendants have now conceded that all 90 calls on the Magna 5 documents were placed on behalf of CBC

---

telephone subscribers. Various courts have considered similar claims by Plaintiff and found that the regulation does not encompass Plaintiff's cellular phones. See, e.g., *Cunningham v. Politi, No. 4:18-CV-00362-ALM-CAN, 2019 U.S. Dist. LEXIS 102447, 2019 WL 2517085, at *4 (E.D. Tex. Apr. 30, 2019)*, report and recommendation adopted, *No. 4:18-CV-362, 2019 U.S. Dist. LEXIS 102054, 2019 WL 2524737 (E.D. Tex. June 19, 2019)*; *Cunningham v. Sunshine Consulting Group, LLC, No. 3:16-2921, 2018 U.S. Dist. LEXIS 121709, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018)*; *Cunningham v. Rapid Capital Funding, LLC/RCF, No. 3:16-02629, 2017 U.S. Dist. LEXIS 136951, 2017 WL 3574451, at *3 (M.D. Tenn. July 27, 2017)*; *Cunningham v. Spectrum Tax Relief, LLC, No. 3:16-2283, 2017 U.S. Dist. LEXIS 118797, 2017 WL 3222559, at *7 (M.D. Tenn. July 7, 2017)*; *Cunningham v. Enagic USA, Inc., No. 3:15-0847, 2017 U.S. Dist. LEXIS 97486, 2017 WL 2719992, *5-6 (M.D. Tenn. June 23, 2017)*; see also **Cunningham v. Rapid Response Monitoring Servs., Inc., 251 F. Supp. 3d 1187, 1195-96 (M.D. Tenn. 2017)** (citing *Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1250 (11th Cir. 2014)* ("To start with, the case concerned *47 U.S.C. § 227(b)(1)(B)*, which prohibits 'initiat[ing] any [prohibited] telephone call to any residential telephone line . . . .' [T]he telephone number in question here . . . is a cell-phone number."); *Bates v. I.C. Sys., Inc., No. 09-CV-103A, 2009 U.S. Dist. LEXIS 96488, 2009 WL 3459740, at *1 (W.D.N.Y. Oct. 19, 2009)* ("[T]he TCPA differentiates between calls made to cellular and residential lines.")). Here, too, Plaintiff only alleges a use of his cell phone. Defendants did not move for summary judgment on such ground.

Conglomerate and USFFC by now claiming they had consent to make the calls in the Magna 5 affidavit" [Dkt. 130 at 2]. The Court does not read such concession from Defendants' Motion for Partial Summary Judgment; instead, as discussed *supra*, Defendants contend that Plaintiff consented to any subsequent calls regarding enrollment in the loan forgiveness program [Dkt. 123 at 6]. Such argument does not establish the **[*25]** number of calls.

Plaintiff has not established that there is no genuine issue of material as to the number of calls placed on behalf Defendants. Plaintiff's request for summary judgment should be denied.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that Defendants CBC Conglomerate, LLC and USFFC, Inc.'s Motion for Partial Summary Judgment [Dkt. 123] should be **GRANTED IN PART** and **DENIED IN PART**. Additionally, Plaintiff Craig Cunningham's Partial Motion for Summary Judgment [Dkt. 125] should be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. *28 U.S.C. § 636(b)(1)(C)*. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the **[*26]** unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. See *Douglas v. United Services Automobile Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996)* (en banc), *superseded by statute on other grounds*, *28 U.S.C. § 636(b)(1)* (extending the time to file objections from ten to fourteen days).

/s/ Christine A. Nowak

Christine A. Nowak

2019 U.S. Dist. LEXIS 224240, *26

UNITED STATES MAGISTRATE JUDGE

**End of Document**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| The Joint Petition Filed by | ) | CG Docket No. 11-50 |
| DISH Network, LLC, the United States of | ) | |
| America, and the States of California, Illinois. | ) | |
| North Carolina, and Ohio for Declaratory Ruling | ) | |
| Concerning the Telephone Consumer Protection | ) | |
| Act (TCPA) Rules | ) | |
| | ) | |
| The Petition Filed by Philip J. Charvat for | ) | |
| Declaratory Ruling Concerning the Telephone | ) | |
| Consumer Protection Act (TCPA) Rules | ) | |
| | ) | |
| The Petition Filed by DISH Network, LLC for | ) | |
| Declaratory Ruling Concerning the Telephone | ) | |
| Consumer Protection Act (TCPA) Rules | ) | |

**DECLARATORY RULING**

**Adopted:  April 17, 2013**                              **Released:  May 9, 2013**

By the Commission:  Commissioner McDowell not participating and Commissioner Pai approving in part, dissenting in part and issuing a statement.

## I.    INTRODUCTION

1.      In this Declaratory Ruling, we address three petitions for declaratory ruling raising issues concerning the Telephone Consumer Protection Act of 1991 (TCPA)[1] that have arisen in two pending federal court lawsuits.  In doing so, we clarify that while a seller does not generally "initiate" calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers.[2]

## II.    BACKGROUND

### A.    The Telephone Consumer Protection Act Of 1991

2.      The TCPA regulates the use of telemarketing – the marketing of goods or services by telephone.  In 1991, Congress found that "[t]he use of the telephone to market goods and services to the home and other businesses" had become "pervasive," that "over 30,000 businesses actively telemarket[ed] goods and services to business and residential customers," that "[m]ore than 300,000

---

[1] Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.

[2] 47 U.S.C. §§ 227(b) & (c).

solicitors call[ed] more than 18,000,000 Americans every day," and that "[m]any consumers [were] outraged over the proliferation of intrusive nuisance calls to their homes from telemarketers."[3]  Congress further found that "[o]ver half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations."[4]  "Under the circumstances," a Congressional committee explained, "federal legislation [was] needed to both relieve states of a portion of their regulatory burden and protect legitimate telemarketers from having to meet multiple legal standards."[5]  Congress accordingly enacted the TCPA to give the FCC the authority to regulate interstate and intrastate telemarketing in order to enable consumers to curb calls that had "become an intrusive invasion of privacy."[6]

3.     Among its provisions, the TCPA makes it unlawful for any person within the United States to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice without the prior express consent of the called party."[7]  The statute also authorizes the Commission to establish a national "do-not-call" registry that consumers can use to notify telemarketers that they object to receiving telephone solicitations.[8]  Under the Commission's regulations, no person or entity is permitted to "initiate any telephone solicitation . . . to any residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry."[9]  In addition, no telemarketer may call a residential telephone subscriber unless the telemarketer has established procedures for maintaining a list of persons who do not wish to be called.[10]

4.     Beyond empowering the FCC and state Attorneys General to enforce the statute,[11] the TCPA creates separate private rights of action for violations of the prerecorded calling and do-not-call restrictions.  With respect to the prerecorded calling restrictions (as well as other telemarketing restrictions imposed in section 227(b)), section 227(b)(3) states that "[a] person or entity" may bring "an action [for damages and injunctive relief] based on a violation" of the statutory prohibition or the Commission's implementing regulations.[12]  With respect to the do-not-call restrictions, section 227(c)(5) allows "persons" to seek damages and injunctive relief if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection."[13]

---

[3] TCPA §§ 2(1), 2(2), 2(3) & 2(6); 47 U.S.C. § 227 note.

[4] TCPA § 2(7).

[5] H.R. Rep. 102-317 (1991), at 10.

[6] *Mainstream Marketing Services, Inc. v. FTC*, 358 F.3d 1228, 1235 (10th Cir. 2004) (*Mainstream Marketing*).  *See generally* 47 U.S.C. § 227.

[7] 47 U.S.C. § 227(b)(1)(B).  *Accord* 47 C.F.R. § 64.1200(a)(2) (implementing statutory prohibition).  Such calls are sometimes referred to as "robocalling."  The restriction in both the statute and the rule is subject to certain exceptions.

[8] 47 U.S.C. § 227(c)(1)-(4).

[9] 47 C.F.R. § 64.1200(c)(2).  Again, the restriction is subject to certain exceptions.

[10] *Id.* § 64.1200(d).

[11] *See* 47 U.S.C. § 227(g)(1), (3).

[12] *Id.* § 227(b)(3).

[13] *Id.* § 227(c)(5).

2

**B.**   *Charvat v. EchoStar Satellite, LLC*

5.      In 2007, plaintiff Philip Charvat sued EchoStar Satellite LLC (the satellite television service operations of which are now provided by the DISH Network) in the United States District Court for the Southern District of Ohio.  Charvat asserted, among other claims, that telemarketers attempting to sell him subscriptions to EchoStar satellite television programming had made 30 calls in violation of the TCPA.[14]  Twenty-seven of the calls were prerecorded, and three were placed by live operators.[15]  Charvat's requests to be placed on the callers' do-not-call list apparently went unheeded.[16]  EchoStar moved for summary judgment, arguing that it could not be held liable for TCPA violations because the calls were made by "independent contractors" rather than by EchoStar itself.[17]

6.      The district court granted EchoStar's motion.  The court held that whether EchoStar's telemarketing "[r]etailers" were "agents" or "independent contractors" was "not necessarily dispositive" of the legal question whether, under the TCPA, their telephone solicitations were made "on behalf of" EchoStar.[18]  To resolve that issue, the district court instead looked to principles of Ohio agency law.  The court observed that, under Ohio law, a hired party "act[s] 'on behalf of' the hiring party" when the "hiring party retains 'the right to control the manner or means' by which a particular job is completed."[19]  The court reasoned that the state law question of whether EchoStar had the "right to control the manner or means" of its retailers' conduct therefore was dispositive of the "on behalf of" question under the TCPA.[20]

7.      Relying on EchoStar's contracts with its retailers, the court held that EchoStar did not have the right to control the manner and means of the retailers' conduct as required under the state agency law standard.  The court acknowledged that EchoStar retained control over the selection and prices of the programming that its retailers offered to potential subscribers; that it reserved the right to discipline or terminate retailers for their failure to comply with telemarketing laws; and that the retailers agreed to indemnify EchoStar for any losses it incurred as a result of their marketing efforts.[21]  Nonetheless, finding that "[t]he Retailers have the sole authority to determine how to best market [the] products [offered] and whom to solicit," the district court concluded that EchoStar did not exercise sufficient control over their marketing efforts to be held liable for their acts under the TCPA.[22]  It therefore granted summary judgment against Charvat on his TCPA claims.

8.      On appeal, the Sixth Circuit determined that, "[a]t the heart of this case (and of Charvat's appeal) is the question whether the [TCPA] and its accompanying regulations permit Charvat to recover damages from EchoStar, an entity that did not place any illegal calls to him but whose independent

---

[14] *Charvat v. EchoStar Satellite, LLC*, 676 F. Supp. 2d 668, 670 (S.D. Ohio 2009).

[15] *Id.*

[16] *Id.*

[17] *Id.* at 674.

[18] *Id.*

[19] *Id.* at 674-75 (quoting *Bostic v. Connor*, 524 N.E.2d 881, 883 (Ohio 1988)).

[20] *See id.* at 676 ("the question [is] whether EchoStar retains the right to control the manner or means by which the Retailers carry out their contractual duties."); *see also id.* (relevant question is "whether EchoStar controls the manner or means by which the Retailers *market* the product") (emphasis in original).

[21] *Id.* at 676; *see also id.* at 674 (quoting Retailer Agreement).

[22] *Id.* at 676.

contractors did."[23]  Finding that that question and subsidiary questions "implicate the FCC's statutory authority to interpret the Act, to say nothing of its own regulations," the court of appeals referred the matter to the Commission under the doctrine of primary jurisdiction for the parties to seek a ruling regarding the proper interpretation of the relevant statutory and regulatory provisions.[24]

### C.    *United States, et al. v. DISH Network, LLC*

9.      Meanwhile, the United States (on behalf of the Federal Trade Commission ("FTC")) and the Attorneys General of California, Illinois, North Carolina, and Ohio filed a lawsuit in 2009 against the DISH Network ("DISH") in federal district court in Illinois seeking damages and injunctive relief for alleged violations of federal and state telemarketing restrictions.[25]  Among other things, the government plaintiffs alleged that DISH, through its authorized dealers, had made unlawful prerecorded calls and had made prohibited calls to telephone numbers on the national do-not-call registry.[26]  The plaintiffs further alleged that: (1) DISH had authorized its dealers "to use DISH Network trademarks and trade names, to collect money for DISH Network, and to perform other services as part of their positions as authorized dealers;" (2) DISH "paid commissions and other financial incentives to the Dealers for telemarketing services;" (3) DISH "received complaints from consumers regarding the Dealers' telemarketing practices, and thereby, knew or consciously avoided knowing that the Dealers were violating" telemarketing restrictions; and (4) despite possessing contractual authority to terminate the dealers, DISH "continued to retain the Dealers to perform telemarketing services . . . after receiving consumer complaints."[27]

10.      The district court denied DISH's motion to dismiss the federal claims on the basis that it was not vicariously liable for the actions of its independent dealers.[28]  Finding that DISH's motion "turns on the meaning of the phrase 'on whose behalf' or 'on behalf of,'" the court determined that the Commission's rules used that language "to impose responsibility on the person 'on whose behalf' a telephone solicitation is made."[29]  The court found that the "plain meaning" of those phrases "is an act by a representative of, or an act for the benefit of, another" and that this reading does not require the plaintiffs to allege any formal agency relationship between DISH and its telemarketers.[30]  The court thus concluded that the plaintiffs' "allegations, if true, could plausibly establish" that the telemarketers "acted on behalf of DISH Network."[31]  Nevertheless, following the Sixth Circuit's decision in the *Charvat* case to permit the parties to seek a primary jurisdiction referral to the Commission of similar questions, the district court stayed proceedings on the TCPA claims (but not the FTC or state law claims) and ordered

---

[23] *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 465 (6th Cir. 2010).

[24] *Id.* at 465-66, 468.

[25] *See United States v. DISH Network, LLC*, 667 F. Supp. 2d 952, 956 (C.D. Ill. 2009) (summarizing claims).  Only the state attorneys general presented claims under the TCPA; the United States based its lawsuit on alleged violations of parallel Federal Trade Commission telemarketing restrictions.  *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at 957-62 (addressing alleged violations of Federal Trade Commission rules), 962-63 (addressing alleged violations of the TCPA).  DISH also sought dismissal of state law claims on the grounds that the TCPA allegedly preempted such claims.  *Id.* at 957.  The court denied that request as well.  *Id.* at 963-64.

[29] *Id.* at 962 (citing 47 C.F.R. § 64.1200(c)(2)).

[30] *Id.* at 963.

[31] *Id.*

the parties "to jointly file an administrative complaint with the FCC seeking the FCC's interpretation of the phrase 'on behalf of'" in section 227 and the Commission's implementing rules.[32]

### D.        The Petitions For Declaratory Ruling

11.      In accordance with the federal district court's primary jurisdiction referral order in the *DISH Network* litigation, on February 22, 2011, DISH, the United States, and the States of California, Illinois, North Carolina and Ohio (the "States") filed a joint petition seeking expedited clarification of and declaratory ruling on the TCPA and the Commission's implementing rules (*Joint Petition*).  In response to the Sixth Circuit's primary jurisdiction order, Charvat and DISH filed separate petitions for declaratory ruling (the *Charvat Petition* and the *DISH Petition*) on March 2, 2011, and March 10, 2011, respectively.

12.      All three petitions sought FCC rulings interpreting the prerecorded and do-not-call provisions of the TCPA and the Commission's implementing regulations to determine whether they create liability for a seller, such as DISH, as a result of unlawful telemarketing calls made by the seller's third-party retailers.  Charvat's petition asks the Commission to declare that a seller is liable under the TCPA for unlawful telemarketing calls that are sent by third parties "on behalf of" or "for the benefit of" the seller.[33]  In its portion of the *Joint Petition* and in its separate petition, DISH asks the Commission to declare that the TCPA does not impose liability on a seller for unlawful telemarketing calls made by third-party retailers, at least in the absence of proof that the third-party telemarketer acted at the seller's direction and request.[34]  The States and the United States ask the Commission to find that, "under the TCPA, a call placed by a seller's dealer to market the seller's services qualifies as a call 'on behalf of' and initiated by the seller."[35]

13.      On April 4, 2011, the Consumer and Governmental Affairs Bureau issued a *Public Notice* seeking comment on the petitions for declaratory ruling.[36]  The Bureau generally requested comment "on the circumstances under which a person or entity is liable for telemarketing violations committed by dealers or other third parties that act on the person's or entity's behalf" and asked, in particular, two sets of questions:

> 1)  Under the TCPA, does a call placed by an entity that markets the seller's goods or services qualify as a call made on behalf of, and initiated by, the seller, even if the seller does not make the telephone call (*i.e.*, physically place the call)?

> 2)  What should determine whether a telemarketing call is made "on behalf of" a seller, thus triggering liability for the seller under the TCPA?  Should federal common law agency principles apply?  What,

---

[32] *United States v. DISH Network, LLC*, 2011 WL 475067 *4 (C.D. Ill. 2011).

[33] *Charvat Petition* at 2.

[34] *Joint Petition* at 1-2; *DISH Petition* at 1-2.

[35] *Joint Petition* at 19, 21.

[36] Public Notice, DA 11-594 (rel. April 4, 2011) ("*Public Notice*").

if any, other principles could be used to define "on behalf of" liability
for a seller under the TCPA?[37]

14.       Numerous parties submitted filings addressing the issues identified in the petitions and
the *Public Notice.*[38]  Petitioner Charvat states that the Commission has long construed the TCPA and its
implementing regulations to create a private right of action against sellers for violations of both do-not-
call restrictions and the prerecorded residential calling prohibition when telemarketers make unlawful
calls on their behalf.[39]  Citing dictionary definitions, Charvat contends that a telemarketing call plainly is
made "on behalf of" a seller within the meaning of the TCPA if it is made "in the interest of" or "for the
benefit of" the seller.[40]  Charvat asserts that proof of agency is not required.[41]

15.       Alternatively, Charvat argues that, to the extent that the absence of "on behalf of"
language in section 227(b)(3) precludes reliance on that "plain meaning" standard with respect to
prerecorded telemarketing calls, the Commission should apply generally applicable agency principles to
ensure that the TCPA protections against such calls are not undermined.[42]  According to Charvat, these
agency principles include: (a) the concept of ratification, when the seller accepts the benefits of the
telemarketer's actions; and (b) apparent authority, when the seller affirmatively, or through negligent
inaction, makes it appear to third parties that the telemarketer has authority to act on the seller's behalf.[43]
Charvat also contends, in the alternative, that "the FCC may extend liability for a Robocall violation of the
TCPA to the entity who ultimately benefits from the call by applying a broad interpretation of the
word 'initiate' as it appears in [section 227(b)(1)(B)]."[44]  In particular, Charvat argues that "[b]y
authorizing its retailers to telemarket on its behalf, and by compensating its retailers for finding new
DISH subscribers, EchoStar facilitated or set into motion the facts that ultimately led to the illegal
Robocall telemarketing campaign at issue."[45]

16.       In contrast, DISH in its formal comments argues that the TCPA – both in the prerecorded
call provisions and the do-not-call provisions – imposes liability only for "a business or person that places
its own unlawful calls, or the call center that places unlawful calls."[46]  DISH asserts that its more limited
view of the TCPA's reach is confirmed by the statute's language and legislative history, which allegedly
focus exclusively on the party that directly uses the telephone network by initiating or making calls.[47]
DISH acknowledges that section 227(c)(5) creates a private right of action for certain calls "'by or on

---

[37] *Public Notice* at 4.  The Commission also sought comments "addressing the applicability of federal agency law
and federal joint venture law to the TCPA liability questions presented herein."  *Id.*

[38] *See* Appendix for a list of commenters.

[39] *Charvat Petition* at 8-10.

[40] *Id.* at 12-13.

[41] *Id.* at 13.

[42] *Id.* at 14-15.

[43] *Id.* at 15-16.

[44] *Id.* at 16 n.5.

[45] *Id.*

[46] DISH Comments at i.  *Accord Joint Petition* at 10-11 and *DISH Petition* at 9 n.29.  *But see DISH Petition* at 9-13
(appearing to acknowledge that section 227(c)(5) creates vicarious liability for violations of the do-not-call rules
when a telemarketer unlawfully makes a call "on behalf of" a seller).

[47] DISH Comments at 4-7.

behalf of the same entity in violation of the [FCC's do-not-call] regulations,'" but argues that this provision does not define the conduct that constitutes a violation and, instead, "merely describes the fact of the call," which "could be by a business or a telemarketer calling on someone's behalf."[48]

17.     DISH further contends that, even if the "on behalf of" language in section 227(c)(5) could be viewed as expanding the scope of liability to reach sellers "on behalf of" whom unlawful calls are made, that section applies only to private actions to enforce the do-not-call rules; it does not reach private actions to enforce the prerecorded call restrictions, since the prerecorded call restrictions are contained in section 227(b)(3) of the statute, which does not contain the "on behalf of" phrase.[49]  DISH relies on the presence of "on behalf of" language in section 227(c)(5) and the absence of such language in section 227(b)(3) to argue that if Congress intended to permit vicarious liability in private actions under the former provision, it also consciously intended to deny the availability of such liability in private actions under the latter provision.[50]

18.     DISH asserts that, "if the TCPA permit[s] 'on behalf of' liability" for do-not-call violations, such liability does not extend to "independent actions of third parties who are not acting under the direction and control" of the party whose services are being marketed.[51]  Rather, DISH contends that the "on behalf of" language should be read to create vicarious liability only in circumstances where the seller has actual knowledge "that a particular consumer will be called."[52]  Alternatively, DISH suggests that "federal common law principles of agency" should be employed to determine when TCPA liability may be imposed upon parties that do not actually make telemarketing calls.[53]  In an ex parte filing submitted after the close of the formal pleading cycle, DISH acknowledged that, under agency principles, a seller could be held vicariously liable for the conduct of third-party telemarketers "if the principal directs the retailer's telemarketing activity by providing call lists," or "if the principal know that a retailer is repeatedly engaging in violative telemarketing when selling the principal's products or services, and the principal fails to take reasonable measures to address the unlawful conduct."[54]

19.     The federal government parties – the United States and the Federal Trade Commission – urge the Commission to rule that, under the TCPA, "a call placed by an entity that markets the seller's goods or services . . . qualif[ies] as a call made on behalf of, and initiated by, the seller even if the seller did not place the call."[55]  According to the FTC, "the plain meaning of 'on behalf of' should be employed when determining whether a seller should be held liable for a marketer's violative telephone calls."[56]  The FTC states that the common meaning of "on behalf of" set out in standard dictionaries would impose

---

[48] *Id.* at 8 (quoting 47 U.S.C. § 227(c)(5)).

[49] *Joint Petition* at 11-13.

[50] *DISH Petition* at 6-7.

[51] *Joint Petition* at 16-17.

[52] *DISH Petition* at 14-15.

[53] *Joint Petition* at 17-18; DISH Comments at ii.

[54] Letter, dated Dec. 9, 2011, from Steven Augustino, to FCC Secretary ("*DISH Dec. 9 Ex Parte*"), at 2.  Accord Letter, dated Dec. 16, 2011, from William M. Wiltshire, Counsel, DIRECTV, to FCC Secretary ("*DIRECTV Dec. 16 Ex Parte*"), at 1.

[55] FTC Comments at 1; *see also* United States Comments at 6-7 (arguing that a telemarketing call made on behalf of a seller also qualifies as a call "initiate[d]" by the seller within the meaning of Robocall prohibition of section 227(b)(1)(B) and a call "ma[de] or transmit[ted]" within the meaning of the do-not-call restrictions authorized in section 227(c)(F)).

[56] FTC Comments at 1-2.

liability on the seller when a marketer acts in the seller's interest or for its benefit, and there accordingly is no basis to import agency principles into the construction.[57]

20.     The States argue that the seller should be deemed to be a party that "initiates" or "mak[es]" a telemarketing call within the meaning of the TCPA prerecorded call and do-not-call restrictions, even if a third-party telemarketer is involved.[58]  They note that a common dictionary definition of "initiate" is to "'cause (a process or action) to begin.'"[59]  The States contend that the seller's involvement in compensating telemarketers for the calls they make satisfies this definition.[60]

21.     "Beyond the liability apportioned to the Seller by the application of the term 'initiate,'"[61] the States point to standard dictionaries that define the phrase "on behalf of" to mean "in the interest of," "as a representative of," or "for the benefit of."[62]  Citing these definitions, the States urge the Commission to rule that a call is made "on behalf of" a seller "if it is in the seller's interest" or "if it aids or benefits the seller."[63]  The States contend that this reading is consistent with prior Commission statements that calls placed by telemarketers on behalf of a seller are treated as if the seller itself made the call.[64]  Moreover, the States dispute that such a reading would unfairly burden lawful telemarketing practices, noting that reputable telemarketers support strict enforcement of TCPA restrictions against both sellers and third parties.[65]

22.     The American Teleservices Association (ATA),[66] which represents "companies with inbound or outbound contact centers, users of teleservices, trainers, consultants, and equipment suppliers who initiate, facilitate, and generate telephone, internet and e-mail sales, service, and support," argues that "sellers should not escape compliance obligations under the Commission's rules simply by outsourcing services to third-party vendors."[67]  ATA "acknowledges that sellers are frequently in the best position to oversee and police compliance of third-party vendors to ensure that the sellers' good and services are marketed to consumers in a compliant manner."[68]  ATA recommends that sellers' liability for unlawful

---

[57] *Id.* at 7.

[58] The States contend that imposing liability on the seller in DISH's "big box" hypothetical is consistent with the statute.  States Reply at 4.

[59] State Comments at 4 (quoting the Oxford online dictionary).

[60] *Id.* at 4.

[61] *Id.* at 4.

[62] *Joint Petition* at 24 (citing Merriam-Webster's Collegiate dictionary 103 (10th ed. 1999) and Webster's Third New International Dictionary 198 (2002)).

[63] *Id.* at 24.

[64] *Id.* at 24-26 (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 20 FCC Rcd 13664, 13667, para. 7 (2005) (*State Farm Ruling*); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397, para. 13(1995) (*TCPA 1995 Order*); *Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd 559, 565, para. 10 (2008) (*ACA International Ruling*); Amicus Brief of FCC and the United States at 9-10, *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 2010 WL 5392875 (6th Cir. 2010)).

[65] States Comments at 9-10 (citing statements by the Direct Marketing Association).

[66] Since its filing, ATA has changed its name to the Professional Association for Customer Engagement.  *See* About PACE, http://paceassociation.com/about/ (last visited Dec. 7, 2012).

[67] ATA Comments at 1, 3.

[68] *Id.* at 3.

calls made by third-party vendors should be "a function of the extent of the sellers' involvement and oversight of the vendors' compliance," including such factors as: (1) the extent to which sellers "measured the vendors' compliance practices and procedures during the selection process;" (2) the extent to which sellers "actively monitor and measure vendors' compliance during the performance of the calling programs and campaigns;" and (3) "[s]pecific instructions provided by sellers to the vendors to foster and best ensure compliance."[69]  ATA argues that, "[t]o the extent that sellers remain actively involved in measuring and monitoring the compliance of their vendors, but the vendors violate the Commission's regulations through no fault of the sellers, sellers should not be held liable for such violations."[70]  Rather, a seller "sh[ould] be liable for calls made in violation of the TCPA by a third-party vendor only when a seller fails to take certain measures to ensure compliance by third-party vendors during a calling program."[71]

23.     Numerous consumers filed comments asserting that they had received telemarketing calls in violation of the statute.  Consumers indicate that when they have contacted DISH about unlawful calls marketing its services, they have received little or no relief from DISH, which claims not to maintain the information necessary to determine which telemarketing entity made the call.[72]  Consumers contend that many telemarketers hide their own Caller ID information and only reveal the identity of the seller of the services or products they are marketing after the consumer expresses some interest in the sales pitch.[73]  Consumers argue that, because telemarketers often go to extreme efforts to hide their own identities, it is essential to hold the sellers liable for the unlawful calls that telemarketers make on their behalf.[74]  Consumers also stress that DISH, in fact, is able to identify the telemarketers that unlawfully make calls on its behalf, because such unlawful calls cease after TCPA lawsuits provide DISH with sufficient incentives to have them curbed.[75]

## III.    DISCUSSION

24.     Petitioners on both sides contend that the statutory text provides a clear answer to the questions of whether and when the TCPA contemplates indirect liability by the seller for unlawful calls made by an independent telemarketer.  We disagree.  The statute defines neither the term "initiate," nor the phrase "on behalf of."  We are therefore left to construe those terms in the course of our administration of the TCPA.  Our rules have long drawn a distinction between the telemarketer who initiates a call and the seller on whose behalf a call is made.  In accordance with those rules, as we explain below, we clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer.

### A.     Sellers Generally Do Not "Initiate" Calls Made By Third-Party Telemarketers.

25.     The TCPA makes it unlawful for any person to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] Gerald Roylance Comments at 3; Robert Braver Comments at 3; Charles Dean Comments at 3-4, 6.

[73] Robert Braver Comments at 2.

[74] Robert Biggerstaff Comments at 15-16.

[75] Joe Shields Comments at 2; Robert Biggerstaff Reply at 9-10; Stewart Abramson Comments at 2-3.

express consent of the called party, unless the call is initiated for emergency purposes or is exempted by [Commission] rule or order."[76]  Likewise, the Commission's do-not-call rules make it unlawful for any person or entity to "initiate any telephone solicitation . . . to any residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry."[77]

26.     Neither the statute nor our rules define the term "initiate."  The dictionary meaning of the term is "to set going, by taking the first step."[78]  The States contend that the seller's involvement in telemarketing calls by third parties satisfies this definition because, absent the contractual arrangements by which the seller compensates telemarketers, "no third party would ever engage in making even legal marketing calls in the attempt to sell the Seller's products and/or services."[79]  That reading is, in our view, too broad, for it would logically encompass a host of activities which have only a tenuous connection with the making of a telephone call, but which could be viewed as a "but for" cause of such calls.  Thus, for example, the mere fact that a company produces and sells a product does not mean that it initiates telephone calls that may be made by resellers retailing that product.  Instead, the word "initiate" suggests a far more direct connection between a person or entity and the making of a call.  We conclude that a person or entity "initiates" a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call.

27.     This reading is reflected in our rules, which define "telemarketer" as "'the person or entity that *initiates* a [telemarketing] call,'" and define the separate term "seller" as "'the person or entity on whose behalf a [telemarketing] call or message *is initiated*.'"[80]  Our rules thus draw a clear distinction between a call that is made by a seller and a call that is made by a telemarketer on the seller's behalf.  To be sure, a seller can also be a telemarketer – *e.g.*, when the seller initiates a call on its own behalf.  And one can imagine a circumstance in which a seller is so involved in the placing of a specific telephone call as to be directly liable for initiating it – by giving the third party specific and comprehensive instructions as to timing and the manner of the call, for example.  But a construction of the statute that concludes that a seller always initiates a call that is made by a third party on its behalf would entirely collapse the distinction, reflected in our current rules, between seller and telemarketer.[81]  Any revision of this codified

---

[76] 47 U.S.C. § 227(b)(1)(B).

[77] 47 C.F.R. § 64.1200(c)(2).

[78] *American Heritage College Dict*. 714 (4th ed. 2003).

[79] State Comments at 4.

[80] DISH Comments at 13 (quoting 47 C.F.R. §§ 64.1200(f)(7) & (9)).

[81] We note that the federal government's amicus brief to the Sixth Circuit in the *Charvat* case stated that an entity can be liable under the TCPA for a call made on its behalf even if the entity did not directly place the call," and that in those circumstances, "the entity is properly deemed to have initiated the call through another."  Brief for the FCC and United States at 2, *Charvat v. Echostar Satellite, LLC*, No. 09-4525 (6th Cir.) (filed Nov. 15, 2010); *see also id*. at 10.  The brief made clear, however, that the government's ultimate conclusion that "an entity may be held liable under the TCPA and the Commission's regulations for calls made on its behalf, even though it did not itself initiate those calls."  *Id*. at 12.  Although we do not, in this declaratory ruling, generally deem the seller to "initiate" a call made on its behalf by another, we adhere to the brief's conclusion that an entity can be vicariously liable for calls made on its behalf, and reaffirm that vicarious liability exists separate and apart from whether the entity can be deemed itself to have initiated a call made by another.

interpretation would require a notice-and-comment rulemaking, and is therefore beyond the scope of this adjudicatory proceeding.[82]

### B.    Sellers Can Be Held Vicariously Liable For Certain Calls Made By Third-Party Telemarketers.

28.    Our conclusion that a seller does not necessarily *initiate* a call that is placed by a third-party telemarketer on the seller's behalf does not end our inquiry.  For even when a seller does not "initiate" a call under the TCPA, we conclude that it may be held vicariously liable for certain third-party telemarketing calls.  In particular, we find that the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers.  In this regard, we explain below that a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.[83]  Because the statute provides separate private rights of action for violations of the do-not-call provisions of section 227(c) and violations of other TCPA prohibitions (such as those against pre-recorded calls) contained in section 227(b), we address each provision in turn.

### 1.    Vicarious Liability With Respect To "Do-Not-Call" Violations

29.    Federal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the statute permits such a construction and doing so would advance statutory purposes.[84]  Consistent with this precedent, and the presumption that "legislatures act with case law in mind,"[85] we find that section 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations.  That provision empowers "any person" to sue for damages and injunctive relief for do-not-call violations "by *or on behalf of*" a company.[86]  In accordance with this statutory provision, the Commission's company-specific do-not-call rules provide that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such

---

[82] *See Bell Atlantic-Delaware, Inc. v. Frontier Communications Services*, 16 FCC Rcd 8112, 8120 (2001) ("We are mindful that the Commission has been asked to clarify or revise existing regulations . . . .  But because this has come before us as part of [an adjudicatory] proceeding regarding past behavior, we are constrained to interpret our current regulations and orders."); *cf. American Federation of Government Employees, AFL-CIO, Local 3090 v. FLRA*, 777 F.2d 751, 759 (D.C. Cir. 1985) ("an agency seeking to repeal or modify a legislative rule promulgated by means of notice and comment rulemaking is obligated to undertake similar procedures to accomplish such modification or repeal").

[83] *See* paras. 33-34, 45-47, below.

[84] *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (holding that Fair Housing Act imposes vicarious liability for racial discrimination according to traditional agency principles, as outlined in HUD regulations); *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565-574 (1982) (holding that "general principles of agency law," including "apparent authority theory," may establish a basis for liability in private antitrust actions under 15 U.S.C. § 15); *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427-1440 (3d Cir. 1994) (general agency principles, including apparent authority, apply to determine liability in private damages action for alleged false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)); *Accounting Outsourcing, LLC v. Verizon Wireless Personal Communications, L.P.*, 329 F. Supp.2d 789, 794-95, 805-06 (M.D. La. 2004) (liability in private TCPA action under section 227(b)(3) for violation of prohibitions against unsolicited fax advertisements may be predicated on agency doctrines of vicarious liability, because to construe the statute otherwise would effectively allow "an end-run around the TCPA's prohibitions").

[85] *Abuelhawa v. U.S.*, 556 U.S. 816, 821 (2009).

[86] 47 U.S.C. § 227(c)(5) (emphasis added).

**Federal Communications Commission**                                    **FCC 13-54**

person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made *by or on behalf of* that person or entity,[87] and they specify, among other things, that if do-not-call requests "are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, *the person or entity on whose behalf the telemarketing call is made will be liable* for any failures to honor the do-not-call request."[88]  Our rules implementing the national do-not-call registry also recognize "on behalf of" liability.  In particular, the rule provides a safe harbor from liability for an entity "on whose behalf telephone solicitations are made," if that entity can "demonstrate that the violation is the result of error and that as part of its routine business practice, it meets [certain] standards," including (1) the adoption of "written procedures to comply with the national do-not-call rules" and (2) the training of "its personnel, *and any entity assisting in its compliance*, in procedures established pursuant to the national do-not-call rules."[89]

30.    Standard dictionary definitions of the phrase "on behalf of" include, among other things, "in the interest of," "as a representative of," and "for the benefit of" – concepts that easily can be read to encompass common law agency principles.[90]  More generally, we also find that reading section 227(c) to recognize "on behalf of" liability by sellers for the third-party telemarketing calls that violate the do-not-call rules best implements Congress's express purpose behind those rules – the "[p]rotection of subscriber privacy rights."[91]  Among other things, section 227(c) directs the Commission, in promulgating do-not-call rules, to determine the "most effective and efficient" measures to serve that purpose and to implement measures "for protecting [subscriber] privacy rights . . . in an efficient, effective, and economical manner" that does not impose additional charges on telephone subscribers.[92]  Reading section 227(c)(5) to impose vicarious seller liability for do-not-call violations under federal common law agency principles serves these goals.

31.    A number of parties argue that statutory "on behalf of" liability extends beyond agency principles to subject the seller to vicarious liability for violations of both section 227(c) and section 227(b) so long as the call is made simply to aid or benefit the seller – even if agency principles would not impose vicarious liability on the seller for the call.[93]  We reject these contentions for purposes of this declaratory ruling proceeding.  In principle, section 227(c)(5), read on a blank slate, might be construed to authorize "on behalf of" liability that extends beyond agency principles.  However, our orders discussing "on behalf of" liability under section 227(c) appear to link that concept to agency principles.[94]  Moreover, the Commission's existing TCPA regulations implementing both sections 227(b) and 227(c) use the same ("on behalf of") phrase.[95]  Since we find below that vicarious liability for violations of section 227(b) is

---

[87] 47 C.F.R. § 64.1200(d) (emphasis added).

[88] *Id.* § 64.1200(d)(3) (emphasis added).

[89] 47 C.F.R. § 64.1200(c)(2)(i)(A) & (B) (emphasis added).

[90] *See, e.g., Merriam-Webster's Collegiate Dictionary* 103 (10th ed. 1999); *Webster's Third New International Dictionary* 198 (2002).

[91] 47 U.S.C. § 227(c).

[92] *Id.* § 227(c)(1)(E) & (2).

[93] *See* Joint Petition at 24; FTC Comments at 7-8; United States Comments at 13.

[94] *See TCPA 1995 Order,* 10 FCC Rcd at 12397, para. 13 (equating calls "on behalf of" a party and calls placed by an "agent"); *State Farm Ruling,* 20 FCC Rcd at 13667, para. 7 (equating calls by "State Farm's exclusive agents" with calls made "on behalf of State Farm").

[95] *See, e.g.,* 47 C.F.R. §§ 64.1200 (a)(2), (a)(3)((iv), (a)(4)(vi), (a)(7)(iv), (f)(9) (all using the term "on behalf of" in circumstances beyond do-not-call).

available only under federal common law agency principles,[96] reading "on behalf of" to provide for more extensive vicarious liability in the context of do-not-call violations under section 227(c) would implausibly require that phrase to have different meanings under our rules, depending on the particular violations at issue, without any indication in past precedent that different meanings were intended. Accordingly, as we hold above with respect to the statutory term "initiate," at a minimum, any attempt to construe "on behalf of" liability for do-not-call violations as extending beyond those applicable to prerecorded calls would require notice and comment rulemaking.[97]

32.     To be clear, and contrary to the partial dissent's contention, we do not find that the statute necessarily provides for a single standard of third-party liability for prerecorded call violations and do-not-call violations. Instead, we leave open the possibility that we could interpret section 227(c) to provide a broader standard of vicarious liability for do-not-call violations.[98] We simply observe that, in light of our current rules, which do treat these provisions analogously, we could not come to such a conclusion in a declaratory ruling proceeding, but only after notice and comment rulemaking. Thus, it may well be that the Commission could ultimately decide that "on behalf of" liability goes beyond agency principles. However, creating such a new interpretation is not appropriate for a Declaratory Ruling. For that reason, the relevant question is not whether the terms of a statute trump a rule, which they do, but whether the Commission should adhere in a Declaratory Ruling to the interpretation of the statute evinced by its prior rules and orders. This *Declaratory Ruling* properly adheres to those prior determinations.

### 2.     Vicarious Liability With Respect To Violations Of Section 227(b).

33.     We find that vicarious seller liability under federal common law agency principles is also available for violations of section 227(b). As we note above in connection with our discussion of section 227(c), federal statutory tort actions, such as those authorized under the TCPA, customarily are construed to incorporate general common law agency principles of vicarious liability where such a construction would advance statutory purposes and does not conflict with the statutory text.[99]

34.     The classical definition of "agency" contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control."[100] Potential liability under general agency-related principles extends beyond classical agency, however. A principal may be liable in circumstances where a third party has apparent (if not actual) authority.[101] Such "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal."[102] Other principles of agency law

---

[96] *See* Section III.B.2, below.

[97] *See* para. 27 & n.82, above.

[98] The partial dissent (at 24) seeks to enlist an April 2, 2013 Department of Justice ("DoJ") filing for the proposition that the statute must be read to require a different (and heightened) vicarious liability standard for do-not-call violations under section 227(c) than for robocall and other violations under section 227(b). However, DoJ made clear in a subsequent filing that although it believes that asymmetrical vicarious liability standard to be "a theoretically permissible view of the statute," it does not endorse that interpretation as mandatory, or even as the best construction of the TCPA. Letter from Patrick Runkle, DoJ, to FCC Secretary, at 1 (Apr. 8, 2013).

[99] *See* para. 29 & n.84, above.

[100] Restatement (Third) of Agency § 1.01.

[101] *E.g., Hydrolevel Corp.*, 456 U.S. at 565-74.

[102] Restatement (Third) of Agency § 2.03, cmt. c. As commonly understood under modern agency principles

(continued . . .)

may support liability in particular cases. For example, a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits.[103] Such ratification may occur "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences."[104]

35.    While section 227(b) does not contain a provision that specifically mandates or prohibits vicarious liability, we clarify that the prohibitions contained in section 227(b) incorporate the federal common law of agency and that such vicarious liability principles reasonably advance the goals of the TCPA.

36.    Reading the TCPA to incorporate baseline agency principles of vicarious liability with respect to violations of section 227(b) is consistent with judicial precedent. The TCPA was enacted primarily to protect consumers from unwanted telemarketing invasions. The private right of action provided in section 227(b)(3) gives consumers the power not only to seek compensation for the harms unlawful telemarketing causes, but also to deter future unlawful invasions of privacy. In *Hydrolevel Corp.*, the Supreme Court determined, in a private antitrust action under 15 U.S.C. § 15, that the statute permitted the imposition of liability against a trade association for the actions of its agents. Noting that a purpose of the statute was to deter anticompetitive actions, the Court held that allowing vicarious liability, in that case on the basis of apparent authority, would advance that goal because, if the trade association "is civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future."[105] The Court explained that "[o]nly [the trade association] can take systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for [it] to take those steps."[106] By contrast, denying trade association liability would allow the association to "avoid liability by ensuring that it remained ignorant of its agents' conduct," contrary to congressional intent that the "private right of action deter antitrust violations."[107]

---

(. . . continued from previous page) ————————————

reflected in the Third Restatement, such apparent authority can arise in multiple ways, and does *not* require that "a principal's manifestation must be directed to a specific third party in a communication made directly to that person. *Id.*, reporter's note a. Rather, "a principal may create apparent authority by appointing a person to a particular position." *Id.* Similarly, "a principal may permit an agent to acquire a reputation of authority in an area or endeavor by acquiescing in conduct by the agent under circumstances likely to lead to a reputation." *Id.*, cmt. c. And "[r]estrictions on an agent's authority that are known only to the principal and the agent do not defeat or supersede the consequences of apparent authority for the principal's legal relations" with others." *Id.* In such circumstances, for example, the presence of contractual terms purporting to forbid a third-party marketing entity from engaging in unlawful telemarketing activities would not, by themselves, absolve the seller of vicarious liability.

[103] Restatement (Third) of Agency § 4.01, cmt. d.

[104] *Id.* Thus, a seller may be bound by the unauthorized conduct of a telemarketer if the seller "is aware of ongoing conduct encompassing numerous acts by [the telemarketer]" and the seller "fail[s] to terminate," or, in some circumstances, "promot[es] or celebrat[es]" the telemarketer. *Id.*

[105] 456 U.S. at 572.

[106] *Id.*

[107] *Id.* at 573. We find that the "general common law" of agency-related principles, "rather than . . . the law of any particular State," should govern in construing the reach of the TCPA. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (*CCNV*). Such a reading "reflects the fact that 'federal statutes are generally intended to have uniform nationwide application.'" *Id.* (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)); *see also Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740, 751 (2012) ("TCPA liability . . . depends on violation of a federal statutory requirement or an FCC regulation, . . . not on a violation of any state substantive law."). And the legislative history of the TCPA, in particular, reflects an intent to promote uniformity of

(continued . . .)

**Federal Communications Commission**                           **FCC 13-54**

---

37.    This analysis applies comfortably to private rights of action for violations of section 227(b).  As government and consumer commenters argue – and as the telemarketing industry acknowledges – the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers.[108]  We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules.[109]  By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions.  This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.[110]  Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief.  As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, . . . suing one or a few of them is unlikely to make a substantive difference for consumer privacy."[111]  And as the Third Circuit determined in an analogous context, absent the application of agency-related principles, the seller (in this instance) "would benefit from undeterred unlawful acts, and the statute's purpose . . . would go unrealized."[112]  Reading the TCPA to incorporate baseline agency-related principles imposing vicarious liability on sellers also advances Congress' intent that the Commission harmonize its TCPA enforcement, to the extent possible, with that undertaken by the

(. . . continued from previous page) ─────────────────────

regulation in telemarketing.  *See, e.g.*, H.R. Rep. 102-317 (1991), at 10 (finding that "federal legislation is needed ... [to] protect legitimate telemarketers from having to meet multiple legal standards"); 137 Cong. Rec. S18317-01, at 1 (1991) (remarks of Sen. Pressler) ("The Federal Government needs to act now on uniform legislation to protect consumers.").  We find that the application of uniform agency principles across the country should benefit both sellers that rely on telemarketing and consumers by reducing uncertainty regarding governing standards of vicarious liability.  We disagree, however, with DISH's assertion that general federal common law principles of agency limit a principal's responsibility to circumstances in which formal agency exists and the principal exerts immediate direction and control.  *Joint Petition* at 17-18 (citing *CCNV*, 490 U.S. at 751-52).  The *CCNV* case on which DISH relies, unlike the present context under the TCPA, involved the application of general agency principles to the statutory term "employee."  490 U.S. at 738.  As noted above, federal common law of agency also extends to concepts such as apparent authority, when statutory goals would thereby be served.  *See Hydrolevel Corp.*, 456 U.S. at 565-574.

[108] FTC Comments at 7 (stating that the seller "is in the best position to monitor the manner in which its products are marketed"); ATA Comments at 3 (stating that "sellers are frequently in the best position to oversee and police compliance of third party vendors to ensure that the sellers' goods and services are marketed to consumers in a compliant manner"); *accord* United States Comments at 13; States Comments at 8.  Consumers with experience challenging TCPA violations argued below that sellers are able to police their telemarketers, but lack sufficient incentive to do so until lawsuits are filed, which threaten to expose them to liability.  Joe Shields Comments at 2; Robert Biggerstaff Reply at 9-10; Steward Abramson Comments at 2-3.

[109] *See* FTC Comments at 9.

[110] *Id.*; United States Comments at 10-11; Robert Biggerstaff Comments at 15-16; Robert Braver Comments at 2.

[111] FTC Comments at 8; FTC Reply at 1; *see Winback and Conserve Program, Inc.*, 42 F.3d at 1434 (finding that the purposes of the Lanham Act would be served by application of agency-related principles because it would be infeasible to expect the injured party "to initiate suit in separate jurisdictions against every independent contractor which it believes violated its intellectual property rights").

[112] *Winback and Conserve Program, Inc.*, 42 F.3d at 1434.

FTC in connection with its Telemarketing Sales Rule.[113]  Under that Rule, the FTC has taken the position that sellers are responsible for the violations of their authorized dealers.[114]

38.    Construing the TCPA prohibitions contained in section 227(b) to incorporate agency principles is also consistent with our administrative precedent.  Addressing section 227(b) prohibitions in 2008, the Commission clarified that autodialed debt collection calls by third-party debt collectors to wireless telephone numbers would be treated as having been made with the called party's express consent, if the called party had provided the creditor with the wireless number during the transaction that resulted in the debt.[115]  At the same time, we stressed that the "creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules.  Calls placed by a third-party collector on behalf of that creditor are treated as if the creditor itself placed the call."[116]  Our precedent in the do-not-call context is to the same effect.  In a 1995 rulemaking order, we explained that "[o]ur rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations."[117]  Responding to commenters' assertions that responsibility for the calls should be "soundly based on agency principles," we stated that "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call."[118]  Accordingly, we stated that calls placed by telemarketing agents of tax exempt nonprofit organizations, as well as those placed by the nonprofit organizations themselves, would be exempted from telemarketing restrictions under the Act.[119]  Similarly, in a 2005 order declaring that State Farm's exclusive independent insurance agents may make lawful telemarketing calls on behalf of State Farm so long as State Farm has a valid "established business relationship" with the customer, we "reiterate[d] that a company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call."[120]

---

[113] *Mainstream Marketing*, 358 F.3d at 1234 n.4 (citing Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003)).  We recently strengthened consumer protections, among other things, by amending our rules to require prior express written consent for all autodialed and prerecorded telemarketing calls to wireless numbers and for prerecorded telemarketing calls to residential lines, thereby eliminating the prior "established business relationship" exemption for such calls to residential lines.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (CG Docket No. 02-278), Report and Order, 27 FCC Rcd 1830, para. 2 (2012).  In doing so, we expressly sought to "harmonize our rules with those of the FTC[]."  *Id.*

[114] FTC Comments at 6.

[115] *ACA International Ruling*, 23 FCC Rcd at 564-65, paras. 9-10.

[116] *Id.* at 565, para. 10.

[117] *TCPA 1995 Order,* 10 FCC Rcd at 12397, para. 13.

[118] *Id.* at 12397, paras. 12, 13.

[119] *Id.* at 12397, para. 13; *see* 47 C.F.R. §64.1200(a)(3)(iv) (prohibiting unsolicited robocalls unless "made by or on behalf of a tax-exempt nonprofit organization").  The partial dissent asserts (at 4) that the interpreting "on behalf of" under our existing rules to reflect federal common law agency principles could have "pernicious and unintended results" with respect to the scope of charitable exemptions.  But that is precisely the result that charities and their allied telemarketers sought and received at the time the Commission adopted the rule exempting from its rules calls "made by or on behalf of a tax-exempt nonprofit organization."  *See TCPA 1995 Order*, 10 FCC Rcd at 12397, paras. 12-13.  Although the partial dissent asserts (at 25 n.16) that these parties were seeking to exempt calls made by "independent telemarketers" (rather than agents) on behalf of charities, those parties argued to the Commission that the scope of the exemption "is soundly based on agency principles."  *TCPA 1995 Order*, 10 FCC Rcd at 12397, para. 12.

[120] *State Farm Ruling*, 20 FCC Rcd at 13667, para. 7.

39.     DISH dismisses these decisions as applying only to the expansion of *exemptions* from TCPA restrictions and not to the expansion of potential liability to the seller for the unlawful actions of its telemarketers.[121]  The terms of the orders are not so limited.  Nor as a matter of policy do we believe that the principles governing the scope of the TCPA's exemptions from liability by telemarketers and sellers should differ from those  governing the scope of the statute's consumer protections, particularly given that the TCPA has as one of its primary goals the protection of consumers from unwanted telemarketing intrusions.

40.     DISH and AT&T assert that the presence of "on behalf of" language applicable to actions under section 227(c)(5) to enforce the TCPA's do-not-call provisions, compared with the absence of such language in connection with actions to enforce the prerecorded call (and other) prohibitions of section 227(b), demonstrates a Congressional determination that vicarious seller liability should apply only to do-not-call violations and not to unlawful prerecorded calls.[122]  We disagree.  The language of sections 227(b)(3) and section 227(c)(5) is not parallel.  Section 227(b)(3) provides a private right of action for a "violation" of the Act; unlike section 227(c)(5), it does not speak to the "person" or "entity" that places a call.[123]  Thus, the absence of the phrase "on behalf of" in section 227(b)(3) does not foreclose the application of baseline federal common law agency principles – which typically apply to federal tort statutes – to impose vicarious liability on the seller for third-party violations of section 227(b).  Moreover, although the Commission has not to date adopted such an interpretation in connection with its TCPA regulations, the specific language in section 227(c)(5) providing for vicarious "on behalf of" liability by the seller for do-not-call violations committed by third-party telemarketers could be read to establish liability that extends *beyond* that available under common law agency-related principles.  Because section 227(c) potentially may be read to provide consumer remedies that are *more expansive* than those available under common law agency principles, there is no reason to read Congressional silence (in section 227(b)) as evidence of intent to preclude the baseline agency principles of vicarious liability that would normally apply with respect to federal tort statutes like the TCPA.  Indeed, two recent district court decisions properly reject any such negative implication.[124]

41.     Similar analysis leads us to reject DISH's suggestion that section 217 of the statute – which provides that "the act, omission, or failure to act of any officer*, agent, or other person acting for or employed by any *common carrier* or *user*" shall be "deemed to be the act, omission, or failure of such carrier or user as well" – also creates a negative implication for holding it vicariously liable, because it allegedly is neither a common carrier nor the physical "user" of the telecommunications network.[125]  We

---

[121] DISH Comments at 16-18.

[122] *Joint Petition* at 11-13; *DISH Petition* at 6-7; *see also* AT&T Comments at 2-3 (arguing that vicarious liability is available only with respect to do-not-call violations).

[123] *Compare* 47 U.S.C. § 227(b)(3) *with id.* § 227(c)(5).

[124] *See Thomas v. Taco Bell Corp.*, 879 F. Supp.2d 1079, 1084 (C.D. Cal.  2012) (TCPA contemplates that a seller may be vicariously liable under agency principles for violations of section 227(b) notwithstanding the absence of "on behalf of" liability available for do-not-call violations under section 227(c)); *Mey v. Pinnacle Security, LLC*, 2012 WL 4009718 *4 - *5 (N.D. W.Va. Sept. 12, 2012) (same).  Although we agree with the courts in *Thomas* and *Mey* that the absence of "on behalf of" language in section 227(b) does not preclude vicarious liability for violations of that section under common law agency principles, we do not believe it is appropriate to limit vicarious liability to the circumstances of classical agency (involving actual seller, or right to control, of the telemarketing call) addressed in those cases.  Principles of apparent authority and ratification may also provide a basis for vicarious seller liability for violations of section 227(b).  *See* paras. 33-34, above, and paras. 45-47, below.

[125] 47 U.S.C. § 217 (emphasis added); *see Joint Petition* at 13-14.

need not decide, for present purposes, whether DISH falls outside the scope of section 217,[126] since we find that Congress in section 217 affirmatively extended vicarious liability of entities within the scope of that provision *beyond* "agents" – in the case of section 217, to *any* party "acting for" "common carriers" or "users."[127]   Congress's express decision to provide (for entities within the scope of section 217) consumer remedies that are *more expansive* than those available under common law agency principles, logically provides no reason to read Congressional silence (with respect to entities outside the scope of section 217) as evidence of intent to withdraw even the baseline agency principles of vicarious liability that normally apply with respect to federal tort statutes like the TCPA.

     42.     In sum, the evident importance of vicarious seller liability in providing an effective remedy for violations makes it unreasonable to believe that Congress would have denied consumers such a remedy for unlawful prerecorded calls by implication.  That is particularly so, given that, as explained above, the application of general common law agency principles to federal tort statutes is the norm in the absence of clear evidence that Congress intended to withdraw the application of such principles.

     43.     DISH's remaining policy arguments do not persuade us that the application of common law principles of vicarious seller liability would conflict with the purposes of the TCPA.  DISH contends, for instance, that, except where the telemarketer is acting at the express direction and control of the seller with respect to the particular customer, imposition of vicarious liability would unacceptably heighten business risk by making liability "unpredictable, unlimited and uncontrollable."[128]  Such liability, according to DISH, "would unreasonably burden legitimate telemarketing practices and have a ripple effect on the economy at large, which relies on legitimate telemarketing activities."[129]  Similarly, DIRECTV asserts that such liability would force sellers to "pull out of the independent retailer channel in order to avoid liability, and consumers would lose local contacts and competitive choices between retailers."[130]  DIRECTV also contends that if third-party telemarketers conclude that liability for their unlawful calls can be shifted to sellers, they will have little incentive to comply with TCPA restrictions and violations will increase.[131]

     44.     We find these concerns to be misplaced.  Sellers can simultaneously employ third-party telemarketers and protect their legitimate commercial interests by exercising reasonable diligence in selecting and monitoring reputable telemarketers and by including indemnification clauses in their contracts with those entities.[132]  Moreover, we disagree that imposing seller liability will increase unlawful telemarketing by reducing the incentives of third-party telemarketers to comply with TCPA restrictions.  To the contrary, overall unlawful activities should be reduced, as sellers will have an incentive to carefully choose their telemarketers to ensure compliance and to force consistent violators out of the marketplace.  Moreover, imposing vicarious liability on the seller would in no way absolve the

---

[126] Although DISH is not a common carrier, we have been presented with no authoritative precedent on the meaning of "user" under section 217, and decline to resolve the question of whether DISH might fall within the scope of that term in the present context.

[127] *Long Distance Direct, Inc.*, 15 FCC Rcd 3297, 3300 & n.12 (2000); *Silv Communication Inc.*, 25 FCC Rcd 5178, 5180 & n.18 (2010).

[128] *Joint Petition* at 9; *see also id.* at 17.

[129] *Id.* at 9.

[130] DIRECTV Comments at 6.

[131] *Id.* at 3-4, 6.

[132] *See* FTC Reply at 2 n.2; ATA Comments at 3.

third-party telemarketer of joint liability.  Thus, vicarious seller liability should not decrease telemarketers' incentives to obey TCPA restrictions.

45.     Finally, we reject DISH's contention in this proceeding that vicarious liability beyond strict, classical agency relationships would extend seller liability to the marketing by "big box stores and national dealers (such as Best Buy, Sears, *etc.*) who sell numerous manufacturers' products (such as Sony televisions, Whirlpool appliances, etc.)."[133]  DISH suggests that, if it is liable for the unlawful telemarketing calls of its third-party retailers, then an unlawful call by an employee of a national retail outlet would "create liability for the business whose brand is on the product being sold . . . (*e.g.*, Sony and Whirlpool), even where the business did not use the telephone or otherwise direct and control the big box store salesperson."[134]  We note that DISH's hypothetical appears to bear no relationship to the telemarketing model giving rise to the petitions before us in this proceeding.[135]  In any event, to the extent that such a store is selling on its own account – *i.e.*, it has purchased goods from a manufacturer and is re-selling them – the manufacturer would not be a seller at all.[136]

46.     To provide guidance in this area, we find that the following are illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations.[137]  For example, apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information.  The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant.  It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.  Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.[138]  At a minimum, evidence of these kinds of relationships

---

[133] DISH Comments at 3.

[134] *Id.* at 3.

[135] FTC Reply at 2.

[136] *See* Gerald Roylance Comments at 8-9 & n.3; Charvat Comments at 2.

[137] *See* Letter, dated Oct. 26, 2011, from Lisa K. Hsiao, U.S. Dept. of Justice, to FCC Secretary, at 5-6 ("October 26 DOJ *Ex Parte* Letter").  Contrary to the partial dissent's contention, we do have expertise – gleaned from our role in administering the TCPA and reviewing the record in this proceeding – in applying Congress's goals under the statute and the circumstances in which telemarketing call may arise on behalf of sellers.  Indeed, the partial dissent agrees that the TCPA, which the Commission interprets, incorporates principles of federal agency law.  There is thus no good reason that we should not provide guidance to regulated parties, consumers, and courts as to how we understand those general incorporated principles to apply in this specific context, where the Commission has decades of experience.  *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952-53 (9th Cir. 2009) (Congress has delegated power to the FCC to interpret and implement the TCPA).

[138] See *id.* at 6.  DISH and DIRECTV agree that "if the principal directs the retailer's telemarketing activity by providing call lists for telemarketing, the principal can be held liable for the reseller's telemarketing based on those lists."  *DISH Dec. 9 Ex Parte*, at 2.  They also agree that "if the principal knows that a retailer is repeatedly engaging in violative telemarketing when selling the principal's products or services, and the principal fails to take reasonable measures to address the unlawful conduct, depending on the facts, that also could be interpreted as directing the unlawful conduct."  *Id.  Accord DIRECTV Dec. 15 Ex Parte*, at 1.  *See also* Letter, dated December 15, 2011, from
(continued . . .)

– which consumers may acquire through discovery, if they are not independently privy to such information[139] – should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.

47.        In sum, under our current rules and administrative precedent interpreting and implementing sections 227(b) and 227(c), we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under section either section 227(c) or section 227(b).[140] However, we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised. In the case of either actions to enforce section 227(b) or actions to enforce do-not-call restrictions under section 227(c), we stress that nothing in this order requires a consumer to provide proof – at the time it files its complaint – that the seller should be held vicariously liable for the offending call.

## IV.      CONCLUSION

48.        For the reasons discussed herein, we grant in part and otherwise deny the above-captioned petitions for declaratory ruling. We clarify that, while a seller does not generally initiate calls made through a third-party telemarketer, it nonetheless may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services.

## V.      ORDERING CLAUSES

49.        Accordingly, IT IS ORDERED that, pursuant to sections 1-4, 227, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, 303(r), and section 64.1200 of the Commission's rules, 47 C.F.R. § 64.1200, this Declaratory Ruling in CG Docket No. 11-50 IS ADOPTED as set forth herein.

---

(. . . continued from previous page)       ——————————

Davida Grant, AT&T, to FCC Secretary, at 3 (Factors relevant to "assess[ing] whether the seller took reasonable measures with respect to the third party to protect customers from unwanted solicitations" include whether "the seller provided the plaintiff's number to the third party for telemarketing purposes," and whether "the seller has actual knowledge of a pattern of telemarketing violations by the third party").

[139] *See*, *e.g.*, Rules 26 – 37, Fed. R. Civ. P. (addressing means of discovery in federal district courts). Needless to say, nothing in our ruling requires a consumer to prove at the time of their complaint (rather than reasonably allege) that a call was made on the seller's behalf.

[140] Accordingly, the partial dissent misreads our decision in asserting (at 5) that we "attempt[] to equate the federal common law of agency with strict liability."

**Federal Communications Commission**                              **FCC 13-54**

50.     IT IS FURTHER ORDERED that the Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois. North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules (filed February 22, 2011); the Petition Filed by Philip J. Charvat for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules (filed March 2, 2011); and the Petition Filed by DISH Network, LLC for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules (filed March 10, 2011) ARE GRANTED TO THE EXTENT SPECIFIED HEREIN AND ARE OTHERWISE DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

21

Federal Communications Commission                                      FCC 13-54

# APPENDIX

**List of Participants in the Proceeding**

*Comments Filed*

Stewart Abramson
American Teleservices Association
AT&T Inc.
Todd Bank
Robert Biggerstaff
Robert H. Braver
Nathan Burdge
Philip J. Charvat
Jay Connor
Charles Dean
DIRECTV, Inc.
DISH Network, LLC
Federal Trade Commission
Diana L. Mey
Gerald Roylance
Joe Shields
States of California, Illinois, North Carolina, and Ohio
Jimmy A. Sutton
The United States
Richard Zelma

*Reply Comments Filed*

Stewart Abramson
Robert Biggerstaff
Nathan Burdge
Philip J. Charvat
DISH Network, LLC
Federal Trade Commission
Mark. R. Lee
Diana Mey
Gerald Roylance
Joe Shields
States of California, Illinois, North Carolina, and Ohio
The United States

STATEMENT OF
COMMISSIONER AJIT PAI,
APPROVING IN PART AND DISSENTING IN PART

Re:     *The Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules; The Petition Filed by Philip J. Charvat for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules; The Petition Filed by DISH Network, LLC for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules*, CG Docket No. 11-50.

Congress passed the Telephone Consumer Protection Act (TCPA) in the wake of increasing complaints about telemarketing from consumers and a ragged patchwork of state laws addressing the problem. The TCPA was a "federal intervention balancing the privacy rights of the individual and the commercial speech rights of the telemarketer."[1] Therefore, it is not surprising that the statutory scheme reflects a compromise (and a complicated one at that) that uses precise distinctions to effectuate Congress's purpose.

Our job at the Commission is to implement the laws as they are written by Congress, not to rewrite them to conform to our own policy preferences. Accordingly, we should—indeed, must—respect the statute's precise boundaries.[2] Moreover, clear rules better protect consumers, better inform businesses engaged in lawful telemarketing, and better serve the courts who must handle the litigation arising under the TCPA. Because today's declaratory ruling does not advance the appropriate interpretation of the statute, eschews clear rules that would preclude wasteful litigation, and expounds an area of law that we are not empowered to administer, I dissent in part.

I.

Let me start with where I agree with today's item. *First*, I agree that a person "initiates" a telephone call when he physically places that call. Thus when a third-party telemarketer places a call on a seller's behalf, it is the telemarketer, and not the seller, who "initiates" that phone call.[3] *Second*, I agree that a seller may be held vicariously liable for TCPA violations committed by third-party telemarketers.

But it is in defining the scope of that third-party liability that I part ways with my colleagues. I find implausible as a matter of statutory construction the declaratory ruling's insistence on one and only one standard of third-party liability for both prerecorded call violations (governed by section 227(b)) and do-not-call violations (governed by section 227(c)). Although administratively convenient, this one-size-fits-all approach gives short shrift to the divergent language of these two provisions. I believe instead that sections 227(b) and 227(c) embrace different approaches to third-party liability. Under section 227(b), sellers should be held vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers. By contrast, under section 227(c), third-party liability

---

[1] Report of the Energy and Commerce Committee of the U.S. House of Representatives, H.R. Rep. 102-317, at 10 (1991) (TCPA House Report).

[2] *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93–94 (2002) (explaining that "like any key term in an important piece of legislation, the [statutory provision in question] was the result of compromise between groups with marked but divergent interests in the contested provision" and that "[c]ourts and agencies must respect and give effect to these sorts of compromises"); *see also* John F. Manning, *Second-Generation Textualism*, 98 Cal. L. Rev. 1287, 1309–17 (2010) (arguing that respecting legislative compromise means that courts "must respect the level of generality at which the legislature expresses its policies").

[3] *See Declaratory Ruling*, para. 26.

exists whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control.

Consider first the language the TCPA uses to confer a private right of action in each context. On one hand, the TCPA states that a person "may . . . bring . . . an action based on a violation" of the prerecorded call rules to enjoin further calls or recover damages.[4] In short, the statute is silent on the scope of third-party liability applicable to section 227(b) violations.

On the other hand, the TCPA's do-not-call rules specifically contemplate third-party liability. The TCPA specifies that a "person who has received more than one telephone call within any 12-month period by *or on behalf of* the same entity in violation of the [do-not-call] regulations . . . may . . . bring . . . an action based on [such] a violation" to enjoin further calls or recover damages.[5] In other words, the statutory phrase "on behalf of" explicitly extends third-party liability to section 227(c) violations.

Congress does not normally use differing language in two parallel provisions to mean the same thing. Just as "[i]t cannot be presumed that any clause in the constitution is intended to be without effect,"[6] statutory language "cannot be regarded as mere surplusage; it means something."[7] And yet the declaratory ruling would read section 227(c) no differently if the phrase "on behalf of" were excised from the text.[8]

Instead of incorporating federal common-law agency principles into section 227(c), the Commission should give meaning to "on behalf of" and impose third-party liability for do-not-call violations whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control.[9] Such a standard would not only respect the specific language Congress used in the TCPA, it would also better implement the statutory scheme.[10]

Two further distinctions in the statutory text confirm the necessity and propriety of an "on behalf of" standard for third-party liability for do-not-call violations. *For one*, an "on behalf of" standard is necessary if consumer enforcement of the do-not-call provisions is to be effective. Section 227(c)(5) imposes a two-call rule for do-not-call violations, prohibiting a consumer from bringing suit unless she has received "more than one telephone call . . . by or on behalf of the same entity."[11] If "on behalf of" means what it says, the consumer's burden of proof is low: She would only need to prove that both calls were marketing the product of a single seller, and she could then file suit against either the telemarketer or

---

[4] 47 U.S.C. § 227(b)(3).

[5] 47 U.S.C. § 227(c)(5) (emphasis added).

[6] *Marbury v. Madison*, 1 Cranch 137, 174 (1803); *id.* ("Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them or they have no operation at all.").

[7] *Potter v. United States*, 155 U.S. 438, 446 (1894).

[8] *See Declaratory Ruling*, paras. 29, 31–32, 40.

[9] *Compare with* Restatement (Third) of Agency § 1.01 (defining "agency" as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf *and subject to the principal's control*" (emphasis added)). To be clear, I do not view "on behalf of" liability as entirely divorced from classical agency principles (and thus I agree with the declaratory ruling that "on behalf of" liability should not extend to resellers such as big-box retailers who are not part of an authorized chain of telemarketers), but I cannot believe Congress intended to simply incorporate agency principles either.

[10] Curiously, the declaratory ruling appears to recognize that the phrase "on behalf of" is often used to mean something more ephemeral than a formal agency relationship—that it can mean simply "in the interest of" or "for the benefit of." *See Declaratory Ruling*, para. 30 (citing *Webster's Third New International Dictionary*).

[11] 47 U.S.C. § 227(c)(5).

24

the seller.  But if "on behalf of" merely incorporates the federal common law of agency, a consumer will be forced to navigate that legal thicket even if she chooses to sue the telemarketer alone.  That's because under the common-law standard, the private cause of action would depend upon the agency relationship between the seller and every telemarketer that called the consumer.  Suppose, for example, the consumer receives calls from two different telemarketers purporting to represent the same seller.  If the federal common law would impute the actions of the first telemarketer that called the consumer to the seller but not the second, then the consumer would not have *any* do-not-call cause of action (let alone an action against the seller), despite the fact that both calls were placed "on behalf of" the same seller.[12]

*For another*, section 227(c)(5) creates an affirmative defense for sellers that have "established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection."  No similar affirmative defense exists under section 227(b).  This discrepancy lends additional weight to the argument that Congress did not intend for sections 227(b) and 227(c) to be interpreted in a parallel manner with respect to third-party liability.  Rather, recognizing that the third-party liability standard under section 227(c) is stricter than under section 227(b) (due to the phrase "on behalf of"), Congress understandably chose to give sellers an affirmative defense under section 227(c) to exempt sellers who had taken substantial precautions to avoid illegal solicitations made on their behalf by unaffiliated telemarketers.

So why would Congress use a different and more expansive concept of third-party liability for do-not-call violations than for prerecorded call violations?  A recent letter from the U.S. Department of Justice lays it out succinctly:  "[B]ecause the federal government created and administers the National Do-Not-Call Registry, Congress may have determined that the federal interest in preventing violations of the Registry under section 227(c)(5) is stronger than the federal interest in preventing robocall violations under section 227(b)(3), which were already the subject of many state laws when the TCPA was enacted.  In addition, Congress may have determined that one set of violations was more serious or more odious to consumers than another."[13]  On the last point, consider this:  The TCPA's prerecorded call rules apply to all consumers whereas the TCPA's do-not-call rules require consumers to opt-in by registering their phone number.  If returning some control to consumers over their phones was the purpose of the TCPA, as evidently it was,[14] it's not hard to see violations that countermand the express wishes of consumers might be "more odious" than other violations.

The Commission does not grapple in any meaningful sense with the differences between the language contained in sections 227(b) and 227(c).  Instead, it relies on language contained in our own rules for its conclusion that the two statutory provisions should mean the same thing when it comes to third-party liability.  Specifically, the Commission states that:

---

[12] It is perhaps for this reason that the U.S. Department of Justice (DOJ) repeatedly and vehemently argues that the Commission should not confine its interpretation of section 227(c)(5) to incorporating only principles of agency law. *See, e.g.*, Letter from Lisa K. Hsiao, U.S. Dep't of Justice, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 11-50, at 3 (filed Oct. 26, 2011) (Dep't of Justice Oct. 26, 2011 *Ex Parte*) ("Agency Law Has No Place in the TCPA"); Letter from Patrick Runkle, Trial Attorney, U.S. Dep't of Justice, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 11-50, at 2 (filed Apr. 2, 2013) (Dep't of Justice Apr. 2, 2013 *Ex Parte*) ("To be perfectly clear, DOJ's position is that, to interpret § 227(c)(5), the Commission need not and should not import agency law under any circumstance."); Letter from Patrick Runkle, Trial Attorney, U.S. Dep't of Justice, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 11-50, at 2 (filed Apr. 8, 2013) ("DOJ also urged that the FCC reject agency law as a rule of decision in this context, and simply confirm that 'on behalf of' means what it says.").

[13] Dep't of Justice Apr. 2, 2013 *Ex Parte* at 2.

[14] TCPA House Report at 6 (describing the TCPA as "designed to return a measure of control to both individual residential telephone customers and owners of facsimile machines").

[E]xisting TCPA regulations implementing both sections 227(b) and 227(c) use the same ('on behalf of') phrase.  Since we find below that vicarious liability for violations of section 227(b) is available only under federal common law agency principles, reading 'on behalf of' to provide for more extensive vicarious liability in the context of do-not-call violations under section 227(c) would implausibly require that phrase to have different meaning under our rules, depending on the particular violations at issue, without any indication in past precedent that different meanings were intended.[15]

This reasoning is curious, to say the least.  It is black-letter law that the terms of a statute trump the terms of a rule.  Therefore, our rules should be interpreted (and promulgated) in a manner that is consistent with the terms of statutes they implement.  Here, that well-established approach is turned on its head; our interpretation of a statute is driven by what the Commission sees as the most plausible interpretation of our rules.  And so the tail wags the dog.

Even if we had the leeway to adopt this approach, it's important to note that the Commission's assessment of its regulations is in error.  The Commission's regulations implementing section 227(b) simply do not use the phrase "on behalf of" to establish the scope of third-party liability.[16]  Rather, this phase is used throughout our TCPA regulations for other purposes.  Sometimes the rules use that phrase to exempt a category of calls from liability.  Other times the rules use that phrase to define a term.  Still other times those rules use that phrase to impose liability on sellers for violations of our do-not-call rules.

Indeed, by my count, our rules implementing the TCPA (contained in 47 C.F.R. § 64.1200) use the phrases "on behalf of" or "on whose behalf" twenty separate times.  And a close examination of these regulations belies the idea that "on behalf of" merely incorporates the federal common law of agency.

*First*, the fact that our rules use the phrase "on behalf of" in some places but not others suggests that the Commission itself has thought the phrase goes beyond the common-law standard of agency, that "on behalf of" actually means as much.  But the declaratory ruling effectively neglects the phrase, or at best reinterprets it, to have no independent meaning in our rules; precisely the same third-party liability will apply, the declaratory ruling states, regardless of its presence or absence.  This cannot be.

*Second*, taking this interpretation of our rules seriously could have pernicious and unintended results.  The charitable exemptions, for example, extend to both charities and third parties calling on a charity's behalf certain liability protections from the prohibition on prerecorded calls to residences.[17]  Now that "on behalf of" means "as the agent of," charities and their third-party callers must reexamine their relationship to determine if the third parties qualify as agents under the federal common law of agency.  If they do not, then the third parties likely have been violating our prerecorded call rules for years.[18]  The same goes for any third party that distributes health care messages in compliance with the Health Insurance Portability and Accountability Act.[19]

---

[15] *Declaratory Ruling*, para. 31 (footnotes omitted).

[16] In claiming that we have used "on behalf of" language indiscriminately in implementing sections 227(b) and (c), the declaratory ruling repeatedly cites a single paragraph discussing "on behalf of" liability.  *See Declaratory Ruling*, para. 38 & notes 94, 117, 119 (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397, para. 13 (1995) (*TCPA 1995 Order*)).  But the citation misses the mark; that paragraph discusses the statutory term "solicitation" (used in section 227(c)) and cites our do-not-call rules (implementing section 227(c)).  It never mentions section 227(b).

[17] *See* 47 C.F.R. § 64.1200(a)(3)(iv).

[18] The declaratory ruling asserts that the incorporation of federal common law principles of agency into the TCPA was "precisely the result that charities and their allied telemarketers sought and received" with the charitable exemption.  *Declaratory Ruling*, note 119.  But charities made clear that they did not seek to exempt calls by their

(continued . . .)

26

*Third*, this approach may generate some peculiar eddies.  Consider the application of the common-law standard to our definition of "seller," which is the person "on whose behalf" a telemarketing call is initiated.[20]  If there is no agency relationship between the person that hires a telemarketer and the telemarketer, does that mean there is no "seller" for purposes of our rules?  What happens to the requirement that consumers who opt-out of future telemarketing be put on the "seller's do-not-call list"?[21]  What about other rules that assume a "seller" always exists?[22]

We could avoid each of these problems simply by adhering to the bright-line language that Congress chose to put in section 227(c)(5) and that the Commission built into its rules:  "On behalf of" means "on behalf of" liability.  It should be as easy as that.[23]

II.

The second problem with the declaratory ruling is its interpretation of the federal common law of agency.  Perhaps as an attempt to cure the problems caused by its interpretation of the phrase "on behalf of," the declaratory ruling attempts to equate the federal common law of agency with a strict liability standard.  It asserts that the federal common law of agency goes beyond classical agency to include the doctrines of apparent authority and ratification.[24]  It claims that contractual terms forbidding a third-party "from engaging in unlawful telemarketing activities would not, by themselves, absolve the seller" of third-party liability.[25]  It provides a laundry list of potential evidence "that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority."[26]  It attempts to shift the

---

(. . . continued from previous page) ——————————————

agents but instead "calls made on their behalf *by independent telemarketers*" and "those placed *by independent contractors* on behalf of" charities.  *TCPA 1995 Order*, 10 FCC Rcd at 12397, para. 12 (emphases added).  To satisfy their request, we did not point to agency law (which would exclude independent contractors) but rather used the phrase "on behalf of" (which would not).

[19] *See* 47 C.F.R. § 64.1200(a)(3)(v).

[20] *See* 47 C.F.R. § 64.1200(f)(9).

[21] 47 C.F.R. § 64.1200(a)(7)(i)(B), (b)(3).

[22] *See, e.g.*, 47 C.F.R. § 64.1200(d)(4).

[23] One last point.  The declaratory ruling also insists that construing the phrase "on behalf of" to mean "on behalf of" would require a notice-and-comment rulemaking.  *See Declaratory Ruling*, paras. 31–32.  But that phrase's meaning is before us now *because* we have not previously answered the question now in front of us.  Neither of the rulings cited by the Commission, *see Declaratory Ruling*, note 94 (citing *TCPA 1995 Order*, 10 FCC Rcd at 12397, para. 13; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 20 FCC Rcd 13664, 13667, para. 7 (Consumer & Gov't Affairs Bur. 2005)), addresses the critical issue: whether a telemarketer *must* be an agent of a company in order to act "on behalf of" that company.  Rather, they merely establish the obvious proposition that an agent of a company does act "on behalf of" that company.  Moreover, one of these two rulings was issued by the Consumer & Governmental Affairs Bureau and thus is not even binding on the Commission.  *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008).  In reality, the Commission has previously refused to interpret the private-right-of-action provisions of the TCPA and thus cannot have established an interpretation of "on behalf of" in section 227(c)(5).  *See, e.g.*, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Protection Act of 2005*, CG Docket Nos. 02-278, 05-338, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787, 3815, para. 56 (2006).  Indeed, if the Commission had already decided this question in a prior order, it is strange that it took us years to issue today's declaratory ruling.  In short, I do not know of any administrative law principle that would prevent us from reading the statute or our rules to mean what they say.

[24] *See Declaratory Ruling*, para. 34.

[25] *See Declaratory Ruling*, note 102.

[26] *See Declaratory Ruling*, para. 46.

27

burden of proof for lack of agency onto the seller.[27]  And it concludes by saying that "we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services."[28]

I am skeptical of these claims (more on that later), but there is a far more fundamental problem with this "guidance."  It is not the Commission's place to opine on the proper contours of the federal common law of agency.  We must of course fill in the gap in the TCPA regarding the source of agency principles that apply to section 227(b)(3).  But once we have determined the applicable body of law and it is evident that we have not been entrusted to administer it (*contra* the TCPA or the Communications Act), our duty and our expertise come to an end.  If we had determined, for example, that state agency law governs, there would be no question that we should not endeavor to construe each state's agency laws.  If we had determined that some general federal statute like the Federal Tort Claims Act governed, we would not claim expertise in its interpretation.  So too here.  The federal common law of agency is a general body of law that covers numerous agencies.  Its ambit extends to labor relations, patents, environmental regulation, telecommunications, and much more.  We cannot opine—at least not with the authority afforded judicial deference[29]—on its scope and meaning, particularly as we are announcing its incipient application to TCPA violations only today.

Turning to the merits of the "guidance" provided by the Commission, the federal common law of agency simply does not impose strict liability on sellers for the actions of their telemarketers.  And even if we were to assume that the Restatement (Third) of Agency were the law of the land, its application to the relationship between a seller and its telemarketers is generally unclear and may require fact-specific inquiries beyond the scope of the present record.

For example, the black-letter law of apparent authority is that third-party liability accrues when a person "reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[30]  The principal may manifest assent or intent "through written or spoken words or other conduct."[31]  The key problem with this theory for victims of TCPA violations is that they interact only with the telemarketer, not the seller, and thus there are no (apparent) manifestations *by the seller* on which to hang the hat of apparent authority.[32]

---

[27] *See Declaratory Ruling*, para. 46 ("At a minimum, evidence of these kinds of relationships . . . should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.").

[28] *See Declaratory Ruling*, para. 47.

[29] *See, e.g., Chevron, U.S.A. Inc. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1986) (deference applies only "[w]hen a court reviews an agency's construction of the statute which it administers"); *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649–50 (1990) (same); *see also* Dep't of Justice Apr. 2, 2013 *Ex Parte* at 2 ("[T]he Commission likely does not have the authority to state for the federal courts what the federal common law of agency is.").  Similarly, *Skidmore* deference makes sense only when an agency's "specialized experience" in a particular field give its arguments added weight.  *U.S. v. Mead Corp.*, 533 U.S. 218, 234–35 (2001).  And though we may have "decades of experience" administering the TCPA, *Declaratory Ruling*, note 137, we have none administering the federal common law of agency.

[30] Restatement (Third) of Agency § 2.03.

[31] Restatement (Third) of Agency § 1.03.

[32] The declaratory ruling tries to sidestep this issue by noting that "a principal may create apparent authority by appointing a person to a particular position" and "may permit an agent to acquire a reputation of authority in an area or endeavor by acquiescing in conduct by the agent under circumstances likely to lead to a reputation."  *See Declaratory Ruling*, note 102 (citations omitted).  While true, this does not explain how a consumer is to know that a seller "appointed" a telemarketer "to a particular position" or that a particular telemarketer has "acquire[d] a

(continued . . .)

Similarly problematic are some of the items on the laundry list set forth by the Commission.  For example, the declaratory ruling claims that "apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services."[33]  But the whole foundation of apparent authority is the reasonable beliefs of consumers, and few if any consumers will know whether or not a seller allows such access to a telemarketer at the time of the call.  And in any case, how does giving a telemarketer access to the detailed information that's available on almost every company's website imply agency?  Rather than clarifying the common law of agency, these dicta only muddy it, to the detriment of both consumers and businesses that want to leave or avoid the courtroom.[34]

III.

Given Congress' inclusion of "on behalf of" in the do-not-call provisions of the TCPA, I would adopt an interpretation consistent with the terms of those provisions and our corresponding rules.  And given our limited authority over and expertise in federal agency law principles, I would abstain from opining on their application here.  I respectfully dissent in part from the Commission's contrary approach.  This is a somewhat unusual situation in that the declaratory ruling is occasioned by judicial requests for assistance;[35] thus, the cases that prompted our decision will return to the courts for review.  Hopefully, they will supply a legally sound result that will also better serve the interests of American consumers victimized by violations of the TCPA and American businesses subject to it.

---

(. . . continued from previous page) ————————————————
reputation of authority in an area," let alone how a consumer would know that at the time that she received the undesired call.

[33] *See Declaratory Ruling*, para. 46.

[34] The U.S. Department of Justice, too, believes that agency law is not as clear as the declaratory ruling suggests.  "[A]gency law is highly malleable" and "is in flux, with multiple—often competing—formulations advanced by litigants and adopted by courts."  Dep't of Justice Oct. 26, 2011 *Ex Parte* at 4.  "[A]gency law has been articulated and applied inconsistently" and "many agency law principles are inapplicable in [the context of the TCPA]."  Dep't of Justice Apr. 8, 2013 *Ex Parte* at 2.  In short, the courts are still ironing out the warps and woofs of agency law, so much so that the declaratory ruling may not even be invoking the right principles, let alone applying those principles correctly.

[35] It bears noting that we do not answer all the questions the courts asked.  For instance, the declaratory ruling declines to resolve what the term "user" means in section 217 of the Communications Act and whether a seller might be liable under that provision, despite the invitation to do so.  *See Charvat v. Echostar Satellite*, 630 F.3d 459, 465 (6th Cir. 2010).  While disappointing, this is understandable given the fact that we never sought comment on the issue and thus do not have a full record to review.

29

## *Lahman v. Nationwide Provider Sols.*

United States District Court for the Eastern District of Texas, Sherman Division

June 19, 2018, Decided; June 19, 2018, Filed

Civil Action No. 4:17-CV-00305

**Reporter**

2018 U.S. Dist. LEXIS 101757 *; 2018 WL 3035916

EARLINE LAHMAN, RANDY LAHMAN, AND NATIONWIDE PROVIDER SOLUTIONS, LLC, v. NATIONWIDE PROVIDER SOLUTIONS, CAPE FOX CORPORATION, CONCENTRIC METHODS LLC, CAPE FOX FEDERAL INTEGRATORS, CAPE FOX PROFESSIONAL SERVICES, LLC, NAVAR INC., CAPE FOX GOVERNMENT SERVICES, CAPE FOX FACILITIES SERVICES, CAPE FOX SHARED SERVICES, MICHAEL BROWN, GEORGE BERNARDY, WILLIAM WALKER, BERNARD GREEN, HAROLD MITCHELL, CHARLES JOHNSON, CLIFFORD BLAIR, KATHERINE MILTON

**Subsequent History:** Reconsideration granted by, in part, Motion granted by, in part, Motion denied by, in part, Costs and fees proceeding at *Lahman v. Cape Fox Corp., 2019 U.S. Dist. LEXIS 40216 (E.D. Tex., Mar. 13, 2019)*

**Prior History:** *Lahman v. Nationwide Provider Sols., 2017 U.S. Dist. LEXIS 152959 (E.D. Tex., Sept. 20, 2017)*

**Counsel: [*1]** For Earline Lahman, Randy Lahman, Plaintiffs, Counter Defendants: David Lynn James, LEAD ATTORNEY, Miller James Miller & Hornsby, Texarkana, TX; Russell Matthew Soloway, Law Office of Russell M. Soloway, PC, Austin, TX.

For Nationwide Provider Solutions, Cape Fox Corporation, Defendants: Katrin U Schatz, Talley Ray Parker, Jackson Lewis PC - Dallas, Dallas, TX.

For Cape Fox Corporation, Counter Claimant: Katrin U Schatz, Talley Ray Parker, Jackson Lewis PC - Dallas,

Dallas, TX.

**Judges:** AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** AMOS L. MAZZANT

# Opinion

## MEMORANDUM OPINION AND ORDER

Before the Court is (1) Defendant Clifford Blair's ("Blair") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for a More Definite Statement (Dkt. #64), (2) Defendant George Bernardy's ("Bernardy") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #65); (3) Defendant William Walker's ("Walker") Motion to Dismiss for Failure to State a Claim (Dkt. #66); (4) Defendant Katherine Milton's ("Milton") Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. #67); (5) Defendant Harold **[*2]** Mitchell's ("Mitchell") Motion to Dismiss for Insufficient Service of Process, for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #72); (6) Defendant Charles Johnson's ("Johnson") Motion to Dismiss for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #73); (7) Defendant Michael Brown's ("Brown") Motion to Dismiss for Insufficient Service of Process, for Failure to State a Claim and, in the Alternative, for a More Definite Statement (Dkt. #75); (8) Defendant Cape Fox Shared Services's ("Shared Services") Motion to Dismiss for Lack of Personal

2018 U.S. Dist. LEXIS 101757, *2

Jurisdiction, for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #76); (9) Defendant Cape Fox Facilities Services's ("Facilities Services") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #77); (10) Defendant Cape Fox Government Services's ("Government Services") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #78); (11) **[*3]** Defendant Concentric Methods, LLC's ("Concentric Methods") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. # 79); (12) Defendant Cape Fox Federal Integrators's ("Federal Integrators") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #80); (13) Defendant Navar, Inc.'s ("Navar") Motion to Dismiss for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #81); and (14) Defendant Cape Fox Professional Services's ("Professional Services") Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #82). After reviewing the relevant pleadings and motions, the Court finds that they should be granted in part and denied in part.

**BACKGROUND**

This case concerns a failed business association. On December 11, 2007, Mrs. Earline Lahman ("Mrs. Lahman"), founded Nationwide Provider Solutions, LLC ("Nationwide Provider"), a Medical Service Organization, to help physicians and health care providers with medical **[*4]** billing and credentialing. Mrs. Lahman aspired to grow Nationwide Provider's client-base by adding private parties, the U.S. Department of Veteran Affairs' Division of Health Affairs, U.S. Department of Health, U.S. Indian Health Affairs, and Texas state and local health providers in the Paris, Texas region.

On March 16, 2011, Nationwide Provider obtained a U.S. General Services Administration Schedule Contract Vehicle, allowing the company to bid for federal government contracts ("Government Services Contract Vehicle"). Nationwide Provider also received 8(a) and 8(m) status from the Small Business Administration. The 8(a) Business Development Program helps small, disadvantaged businesses secure government contracts. Meanwhile, the 8(m) Program promotes Women-Owned Small Businesses—businesses with at least fifty-one percent direct, female ownership and control. As a company with 8(a) and 8(m) status and a Government Services Vehicle, Nationwide Provider was one of nine businesses able to bid for federal agency contracts through multiple contract vehicles in the Paris, Texas region. In June 2011, Nationwide Provider received certification from the State of Texas Comptroller **[*5]** of Public Accounts as a certified Historically Underutilized Business and its accompanying state contracting advantages. Nationwide Provider's right to bid on federal agency contracts in the Paris, Texas region and help federal agencies meet their stated goal of awarding five percent of their contracts to Women-Owned Small Businesses made it valuable.

A year later, Randy Lahman ("Mr. Lahman") fell thirty feet onto concrete when a tree limb struck a lift he was using. From July 2012 through March 2015, Mr. Lahman underwent six surgeries for his injuries, four of which were on his spine. Mr. Lahman's medical expenses and his lost income put a severe emotional and financial strain on his family and Nationwide Provider. Mrs. Lahman continued to run Nationwide Provider, but in time recognized that she and Nationwide Provider could use outside help.

The 8(a) Program has a Mentor-Protégé Program, permitting young 8(a) companies to learn from other more experienced businesses. The Small Business Administration Mentor-Protégé Program not only provides needed support, advice, and resources for the protégé 8(a) company but also permits the mentor and protégé to enter into joint venture arrangements **[*6]** where the mentor may buy up to forty percent of the protégé in order to help the protégé raise capital.

Mrs. Lahman connected with Kay Bills ("Ms. Bills"), the head of Mid America Government Industry Coalition, Inc. ("MAGIC"). MAGIC is a regional trade association for growing businesses involved with Federal Contracting in Oklahoma, Texas, New Mexico, and Colorado. On September 4, 2012, Ms. Bills introduced Mrs. Lahman via e-mail to Cape Fox's Chief Executive Officer ("CEO") Brown, as a potential mentor for Nationwide Provider. In that e-mail, Mrs. Lahman summarized Nationwide Provider's history and goals for growth with Brown. The following day, Brown telephoned Mrs. Lahman to schedule a face-to-face meeting.

On September 26, 2012, Brown, Bernardy, Cape Fox's

2018 U.S. Dist. LEXIS 101757, *6

Chief Financial Officer ("CFO") and Johnson, the CEO of Navar, a wholly owned Cape Fox subsidiary, met with Mrs. Lahman in Paris, Texas. In order to discuss the details and business plan of Nationwide Provider more fully, Mrs. Lahman and Brown signed a mutual non-disclosure agreement. At the meeting's conclusion, Brown and Bernardy told Mrs. Lahman about their plan for Cape Fox to buy Nationwide Provider.

On October 2, 2012, Walker, **[\*7]** Cape Fox's General Counsel, expressed his enthusiasm for Cape Fox to quickly purchase Nationwide Provider in a letter to Mrs. Lahman, as President of Nationwide Provider. The letter also outlined the initial terms of Cape Fox's offer.

In November 2012, Cape Fox and Nationwide Provider recorded the terms and conditions for Cape Fox's purchase of Nationwide Provider in a Letter of Intent in Manassas, Virginia. Brown signed this letter on Cape Fox's behalf. Mrs. Lahman agreed to and acknowledged the Letter of Intent on November 19, 2012. The Letter of Intent conditioned Cape Fox's purchase of Nationwide Provider on the Small Business Administration's approval of the transaction and left the purchase price open for future negotiation. The Letter of Intent, however, also included several conditions that the parties had to satisfy in order to complete the purchase of Nationwide Provider (Dkt. #25 at pp. 12-13).

In early January 2013, Cape Fox sent another Agreement for Purchase and Sale of Membership Interests of Nationwide Provider to Mrs. Lahman and Mr. Lahman. The Agreement stipulated that it "shall have no present effect and no enforceable legal rights are created arising from this Agreement **[\*8]** prior to the approval of this Agreement by the [Small Business Administration]." On January 31, 2013, Plaintiffs allege that Cape Fox "drafted and insisted that [Nationwide Provider] sign a Contract for Administrative Services." (the "Administrative Services Contract") (Dkt. #25 at p. 18). Per the Administrative Services Contract, Cape Fox assumed operational control of Nationwide Provider's accounting, finances, information technology, network management, and human resources (Dkt. #25 at p. 16). The Small Business Administration ultimately never approved of any agreement for Cape Fox to buy Nationwide Provider.

Plaintiffs allege that Defendants, working collectively, exercised unauthorized and unlawful control over Nationwide Provider's operations, reneged on various representations central to the agreement to sell Nationwide Provider to Cape Fox, and deprived the Plaintiffs of their corporate authority, income, and property. Notably, Plaintiffs allege that Navar's CEO Johnson first asked Mrs. Lahman to "add [Navar's] NAICS code for construction to [Nationwide Provider's] System for Award Management (SAM) Profile for qualification and submit a bid for repair work on a hangar at [a **[\*9]** Naval Air Station in Texas]." (Dkt. #25 at p. 21). Plaintiffs allege that after Mrs. Lahman refused to add the code, Johnson directed Cape Fox's Chief Administrative Officer Debbie Smith ("Smith") to add the [NAICS] code to [Nationwide Provider's] profile to enable [Navar] to submit the bid." (Dkt. #25 at p. 21).

On October 3, 2017, Plaintiffs filed their Second Amended Complaint, alleging (1) fraud, (2) misrepresentation, (3) breach of agreements of Cape Fox's purchase of Nationwide Provider, (4) breach of employment agreements, (5) that the Court should void the purchase/sale contract, (6) unconscionability, (7) quantum meruit, (8) conversion, (9) trespass to real property, (10) tortious inference, (11) breach of fiduciary duty, (12) intentional infliction of emotion distress, (13) conspiracy, (14) single business enterprise liability, and (15) violation of law regarding the handling of medical records against Defendants (Dkt. #25).

On November 20, 2017, Blair filed his Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for a More Definite Statement (Dkt. #64). On November 21, 2017, Bernardy filed his Motion to Dismiss for Lack **[\*10]** of Subject Matter Jurisdiction, for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #65). On December 7, 2017, Walker filed his Motion to Dismiss for Failure to State a Claim (Dkt. #66). On December 8, 2017, Milton filed her Motion to Dismiss for Lack of Personal Jurisdiction, for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #67). On December 12, 2017, Mitchell filed his Amended Motion to Dismiss for Insufficient Service of Process, Lack of Personal Jurisdiction, Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #72). On December 12, 2017, Johnson filed his Motion to Dismiss for Failure to State a Claim and, in the Alternative, for More Definite Statement (Dkt. #73). On December 15, 2017, Brown filed his Motion to Dismiss for Insufficient Service of Process, Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #75).

On December 15, 2017, Shared Services, Facilities Services, Government Services, Concentric Methods, Federal Integrators, and Professional Services filed

2018 U.S. Dist. LEXIS 101757, *10

Motions to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim, **[*11]** and, in the Alternative, for More Definite Statement[1] (Dkt. #76; Dkt. #77; Dkt. #78; Dkt. #79; Dkt. #80; Dkt. #82). On the same day, Navar filed its Motion to Dismiss for Failure to State a Claim, and, in the Alternative, for More Definite Statement (Dkt. #81).

The Plaintiffs filed no response. Local Rule CV-7(d) provides as follows:

> **Response and Briefing**. The response and any briefing shall be contained in one document. A party opposing a motion shall file the response, any briefing and supporting documents within the time period prescribed by Subsection (e) of this rule. A response shall be accompanied by a proposed order conforming to the requirements of Subsection (a) of this rule. Briefing shall contain a concise statement of the reasons in opposition to the motion and a citation of authorities upon which the party relies. A party's failure to oppose a motion in the manner prescribed herein creates a presumption that the party does not controvert the facts set out by movant and has no evidence to offer in opposition to the motion.

Local Rule CV-7(d). Since no response was filed, the Court will assume that Plaintiffs do not controvert the facts set out in the aforementioned motions.

**LEGAL STANDARD**

*Rule 12(b)(2)*

*Federal Rule of Civil Procedure 12(b)(2)* requires a court **[*12]** to dismiss a claim if the court does not have personal jurisdiction over the defendant. *FED. R. CIV. P. 12(b)(2)*. After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)* (citing *WNS, Inc. v. Farrow, 884 F.2d 200, 202 (5th Cir. 1989))*.

To satisfy that burden, the party seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a prima facie case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000)*. When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003)* (citing *Wyatt v. Kaplan, 686 F.2d 276, 282-83 n.13 (5th Cir. 1982))*; *accord Black v. Acme Mkts., Inc., 564 F.2d 681, 683 n.3 (5th Cir. 1977)*. Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical, Geosource, Inc., 954 F.2d 1061, 1067 (5th Cir. 1992))*. However, if a court holds an evidentiary hearing, a plaintiff "must establish jurisdiction by a preponderance of the admissible evidence." *In re Chinese Manufactured Drywall Prods. Liab. Lit., 742 F.3d 576, 585 (5th Cir. 2014)* (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 241-42 (5th Cir. 2008))*.

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cienega Music Co., 4 F.3d 413, 415 (5th Cir. 1993)*. First, absent a controlling **[*13]** federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution.

The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc., 963 F.2d 90, 93 (5th Cir. 1992)*. Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion, 895 F.2d at 216*. The *Due Process Clause* permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. Minimum contacts with a forum state can be satisfied by contacts that give rise to either general jurisdiction or specific jurisdiction. *Wilson v.*

---

[1] When collectively referring to Shared Services, Facilities Services, Government Services, Concentric Methods, Federal Integrators, and Professional Services, the Court does so as the "Subsidiary Defendants."

*Belin, 20 F.3d 644, 647 (5th Cir. 1994)*.

General jurisdiction exists only when the defendant's contacts with the forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014)* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)*; see *Cent. Freight Lines v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003)* (citing *Helicopteros Nacionales de Colum., S.A. v. Hall, 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984))*. Substantial, continuous and systematic contact **[*14]** with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum. *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008)*. "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717 (5th Cir. 1992)* (citation omitted). However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston, 523 F.3d at 609* (citing *Gardemal v. Westin Hotel Co., 186 F.3d 588, 596 (5th Cir. 1999))*.

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros, 466 U.S. at 414 n.8*. For the Court to exercise specific jurisdiction, the Court must determine "(1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374, 378 (5th Cir. 2002)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))*. Defendants who "'reach out beyond one state' and create continuing relationships and obligations with **[*15]** citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King Corp., 471 U.S. at 475* (citing *Travelers Health Assoc. v. Virginia, 339 U.S. 643, 647, 70 S. Ct. 927, 94 L. Ed. 1154 (1950))*. Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or

of the unilateral activity of another party or third person." *Id*.

### Rule 12(b)(5)

*Federal Rule of Civil Procedure 12(b)(5)* provides that a party may file a motion to dismiss for insufficient service of process. A district court has "broad discretion to dismiss an action for ineffective service of process." *Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 645 (5th Cir. 1994)*. Federal *Rule 4(m)* permits dismissal of a suit if the plaintiff fails to serve a defendant within 90 days of filing, but provides that "if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." *FED. R. CIV. P. 4(m)*; *Gartin v. Par Pharm. Cos., Inc., 289 F. App'x 688, 692 (5th Cir. 2008)*. "[G]ood cause under *Rule 4(m)* requires at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice." *Gartin, 289 F. App'x at 692* (citing *Lambert v. United States, 44 F.3d 296, 299 (5th Cir. 1999))*.

### Rule 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." *FED. R.CIV. P. 8(a)(2)*. Each claim must include enough factual **[*16]** allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

A *Rule 12(b)(6)* motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. *FED. R. CIV. P. 12(b)(6)*. When considering a motion to dismiss under *Rule 12(b)(6)*, the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen, 681 F.3d 215, 219 (5th Cir. 2012)*. The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010)*. The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "'A claim has facial plausibility when the plaintiff

2018 U.S. Dist. LEXIS 101757, *16

pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))*. "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal, 556 U.S. at 679* (quoting *FED. R. CIV. P. 8(a)(2)*).

In *Iqbal,* the Supreme Court established a two-step approach for assessing **[*17]** the sufficiency of a complaint in the context of a *Rule 12(b)(6)* motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id. at 664*. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert, 335 F. App'x 466, 470 (5th Cir. 2009)* (citation omitted). This evaluation will "be a context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679*.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id. at 678* (quoting *Twombly, 550 U.S. at 570*).

### *Rule 12(e)*

*Rule 12(e) of the Federal Rules of Civil Procedure* allows a party to move for a more definite statement of the pleadings when the pleadings are "so vague or ambiguous that the party cannot reasonably prepare a response." *FED. R. CIV. P. 12(e)*. "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement . . . before responding." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. Motions for a more definite **[*18]** statement are generally disfavored because "in view of the great liberality of *Federal Rule of Civil Procedure 8* . . . it is clearly the policy of the Rules that *Rule 12(e)* should not be used to . . . require a plaintiff to amend his complaint which under *Rule 8* is sufficient to withstand a motion to dismiss." *Source Data Acquisition v. Talbot Grp., Inc., 4:07-cv-294, 2008 U.S. Dist. LEXIS 130135, 2008 WL 678645, at *2 (E.D. Tex. Mar. 11, 2008)* (citing

*Mitchell v. E-Z Way Towers, Inc., 269 F.2d 126, 132 (5th Cir. 1959))*. In addition, "when a defendant is complaining of matters that can be clarified and developed during discovery, not matters that impede his ability to form a responsive pleading, an order directing the plaintiff to provide a more definite statement is not warranted." *Hoffman v. Cemex, Inc., No. H-09-2144, 2009 U.S. Dist. LEXIS 114130, 2009 WL 4825224, at *3 (S.D. Tex. Dec. 8, 2009)* (citing *Arista Records LLC v. Greubel, 453 F.Supp. 2d 961, 972 (N.D. Tex. 2006))*. "Nevertheless, parties may rely on *Rule 12(e)* as a mechanism to enforce the minimum requirements of notice pleading." *Id.*

### ANALYSIS

### I. The Court Lacks Personal Jurisdiction over Blair, Bernardy, Milton, and the Subsidiary Defendants

### A. The Defendants Do Not Have Sufficient Contacts with Texas for the Court to Exercise General Jurisdiction

After examining the facts currently before the Court, it is clear that Plaintiffs cannot meet the burden to show that Blair's, Bernardy's, Milton's[2], and the Subsidiary Defendants' contacts with Texas are sufficient to establish general jurisdiction. Blair, Bernardy, **[*19]** and Milton are not Texas residents. Blair and Bernardy are individuals who reside in Alaska. Milton is an individual who resides in Seattle, Washington. Each of the Subsidiary Defendants is a privately held Alaskan Native Corporation that Cape Fox owns and is located in Manassas, Virginia. Cape Fox is an Alaskan Native Corporation with is principal place of business in Ketchikan, Alaska. Such facts fall well short of the substantial hurdle of showing that Defendants are at home in Texas and fail to establish general jurisdiction over them. *See Daimler AG, 571 U.S. at 127*. In turn, the Court will determine whether it has specific jurisdiction over the Individual Defendants and the Subsidiary Defendants.

---

[2] The Court refers to Blair, Bernardy, and Milton collectively as the "Individual Defendants."

2018 U.S. Dist. LEXIS 101757, *19

## B. The Court Lacks Specific Jurisdiction over the Individual Defendants

### i. Blair

Blair argues that the Second Amended Complaint alleges that (1) he resides in Ketchikan, Alaska, (2) during the events giving rise this case, he served as Chair of Cape Fox's Board of Directors, and (3) he is Cape Fox's President. Blair contends that such vague allegations cannot serve as a basis for specific personal jurisdiction over him individually. Blair advances that his status as Cape Fox's officer would not create personal jurisdiction [*20] over him even if the Court had personal jurisdiction over Cape Fox.

Via affidavit, Blair swears that he works and keeps a permanent residence in Saxman, Alaska and has only lived and worked in Alaska and Washington (Dkt. #64, Exhibit 1 at p. 2). Blair concedes that he is President of the Board of Directors for Cape Fox and has previously served as a Cape Fox board member, but asserts that he has never visited Texas in those capacities (Dkt. #64, Exhibit 1 at pp. 1-2). At last, Blair claims his only two visits to Texas consisted of walking through a Dallas airport to reach connecting flights (Dkt. #64, Exhibit 1 at p. 2).

### ii. Bernardy

Bernardy argues that the Second Amended Complaint only alleges that: (1) he resides in Anchorage, Alaska, (2) he was the Chief Operating Officer ("COO") of Cape Fox during the events leading to this cause of action, (3) he participated in a meeting with Mrs. Lahman in September 2012 in Paris, Texas, (4) Mrs. Lanham told Bernardy and others that she had scheduled a meeting with Liberty Bank, and (5) Bernardy explained the business reasons for Cape Fox's interest in acquiring Nationwide Providers to Mrs. Lahman. Bernardy claims that these pleadings and his [*21] status as Cape Fox's corporate officer cannot provide specific jurisdiction over him as an individual.

In his affidavit, Bernardy asserts that he keeps a permanent residence in Anchorage, Alaska and he has not lived or worked elsewhere (Dkt. #65, Exhibit 1 at p. 2). Bernardy declares that he is not employed by or affiliated with any of the entities named as defendants in the Second Amended Complaint (Dkt. #65, Exhibit 1 at pp. 1-2). Bernardy avers that he once served as Cape Fox's COO, but left the company in 2014 (Dkt. #65, Exhibit 1 at pp. 1-2). Bernardy proclaims that he has made fewer than six short visits to Texas in his life (Dkt. #65, Exhibit 1 at p. 2). Bernardy submits that while working with Cape Fox, he visited Texas for two days to meet with Mrs. Lahman and her associates at Nationwide Provider's offices in Paris, Texas as previously mentioned. (Dkt. #65, Exhibit 1 at p. 2).

### iii. Milton

Milton argues that the Second Amended Complaint alleges that: (1) she resides in Seattle, Washington, (2) she served as President of Cape Fox's Board of Directors during the events leading to this action, and (3) she acted in other executive positions with the Defendant entities. Milton claims [*22] that these vague and conclusory allegations cannot support specific personal jurisdiction over Milton individually.

In her affidavit, Milton declares that she works and resides in Seattle, Washington, and that she has not lived or worked in any other state except Alaska (Dkt. #67, Exhibit 1 at pp. 1-2). Milton contends that she is not currently associated with Cape Fox or the Defendant entities (Dkt. #67, Exhibit 1 at pp. 1-2). Milton asserts that she previously served as President of Cape Fox's Board from October 2014 through December 2015 and then served as a Cape Fox Board member until the end of 2016 (Dkt. #67, Exhibit 1 at pp. 1-2). Milton also claims that aside from attending a mediation for this case in August 2015, she did not visit Texas while serving in these roles, and she has not returned to Texas since the mediation (Dkt. #67, Exhibit 1 at p. 2).

### iv. The Individual Defendants' Affidavits Show that Their Contacts with Texas Do Not Permit the Court to Exercise Specific Jurisdiction over Them

Via affidavit, the Individual Defendants declare that they have entered no contracts and pursued no business in Texas (Dkt. #64, Exhibit 1 at p. 2; Dkt. #65, Exhibit 1 at p. 2; Dkt. #67, [*23] Exhibit 1 at p. 2). The Individual Defendants claim that they have never sued anyone, been sued by anyone, submitted to jurisdiction, and maintain no registered agent for service in Texas (Dkt. #64, Exhibit 1 at p. 2; Dkt. #65, Exhibit 1 at p. 2; Dkt. #67, Exhibit 1 at p. 2). The Individual Defendants also submit that they have never worked, filed, or paid taxes in Texas (Dkt. #64, Exhibit 1 at p. 2; Dkt. #65, Exhibit 1

at p. 2; Dkt. #67, Exhibit 1 at p. 2).

The Individual Defendants reject Plaintiffs' claims that they were involved in a joint enterprise with the other Defendants as conclusory and "completely devoid of any specific allegations to support application of [Single Business Enterprise Liability or Joint Enterprise Liability]." (Dkt. #64 at p. 23; Dkt. #65 at p. 23; Dkt. #67 at p. 23). Accordingly, the Individual Defendants contend that "Plaintiffs cannot extend liability to [them] under a single business enterprise theory." (Dkt. #64 at p. 24; Dkt. #65 at p. 24; Dkt. #67 at p. 24). The Individual Defendants also aver that the Second Amended Complaint is "devoid of any specific allegations that [they were parties] to any fraud or [were] unjustly enriched by alleged wrongful [*24] control of [Nationwide Provider]." (Dkt. #64 at p. 19; Dkt. #65 at p. 19; Dkt. #67 at p. 19). The Individual Defendants also contend that the Second Amended Complaint "contains no specific allegations that [the Individual Defendants] made false, material representations to give rise to a fraud or misrepresentation claim, much less any allegations that Plaintiffs relied on such representations made by [them] and were damaged by their reliance on such representations." (Dkt. #64 at p. 17; Dkt. #65 at p. 17; Dkt. #67 at p. 17). Indeed, the Individual Defendants generally deny that the Second Amended Complaint pleads any specific factual basis for the claims against them (Dkt. #64; Dkt. #65; Dkt. #67).

Again, since Plaintiffs filed no response, the Court assumes that they do not "controvert the facts set out by [the Individual Defendants] and [have] no evidence to offer in opposition to [these arguments]." Local Rule CV-7(d).

The Fifth Circuit permits a corporate officer to be held individually liable when a corporate entity serves as their alter ego or the officer perpetrates tortious conduct in the forum on the corporation's behalf. *Stuart v. Spademan, 772 F.2d 1185, 1197 (5th Cir. 1985)*. The Second Amended Complaint contains no allegation [*25] demonstrating such circumstances existed for the Individual Defendants. Though the Second Amended Complaint alleges that Bernardy met with Mrs. Lahman for two days in Paris, Texas and expressed interest in Cape Fox purchasing Nationwide Provider, these actions did not give rise to Plaintiffs' causes of action and do not permit the Court's exercise of specific jurisdiction over Bernardy individually. Next, the Second Amended Complaint hardly mentions Blair and Milton, let alone pleads sufficient facts to show that the Court can exert specific jurisdiction over them. Thus,

the Court has no basis to exert personal jurisdiction over the Individual Defendants.

Additionally, since Plaintiffs filed no response and presented no affidavits to create any genuine, material conflict with the facts established by the Individual Defendants' affidavits, Plaintiffs' contradicted facts alleged in their complaint are not takin as true. *See Quintana, 259 F. Supp. 2d at 557* ("[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits.") (citing *Wyatt, 686 F.2d at 282-83*). Accordingly, Plaintiffs have not adequately pleaded a basis for the Court to exert specific jurisdiction over the [*26] Individual Defendants since Plaintiffs have not shown that the Individual Defendants purposefully directed their activities to or availed themselves of the privilege to pursue activities in Texas, Plaintiffs' claims arise or result from the Individual Defendants' forum-related contacts, and the exercise of personal jurisdiction over the Individual Defendants is fair and reasonable. *See STORMAN ASIA M/V, 310 F.3d at 378*. Thus, the Individual Defendants' motions to dismiss for lack of personal jurisdiction are hereby granted.

## C. The Court Lacks Specific Jurisdiction over the Subsidiary Defendants

### i. Shared Services

Shared Services argues that the Second Amended Complaint alleges that: (1) Shared Services is a privately held Alaskan Native Corporation that Cape Fox wholly owns; (2) Shared Services is located at 7050 Infantry Ridge Road, Manassas, Virginia; (3) Shared Services has transacted business in Lamar County, Texas but the company is not registered as a foreign corporation doing business in Texas with the Texas Secretary of State; (4) Shared Services has no regular place of business or registered agent for service of process in Texas; and (5) Shared Services's former CFO, Verbena Williams, visited Paris, Texas in [*27] August 2013 to meet with local business people and a local bank representative.

Shared Services asserts that the Second Amended Complaint does not purport that it engaged in any specific, wrongful conduct with respect to Plaintiffs, let alone that Shared Services engaged in such conduct in Texas. Shared Services advances that the Second

2018 U.S. Dist. LEXIS 101757, *27

Amended Complaint does not claim that Shared Services falsely represented anything to the Plaintiffs in Texas, trespassed upon or wrongfully exerted its dominion or control over Plaintiffs' property in Texas, tortiously interfered with the Plaintiffs' business in Texas, took any action designed to emotionally distress the Plaintiffs in Texas, or pursued other tortious behavior in Texas.

## ii. Facilities Services

Facilities Services argues that the Second Amended Complaint only alleges that: (1) Facilities Services is a privately held Alaskan Native Corporation that Cape Fox owns; (2) Joseph Hunt is Facilities Services's President; (3) Facilities Services is located at 7050 Infantry Ridge Road, Manassas, Virginia; (4) Facilities Services has done business in Lamar County, Texas but has not registered as a foreign corporation doing business in Texas with the **[*28]** Texas Secretary of State; (5) Facilities Services maintains no regular place of business in Texas or registered agent for service of process in the state.

Facilities Services argues that these allegations cannot support specific personal jurisdiction over it. Facilities Services asserts that, if anything, they demonstrate its lack of contacts with Texas. Facilities Services contends that Plaintiffs' conclusory assertion that Facilities Services has done business in Lamar County, Texas does not alter this fact. Facilities Services elaborates that the Court need not accept conclusory jurisdictional allegations, even if undisputed. Accordingly, Facilities Services argues that the Second Amended Complaints alleges no acts through which Facilities Services has purposefully availed itself of Texas, let alone acts giving rise to any of the claims broadly asserted against the Defendants in the Second Amended Complaint. In turn, Facilities Services argues that Plaintiffs allege nothing that would support specific jurisdiction over Facilities Services based on any of their tort claims.

## iii. Government Services

Government Services argues that the Second Amended Complaint only alleges that: (1) Government **[*29]** Services is a privately held Alaskan Native Corporation that Cape Fox owns; (2) Fernando Pereira is Government Services's President; (3) Government Services is located at 7050 Infantry Ridge Road, Manassas, Virginia; (4) Government Services has

transacted business in Lamar County, Texas but has not registered as a foreign corporation doing business in Texas with the Texas Secretary of State; (5) Government Services keeps no regular place of business in Texas and does not have a registered agent for service of process in the state; and (6) Government Services's Director of Operations, Mike Reed, visited Paris, Texas in early August 2013 so that Mrs. Lahman could introduce Chris Jones to community leaders, healthcare administrators, healthcare providers, and economic development personnel in Paris.

Government Services argues that these allegations cannot support specific personal jurisdiction over Government Services and, rather, show its lack of contacts with Texas. Government Services advances that Plaintiffs' claims that it has done business in Lamar County, Texas are conclusory and insufficient to support specific jurisdiction. Government Services advances that its Director of Operations's **[*30]** attending a meetings held in Paris, Texas in 2013 does not satisfy minimum contacts to establish specific jurisdiction. Government Services declares that the Second Amended Complaint does not allege that Government Services misrepresented anything at these meetings, that the meetings were connected with Government Services's negotiation of any agreement at issue in this litigation, or that anything else happened at the meetings that could give rise to any of Plaintiffs' claims. Government Services asserts that its officers' presence at a meeting does not establish minimum contacts absent evidence that the defendant engaged in tortious conduct aimed at the forum that gave rise to Plaintiffs' claims. Accordingly, Government Services claims that Plaintiffs' claims against it should be dismissed for lack of personal jurisdiction.

## iv. Concentric Methods

Concentric Methods argues that the Second Amended Complaint alleges that: (1) Concentric Methods is a privately held Alaskan Native Corporation that Cape Fox owns; (2) Harold Mitchell is Concentric Method's President; (3) Concentric Methods is located at 7050 Infantry Ridge Road, Manassas, Virginia; (4) Concentric Methods has done business **[*31]** in Lamar County, Texas but has not registered as a foreign corporation doing business in Texas with the Texas Secretary of State; and (5) Concentric Methods has no regular place of business in Texas or registered agent for service of process in the state.

2018 U.S. Dist. LEXIS 101757, *31

Concentric Methods argues that these allegations do not permit specific personal jurisdiction over it and prove its lack of contacts with Texas. Concentric Methods states that Plaintiffs' allegation that it has done business in Lamar County, Texas does not permit personal jurisdiction and the Court need not accept conclusory jurisdictional allegations, even if undisputed. Concentric Methods declares that Plaintiffs did not plead a single act by which Concentric Methods has purposefully availed itself of Texas, let alone one yielding any of the claims asserted against it in the Second Amended Complaint. At last, Concentric Methods argues that if Plaintiffs could allege some conduct by it that harmed them, such conduct would not enable specific jurisdiction over Concentric Methods unless it occurred in Texas.

**v. Federal Integrators**

Federal Integrators argues that the Second Amended Complaint alleges: (1) Federal Integrators is a privately **[\*32]** held Alaskan Native Corporation that Cape Fox owns; (2) Federal Integrator's President is Fernando Pereira; (3) Federal Integrators is located at 7050 Infantry Ridge Road, Manassas, Virginia; (4) Federal Integrators has pursued business in Lamar County, Texas but has not registered as a foreign corporation doing business in Texas with the Texas Secretary of State; and (5) Federal Integrators has no regular place of business in Texas and keeps no registered agent for service of process in Texas.

Federal Integrators contends that these allegations cannot establish specific jurisdiction over it. Federal Integrators asserts that such pleadings actually demonstrate its lack of its contacts with Texas and Plaintiffs' conclusory pleadings that Federal Integrators has done business in Lamar County, Texas does not change this. Federal Integrators avers that the Court need not accept conclusory jurisdictional allegations, even if unchallenged. Federal Integrators argues that the Second Amended Complaint fails to allege a single act by which it has purposefully availed itself of Texas, let alone one act that would give rise to any of the claims asserted against it in the Second Amended Complaint. **[\*33]**

**vi. Professional Services**

Professional Services argues that the Second Amended Complaint alleges that: (1) Professional Services is a privately held Alaskan Native Corporation that Cape Fox owns; (2) Harold Mitchell is Professional Services' President; (3) Professional Services is located at 7050 Infantry Ridge Road, Manassas, Virginia; (4) Professional Services has done business in Lamar County, Texas but has not registered as a foreign corporation doing business in Texas with the Texas Secretary of State; and (5) Professional Services keeps no regular place of business in Texas and no registered agent for service of process in the state.

Professional Services argues that these allegations cannot support the Court's specific personal jurisdiction over it and, instead, show its lack of contacts with Texas. Professional Services claims Plaintiffs' assertion that Professional Services has done business in Lamar County, Texas is conclusory and does not change this. Professional Services states that a court need not accept conclusory jurisdictional allegations, even if undisputed.

**vii. The Subsidiary Defendants' Affidavits Show that Their Contacts with Texas Do Not Permit the Court to Exercise [\*34] Specific Jurisdiction over Them**

In support of these arguments, the Subsidiary Defendants submitted an affidavit by Cape Fox's Director of Contracts Shane Muncy (the "Muncy Affidavit"), declaring that they lacked minimum contacts for the Court to wield general or specific jurisdiction over them (Dkt. #76, Exhibit 1; Dkt. #77, Exhibit 1; Dkt. #78, Exhibit 1; Dkt. #79, Exhibit 1; Dkt. #80, Exhibit 1; Dkt. #82, Exhibit 1). Muncy most notably asserts that the Subsidiary Defendants have never entered contracts or done business with Mrs. Lahman, Mr. Lahman, or Nationwide Provider. (Dkt. #76, Exhibit 1 at p. 5; Dkt. #77, Exhibit 1 at p. 12; Dkt. #78, Exhibit 1 at p. 10; Dkt. #79, Exhibit 1 at p. 4; Dkt. #80, Exhibit 1 at p. 6; Dkt. #82, Exhibit 1 at p. 8).

Muncy avers that Cape Fox does not routinely manage the Subsidiary Defendants and each of the Subsidiary Defendants has its own corporate officers, keeps distinct books and accounts, earns separate revenues, is responsible for its own profits and losses, and has its own financing. Muncy declares that each of the Subsidiary Defendant has its own employees and pays its own wages. Muncy states that Shared Services provides some administrative **[\*35]** functions to the Subsidiary Defendants at arm's length. Muncy claims that the Subsidiary Defendants share no departments or businesses with Cape Fox. Muncy avers that each

2018 U.S. Dist. LEXIS 101757, *35

Subsidiary Defendant's management is distinct from the management of Cape Fox and acts solely in the best interests of the particular Subsidiary Defendant.

Muncy declares that Concentric Methods provided traffic safety training to service members at two army bases in Texas (Dkt. #79, Exhibit 1 at p. 4). Muncy explains that this training was sporadic, used largely part-time employees as needed, and yielded a small portion of Concentric Method's total revenue from 2009 to 2010. Muncy claims that Concentric Methods also contracted to provide two doctors to Fort Hood and Fort Bliss and two physicians to Fort Sam Houston in Texas from 2009 to 2011. Muncy states that Concentric Methods provided five doctors to Fort Hood and the resulting revenues were a small portion of its yearly income.

Muncy asserts that Federal Integrators had one contract with the U.S. Air Force to supply traffic safety training to personnel at three bases in Texas (Dkt. #80, Exhibit 1 at p. 6). Muncy explains that these services accounted for six percent **[*36]** of the work it performed under a larger contract with the Air Force. Muncy advances that these services were irregular, used one to three part-time employees as needed, and generated a small portion of its revenues. Muncy explains that in 2017, Federal Integrators began offering Family Readiness Support Services to a base in Houston, Texas. Muncy asserts that all of Federal Integrator's work in Texas involved at most two employees and yielded one percent of its revenue for 2017.

Muncy claims that Professional Services supplied traffic safety training to personnel at two military bases in Texas (Dkt. #82, Exhibit 1 at p. 8). Muncy asserts that this training was intermittent, used primarily part-time employees, and produced only part of its income. Muncy avers that Professional Services provided technical services to the U.S. Military as a subcontractor and that these services generated two percent of the company's revenue in 2013.

Muncy declares that Government Services provided traffic safety training to personnel at three Army bases in Texas until 2016 (Dkt. #78, Exhibit 1 at p.10). Muncy explains that these services were variable and used part-time employees. Muncy explains that Facilities **[*37]** Services began supplying traffic safety training to personnel at two Texas army bases in 2017. Muncy contends that this service is irregular, uses at most eight part-time employees, and totals a "mere fraction" of Facilities Services's annual revenues (Dkt. #77, Exhibit 1 at p. 11). Finally, Muncy proclaims that

Shared Services "has never solicited or conducted any business in the State of Texas or performed services in Texas or for any Texas client." (Dkt. #76, Exhibit 1 at p. 13).

In Texas, a court may attribute the actions of a parent company to its subsidiary for purposes of exercising personal jurisdiction over it if the subsidiary and parent company fail to operate as separate business entities. See *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P., 493 S.W.3d 65, 72 (Tex. 2016)*. Since Plaintiffs filed no response and presented no affidavits to create any genuine, material conflict with the facts established by the Muncy Affidavit, Plaintiffs' contradicted facts, if any, alleged in their complaint are not taken as true. See *Quintana, 259 F. Supp. 2d at 557* ("[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits.") (citing *Wyatt, 686 F.2d at 282-83 n.13*). Accordingly, Plaintiffs have not adequately pleaded a basis for the Court to exert **[*38]** specific jurisdiction over the Subsidiary Defendants since Plaintiffs have not shown that the Subsidiary Defendants purposefully directed their activities to or availed themselves of the privilege to pursue activities in Texas, Plaintiffs' claims arise or result from the Subsidiary Defendants' forum-related contacts, and the exercise of personal jurisdiction over the Subsidiary Defendants is fair and reasonable. See *STORMAN ASIA M/V, 310 F.3d at 378*. Plaintiffs also did not plead sufficient facts to demonstrate that Cape Fox's actions in the forum can be attributed to the Subsidiary Defendants. Accordingly, Plaintiffs provided no basis for the Court to exercise specific jurisdiction over the Subsidiary Defendants. Thus, the Subsidiary Defendants' motions to dismiss for lack of personal jurisdiction are hereby granted.

## II. Plaintiffs Did Not Demonstrate Good Cause, Good Faith, and a Reasonable Basis for Failing to Serve Mitchell and Brown in a Timely Manner

Mitchell argues that the Court already gave Plaintiffs more time to serve non-Cape Fox Defendants by denying Cape Fox's motion to dismiss for failing to serve Mitchell, Brown, and the other non-Cape Fox Defendants on September 20, 2017 (Dkt #23) (extending the deadline **[*39]** for service until October 31, 2017). Mitchell advances that Plaintiffs, nevertheless, did not serve him until November 3, 2017—after the Court's extended deadline expired and 210 days after Plaintiffs first added Mitchell as a

defendant. Mitchell asserts that there is no evidence that Plaintiffs even tried to serve him until November 2, 2017—after the Court's deadline had passed. Mitchell contends that on October 31, 2017—the last day for service—copies of the requisite documents were served on a wholly unaffiliated party—Harold Wayne Mitchell—in Tampa, Florida. Mitchell avers that Plaintiffs consistently and clearly pleaded that he could be served at 7050 Infantry Ridge Road in Manassas, Virginia—the location where Mitchell was eventually served on November 3, 2017.

Mitchell declares that Plaintiffs served him in his office as President—i.e. as an individual designated by law to accept service for Cape Fox. Accordingly, Mitchell claims that any service he received was solely as an agent of Cape Fox and he has not been personally served in this lawsuit. At last, Mitchell argues that since Plaintiffs were granted an extension of 117 days past the original July 6, 2017 service deadline, **[*40]** the failure to effect service merits dismissal of this action under *Federal Rule of Civil Procedure 12(b)(5)*.

Brown argues that Plaintiffs did not serve him until November 2, 2017—well after the Court's extended deadline expired and 209 days after Plaintiffs first added Brown as a defendant. Brown avers that Plaintiffs did not send a summons for him to a process server until October 26, 2017. Brown asserts that Plaintiffs' choice to delay giving the summons to a process server until five days before the extended service deadline is not good cause to excuse their failure to affect timely service. Brown advances that since the Plaintiffs received an extension of 117 more days past the initial July 6, 2017 deadline for service, their failure to serve him by that deadline merits dismissal of this action for insufficient service of process under *Federal Rule of Civil Procedure 12(b)(5)*.

Plaintiffs did not respond to Brown's and Mitchell's[3]

---

[3] The Court also lacks personal jurisdiction over Mitchell. Via affidavit, Mitchell declares that he has made three, brief visits to Texas to visit a friend, to attend a conference, and to celebrate Concentric Method's winning a contract with the Defense Health Agency (Dkt. #72, Exhibit 1 at p. 2). Mitchell further asserts that has never lived in Texas, keeps no mailing address, bank account, or business office in Texas (Dkt. #72, Exhibit 1 at p. 2). Mitchell also avers that he had never done any business, filed suit, been sued, and has no registered agent for service in Texas (Dkt. #72, Exhibit 1 at p. 2). Finally, Mitchell advances that he has not worked, filed, or paid taxes in Texas (Dkt. #72, Exhibit 1 at p. 2). Since Plaintiffs filed no

Motions to Dismiss, let alone demonstrate good cause, good faith, and a reasonable basis for not serving Brown and Mitchell within the time allotted. *Sys. Signs Supplies v. U.S. Dep't of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990)*. Additionally, the Court already lengthened the deadline for Plaintiffs to serve Mitchell and Brown (Dkt. #23). Given Plaintiffs' repeated failure to timely serve Defendants, Plaintiffs' **[*41]** lack of any explanation for their failure to serve Defendants in a timely manner, and the Court's earlier extension of the deadline to serve Defendants, the Court will not excuse Plaintiffs' insufficient and untimely service and grants Brown's and Mitchell's motions to dismiss.

### III. Plaintiffs Pleaded a Plausible Claim for Relief Against Walker but Need to Further Explain Their Claims Against Johnson and Navar

### A. Plaintiffs Pleaded a Plausible Fraud Claim Against Walker

Walker argues that Plaintiffs do not sufficiently plead facts to state a plausible claim for relief under any of the Second Amended Complaint's causes of action. Walker advances that several of Plaintiffs' claims are barred by statutes of limitations. Walker further contends that federal courts require greater particularity for pleading fraud. In his motion, Walker notably asserts that the Second Amended Complaint alleges that he met with Brown, Verbena Williams, and Mrs. Lahman to discuss Cape Fox's acquisition of Nationwide Provider. Walker also claims that the Second Amended Complaint alleges that Mrs. Lahman asked Walker to review her letter to the Small Business Administration, Walker revised it, Mrs. Lahman did **[*42]** not fully understand his revisions, and Walker did not elaborate upon his revisions to Mrs. Lahman.

After reviewing the Second Amended Complaint and the motion to dismiss, the Court finds that Plaintiffs have stated a plausible claim for purposes of defeating a *Rule 12(b)(6)* motion. In turn, the Court denies Walker's motion to dismiss for failure to state a claim.

---

response and presented no affidavits to create any genuine, material conflict with the facts established by Mitchell's Affidavit, Plaintiffs' contradicted facts alleged in their complaint are not taken as true. See *Quintana, 259 F. Supp. 2d at 557*. Thus, Plaintiffs have not pleaded sufficient facts for the Court to exert general or specific jurisdiction over Mitchell.

## B. The Plaintiffs Did Not Plead A Plausible Claim Against Johnson and Navar and Must Further Explain Their Claims

Johnson and Navar argue that the Second Amended Complaint does not clearly or specifically plead any cause of action against them. To that end, Johnson and Navar meticulously account the critical elements of each cause of action in the Second Amended Complaint and stress how the Second Amended Complaint does not plead facts to fully allege any of those causes of action against them. Johnson and Navar most notably claim that the Second Amended Complaint alleges that Johnson told Mrs. Lahman to add a NAICS code to Nationwide Provider's Award Management Profile and submit a bid for repair work at a Naval Air Station in Texas, and Mrs. Lahman refused. Johnson claims that the Second Amended Complaint alleges that Johnson ordered a **[*43]** Cape Fox employee to add the NAICS code to Nationwide Provider's Award Management Profile so Navar could bid on the repair work despite Mrs. Lahman's objection.

The Second Amended Complaint pleads that Johnson, Navar's CEO, ignored that "[Cape Fox], and its many wholly owned subsidiaries" lacked any control over Nationwide Provider and ordered Mrs. Lahman to "add Navar's NAICS code for construction" to Nationwide Provider's System for Award Management and bid on a construction project in Texas (Dkt. #25 at p. 21). As alleged, when Mrs. Lahman refused to do so, Johnson instructed a Cape Fox employee to add the construction code to [Nationwide Provider's] profile "to enable Navar to submit the bid." (Dkt. #25 at p. 21). Such claims could serve as a basis for tortious interference with existing or potential business relationships, but Plaintiffs do not address all of the elements for that cause of action in the Second Amended Complaint. The Second Amended Complaint does not explain how Johnson's and Navar's actions interfered with Nationwide Provider's current or prospective business and how that interference damaged Nationwide Provider. Put simply, it is unclear whether Cape Fox's Employee **[*44]** could have even interfered with Nationwide Provider's business by adding "Navar's NAICS code for construction" to Nationwide Provider's System for Award Management given Cape Fox's prerogatives under the Administrative Services Contract. After all, the Administrative Services Contract gave Cape Fox "operational control of Nationwide Provider's accounting, finances, information technology, network management, and human resources." *See supra* at 5. In turn, the Court finds that

the Second Amended Complaint has not satisfied the pleading requirements under *Iqbal* and *Twombly* and additional briefing is needed. Thus, the Court grants Johnson's and Navar's Motions for a More Definite Statement.

## CONCLUSION

After reviewing the parties' briefing, the Court finds that Plaintiffs did not plead sufficient facts for the Court to wield personal jurisdiction over the Individual Defendants and the Subsidiary Defendants. The Court also concludes that Plaintiffs did not timely serve Mitchell and Brown and did not demonstrate good cause, good faith, and a reasonable basis for not serving them in a timely manner. Lastly, the Court finds that Plaintiffs pleaded plausible claims for relief against Walker but did not **[*45]** fully plead claims for relief against Johnson and Navar.

It is therefore **ORDERED** that Defendant Clifford Blair's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #64) is **GRANTED**.

It is further **ORDERED** that Defendant George Bernardy's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #65) is **GRANTED**.

It is further **ORDERED** that Defendant Katherine Milton's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #67) is **GRANTED**.

It is further **ORDERED** that Defendant Cape Fox Shared Services' Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #76) is **GRANTED**.

It is also **ORDERED** that Defendant Cape Fox Facilities Services' Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Failure **[*46]** to State a Claim and Alternative Motion for More Definite Statement (Dkt. #77) is **GRANTED**.

It is further **ORDERED** that Defendant Cape Fox Government Services' Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Failure to

State a Claim and Alternative Motion for More Definite Statement (Dkt. #78) is **GRANTED**.

It is further **ORDERED** that Defendant Concentric Methods, LLC's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #79) is **GRANTED**.

It is further **ORDERED** that Defendant Cape Fox Federal Integrators' Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #80) is **GRANTED**.

It is further **ORDERED** that Defendant Cape Fox Professional Services' Motion to Dismiss for Lack Of Personal Jurisdiction or, in the Alternative, for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #82) is **GRANTED**.

It is further **ORDERED** that Defendant Harold Mitchell's Amended Motion to Dismiss for Insufficient Service of Process or, in the Alternative, **[*47]** for Lack Of Personal Jurisdiction or, in the Alternative, Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #72) is **GRANTED**.

It is further **ORDERED** that Defendant Michael Brown's Motion to Dismiss for Insufficient Service of Process or, in the Alternative, Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #75) is **GRANTED**.

It is further **ORDERED** that Defendant Charles Johnson's Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #73) is **GRANTED**. Plaintiffs should file an amended complaint within seven (7) days of this Order.

It is further **ORDERED** that Defendant Navar, Inc.'s Motion to Dismiss for Failure to State a Claim and Alternative Motion for More Definite Statement (Dkt. #81) is **GRANTED**. Plaintiffs should file an amended complaint within seven (7) days of this Order.

It is further **ORDERED** that Defendant Walker's *Rule 12(b)(6)* Motion to Dismiss Plaintiffs'

Second Amended Complaint (Dkt. #66) is **DENIED**.

**SIGNED this 19th day of June, 2018**.

/s/ Amos L. Mazzant

AMOS L. MAZZANT

UNITED STATES DISTRICT JUDGE

---

*End of Document*

## *Walker v. Beaumont Indep. Sch. Dist.*

United States District Court for the Eastern District of Texas, Beaumont Division

March 11, 2016, Decided; March 11, 2016, Filed

CIVIL ACTION NO. 1:15-CV-379

**Reporter**

2016 U.S. Dist. LEXIS 41408 *

CALVIN GARY WALKER, et al., Plaintiffs, v. BEAUMONT INDEPENDENT SCHOOL DISTRICT, et al., Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Motion granted by, in part, Motion denied by, in part, As moot, Dismissed by, in part, Motion denied by, As moot, in part *Walker v. Beaumont Indep. Sch. Dist., 2016 U.S. Dist. LEXIS 38853 (E.D. Tex., Mar. 24, 2016)*

**Prior History:** *Walker v. Beaumont Indep. Sch. Dist., 2016 U.S. Dist. LEXIS 101704 (E.D. Tex., Jan. 22, 2016)*

**Counsel:  [*1]** For Calvin Gary Walker, Walker's Electric, Walkers Electric, Plaintiffs: Maria-Vittoria Galli Carminati, Carminati Law PLLC, Houston, TX.

For Beaumont Independent School District, Aaron Covington, Leroy Saleme, Vernon Butler, Jane Kingsley, Terry Ingram, Venice Monroe, A.B. Bernard, Jimmy Simmons, Robert Turner, Joe Domino, Lenny Cabarello, Jack Carroll, Defendants: Clay T Grover, Rogers, Morris & Grover, LLP, Houston, TX; Michael Charles Smith, Siebman Burg Phillips & Smith, LLP-Marshall, Marshall, TX.

For Michael "Mike" Neil, Tom Neild, Defendants: Christopher Blewer Gilbert, LEAD ATTORNEY, Thompson & Horton LLP, Houston, TX.

For The Beaumont Examiner, Defendant: Harry M Reasoner, LEAD ATTORNEY, Stacey Neumann Vu, Vinson & Elkins - Houston, Houston, TX; Gary Neale

Reger, Orgain Bell & Tucker, Beaumont, TX; Gilbert Irvine Low, Robert L Florance, IV, Orgain, Bell & Tucker LLP - Beaumont, Beaumont, TX; John C Wander, Thomas S Leatherbury, Vinson & Elkins, Dallas, TX; L DeWayne Layfield, Attorney at Law, Beaumont, TX; Marc A Fuller, Vinson & Elkins LLP - Dallas, Dallas, TX; Michael Joseph Truncale, Orgain Bell & Tucker - Beaumont, Beaumont, TX.

**Judges:** KEITH F. GIBLIN, UNITED STATES DISTRICT JUDGE. **[*2]**

**Opinion by:** KEITH F. GIBLIN

## Opinion

**REPORT AND RECOMMENDATION ON ENTERPRISE DEFENDANTS' MOTION TO DISMISS UNDER TEXAS CITIZENS PARTICIPATION ACT ("*TCPA*")**

In accordance with *28 U.S.C. § 636* and the Local Rules for the United States District Court for the Eastern District of Texas, on October 15, 2015, the District Court referred this matter to the undersigned United States Magistrate Judge for pretrial management. *See Order* (doc. #55). Pending before the Court for purposes of this report is Hearst Newspapers II, LLC ("Hearst") and Brooke Crum's ("Crum") (collectively, "the Enterprise Defendants") *Motion to Dismiss Under Tex. Civ. Prac. & Rem. Code § 27.001 et seq. and Federal Rule of Civil Procedure 12(b)(6)* (doc. #168). Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, the Court recommends that the Enterprise Defendants' motion be **GRANTED**.

2016 U.S. Dist. LEXIS 41408, *2

## I. Background

Plaintiffs Calvin Gary Walker ("Walker"), Walkers Electric, and Walker's Electric originally filed suit in July 16, 2015, in the United States District Court for the Eastern District of Texas, Marshall Division. Walker and Plaintiff Jessie Haynes ("Haynes") (collectively, "Plaintiffs") amended their complaint twice more before the Marshall Division transferred the case to the United States District Court for **[*3]** the Eastern District of Texas, Beaumont Division, on October 2, 2015. After the case was transferred, Plaintiffs were again granted leave to amend, and their Third Amended Complaint (#79) was deemed filed on September 28, 2015. The Enterprise Defendants timely filed the instant motion to dismiss, and the Court held an oral hearing on the matter on March 3, 2016.

In Plaintiffs' *Fourth Amended Complaint*, they assert that they are the victims of an extensive, long-lasting conspiracy designed to prevent African-American individuals in Beaumont from gaining power and influence in order to perpetuate "white dominion over Beaumont local politics." This conspiracy, spanning approximately a decade, allegedly involved around 35 residents and organizations in the Beaumont area, including Beaumont Independent School District ("BISD"), the BISD Board of Trustees and subsequent Board of Managers, two local newspapers and their employees, two online journalists, the local chapter of the International Brotherhood of Electrical Workers ("IBEW") and several of its members, a Beaumont City Councilman, two local attorneys, the United States Attorney for the Eastern District of Texas, two Assistant United **[*4]** States Attorneys, and two agents with the Federal Bureau of Investigation ("FBI"). The objective of this alleged conspiracy was to ruin Plaintiffs' reputations and businesses as part of a larger campaign to harm minority individuals who "stepped out of line" and "defied the status quo."

Walker is a Master Electrician and owner of Walker's Electric Company, which offers electrical services in Beaumont. Plaintiffs assert that the conspiracy began around 2004 when members of IBEW asked Walker to join and he refused, at which point he was told that the union would "get him one way or another." Several years later, Walker contracted to provide electrical services to BISD, a position that had previously been held by an IBEW member. In April 2008, IBEW filed a complaint against Walker with the Texas Department of Licensing and Registration ("TDLR"), asserting that

Walker had obtained his electrician's license through fraud. Although Walker initially contested the matter and continues to assert that IBEW was behind and heavily involved with the investigation, Walker ultimately agreed to pay a fine, relinquish his Master Electrician's license, and re-take the required licensing exam.

Walker asserts **[*5]** that IBEW then conspired with BISD board members to ruin Walker's reputation and business. According to Walker, BISD board members complained that he was making too much money for a minority and was a sloppy businessman. He asserts that BISD personnel sought to ensure that he did not get any other contracts with BISD and imposed onerous record-keeping requirements upon him. Walker, however, continued to work on BISD construction projects.

Having failed to prevent Walker from contracting with BISD, IBEW and BISD allegedly turned to the United States Attorney for the Eastern District of Texas, Malcolm Bales, to get Walker indicted. Walker contends that members of IBEW and BISD worked closely with the federal government to see that he was indicted on 37 counts of fraud in May 2011. In addition, Walker alleges that FBI agents involved in his prosecution tampered with potential witnesses during Walker's trial, offering bribes to one and threatening two others. Members of the United States Attorney's Office also allegedly leaked information about Walker's case to members of IBEW and BISD. Walker was tried on these counts in December 2011, but a mistrial ensued. Walker subsequently pleaded **[*6]** guilty to one count of willful failure to pay income taxes and signed a *Factual Basis and Stipulation* attached to his plea agreement. Walker complains that members of the conspiracy, including members of the press and BISD's Board of Trustees, then relentlessly smeared him by wrongfully stating that he had pleaded guilty to defrauding BISD and that he had agreed to repay BISD for the money that he had stolen. Walker asserts that, although the records of BISD contained altered documents, there was no evidence admitted at trial that Walker or his wife submitted those documents to BISD in connection with receiving payments for projects. In addition, Walker alleges that the Assistant United States Attorney assigned to the case urged BISD to cease doing business with Walker and sent letters to a number of government entities and individuals, falsely informing them that Walker was a thief.

Walker complains that members of the conspiracy continued to engage in a smear campaign against him and that BISD board members and other conspirators

2016 U.S. Dist. LEXIS 41408, *6

repeatedly stated that Walker had admitted to submitting fraudulent invoices. Walker further contends that members of this conspiracy joined with their allies **[*7]** at a number of local news sources, including local newspaper *The Beaumont Enterprise*, and two websites to spread these allegedly unfounded allegations. Members of the conspiracy also purportedly interfered with Walker's existing contract with BISD and ordered BISD to stop using his services.[1] Additionally, Walker alleges that he was prevented from being awarded another BISD contract and that he has lost substantial business from other prospective clients because the district's "Evaluation Matrix" contained false information that he admitted to padding BISD invoices. Walker claims that the conspiracy has continued and that the United States Attorney's Office conspired with the Jefferson County District Attorney's Office to form a joint task force in order to prosecute him in state court.

Haynes asserts that she, too, was victimized by the alleged conspiracy when BISD Board of Trustees member Michael Neil ("Neil") moved her away from a door leading to a press conference at BISD after Haynes prevented **[*8]** Defendant Jerry Jordan ("Jordan"), owner of SETInvestigates.com, from entering the press conference. Haynes was subsequently convicted of obstruction of a public passageway. Haynes nonetheless asserts that her trial, at which Defendants Neil, Jordan, and Michael Getz ("Getz") (who was also present outside the press conference) testified, was a product of the conspiracy. Haynes then claims that the conspirators "engaged in a concerted campaign to harass [her], tarnish her reputation, attack her integrity, and threats of [sic] criminal and/or administrative repercussions."

In Plaintiffs' *Fourth Amended Complaint*, Walker asserts the following claims against the Enterprise Defendants: defamation, tortious interference, civil conspiracy, and Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy under *18 U.S.C. § 1962(d)*. Walker claims that this conspiracy is responsible for, among other things, the loss of his electrical license, his federal criminal prosecution for fraud and subsequent guilty plea for willful failure to file income taxes, his ongoing criminal prosecution by the Jefferson County District Attorney's Office, BISD's decision not to renew Walker's contract for electrical services, **[*9]** and the loss of a

number of prospective contracts for electrical services.[2]

Walker claims specifically that the Enterprise Defendants published six defamatory articles about him that, among other things, mischaracterized his plea agreement and included factual stipulation for willful failure to pay income taxes as an admission of fraud and misstated the amount he had agreed to forfeit.[3] The Enterprise Defendants seek dismissal of all of Walker's claims against them under the Texas Citizens Participation Act ("*TCPA*") and *Federal Rule of Civil Procedure 12(b)(6)*, *Fed. R. Civ. P. 12(b)(6)*; *Tex. Civ. Prac. & Rem. Code § 27.001 et seq.* (West 2015). Specifically, the Enterprise Defendants assert that

---

[2] The Enterprise Defendants reported to the Court in their motion to dismiss that counsel for Haynes had informed them on January 11, 2016, during their meet and confer that Haynes was not asserting any claims against the Enterprise Defendants. Haynes does not address this report in Plaintiffs' response; nonetheless, Haynes asserts no facts in the *Fourth Amended Complaint* specific to the Enterprise Defendants. Any claims she intended to assert against them are, therefore, dismissed.

[3] The factual stipulation states, in relevant part:

> The defendant was aware of the additional business income as it resulted from the submission of invoices to the BISD. Records from the BISD reflect that on or about August 29, 2009, the defendant submitted an invoice for labor, materials, and rental equipment in the amount of $1,592,839.10 for the electrical wiring of two temporary campuses. On or about September 9, 2009, the BISD issued a check in the amount of $1,592,893.10 for the payment of such materials as well for labor and equipment rental charges. The gross income from this check was never reported on the 2009 tax return of the defendant. Records of the BISD contained copies of bills of materials from third party electrical wholesale companies along with copies of unnegotiated **[*11]** checks drawn on defendant's bank account in the same amounts, payable to said wholesalers. Included in the wholesale invoices was an invoice in the amount of $382,975.32 which had been altered to reflect it was an invoice when in fact the document was a quote and not an actual purchase. The defendant's check payable to that wholesaler in the amount of $382,975.32 was never presented to the wholesaler or negotiated. Records of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects.

*Factual Basis and Stipulation* (doc. #157 of Case No. 1:11-CR-67).

---

[1] The BISD Board of Trustees was replaced by a Board of Managers in 2014. Walker alleges that the Board of Managers, as members of the conspiracy, improperly terminated his contract with BISD.

Walker's claims are statutorily privileged under Texas law, true and privileged under Texas common law, and partially barred **[*10]** by the applicable statute of limitations. They further assert that Walker has failed to plead his claims properly according to *Rule 12(b)(6)*. In response, Walker concedes that the *TCPA* applies to his state-law claims, contests whether it applies to his federal-law claims, and otherwise argues that he has sufficiently pleaded and provided evidence for his claims necessary to survive dismissal under both the *TCPA* and *Rule 12(b)(6)*.

## II. Discussion

### A. Background of the Texas Citizens Participation Act

In 2011, the Texas Legislature enacted the *TCPA* to "encourage and safeguard the constitutional rights of persons to petition, speak freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Tex. Civ. Prac. & Rem. Code § 27.002*. To that end, the *TCPA* creates an expedited process so defendants can quickly obtain dismissal of "retaliatory lawsuits that seek to intimidate **[*12]** or silence them on matters of public concern." *In re Lipsky, 460 S.W.3d 579, 586 (Tex. 2015)*. A defendant who prevails on a motion to dismiss under the *TCPA* shall recover court costs, reasonable attorney's fees, expenses, and possible sanctions against the party who brought the claim. *Tex. Civ. Prac. & Rem. Code § 27.009(a)*. Likewise, a plaintiff who prevails against a *TCPA* motion to dismiss is entitled to recover court costs and attorney's fees if a court finds that the motion to dismiss was frivolous or filed solely to delay proceedings. *Id. § 27.009(b)*. The *TCPA* is enforceable in a federal court sitting in diversity jurisdiction. *Williams v. Cordillera Commc'ns Inc., No. 2:13-CV-124, 2014 U.S. Dist. LEXIS 79584, 2014 WL 2611746, at *2 (S.D. Tex. June 11, 2014)*; *see Cuba v. Pylant, 814 F.3d 701, 2016 U.S. App. LEXIS 3157, 2016 WL 723311, at *2 n.6 (5th Cir. 2016)* (applying the *TCPA*); *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C., 745 F.3d 742, 746 (5th Cir. 2014)* (same).

### B. Step One: Does the *TCPA* Apply to Plaintiffs' Claims?

A *TCPA* motion triggers a two-step process; the first step requires the Enterprise Defendants to prove by a preponderance of the evidence that the Plaintiffs' claims are "based on, relate[ ] to, or [are] in response to the [Enterprise Defendants'] exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Tex. Civ. Prac. & Rem. Code § 27.005(b)* (West 2015); *In re Lipsky, 460 S.W.3d at 586-87* (internal footnotes and citations omitted). All parties agree that the *TCPA* applies to Walker's claims of defamation, tortious interference, and **[*13]** civil conspiracy, but contest whether it can be applied to his claims of RICO conspiracy.[4] Whether the *TCPA* applies to federal claims asserted in federal court is a novel issue in this Court. As explained below, however, the Court need not address this issue because the Court finds that Walker failed to adequately plead his RICO claims under *Rule 12(b)(6)*. Therefore, the Court finds that the *TCPA* applies to Walker's claims of defamation, tortious interference, and civil conspiracy, and declines to decide whether the *TCPA* also applies to Walker's RICO claims.

### C. Step Two: Has Walker Presented Clear and Specific Evidence Establishing a Prima Facie Case for Each Element of His Cause of Action or, Alternatively, Have the Enterprise Defendants Proven a Defense to Walker's Claims by a Preponderance of the Evidence?

Under the *TCPA*, a plaintiff's action may only survive dismissal if that plaintiff "establishes by clear and specific evidence a prima facie case for each essential element of the claims in question." *Tex. Civ. Prac. & Rem. Code § 27.005(c)*. In determining whether a plaintiff has met this burden, the Court looks to pleadings and supporting or opposing affidavits. *Id. § 27.006(a)*. A court may also consider both direct and circumstantial evidence. *In re Lipsky, 460 S.W.3d at 590*. Upon a showing of good cause and motion of a party or the court's own motion, a court is permitted to allow limited discovery relevant to a *TCPA* motion to dismiss. *Id. § 27.006(b)*.

---

[4] During the Court's previous *TCPA* hearing on January 14, 2016, Plaintiffs conceded that the *TCPA* applied to their RICO claims asserted against a number of other Defendants; however, Plaintiffs now argue that the *TCPA* cannot be applied to federal claims asserted in federal court. In response, the Enterprise Defendants assert that Plaintiffs are judicially estopped from contesting whether the *TCPA* can be applied to Plaintiffs' RICO claims and also waived this argument by not addressing it in Plaintiffs' response to the Enterprise Defendants' motion. Additionally, they argue that because Walker's RICO claims against them are entirely based on defamation, **[*14]** the Court may properly dismiss the RICO claims under the *TCPA*.

2016 U.S. Dist. LEXIS 41408, *14

Although "clear and specific" is not defined by the statute, the Supreme Court of Texas has interpreted the phrase to mean "unambiguous, sure, or free from doubt" and "explicit or relating to a particular named thing." *In re Lipsky, 460 S.W.3d at 590* (citing *KTRK Television, Inc. v. Robinson, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, no pet.))*. "Prima facie" refers to "the minimum quantum of evidence necessary to support a rational **[*15]** inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co., 136 S.W.3d 218, 223 (Tex. 2004)* (per curiam)). The Supreme Court of Texas has interpreted these phrases together to require the plaintiff to "provide enough detail to show the factual basis for [his] claim" and has expressly stated that "mere notice pleading—that is, general allegations that merely recite the elements of a cause of action—will not suffice." *In re Lipsky, at 590-91*; *see Cuba, 2016 U.S. App. LEXIS 3157, 2016 WL 723311, at *6* (citing *Lipsky, 460 S.W.3d at 590-91*; *Serafine v. Blunt, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.))* ("[T]he Texas cases inform that a litigant's evidentiary burden in a *TCPA* motion may be satisfied by either detailed pleading or supporting affidavits: [a] party need not provide 'evidence' in the traditional sense if the pleadings are sufficiently clear."). In response to a *TCPA* motion, a plaintiff should cite evidence to support each element of the plaintiff's claims. *See Better Bus. Bureau of Metro. Dallas, Inc. v. Ward, 401 S.W.3d 440, 445 (Tex. App.—Dallas 2013, pet. denied)* (dismissing a plaintiff's defamation claim when "he merely set out the elements of his claims, and concluded after a discussion of the elements that 'the actions by [the BBB] are defamatory per se, and [the BBB is] liable for damages . . . .' but "cited no evidence to support each element of his defamation claims"). Regardless of whether a plaintiff proves by clear and specific evidence a prima facie case for each essential **[*16]** element of the plaintiff's claims, a court must grant the defendant's motion to dismiss under the *TCPA* if the defendant establishes by a preponderance of the evidence each essential element of a valid defense. *Tex. Civ. Prac. & Rem. Code § 27.005(d)*.

1. Privilege: Fair Reporting of Official Proceedings

The Enterprise Defendants' primary argument the defense is that all of the articles they are alleged to have published are privileged under Texas law as fair reports of official proceedings and so cannot support Walker's claims for defamation. *See Tex. Civ. Prac. & Rem. Code § 73.002*. Under Texas law, "[t]he publication by a newspaper or other periodical material . . . is privileged"

when that newspaper presents "a fair, true, and impartial account" of a judicial proceeding, an official proceeding to administer the law, or other public proceeding, including a proceeding before "a managing board of an educational . . . institution [or] . . . of a public school board." *Id. § 73.002(a)-(b)*. This privilege extends to information a newspaper receives from a press release issued by law enforcement or a governmental agency. *Freedom Commc'ns, Inc. v. Sotelo, No. 11-050336-CV, 2006 Tex. App. LEXIS 5132, 2006 WL 1664602, at *4 (Tex. App.—Eastland June 15, 2006, no pet.)* (mem. op.). Privilege, however, "does not extend to the republication of a matter if it is proved that the matter was republished **[*17]** with actual malice after it had ceased to be of public concern." *Tex. Civ. Prac. & Rem. Code § 73.002(a)*. A court may determine privilege as a matter of law "[w]here the facts are undisputed and the language used in the publication is not ambiguous . . . ." *Klentzman v. Brady, 456 S.W.3d 239, 252-53 (Tex. App.—Houston [1st Dist.] 2014, pet. granted)* (citing *Denton Pub. Co. v. Boyd, 460 S.W.2d 881, 884 (Tex. 1970))*.

To determine if a publication is protected by the fair reporting privilege, a court must interpret the account "in the sense that the ordinary reader would understand." *Tex. Monthly, Inc. v. Transamerican Nat'l Gas Corp., 7 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 1999, no pet.)* (op. on reh'g) (citing *Crites v. Mullins, 697 S.W.2d 715, 717 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.))*; *accord Klentzman, 456 S.W.3d at 252-53*; *Finklea v. Jacksonville Daily Progress, 742 S.W.2d 512, 515 (Tex. App.—Tyler 1987, writ dism'd w.o.j.)* ("In determining whether the newspaper's account was fair, true or impartial, the critical test is the effect on the mind of the reader or listener; if the effect on the mind of the recipient would be the same, any variance between the actions charged and the actions proved should be disregarded.") (citations omitted). "The statutory requirement that the published account be true is satisfied if it is substantially correct." *Klentzman, 456 S.W.3d at 252-53* (citing *Tex. Monthly, Inc., 7 S.W.3d at 805*). Even greatly exaggerated accounts are substantially true "if no more opprobrium would be attached to the [plaintiff's] actions merely because of such exaggeration." *Finklea, 742 S.W.2d at 515* (citations omitted); *accord Klentzman, 456 S.W.3d at 253*. Further, "[u]nder *section 73.002(b)(2)*, the proper comparison should be between a news report or broadcast and an otherwise unprivileged record of the state or federal **[*18]** government." *Klentzman, 456 S.W.3d at 253* (citing *Freedom Commc'ns, Inc., 2006 Tex. App. LEXIS 5132, 2006 WL 1644602, at *3* ("[T]he

publications should be compared, not with actual fact, but with the governmental reports that defendants republished.")).

In this case, the Enterprise Defendants assert that all of the news articles at issue are privileged accounts of the four following government proceedings and records: (1) a press release from the United States Attorney's Office (doc. #168, exh. 2) stating that Walker had wilfully failed to report approximately $1.5 million in income to the federal government, a bid altered to look like an invoice for labor in the amount of $382,975.32 had been submitted to BISD, and had agreed to forfeit $3.2 million, out of which BISD could seek restitution; (2) a letter from the United States Attorney's Office to BISD (doc. #168, exh. 3) informing BISD that Walker would be forfeiting $3.2 million and that BISD could potentially seek restitution for at least $1.8 million that it had overpaid Walker; (3) the factual basis and stipulation attached to Walker's plea agreement (doc. #168, exh. 1), in which he agreed that bid documents altered to look like invoices were submitted to BISD; and (4) the finding by the Texas Comptroller that Walker's admissions **[*19]** in his plea agreement "constitute[d] sufficient admitted evidence of fraudulent behavior in a procurement setting" to support its decision to debar Walker from working for the State of Texas for five years (doc. #168, exh. 4). In response, Walker does not specifically address privilege under § 73.002. Neither does he address any of the government documents provided to the Court by the Enterprise Defendants, aside from the factual basis and stipulation attached to his plea agreement. Instead, he simply argues generally that the articles are not substantially true or fair, or, at the very least, are ambiguous in meaning.

Turning to the articles at issue, the first three are very similar. The first is an article published October 19, 2012, titled "BISD will not seek Calvin Walker restitution," which discusses BISD's decision not to make a claim for "funds from the $3.2 million that [Walker] will have to forfeit to the federal government at a future sentencing." *Fourth Amended Complaint* (doc. #144, exh. 8). Walker asserts that this article is defamatory because, by announcing that BISD could seek $2 million in restitution, the article misleads readers into believing that Walker had defrauded BISD by that amount. **[*20]** Second, Walker asserts that an article published on March 11, 2014, titled "TEA report questions BISD's employment of Calvin Walker" is defamatory because it states, "In his plea agreement, Walker signed a statement that he knowingly altered invoices that were submitted to the school district for

repayment in the amount of $2 million. He forfeited a total of $3.5 million in his plea agreement, $2 million of which the school district could have sought." *Fourth Amended Complaint* (doc. #144, exh. 7).[5] Third, Walker identifies an allegedly defamatory article published by Crum on July 28, 2014, titled "BISD will rebid contract given to Calvin Walker." *Fourth Amended Complaint* (doc. #144, exh. 6). Walker asserts that the article is defamatory because it states that he admitted in his plea agreement to "falsifying" invoices submitted to BISD, thus implying that he had defrauded BISD.

Although Walker never specifically addresses the Enterprise Defendants' claims of fair reporting privilege, he argues generally that these three articles are false and misleading for two reasons: (1) the monetary amounts listed for Walker's forfeiture agreement and BISD's possible **[*22]** forfeiture claims are too high and (2) the articles imply that Walker admitted to defrauding BISD in his plea agreement. As to the first issue, the effect of the Enterprise Defendants' articles on the mind of the ordinary reader would not be altered even if the Enterprise Defendants' exaggerated the monetary amounts at issue. *See Dudley v. Farmers Branch Daily Times, 550 S.W.2d 99 (Tex. Civ. App.—Eastland 1977, writ ref'd n.r.e.)* (privilege still attached when article reported that plaintiff had been charged with theft of $168,000 instead of actual amount of $6,655.00) (cited with approval in *Finklea, 742 S.W.2d at 515*). A comparison of the Enterprise Defendants' articles to the previously listed government documents indicates that

---

[5] Walker asserts that the article also falsely stated, "In 2009, Walker previously had to surrender his master electrician license after he falsified the renewal application." The Enterprise Defendants assert that they based this statement on the *Amended Agreed Order* between Walker and the TDLR (doc. #180, exh. A) **[*21]** signed on November 13, 2009, wherein Walker agreed that "[o]n the application for licensure, Calvin Gary Walker gave inaccurate, deceitful[,] or misleading information to the Department regarding his work related qualifications," specifically, that Walker had submitted fraudulent documents regarding his work history in his application to renew his Master Electrician's License. The *Amended Agreed Order* constitutes a settlement agreement between Walker and the TDLR where Walker agreed to accept the TDLR's determination of fault and surrender his Master Electrician's license. In light of this document, the Enterprise Defendants' statement that Walker had to surrender his license in 2009 is accurate. Additionally, Walker pleaded that he agreed to surrender his license in 2009 as a result of the TDLR's investigation. Neither does this completely accurate account make the article as a whole in any way false or misleading.

Patricia O'Neill

2016 U.S. Dist. LEXIS 41408, *21

the press release from the United States Attorney's Office had stated that Walker was anticipated to owe the federal government approximately $3.2 million in forfeiture and that BISD was entitled to file a claim in that proceeding to recover overpayments to Walker. Also, in Walker's plea agreement, he admitted that BISD's records contained a quote that had been altered to look like an invoice for $382,975.32 along with a check for the same amount purportedly from Walker to a wholesaler that was actually never presented to that wholesaler or negotiated. BISD's records contained additional **[*23]** "similar[ly] altered documents" for invoices submitted in relation to Walker's other projects.[6] Accordingly, Walker's first argument is rejected.

Walker also contends that the Enterprise Defendants' first three articles are defamatory because they state that Walker admitted to falsifying invoices in his plea agreement and factual stipulation, which implies that Walker defrauded BISD. Comparing the Enterprise Defendants' articles to the listed government documents, particularly Walker's plea agreement, it becomes clear that the differences in wording are minor and merely semantic. In Walker's plea agreement, he admitted that multiple bid quotes were submitted to BISD that had been altered to look like invoices, one such "invoice" was accompanied by a check payable to a wholesaler for the same amount that was never presented to that wholesaler or negotiated, and the "invoice" **[*24]** came from Walker's company. An ordinary reader would not discern a difference in meaning between Walker's plea agreement and the Enterprise Defendants' accounts after comparing Walker's plea agreement, the various government documents provided by the Enterprise Defendants in their motion to dismiss, and these three articles.[7] Therefore, these three articles are privileged under Texas law.

Fourth, Walker identifies an article published on July 30,

2014, titled "Grand jury indicts BISD electrician for fraud," discussing Walker's indictments for fraud and money laundering by the Jefferson County District Attorney's Office. *Fourth Amended Complaint* (doc. #144, exh. 5). Walker says this article is defamatory because it states that the only reason BISD would not recover $343,000 from Walker was because BISD "refused to say it was a victim of a crime." This article cites a vote by BISD's school board that it had not **[*25]** been defrauded by Walker, a statement from the former BISD school board president explaining the school board decision, and a statement from Walker's attorney, Dick DeGuerin, that "What BISD did say through their lawyer in court was that BISD was not defrauded." As a threshold matter, this Court cannot see how an account of BISD's insistence that it had *not* been defrauded by Walker is defamatory to Walker. Nonetheless, looking at the article as a whole, it presents a true, fair, and accurate account of Walker's indictments in state court, previous criminal proceedings, and government documents. Therefore, this article is privileged.

Walker pleads a fifth supposedly defamatory article published on October 2, 2014, titled "U.S. Attorney: BISD restitution money is gone." *Fourth Amended Complaint* (doc. #144, exh. 4). Walker's argument as to why this article is defamatory is similar to the arguments made previously. He asserts that statements that he "altered electrical invoices presented to the school district" and that "in exchange, he pleaded guilty to federal tax violations" are false and defamatory. However, when these statements—and the article as a whole—are compared with the government **[*26]** records attached to the Enterprise Defendants' motion and before the Court as a matter of public record, it is clear that the article is fair, true, and impartial. Further, any difference in wording between Walker's plea agreement and the language of the article presents a minor variation insufficient to overcome the Enterprise Defendants' claims of privilege.

Finally, Walker asserts that the Enterprise Defendants published a defamatory article on October 15, 2014, titled "BISD board ditches electrician." *Fourth Amended Complaint* (doc. #144, exh. 3). Similar to his previous arguments, Walker asserts that this article implies that he defrauded BISD by $382,975.32, the amount of the altered invoice submitted to BISD by stating that Walker admitted to altering an invoice submitted to BISD. The Court has already addressed and rejected the distinction between the Enterprise Defendants' account and what Walker actually admitted to (which is quoted verbatim in the same article). The article—both in

---

[6] In fact, BISD had been informed via a letter from the United States Attorney's Office that Walker was anticipated to owe the federal government approximately $3.2 million in forfeiture and that BISD was entitled to file a claim in that proceeding to recover overpayments to Walker valued approximately $1,877,413. (doc. #168, exh. 3).

[7] Indeed, as the Enterprise Defendants have pointed out, the Texas Comptroller interpreted Walker's plea agreement and factual stipulation as evidence of fraudulent behavior sufficient to debar Walker and his companies from working for the State of Texas for a period of five years.

2016 U.S. Dist. LEXIS 41408, *26

regards to the specific statements identified by Walker and as a whole—presents a fair, accurate, and impartial account of Walker's plea agreement and is therefore privileged under Texas law.

2. **[*27]** Substantial Truth

The Enterprise Defendants also assert that Walker cannot prevail on his defamation claims against them because he has failed to provide evidence of the falsity of any of the allegedly defamatory articles.[8] In a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity. *Neely v. Wilson, 418 S.W.3d 52, 62 (Tex. 2013)* (citing *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)*; *McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex. 1990)*. In determining whether a statement is false, Texas has adopted the substantial-truth doctrine, under which a plaintiff is precluded from recovery when a "publication . . . correctly conveys a story's 'gist' or 'sting' although erring in the details." *Turner v. KTRK Television, Inc., 38 S.W.3d 103, 115 (Tex. 2000)*. To determine if a statement is substantially false, a court must determine "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been." *Neely, 418 S.W.3d at 63* (citing *Turner, 38 S.W.3d at 115*); *accord McIlvain, 794 S.W.2d at 16*; *see AOL, Inc. v. Malouf, No. 05-13-01637-CV, 2015 Tex. App. LEXIS 3312, 2015 WL 1535669, at *4 (Tex. App.—Dallas Apr. 2, 2015, no pet.)* (mem. op.) (holding news article was not substantially false even though it stated that plaintiff had been

---

[8] The Enterprise Defendants further assert that their articles are substantially true as a matter of law and so Walker's defamation, tortious interference, and civil conspiracy claims should be dismissed under *Rule 12(b)(6)*. When the underlying facts as to the gist of the statement are undisputed, the court may determine substantial truth as a matter of law. *McIlvain, 794 S.W.2d at 16* (citing *Crites v. Mullins, 697 S.W.2d 715, 717-18 (Tex. App.—Corpus Christi, 1985, writ ref'd n.r.e.)*); *Klentzman, 312 S.W.3d at 899*; *see Priester v. JP Morgan Chase Bank, N.A., 708 F.3d 667, 678 (5th Cir. 2013)* (dismissing defamation claim in response to a 12(b)(6) motion to dismiss when allegedly defamatory statements were true). Because Walker's defamation claims—and, thus, his claims of tortious interference and civil conspiracy—depend on whether the Enterprise Defendants' articles are a substantially true interpretation of the factual basis submitted with Walker's plea agreement, and all of those documents are properly before the Court as either matters of public record or documents attached to the *Fourth Amended Complaint*, the Court's analysis is the same under either theory.

charged with criminal Medicaid fraud when the charges were civil and despite the article using the words "charged" and "stolen"); *Basic Capital Mgmt., Inc. v. Dow Jones & Co., 96 S.W.3d 475, 481-82 (Tex. App.—Austin 2002, no pet.)* (newspaper article stating that investment firm had been involved in money laundering **[*28]** was substantially true when only two employees had been charged with fraud and conspiracy, not money laundering, and company was only mentioned in indictment, but not charged).

Looking at the Enterprise Defendants' first article, "BISD will not seek Calvin **[*29]** Walker restitution," the gist of the article is clear from its face. The article concerns BISD's decision not to seek a possible restitution claim after Walker agreed to forfeit money as part of his plea agreement to federal tax violations, during which he admitted that altered invoices had been submitted to BISD. Variations in the the specific amount of BISD's possible recovery does not alter the "sting" of the article.

The Enterprise Defendants' second article, "TEA report questions BISD's employment of Calvin Walker" is equally unambiguous. It concerns a report submitted by the Texas Education Agency ("TEA") criticizing BISD's failure to protect taxpayers from fraud, including continuing to support of Walker despite his guilty plea. The minor details of Walker's crime and plea agreement—including the exact monetary amounts at issue or precise extent of Walker's acceptance of responsibility for the false invoices submitted to BISD—do not alter the sting of the article and thus cannot support a claim of defamation. Neither do these details alter the gist of the third article, "BISD will rebid contract given to Calvin Walker," which concerns BISD's new Board of Managers' decision to **[*30]** rebid Walker's electrical contract, noting Walker's guilty plea and BISD's previous insistence that it had not been defrauded by Walker, or the sixth article, "BISD board ditches electrician," which concerns BISD's decision to sever ties with two contractors, one of whom was Walker.

The fourth article, "Grand Jury indicts BISD electrician for fraud," is also attached to the *Fourth Amended Complaint*. (doc. #144, exh. 5). It concerns a five-count grand jury indictment against Walker in Jefferson County for Money Laundering and Securing Execution of a Document by Deception. Walker says this article is defamatory because it states that the only reason BISD did not recover restitution in federal court was because it refused to say it was a victim of a crime, instead holding that there was no evidence that Walker had

Patricia O'Neill

defrauded it. Regardless of the truth of this statement, an article detailing BISD's insistence that it had *not* been defrauded by Walker is not defamatory to Walker. Neither is it defamatory in the article "U.S. Attorney: BISD restitution money is gone," which concerns BISD's new Board of Managers' likely inability to recover nearly $4 million from two former BISD employees accused [*31] of embezzling from the school district and cites Walker's plea agreement and BISD's previous decision not to seek restitution from Walker because it did not want to claim victim status in his case.

3. Statute of Limitations

Additionally, the Enterprise Defendants assert that Walker's claims of defamation, tortious interference, and civil conspiracy are barred by limitations. Under Texas law, defamation is subject to a one-year limitations period. *See Tex. Civ. Prac. & Rem. Code § 16.002(a)* (West 2015). Additionally, Texas applies the one-year statute of limitations to a plaintiff's other causes of action when "the gravamen of the complaint is injury to the plaintiff's reputation because of allegedly defamatory statements." *Hamad v. Ctr. for Jewish Cmty. Studies, 265 F. App'x 414, 417 (5th Cir. 2008)* (citing *Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 768 (Tex. 1987); Williamson v. N.Y. Times, Inc., 980 S.W.2d 706, 710-11 (Tex. App.—Fort Worth 1998, pet. denied))*.

The one-year period begins to run when publication is complete, under the "single-publication rule." *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 142 (5th Cir. 2007)* (citing *Holloway v. Butler, 662 S.W.2d 688, 692 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.))*. The Supreme Court of Texas has yet to decide whether the single-publication rule applies to online publications, but the Fifth Circuit in *Nationwide* held that it does. *Id. at 146* (finding that the statute of limitations for a newspaper article republished to the newspaper's online website began to run as of the date of republication and affirming the trial court's granting of defendant's motion [*32] to dismiss under *Rule 12(b)(6)*); *see Hamad, 265 F App'x at 417* ("[A]ccordingly, the one-year limitations period begins to run on the first day the publication is posted on the Internet.") (citing *Nationwide, 512 F.3d at 145-46*). The Fifth Circuit also noted that strong public policy considerations favor application of the single-publication rule to Internet postings and that nearly every court to address the issue has held that the single-publication rule applies to information widely available on the Internet. *Nationwide, 512 F.3d at 145-46* (internal citations omitted); *see Mayfield v. Fullhart, 444 S.W.3d 222, 228-29 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)* (agreeing with *Nationwide* and the Fifth Circuit's reasoning); *Cruz v. Van Sickle, 452 S.W.3d 503, 518 n.20 (Tex. App.—Dallas 2014, no pet.)* (same).

The Enterprise Defendants argue that the one-year statute of limitations bars a defamation claim against them based on two articles, "BISD will not seek Calvin Walker Restitution" and "TEA report questions BISD's employment of Calvin Walker." Walker has affirmatively pleaded that the first article was published "in 2012" and Exhibit 8, attached to the *Fourth Amended Complaint*, clearly states that this article was published "10:49 am, Friday, October 19, 2012." Walker pleaded the second article was published "on March 11, 2014l"—the same date plainly stated on the article. Plaintiffs did not file suit until July 16, 2015, well over a year after the publication [*33] of either article.[9] Thus, the defamation claims against the Enterprise Defendants based on these articles are time-barred under Texas law. Further, because the defamation allegations are the "gravamen" of Walker's claims of tortious interference and civil conspiracy against the Enterprise Defendants, they too are barred by limitations to the extent they are based on the 2012 or March 11, 2014, articles.

Therefore, because the articles at issue are privileged under Texas law, substantially true, and partially barred

—————————————————

[9] In his response, Walker repeats his argument previously rejected by this Court in its last *TCPA* report and recommendation (doc. #170) that the Court cannot dismiss his claims on limitations grounds without affording him the opportunity to conduct discovery to determine if any of the articles have been altered or republished. In essence, Walker is arguing that he should be entitled to conduct discovery to determine if he can overcome facts he affirmatively pleaded *in his own complaint*. The Court rejects this argument for the same reasons laid out in its previous order (doc. #170) and notes that Walker has *still* not sought any discovery in this case. Additionally, because the limitations bar is apparent on the face of Walker's well-pleaded complaint, the Court finds that Walker's claims [*34] based on the 2012 or March 11, 2014, articles should be dismissed under *Rule 12(b)(6)* as well as under the *TCPA*. *Coinmach Corp. v. Aspenwood Apartment Corp., 417 S.W.3d 909, 923 (Tex. 2013)* (citing *Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 716-21, 725, 727 (Tex. 2001))* (listing elements of tortious interference with prospective contract or business relations); *Chon Tri v. J.T.T., 162 S.W. 3d 552, 556 (Tex. 2005)* (listing elements of civil conspiracy); *Butnaru v. Ford Motor Co., 84 S.W. 3d 198, 207 (Tex. 2002)* (listing elements of tortious interference with existing contract). Therefore, these claims must be dismissed under the *TCPA*.

by Texas' statute of limitations, the Court recommends that Walker's defamation claims be dismissed. Additionally, because the defamation claims are the basis of Walker's tortious interference and civil conspiracy claims against the Enterprise Defendants, these claims should be dismissed as well.[10]

D. Motion to Dismiss **[*35]** Under *Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss for failure to state a claim upon which relief can be granted under *Rule 12(b)(6)* tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001)*, cert. denied, 536 U.S. 960, 122 S. Ct. 2665, 153 L. Ed. 2d 839 (2002). It is not a procedure for resolving contests about the facts or the merits of a case. *See* 5B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2015). In ruling on such a motion, the Court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, abrogated on other grounds by *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*; *Warren v. Chesapeake Expl., L.L.C., 759 F.3d 413, 415 (5th Cir. 2014)*; *Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013)* (noting that at the *12(b)(6)* stage, the court must construe all facts in favor of the non-moving party); *Wilson v. Birnberg, 667 F.3d 591, 595 (5th Cir.)*, cert. denied, 133 S. Ct. 32, 183 L. Ed. 2d 678 (2012). Nevertheless, "the plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Ramming, 281 F.3d at 161* (citing *Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989))*. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; accord *In re La. Crawfish Producers,*

Generally, the Court may not look beyond the four corners of the plaintiff's pleadings. **[*36]** *Indest v. Freeman Decorating, Inc., 164 F.3d 258, 261 (5th Cir. 1999)*; *Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996)*; see *Wilson, 667 F.3d at 595*. The Court may, however, consider matters that are outside the pleadings if those materials are matters of public record. *Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006)* (citing *Davis v. Bayless, 70 F.3d 367, 372 n.3 (5th Cir. 1995))*; *Cinel v. Connick, 15 F.3d 1338, 1343 n.6 (5th Cir.)*, cert. denied, 513 U.S. 868, 115 S. Ct. 189, 130 L. Ed. 2d 122 (1994). The Court may also consider "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010)*.

"[A] motion to dismiss under *rule 12(b)(6)* 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011)* (quoting *Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009))*; accord *Leal, 731 F.3d at 410*. "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000)* (quoting 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 601 (1969)); accord *Wilson, 667 F.3d at 595*. "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Ramming, 281 F.3d at 161-62* (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1137 (5th Cir. 1992))*.

A *Rule 12(b)(6)* motion to dismiss must be read in conjunction with *Rule 8(a) of the Federal Rules of Civil Procedure*. *Twombly, 550 U.S. at 555*. Accordingly, a district court should not dismiss a complaint for failure to state a claim unless a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Id. at 570*; accord *Wilson, 667 F.3d at 595*; *Turner, 663 F.3d at 775*; *Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 796 (5th Cir. 2011)*. "A claim has facial plausibility when **[*37]** the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[10] For the sake of completeness, the Court would note that Walker has failed to provide a factual basis for a number of elements of his defamation, civil conspiracy, and tortious interference claims. Specifically, there are no facts supporting actual malice necessary for defamation, proximate cause necessary for tortious interference, or a meeting of the minds necessary for civil conspiracy. *Coinmach*

misconduct alleged." *Coleman v. Sweetin, 745 F.3d 756, 763 (5th Cir. 2014)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*); *Harold H. Huggins Realty, Inc., 634 F.3d at 796*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 555*); *Gibson, 700 F.3d at 233*. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 557*). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id. at 679*. In other words, to state a cognizable cause of action, the complaint must allege sufficient facts to "nudge" the claims "across the line from conceivable to plausible." *Twombly, 550 U.S. at 570*; *Leal, 731 F.3d at 410*.

The Enterprise Defendants assert that Walker has failed to adequately plead the necessary elements of RICO conspiracy. In order to show a RICO conspiracy, a plaintiff has to demonstrate that two or more persons agreed to commit a substantive RICO offense and that each defendant knew of and agreed to the overall objective of the RICO offense. *18 U.S.C. § 1962(d)*; *Chaney v. Dreyfus Serv. Corp., 595 F.3d 219, 239 (5th Cir. 2010)*; *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139-40 (5th Cir. 1992)* (dismissing plaintiff's RICO conspiracy claim when the complaint "[did] not allege facts implying any agreement involving each of the Defendants to commit at least **[*38]** two predicate acts"); *Marina Dist. Dev. Co., LLC v. Ivey, 93 F. Supp. 3d 327, 341 (D.N.J. 2015)* (citing *United States v. Phillips, 874 F.2d 123, 127 n.4 (3d Cir. 1989))*. Each defendant must understand the scope of the enterprise and knowingly agree to further its affairs through committing substantive RICO offenses. *United States v. Marcello, 537 F. Supp. 1364, 1379 (E.D. La. 1982)*, aff'd sub nom. *United States v. Roemer, 703 F.2d 805 (5th Cir. 1983)*.

Walker asserts two substantive RICO offenses—he claims that IBEW and its "members" committed an offense under *18 U.S.C. § 1962(a)* in conjunction with BISD and that BISD employees and Board of Trustee members committed an offense under *18 U.S.C. § 1962(c)*. Because it is unclear from the Fourth Amended Complaint which (or both) of these offenses are related to the RICO conspiracy, the court will analyze whether Walker has adequately pleaded either one.

1. RICO Rackeetering Under *Section 1962(c)*

Walker first asserts that a RICO rackeetering enterprise under *18 U.S.C. § 1962(c)* was created to ruin his business and reputation as part of a larger campaign to prevent African American citizens of Beaumont from rising to power in the community. To prove RICO rackeetering under *18 U.S.C. § 1962(c)*, a plaintiff must show: (1) an enterprise and (2) a pattern of racketeering activity. *Tel-Phonic Servs., Inc., 975 F.2d at 1139-40*. "Each concept is a term of art which carries its own inherent requirements of particularity." *Elliott, 867 F.2d at 880*; see *Andrews v. Am. Nat'l Red Cross, Inc., 176 F. Supp. 2d 673, 685 (W.D. Tex. 2001)*.

To establish an enterprise, a plaintiff must provide evidence of the existence of an entity separate and apart **[*39]** from the pattern of racketeering activity. *United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)*. The entity does not have to be a formal or legal entity, but it must have some sort of hierarchical or consensual decision-making structure, and it must exist for purposes other than just to commit predicate acts. *In re McCann, 268 F. App'x 359, 366 (5th Cir. 2008)*; *United States v. Bledsoe, 674 F.2d 647, 663 (8th Cir. 1982)*. A plaintiff establishes the existence of an enterprise by providing "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette, 452 U.S. at 583*. For an informal enterprise, known as an association-in-fact enterprise, the "group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle v. United States, 556 U.S. 938, 948, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)*. "Members of the group need not have fixed roles; different members may perform different roles at different times . . . ." *Id.* Further, "while the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity.'" *Id.* Plaintiffs must "plead specific facts, not mere conclusory allegations which establish the enterprise." *Manax v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988)*. **[*40]** "[A] RICO plaintiff must plead the specified facts as to each defendant. It cannot . . . 'lump[ ]' together the defendants.'" *In re MasterCard Int'l, Inc., Internet Gambling Litig., 132 F. Supp. 2d 468, 476 (E.D. La. 2001)*, aff'd, *313 F.3d 257 (5th Cir. 2002)* (quoting *Goren v. New Vision Int'l, Inc., 156 F.3d 721, 730 (7th Cir. 1988))*.

Here, Walker's pleading of an enterprise is wholly

conclusory and thus inadequate to survive a motion to dismiss under _Rule 12(b)(6)_. Walker pleads that Reaud was a ringleader, Neil was an "enforcer," and Defendants Tom Neild and Getz were voices of this entity. Walker further maintains that the RICO enterprise used the Enterprise Defendants to spread false statements and information collected by BISD. None of these conclusions is supported in the _Fourth Amended Complaint_. Therefore, the Court finds that Walker has failed to plead the existence of an enterprise.

Furthermore, to prove a pattern of racketeering activity, "a plaintiff must show at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity." _Tel-Phonic Servs., Inc., 975 F.2d at 1139_ (citing _18 U.S.C. § 1961(5)_; _H.J., Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 238, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989))_. _Section 1961(1)_ provides the exclusive list of acts that constitute RICO predicate acts. _18 U.S.C. § 1961(1)_; _Zastrow v. Houston Auto Imps. Greenway Ltd., 789 F.3d 553, 559 (5th Cir. 2015)_. The plaintiff must also show that the predicate offenses asserted are related and amount to or pose a threat of continued criminal activity. _Zastrow, 789 F.3d at 560_ (quoting _Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007))_. "To establish continuity, plaintiffs must prove 'continuity [*41] of racketeering activity, or its threat.'" _Id. at 561_ (quoting _Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer, 90 F.3d 118, 122 (5th Cir. 1996)_ (quoting _H.J. Inc., 492 U.S. at 241_))). The Fifth Circuit has expressly held that "where alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction, a 'pattern of racketeering activity' has not been shown. _Id. at 561_ (quoting _Sawyer, 90 F.3d at 123_). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ." _Id_. (holding that plaintiff failed to establish a pattern under RICO when all of the alleged witness intimidation and retaliation asserted occurred within one week and were directed at a single lawsuit and noting that the plaintiff "cannot credibly argue that obstructing justice is part of the defendants' regular way of doing business or that their purported attempts to intimidate him create a threat of long-term racketeering activity") (quoting _H.J. Inc., 492 U.S. at 242_). In his complaint, Walker includes a number of alleged predicate acts; of these, only extortion, witness tampering, attempted bribery, and witness retaliation are listed in _Section 1961_ as RICO predicate acts.[11] _18 U.S.C. §§ 201(b)(3), 1961(1), 1512,_

_1513_.

Extortion as listed under _§ 1961_ is defined in _18 U.S.C. § 1951_ and means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." _18 U.S.C. § 1951_. Walker states in his complaint that IBEW members threatened him when he refused to join the union. Because Walker refused to join the union, however, there is no indication that any property was taken [*43] from him or where he was induced to give consent to IBEW to take such property. Thus, Walker has failed to plead extortion as a predicate act.

A person is guilty of witness tampering if he or she:

(b) [K]nowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
　　(1) influence, delay, or prevent the testimony of any person in an official proceeding;
　　(2) cause or induce any person to--
　　　　(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
　　　　(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
　　　　(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
　　　　(D) be absent from an official proceeding to which such person has been summoned by legal process; or

---

Walker with the TDLR, defamation, tortious interference with contract, [*42] "interference with Walker's lawful business activities," BISD "engaging in official oppression" under _Texas Penal Code § 39.03_, BISD "misusing official information" under _Texas Penal Code § 39.06_, and IBEW's "threatening Walker with repercussions for failure to join the union and for obtaining BISD contracts." The filing of spurious complaints with a state agency and Walker's civil tort claims are not RICO predicate acts. As to the assertion of "official oppression" and "misusing official information," Walker has not explained the factual basis for these claims. Additionally, the Court notes that both claims are ordinarily misdemeanors and do not involve murder, kidnapping, gambling, arson, robbery, bribery, extortion, obscenity, or controlled substances. _See Tex. Pen. Code §§ 39.03, 39.06_ (West 2015). Thus, they also are not RICO acts. _See 18 U.S.C. § 1961(1)(A)_.

---

[11] Walker also lists the filing of "spurious complaints" against

2016 U.S. Dist. LEXIS 41408, *42

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . .

18 U.S.C. § 1512(b). Witness retaliation [*44] imposes criminal liability on:

(a)(1) Whoever kills or attempts to kill another person with intent to retaliate against any person for—

(A) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

(B) providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings . . .

(b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement [*45] officer;

or attempts to do so . . .

* * *

(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense. . . .

18 U.S.C. § 1513. Walker alleges three possible instances of witness tampering and retaliation. First, Walker asserts that during a 2009 investigation into the validity of Walker's electrical license by the TDLR, IBEW allegedly scared one of Walker's former coworkers, Timothy Jones ("Jones"), into denying having previously worked with Walker in Nevada, despite Jones signing an affidavit to the contrary when Walker applied for his license. This incident does not meet the definition of witness retaliation because there are no facts to suggest that Jones suffered or was threatened with bodily injury or damage to his property, or was prevented from reporting the commission of a federal offense to a law enforcement official. Id. § 1513(a), (b), (e). Additionally, Walker's factual support for IBEW's involvement in witness tampering is Walker's own conclusory, self-serving [*46] statement that tampering or retaliation occurred. Walker says, "Upon hearing this [referring to Jones' denial], Mr. Walker immediately stated that IBEW was scaring electricians into saying things to harm him . . . ." This self-created support is insufficient to plead an instance of witness tampering.

Second, Walker asserts that witness tampering and retaliation occurred when FBI agent Deanna Stevens ("Deanna") convinced her ex-husband, Luke Stevens ("Luke"), not to inform Walker's defense counsel or the judge presiding over Walker's criminal trial about "leaks" allegedly coming from the U.S. Attorney's office. Walker has included an affidavit from Luke stating that Deanna threatened to take his children away and otherwise make him suffer if he came forward with information about the leaks. Luke further wrote that, after he spoke with Defendant Assistant U.S. Attorney Bob Rawls about the leaks, the FBI allowed Deanna to work shorter hours and that she used the time to keep him away from his children. This incident, if true, is sufficient to constitute an instance of witness tampering and retaliation for pleading purposes.

Finally, Walker alleges that Haynes was criminally prosecuted for [*47] obstruction of a public passageway when she tried to file charges against Neil for assaulting her outside of a BISD press conference. This incident constitutes neither witness tampering or witness retaliation, as both statutes apply solely to federal proceedings. 18 U.S.C. § 1515(a)(1) (defining "official proceeding" as used in §§ 1512, 1513 as proceedings before federal courts or Congress). Additionally, there are no facts pleaded to suggest that any action taken against Haynes was in retaliation for or intended to prevent her from testifying or attending a federal proceeding or providing information to law enforcement about a federal offense. 18 U.S.C. §§ 1512, 1513. Thus, this incident is not a RICO predicate act.

Bribery is governed by 18 U.S.C. § 201(b)(3) and occurs

2016 U.S. Dist. LEXIS 41408, *47

> directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the **[*48]** United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom . . . .

*18 U.S.C. § 201(b)(3)*. Walker pleads that FBI agents Deanna and Timothy Brewer (both of whom are also named defendants in this case) offered to make James Brown's ("Brown") child support obligations "disappear" if Brown would testify against Walker. Because Brown was allegedly promised a benefit in exchange for his testimony as a witness against Walker, the Court finds that this is a sufficiently pleaded instance of attempted bribery and witness tampering.

Therefore, in total, Walker has pleaded four possible predicate acts—alleged witness tampering and retaliation against Luke and the attempted bribery and witness tampering involving Brown. The Court cannot find, however, that Walker has sufficiently pleaded that these acts constitute a "pattern." All of the predicate acts occurred during a relatively brief period of time in the context of Walker's criminal trial for fraud. Further, Walker's criminal prosecution ended with a plea agreement between Walker and the government. Walker has not pleaded any facts to support an argument that there exists a threat of continuing criminal activity. **[*49]** Therefore, Walker has failed to plead a pattern of racketeering activity essential for his claim of RICO racketeering under *18 U.S.C. § 1962(c)*.

## 2. RICO Racketeering Under *Section 1962(a)*

To prove a violation under *§ 1962(a)*, a plaintiff must show (1) the existence of an enterprise, (2) the defendant's derivation of income from a pattern of racketeering activity, and (3) the use of any part of that income in acquiring an interest in or operating the enterprise. *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare, 781 F.3d 182, 202 (5th Cir. 2015)*. Walker includes in his complaint the wholly conclusory statement that IBEW and its members collected

membership dues and received business by engaging in racketeering activity and that, but for the racketeering activities, this business would have gone to individuals like Walker. Walker makes no mention of how the derived income was used to acquire an interest in or operate the alleged enterprise. This is insufficient to constitute a viable claim under *18 U.S.C. § 1962(a)*. *Id.* (affirming dismissal of plaintiff's *§ 1962(a)* RICO claim when plaintiff "did not plead that [defendant] used any part of its income to acquire an interest in or operate the alleged enterprise" and "did not explain how the use of investment of racketeering income injured [plaintiff]"). Thus, Walker has failed to plead a RICO claim **[*50]** under *18 U.S.C. § 1962(a)*.[12]

## 3. RICO Conspiracy

Even if this court were to assume, however, that Walker had adequately pleaded a substantive RICO offense, which he has not, Walker has failed to plead that the Enterprise Defendants "knew of or agreed to the overall objective of the RICO offense," as required for RICO conspiracy. As noted above, Walker must allege an "agreement involving each of the Defendants to commit at least two predicate acts." *Tel-Phonic Servs., Inc., 975 F.2d at 1140*. Walker's only factual allegations against the Enterprise Defendants are that they published a number of allegedly defamatory articles against him. He pleads no facts whatsoever that they knew of or agreed to a RICO conspiracy. "A person cannot be held liable for a RICO conspiracy 'merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul.'" *Chaney, 595 F.3d at 239* (quoting *United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998)*) (citing *Marlin v. Moody Nat. Bank, N.A., 248 F. App'x 534 (5th Cir. 2007))*. "A conspirator must at least know of the conspiracy **[*51]** and 'adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (quoting *Salinas v. United States, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997))*. Walker's pleadings are plainly insufficient to demonstrate that the Enterprise Defendants each agreed to participate in a RICO enterprise as required by *18 U.S.C. § 1962(d)*. Therefore, the Court recommends that Walker's RICO claims against the Enterprise Defendants be dismissed with prejudice.

---

[12] It does not appear that Walker has alleged a substantive RICO claim against the Enterprise Defendants. In any event, any substantive RICO claim that Walker intended to assert against the Enterprise Defendants is dismissed for the foregoing reasons.

Patricia O'Neill

2016 U.S. Dist. LEXIS 41408, *51

## III. Leave to Amend

Generally, a court should not dismiss an action for failure to state a claim under *Rule 12(b)(6)* without giving the plaintiff an opportunity to amend. *See Hart v. Bayer Corp., 199 F.3d 239, 248 n.6 (5th Cir. 2000)* (plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *accord Goldstein v. MCI WorldCom, 340 F.3d 238, 254 (5th Cir. 2003)*. Where, however, a claim is frivolous or the "complaint alleges the plaintiff's best case," a further factual statement from the plaintiff need not be allowed. *Jones v. Greninger, 188 F.3d 322, 327 (5th Cir. 1999)*; *see Neitzke, 490 U.S. at 327-28*; *Hart, 199 F.3d at 248 n.6*. Moreover, when the plaintiffs declare the sufficiency of their pleadings and make no attempt to amend their complaint in response to the defendant's challenge pursuant to *Rule 12(b)(6)*, dismissal is proper when the plaintiffs' allegations fail to state a claim for which relief can be granted. *See Rosenblatt v. United Way of Greater Houston, 607 F.3d 413, 419 (5th Cir. 2010)*; *Spiller v. City of Tex. City, 130 F.3d 162, 167 (5th Cir. 1997)*. In addition, plaintiffs should not be **[*52]** granted leave to amend after being afforded repeated opportunities to do so. *See Torch Liquidating Trust ex rel. Bridge Assoc. L.L.C. v. Stockstill, 561 F.3d 377, 391 (5th Cir. 2009)* (finding that plaintiff had ample opportunity to cure noted defects through a prior amendment); *United States ex rel. Adrian v. Regents of the Univ. of Cal., 363 F.3d 398, 404 (5th Cir. 2004)* (noting that "pleading review is not a game where the plaintiff is permitted to file serial amendments until he finally gets it right"); *United States ex rel. Willard v. Humana Health Plan of Tex., Inc., 336 F.3d 375, 387 (5th Cir. 2003)* (holding leave to amend was properly denied where the relator had previously filed two amended complaints). Furthermore, "where a proposed amendment would be a futile act, a court does not abuse its discretion in denying leave to amend." *SB Int'l, Inc. v. Jindal, No. 3:06-CV-1174-G, 2007 U.S. Dist. LEXIS 62581, 2007 WL 2410007, at *3 (N.D. Tex. Aug. 23, 2007)* (citing *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*).

"Whether leave to amend be granted is entrusted to the sound discretion of the district court." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc., 283 F.3d 282, 286 (5th Cir.)*, *cert. denied*, 537 U.S. 1044, 123 S. Ct. 659, 154 L. Ed. 2d 516 (2002) (quoting *Quintanilla v. Tex. Television, Inc., 139 F.3d 494, 499 (5th Cir. 1998)*). Here, Walker has amended his complaint four times

since the case was filed July 16, 2015, and the Court has already ruled on dispositive motions. He has been afforded ample opportunity to rectify any pleading defects. *See Adrian, 363 F.3d at 404* (opining that the district court did not abuse its discretion by denying leave to amend where the plaintiff did not indicate "what additional facts he could plead that would correct the deficiencies in his previous complaints"). Therefore, **[*53]** dismissal of the complaint for failure to state a claim is warranted.

## IV. Conclusion and Recommendation

Based on the findings and legal reasoning stated herein, the undersigned recommends that the Court **GRANT IN PART** and **DENY AS MOOT IN PART** the Enterprise Defendants' *Motion to Dismiss Under Tex. Civ. Prac. & Rem. Code § 27.001 et seq. and Federal Rule of Civil Procedure 12(b)(6)* (doc. #168) as set forth in this recommendation. Specifically, the Enterprise Defendants' motion to dismiss under the *TCPA* should be **GRANTED** as to Walker's claims of defamation, tortious interference, and civil conspiracy and **DENIED AS MOOT** as to Walker's claims under RICO. The Enterprise Defendants' motion to dismiss under *Rule 12(b)(6)* should be **GRANTED** as to all of Plaintiffs' claims. Accordingly, the undersigned recommends that the Court **DISMISS** with prejudice Plaintiffs' claims against Hearst Newspapers II, LLC (sued as "The Beaumont Enterprise") and Brooke Crum in their entirety.[13] This recommended dismissal is based on the extent these claims are precluded under the *TCPA*, to the extent that the Enterprise Defendants have prevailed on their defenses under the *TCPA*, and to the extent that the Enterprise Defendants have prevailed under *Federal Rule of Civil Procedure 12(b)(6)*.

## V. Objections

_____

[13] As stated above, the *TCPA* provides for the imposition of costs, attorney's **[*54]** fees, other expenses and possible sanctions to the moving party if the court orders dismissal under the *TCPA* (the *TCPA* also provides for the same awards if a motion to dismiss is found to be frivolous). *See Tex. Civ. Prac. & Rem. Code § 27.009* (West 2015). The Enterprise Defendants have requested the award of costs, expenses, attorney's fees and possible sanctions in their *TCPA* motions. The Court would entertain separate motions for these various costs, fees, expenses and sanctions under *Section 27.009* at a later date should the Enterprise Defendants ultimately prevail on the dismissal of Plaintiffs' claims under the *TCPA*.

Patricia O'Neill

2016 U.S. Dist. LEXIS 41408, *54

Pursuant to *28 U.S.C. § 636(b)(1)(C)*, all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within fourteen (14) days of service. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *Douglass v. United Servs. Auto. Ass'n., 79 F.3d 1415 (5th Cir. 1996)* (en banc); *28 U.S.C. § 636(b)(1)*.

**SIGNED [\*55]  this the 11st day of March, 2016**.

/s/ Keith F. Giblin

KEITH F. GIBLIN

UNITED STATES MAGISTRATE JUDGE

---

*End of Document*